☐ORIGINAL

FILED

AUG 1 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ AD DEPUTY

1   LANCE N. JURICH (SBN 132695)
    ljurich@loeb.com
2   DERRICK TALERICO (SBN 223763)
    dtalerico@loeb.com
3   LOEB & LOEB LLP
    10100 Santa Monica Boulevard, Suite 2200
4   Los Angeles, California 90067-4120
    Telephone:  310-282-2000
5   Facsimile:  310-282-2200

6   MICHAEL L. MOLINARO (*pro hac vice pending*)
    BLAIR R. ZANZIG (*pro hace vice pending*)
7   LOEB & LOEB LLP
    321 N. Clark Street, Suite 2300
8   Chicago, Illinois 60657
    Telephone:  312-646-3100
9   Facsimile:   312-464-3111

NUNC PRO TUNC

JUL 3 1 2008

10  Attorneys for Plaintiff
    LaSalle Bank National Association
11

12                  UNITED STATES DISTRICT COURT
13              SOUTHERN DISTRICT OF CALIFORNIA
14
                                              BY FAX
15
16  LASALLE BANK NATIONAL          )  Case No.  08-cv-1387 DMS (POR)
    ASSOCIATION,                   )
17                                 )  Assigned to Hon. Dana M. Sabraw
               Plaintiff,          )
18                                 )
          v.                       )  **PLAINTIFF LASALLE BANK'S**
19                                 )  **MOTION FOR APPOINTMENT OF**
    COMAIR ROTRON, INC.;           )  **A RECEIVER**
20  THERMAFLO, INC.; and COMAIR    )
    PARENT CORP.,                  )
21                                 )
               Defendants.         )
22                                 )
23

24        Plaintiff LaSalle Bank National Association, by and through its undersigned

25  counsel, pursuant to Federal Rule of Civil Procedure 66 and Local Civil Rule for the

26  United States District Court for the Southern District of California 66.1, hereby

27  moves (the "Motion") the Court for the appointment of a temporary, and in due

28  course a permanent, receiver with respect to the assets and the business operations

LA1795157.1                        PLAINTIFF LASALLE BANK'S MOTION
210322-10006                       FOR APPOINTMENT OF A RECEIVER
                                   Case No. 08-cv-1387 DMS (POR)

1  of Defendants Comair Rotron, Inc., Thermaflo, Inc., and Comair Parent Corp.  In

2  support of its Motion, Plaintiff has filed the Declaration of Ronald J. Parisi and a

3  Memorandum of Points and Authorities in support of the Motion.  In further support

4  of its Motion, LaSalle respectfully states as follows:

5        1.     LaSalle has extended financing to Comair Rotron and Thermaflo

6  (collectively, the "Borrowers") in the form of a revolving credit facility and two

7  term loans (collectively the "Loans").

8        2.     Borrowers are manufacturers of fans, blowers and other components

9  used to cool electronic devices.  Borrowers' businesses includes operations in the

10  United States, the United Kingdom, Mexico and China.

11        3.     The Loans are evidenced by (a) that certain Loan and Security

12  Agreement dated April 2, 2004 (as amended "the Loan and Security Agreement");

13  (b) that certain Term Note A dated June 27, 2006 in the original principal amount of

14  $14,000,000.00 ("Term Note A"); (c) that certain Term Note B dated June 27, 2006

15  in the original principal amount of $5,000,000.00 ("Term Note B"); and (d) that

16  certain Replacement Revolving Note dated June 27, 2006 in the maximum principal

17  amount of $5,000,000.00.  Term Note A, Term Note B, and the Revolving Credit

18  Note shall be referred to collectively as the "Notes."

19        4.     Under Section 4.1 of the Loan and Security Agreement, Borrowers

20  secured their obligations and liabilities to LaSalle by granting LaSalle a security

21  interest in all of Borrowers' "Property" defined in the Loan and Security Agreement

22  to include "any and all rights, titles and interests in and to any and all property

23  whether real or personal, tangible (including cash) or intangible, and wherever

24  situated and whether now owned or hereafter acquired."  Borrowers futher secured

25  their obligations to LaSalle through of additional instruments, agreements and

26  documents, including certain pledge stock, intellectual property security agreements,

27  and UCC-1 Financing Statements.

28

1    5.    Comair Parent additionally entered into that certain Holding Guaranty

2 dated April 2, 2004 (as subsequently reaffirmed, the "Holding Guaranty") pursuant

3 to which Comair Parent "unconditionally, absolutely and irrevocably" guaranteed

4 the full payment of the Loans, including accrued interest and all monies due or may

5 become due under the Loan and Security Agreement and Notes.

6    6.    Beginning in late summer of 2007, Borrowers defaulted under various

7 financial covenants set forth in the Loan and Security Agreement.  Despite several

8 notices of default and demands to cure sent by LaSalle to Defendants and several

9 periods of forbearance by LaSalle, Defendants remained in default of their

10 obligations to LaSalle.

11    7.    Defendants have advised LaSalle that they lack the working capital and

12 other financial resources to operate their businesses and to pay their debts as they

13 come due.  Defendants have also advised LaSalle that they have begun

14 implementing an irreversible cessation operations.  To that end, Defendants have

15 advised LaSalle that they consent to the appointment of a receiver over their assets.

16    8.    As a result of Defendants' financial problems, the property securing

17 Defendants obligations to LaSalle is at risk of being dissipated.

18    9.    As of the filing of this Motion, Defendants have failed to pay the full

19 amount due and owing to LaSalle under the Loan Documents.

20    10.    Appointment of a receiver is therefore necessary to protect LaSalle's

21 interest in the property securing Defendants' obligations and liabilities under the

22 Loan Documents.

23    11.    LaSalle nominates Joel B. Weinberg , Insolvency Services Group, Inc.,

24 17401 Ventura Boulevard, Suite B-21, Encino, California 91316 to serve as the

25 receiver, and in due course the permanent receiver. Mr. Weinberg has agreed to so

26 serve and is well-qualified to fulfill the responsibilities of a receiver.  Mr. Weinberg

27 has worked with financially distressed businesses since 1984.  Mr. Weinberg has

28 previously been appointed receiver or served as an assignee for the benefit of

1  creditors in numerous matters, including those involving manufacturing concerns

2  such as Defendants.  A description of Mr. Weinberg's qualifications, including

3  examples of his representative experiences, is attached as Exhibit A to the

4  Memorandum of Points and Authorities filed concurrently with this Motion.

5      **WHEREFORE**, LaSalle requests that this Court:

6      (A)  entering an order substantially in the form of the Stipulated Order

7  Appointing a Receiver that appoints a receiver to take possession of and secure the

8  Collateral (as that term is defined in the Complaint);

9      (B)  designating and appointing of Joel B. Weinberg as receiver for the

10  Collateral; and

11      (C)  granting LaSalle such other and further relief as this Court deems just

12  and appropriate under the circumstances.

13

14  Dated:  July 31, 2008

    LOEB & LOEB LLP
    LANCE N. JURICH

15      MICHAEL L. MOLINARO
    DERRICK TALERICO

16      BLAIR R. ZANZIG

17      By: _____

18      Derrick Talerico
    Attorneys for Plaintiff

19      LaSalle Bank National Association

20

21

22

23

24

25

26

27

28

LA1795157.1
210322-10006
    4
    PLAINTIFF LASALLE BANK'S MOTION
FOR APPOINTMENT OF A RECEIVER
Case No. 08-cv-1387 DMS (POR)

1  LANCE N. JURICH (SBN 132695)
   ljurich@loeb.com
2  DERRICK TALERICO (SBN 223763)
   dtalerico@loeb.com
3  LOEB & LOEB LLP
   10100 Santa Monica Boulevard, Suite 2200
4  Los Angeles, California 90067-4120
   Telephone:  310-282-2000
5  Facsimile:  310-282-2200

6  MICHAEL L. MOLINARO (*pro hac vice pending*)
   BLAIR R. ZANZIG (*pro hace vice pending*)
7  LOEB & LOEB LLP
   321 N. Clark Street, Suite 2300
8  Chicago, Illinois 60657
   Telephone:  312-646-3100
9  Facsimile:  312-464-3111

10 Attorneys for Plaintiff
   LaSalle Bank National Association
11

**FILED**

AUG 1 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

**NUNC PRO TUNC**

JUL 3 1 2008

12

13              UNITED STATES DISTRICT COURT

14             SOUTHERN DISTRICT OF CALIFORNIA

15

**BY FAX**

16 LASALLE BANK NATIONAL          )  Case No.  08-cv-1387 DMS (POR)
   ASSOCIATION,                   )
17                                )  Assigned to Hon. Dana M. Sabraw
              Plaintiff,          )
18                                )
       v.                         )  **MEMORANDUM OF POINTS AND**
19                                )  **AUTHORITIES IN SUPPORT OF**
   COMAIR ROTRON, INC.;           )  **PLAINTIFF LASALLE BANK'S**
   THERMAFLO, INC.; and COMAIR    )  **MOTION FOR APPOINTMENT OF**
20 PARENT CORP.,                  )  **A RECEIVER**
21            Defendants.         )
22                                )
   _____)

23
        Plaintiff, LaSalle Bank National Association ("LaSalle"), by its attorneys,
24
   hereby submits this memorandum of law in support of its Motion for the
25
   Appointment of a Temporary and Permanent Receiver.
26

27

28

**INTRODUCTION**

1   This receivership request arises out of a business failure and loan default.

2 Defendants, who have defaulted on certain loans made to them by LaSalle, have

3 advised LaSalle that they lack the working capital and other financial resources to

4 continue their business operations. Defendant Comair Rotron, Inc. ("Comair

5 Rotron") and Thermaflo, Inc. ("Thermaflo") are manufacturers of fans, blowers and

6 other components used to cool electronic devices. Their businesses include

7 operations in the United States, the United Kingdom, Mexico and China. Defendant

8 Comair Parent Corp. ("Comair Parent") wholly owns Comair Rotron (who, in turn,

9 wholly owns Thermaflo). LaSalle provided loans to Comair Rotron and Thermaflo

10 (the "Borrowers") in the form of a revolving credit facility and two term loans.

11 Comair Parent guaranteed the Borrowers' obligations and liabilities to LaSalle.

12 LaSalle additionally took a security interest in all, or substantially all, of the assets

13 of Borrowers. Borrowers defaulted and remain in default with respect to the loan

14 documents they executed with LaSalle. Comair Parent defaulted under its guaranty

15 and related agreements. Defendants have advised LaSalle that they have begun an

16 irreversible cessation of business operations. Moreover, Defendants have expressed

17 their willingness to consent to the relief LaSalle seeks.

18   As a result of Defendants' financial problems, LaSalle's interest in

19 Defendants' property securing their obligations and liabilities to LaSalle (the

20 "Collateral") is at risk of being dissipated and may already be eroding given

21 Defendants' actions to suspend their operations. Given LaSalle's interest in the

22 Collateral, Defendants' financial problems and stated intent to wind-down their

23 businesses, the Court should appoint a receiver to safeguard the assets.

**ARGUMENT**

Federal Rule of Civil Procedure 66 provides, in part:

These rules govern an action in which the appointment of a receiver is

sought or a receiver sues or is sued. But the practice in administering

1    an estate by a receiver or a similar court-appointed officer shall be in

2    accordance must accord with the historical practice in federal courts or

3    with a local rule.

4  Fed. R. Civ. P. 66.  The Federal Courts have routinely appointed receivers at the

5  request of secured creditors, concluding that creditors with a security interest in real

6  property and/or personal property have a well-established property interest

7  warranting the appointment of a receiver. *See e.g., Brill & Harrington Investments*

8  *v. Vernon Sav. & Loan Ass'n*, 787 F.Supp. 250, 253 (D.D.C. 1992); *Ivey v. Housing*

9  *Foundation of America*, 73 F.Supp. 201, 204 (D.C. Pa. 1947).  Indeed, the United

10  States Supreme Court recognized long ago that a "receiver is often appointed upon

11  application of a secured creditor who fears that his security will be wasted." *Pusey*

12  *& Jones Co.  v. Hanssen*, 261 U.S. 491, 497 (1923).  Moreover, the appointment of

13  a receiver is appropriate when the parties have agreed to a receivership. *American*

14  *Bank and Trust Co. v. Bond Intern. Ltd.*, 2006 WL 2385309 at *7 (N.D. Okla. Aug.

15  17, 2006).  *See also, Fleet Business Credit, L.L.C. v. Wings Restaurants, Inc.*, 291

16  B.R. 550, 555-556 (N.D. Okla. 2003) (receiver appointed where loan and security

17  documents contained provisions for the appointment of a receiver).  Here,

18  Defendants, recognizing their dire financial condition and desiring to wind down

19  their business in an orderly manner, have agreed to the appointment of a receiver.

20  Without the appointment of a receiver, LaSalle faces the likelihood that its

21  Collateral will be dissipated and otherwise adversely affected by the Defendants'

22  financial problems.

23       In light of Defendants' consent to the appointment of a receiver, LaSalle

24  contends that no further hearing confirming the appointment of a permanent receiver

25  is necessary.  Even were such a hearing necessary, LaSalle would nevertheless be

26  entitled to the appointment of a temporary receiver pursuant to Local Civil Rule of

27  Practice for the United States District Court for the Southern District of California

28  66.1 ("Local Rule 66.1").  Under Local Rule 66.1, the Court may appoint a

3

1   temporary receiver without notice in accordance with the requirements and

2   limitations of Rule 65(b) of the Federal Rules of Civil Procedure.  Given that

3   Defendants have indicated that they have already ceased operations thereby leaving

4   the Collateral subject to immediate and ongoing dissipation, the appointment of a

5   temporary receiver is warranted here until a hearing on the appointment of a

6   permanent receiver may be had.  The Ninth Circuit has prescribed the following

7   equitable criteria for determining whether to grant injunctive relief under Fed. R.

8   Civ. P. 65(b):

9           (1) the likelihood of the moving party's success on the merits; (2) the

10          possibility of irreparable injury to the moving party if relief is not

11          granted; (3) the extent to which the balance of hardships favors the

12          respective parties; and (4) in certain cases, whether the public interest

13          will be advanced by granting the preliminary relief. The moving party

14          must show either (1) a combination of probable success on the merits

15          and the possibility of irreparable harm, or (2) the existence of serious

16          questions going to the merits, the balance of hardships tipping sharply

17          in its favor, and at least a fair chance of success on the merits. . . . [T]he

18          required degree of irreparable harm increases as the probability of

19          success decreases.

20  *Owner Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co.*, 367 F.3d 1108,

21  1111 (9th Cir. 2004) (quoting *Miller ex rel. N.L.R.B. v. Cal. Pac. Med. Ctr.*, 19 F.3d

22  449, 456 (9th Cir. 1994)).

23          Here, each of those criteria strongly favors appointing a temporary receiver.

24  First, there is no dispute that Defendants' financial troubles have caused them to

25  default on their obligations under the Loan Documents thereby entitling LaSalle to

26  enforce its security interest in the Collateral.  Accordingly, LaSalle is more than

27  likely to prevail on the merits.  Second, given that Defendants have already begun

28  an irreversible cessation of operations leaving the Collateral unprotected, LaSalle

1  faces the distinct possibility of irreparable injury if a temporary receiver were not

2  appointed to secure and manage the Collateral. Third, because the Court will retain

3  supervision over the Receiver's conduct, and in light of Defendants' consent to the

4  appointment of a receiver, the balance of hardships tips decidedly in favor of

5  LaSalle. Finally, the public interest is best served here by the orderly liquidation of

6  Defendants' assets and distribution to creditors subject to the Court's supervision.

7  Therefore, with both a likelihood of success on the merits and the possibility of

8  irreparable harm to LaSalle, LaSalle would be entitled to the appointment of a

9  temporary receiver over the Collateral if further hearings to confirm a permanent

10  receiver were necessary.

11       LaSalle nominates Joel B. Weinberg, Insolvency Services Group, Inc., 17401

12  Ventura Boulevard, Suite B-21, Encino, California 91316 to serve as the receiver.

13  Mr. Weinberg has agreed to so serve and is well-qualified to fulfill the

14  responsibilities of a receiver. Mr. Weinberg has worked with financially distressed

15  businesses since 1984. Mr. Weinberg has previously been appointed receiver or

16  served as an assignee for the benefit of creditors in numerous matters, including

17  those involving manufacturing concerns such as Defendants. A description of Mr.

18  Weinberg's qualifications, including examples of his representative experiences, is

19  attached to this Memorandum as Exhibit A.

20                            **CONCLUSION**

21       For the foregoing reasons, LaSalle Bank National Association respectfully

22  requests the Court grant its Motion by (A) entering an order substantially in the form

23  of the Stipulated Order Appointing a Receiver that appoints a receiver to take

24  possession of and secure the Collateral (as that term is defined in the Complaint);

25  (B) designating and appointing Joel B. Weinberg as receiver for the Collateral; and

26  (C) granting LaSalle such other and further relief as this Court deems just and

27  appropriate under the circumstances.

28

1 | Dated: July 31, 2008

2

3

LOEB & LOEB LLP
LANCE N. JURICH
MICHAEL L. MOLINARO
DERRICK TALERICO
BLAIR R. ZANZIG

4

5

6

By:_____
Derrick Talerico
Attorneys for Plaintiff
LaSalle Bank National Association

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

☐ORIGINAL

1  LANCE N. JURICH (SBN 132695)
   ljurich@loeb.com
2  DERRICK TALERICO (SBN 223763)
   dtalerico@loeb.com
3  LOEB & LOEB LLP
   10100 Santa Monica Boulevard, Suite 2200
4  Los Angeles, California 90067-4120
   Telephone:  310-282-2000
5  Facsimile:   310-282-2200

6  MICHAEL L. MOLINARO (pro hac vice pending)
   BLAIR R. ZANZIG (pro hace vice pending)
7  LOEB & LOEB LLP
   321 N. Clark Street, Suite 2300
8  Chicago, Illinois 60657
   Telephone:  312-646-3100
9  Facsimile:   312-464-3111

10 Attorneys for Plaintiff
   LaSalle Bank National Association
11

12

13                UNITED STATES DISTRICT COURT

14               SOUTHERN DISTRICT OF CALIFORNIA

15

16 LASALLE BANK NATIONAL          )  Case No.  08-cv-1387 DMS (POR)
   ASSOCIATION,                   )
17                                )  **DECLARATION OF RONALD J.**
        Plaintiff,                )  **PARISI IN SUPPORT OF**
18                                )  **PLAINTIFF LASALLE'S MOTION**
        v.                        )  **FOR APPOINTMENT OF A**
19                                )  **RECEIVER**
   COMAIR ROTRON, INC.;           )
20 THERMAFLO, INC.; and COMAIR    )
   PARENT CORP.,                  )
21                                )
        Defendants.               )
22                                )
                                  )
23 ─────────────────────────────  )

24

25     I, Ronald J. Parisi, declare as follows:

26     1.     I am Ronald J. Parisi, Senior Vice President of LaSalle Bank National

   Association ("LaSalle").  My office is located at 5 Park Plaza, Suite 1260, CA6-503-
27
   12-12, Irvine, CA 92614.
28

FILED

AUG  1 2008

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY              DEPUTY

NUNC PRO TUNC

JUL 3 1 2008

BY FAX

1  2.  I am one of the employees of LaSalle that is responsible for

2 administering the related agreements among LaSalle and Defendants Comair

3 Rotron, Inc. ("Comair Rotron"), Thermaflo, Inc. ("Thermaflo"), and Comair Parent

4 Corp. ("Comair Parent").

5  3.  I am familiar with LaSalle's records and data compilations pertaining

6 to the Defendants. LaSalle retains such records and data compilations in the

7 ordinary course of LaSalle's business. Such records are prepared at, or near, the

8 time of the act, events, conditions or opinions reflected therein.

9  4.  I am over eighteen years of age and familiar with the facts and matters

10 stated herein based upon my personal involvement with the LaSalle's financing

11 agreements with the Defendants, and my review of LaSalle's records and data

12 compilations. If called and sworn as a witness, I could and would testify to the facts

13 contained herein.

14  5.  I make this affidavit in support of Plaintiff LaSalle's Motion for the

15 Appointment of a Receiver.

16  6.  LaSalle has extended financing to Comair Rotron and Thermaflo

17 (collectively, the "Borrowers") in the form of a revolving credit facility and two

18 term loans (collectively the "Loans").

19  7.  Borrowers are manufacturers of fans, blowers and other components

20 used to cool electronic devices. Borrowers' businesses include operations in the

21 United States, the United Kingdom, Mexico and China.

22  8.  The Loans are evidenced by (a) that certain Loan and Security

23 Agreement dated April 2, 2004 (as amended "the Loan and Security Agreement");

24 (b) that certain Term Note A dated June 27, 2006 in the original principal amount of

25 $14,000,000.00 ("Term Note A"); (c) that certain Term Note B dated June 27, 2006

26 in the original principal amount of $5,000,000.00 ("Term Note B"); and (d) that

27 certain Replacement Revolving Note dated June 27, 2006 in the maximum principal

28 amount of $5,000,000. Term Note A, Term Note B, and the Revolving Credit Note

CH44653.1
210322-10006

2

DECL. OF RONALD J. PARISI IN SUPPORT
OF PLAINTIFF'S MOT. FOR
APPOINTMENT OF A RECEIVER Case No.

1  shall be referred to collectively as the "Notes." I am attaching a true and correct

2  copy of the Loan and Security Agreement as amended, but without exhibits and

3  schedules hereto as Group Exhibit A. I am also attaching a true and correct copy of

4  the Notes hereto as Group Exhibit B.

5       9.    The Loan and Security Agreement was amended twice. First,

6  Borrowers and LaSalle entered into that First Amendment to Loan and Security

7  Agreement dated December 9, 2005 (the "First Amendment"). Second, Borrowers

8  entered into that certain Second Amendment to Loan and Security Agreement dated

9  July 5, 2006 (the "Second Amendment"). I have attached true and correct copies of

10  the First and Second Amendments as part of Group Exhibit A.

11       10.    Under Section 4.1 of the Loan and Security Agreement, Borrowers

12  secured their obligations and liabilities to LaSalle by granting LaSalle a security

13  interest in all of Borrowers' "Property" defined in the Loan and Security Agreement

14  in include "any and all rights, titles and interests in and to any and all property

15  whether real or personal, tangible (including cash) or intangible, and wherever

16  situated and whether now owned or hereafter acquired."

17       11.    Borrower's obligations and liabilities to LaSalle are further secured by,

18  among other things, the following instruments, agreements and documents:

19      (i)    That certain Equity Quotas Pledge Agreement dated April 2, 2004 (as

20          subsequently reaffirmed, the "Quotas Pledge Agreement")

21          encumbering Comair Rotron's shares of Comair Rotron de Mexico, S.

22          de R.L. de C.V. ("Comair Mexico") stock, which constitutes 99.96% of

23          the outstanding capital stock of Comair Mexico.

24      (ii)    That certain Holding Pledge Agreement dated April 2, 2004 (as

25          subsequently reaffirmed, the "Holding Pledge Agreement")

26          encumbering Comair Parent's shares of Comair Rotron stock, which

27          constitutes 100% of Comair Rotron's outstanding capital stock.

28

CH44653.1
210322-10006

3

DECL. OF RONALD J. PARISI IN SUPPORT
OF PLAINTIFF'S MOT. FOR
APPOINTMENT OF A RECEIVER Case No.

1    (iii)   That certain Subsidiary Stock Pledge Agreement, dated December 9,

2            2005 (the "Subsidiary Pledge Agreement") encumbering Comair

3            Rotron's shares of Thermaflo stock, which constitutes 100% of

4            Thermaflo's outstanding capital stock.  The Quotas Pledge Agreement,

5            the Holding Pledge Agreement, and the Subsidiary Pledge Agreement

6            as subsequently reaffirmed shall be referred collectively to as the

7            "Pledge Agreements."  I have attached true and correct copies of the

8            Pledge Agreements hereto as Group Exhibit C.

9    (iv)   Those certain UCC-1 Financing Statements (the "Financing

10           Statements"):  (a) recorded with the Delaware Department of State with

11           respect to Comair Rotron on April 5, 2004 as document number

12           40954802, and as amended by those certain UCC-3 Financing

13           Statements recorded on December 15, 2005 as amendment number

14           53896587, and recorded on December 15, 2005 as amendment number

15           53896587; (b) recorded with the California Secretary of State with

16           respect to Thermaflo on December 13, 2005 as document number

17           6158800004; (c) recorded with the California Secretary of State with

18           respect to Thermaflo on December 13, 2005 as document number

19           6158800005; and (d) recorded with the California Secretary of State

20           with respect to Thermaflo on December 13, 2005 as document number

21           6158800006.  I have attached true and correct copies of the Financing

22           Statements hereto as Group Exhibit D.

23    (v)   That certain Patent Security Agreement dated April 2, 2004 (the

24           "Patent Security Agreement") encumbering certain intellectual property

25           rights owned by Comair Rotron.  I have attached a true and correct

26           copy of the Patent Security Agreement hereto as Exhibit E.

27    (vi)   That certain Trademark Security Agreement dated April 2, 2004 (the

28           "Trademark Security Agreement") encumbering certain intellectual

1          property rights owned by Comair Rotron.  I have attached a true and

2          correct copy of the Trademark Security Agreement hereto as Exhibit F.

3          12.    In addition to the foregoing security interests securing Borrowers'

4    obligations to LaSalle, Comair Parent additionally entered into that certain Holding

5    Guaranty dated April 2, 2004 (as subsequently reaffirmed, the "Holding Guaranty")

6    pursuant to which Comair Parent "unconditionally, absolutely and irrevocably"

7    guaranteed the full payment of the Loans, including accrued interest and all monies

8    due or may become due under the Loan and Security Agreement and Notes.  I have

9    attached a true and correct copy of the Holding Guaranty, including subsequent

10   reaffirmations hereto as Group Exhibit G.  The Loan and Security Agreement,

11   Notes, Pledge Agreements, Financing Statements, the Patent Security Agreement,

12   Trademark Security Agreement, Holding Guaranty, "Forbearance Agreements" (as

13   defined below) and all related instruments, agreements, and documents shall be

14   collectively referred to as the "Loan Documents."

15         13.    Under the Loan Documents, Defendants agreed to pay on demand all of

16   LaSalle's costs and expenses, including attorneys' fees and LaSalle's legal

17   expenses, incurred in connection with the enforcement of the Loan Documents.

18         14.    By letter from its counsel dated September 26, 2007 (the "September

19   2007 Default Notice"), LaSalle notified Comair Rotron that it was in breach of

20   financial covenants set forth in the Loan and Security Agreement, and that such

21   breaches had continued for no less than thirty days.  As a condition to LaSalle not

22   declaring an Event of Default under the Loan and Security Agreement, LaSalle

23   renewed one of its earlier demands that Comair Rotron obtain an additional $3

24   million of capital.  I have attached a true and correct copy of the September 2007

25   Default Notice hereto as Exhibit H.

26         15.    Defendants failed to obtain the additional capital and continued in

27   breach of the financial covenants set forth in the Loan and Security Agreement.

28

CH44653.1
210322-10006

5

DECL. OF RONALD J. PARISI IN SUPPORT
OF PLAINTIFF'S MOT. FOR
APPOINTMENT OF A RECEIVER Case No.

16.    As of December 30, 2007, Defendants had breached the financial covenants set forth in Section 7.1(ii) of the Loan Agreement relating to the "Senior Leverage Ratio," and Section 7.1 (iii) of the Loan Agreement relating to the "Total Leverage Ratio" as such terms are defined in the Loan and Security Agreement.

17.    Pursuant to a letter dated February 2, 2008 (the "February Default Notice"), LaSalle again notified Borrowers of their breach, noted that Borrowers had also not obtained the additional necessary cash infusion, and demanded Borrowers cure no later than March 7, 2008. Again, Defendants failed to cure their breaches. LaSalle also directed the Default Notice Letter to Comair Parent as Guarantor of Borrowers' obligations under the Loan Documents. I have attached a true and correct copy of the February Default Notice hereto as Exhibit I.

18.    In a March 10, 2008 letter (the "March Default Notice") to Defendants, LaSalle declared an Event of Default under the Loan and Security Agreement. As was its right, LaSalle terminated the Revolving Credit Loan Commitment (as that term is defined in the Loan and Security Agreement), and accelerated all outstanding indebtedness due and owing to LaSalle. As of March 7, 2008, Defendants owed outstanding principal totaling $20,168,873.35, plus accrued interest and costs, fees and expenses incurred by Bank, including without limitation attorneys' fees and expenses. Finally, LaSalle notified Defendants that interest would continue to accrue at the Default Interest Rate specified in the Loan Agreement. I have attached a true and correct copy of the March Default Notice hereto as Exhibit J.

19.    Defendants and LaSalle thereafter entered into that certain Forbearance Agreement dated March 31, 2008 (the "First Forbearance Agreement"), pursuant to which LaSalle rescinded its termination of the Revolving Credit Loan Commitment and agreed to forbear temporarily from enforcing its rights and remedies available under the Loan Documents. Among other things, Defendants promised to pay all outstanding indebtedness by May 2, 2008. Defendants, however, failed to make

CH44653.1
210322-10006

6

DECL. OF RONALD J. PARISI IN SUPPORT
OF PLAINTIFF'S MOT. FOR
APPOINTMENT OF A RECEIVER Case No.

1  such payments, and Borrowers continued in breach of the financial covenants set

2  forth in the Loan and Security Agreement.

3      20.    Defendants and LaSalle then entered into a second Forbearance

4  Agreement dated May 2, 2008 (the "Second Forbearance Agreement"), pursuant to

5  which LaSalle agreed to forbear temporarily from enforcing its rights and remedies

6  under the Loan Documents. Defendants in turned promised to pay all outstanding

7  indebtedness by May 31, 2008. Again, Defendants failed to make such payments

8  and Borrowers continued in breach of the financial covenants set forth in the Loan

9  and Security Agreement.

10      21.    Defendants and LaSalle then entered into a third and final Forbearance

11  Agreement dated May 31, 2008 (the "Third Forbearance Agreement"), pursuant to

12  which LaSalle agreed to forbear temporarily for enforcing its rights and remedies

13  under the Loan Documents. Defendants promised to pay all outstanding

14  indebtedness by June 30, 2008. Defendants, however, failed to make such payments

15  and Borrowers continued in breach of the financial covenants set forth in the Loan

16  and Security Agreement. The First, Second and Third Forbearance Agreements

17  shall collectively be referred to as the "Forbearance Agreements." I have attached

18  true and correct copies of the Forbearance Agreements hereto as Group Exhibit K.

19      22.    In light of Defendants ongoing defaults, LaSalle notified Defendants

20  pursuant to a letter dated July 8, 2008 (the "July Default Notice") from LaSalle's

21  counsel that Defendants failure to make the payments required by the May 31

22  Forbearance Agreement constituted a further additional Event of Default under the

23  Loan and Security Agreement. LaSalle further notified Defendants, among other

24  things, that as of July 7, 2008, the sum of $20,640,000 plus all accrued interest and

25  cost, fees and expenses incurred by LaSalle, including without limitation, attorneys

26  fees and expenses is due and owing to the Bank, and that such indebtedness would

27  continue grow through the accumulation of interest at the Default Interest Rate of

28

CH44653.1
210322-10006

7

DECL. OF RONALD J. PARISI IN SUPPORT
OF PLAINTIFF'S MOT. FOR
APPOINTMENT OF A RECEIVER Case No.

1  Prime plus 3%, plus additional expenses incurred by LaSalle. I have attached a true
2  and correct copy of the July Default Notice hereto as Exhibit L.

3       23.    Defendants have advised LaSalle that they lack the working capital and
4  other financial resources to operate their businesses and to pay their debts as they
5  come due. Defendants have also advised LaSalle that they began implementing an
6  irreversible cessation of operations. To that end, Defendants have advised LaSalle
7  that they consent to the appointment of a receiver over their assets.

8       24.    As a result of Defendants financial problems, LaSalle believes that the
9  collateral securing Defendants obligations to LaSalle is at risk of being dissipated.

10      25.    To date, Defendants have failed to pay the full amount due and owing
11  to LaSalle under the Loan Documents.

12

13  I declare under penalty of perjury under the laws of the State of California that the
14  foregoing is true and correct and that this declaration was executed on the 31st day
15  of July, 2008 at Irvine, California.

16

17

18  Ronald J. Parisi

19

20

21

22

23

24

25

26

27

28

EXHIBIT A

# LOAN AND SECURITY AGREEMENT

BY AND BETWEEN

COMAIR ROTRON, INC.,
AS BORROWER

AND

LASALLE BANK NATIONAL ASSOCIATION,
AS LENDER

DATED AS OF APRIL 2, 2004

618938-06

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATIONS | 1 |
| 1.1 | Definitions | 1 |
| 1.2 | Accounting Terms | 16 |
| 1.3 | Other Terms | 16 |
| 1.4 | Interpretation | 16 |
| | | |
| 2. | LOANS; GENERAL TERMS | 17 |
| 2.1 | Credit Facilities | 17 |
| 2.2 | Evidence of Debt | 18 |
| 2.3 | Loan Accounts; Amount and Maintenance of Loans; Interest Rate Not Determined | 18 |
| 2.4 | Interest Rate | 19 |
| 2.5 | Borrowing Procedures Under the Revolving Credit Facility | 19 |
| 2.6 | General Provisions | 20 |
| 2.7 | Conversion Options; Continuance | 20 |
| 2.8 | Requirements of Law | 21 |
| 2.9 | Illegality | 22 |
| 2.10 | Indemnity | 23 |
| 2.11 | Conditions Precedent | 23 |
| 2.12 | Letters of Credit | 25 |
| | | |
| 3. | PAYMENTS | 28 |
| 3.1 | Making of Payments | 28 |
| 3.2 | Payment Terms | 29 |
| 3.3 | Lockbox; Collection of Accounts and Payments | 30 |
| 3.4 | Application of Payments and Collections | 31 |
| 3.5 | Records | 31 |
| 3.6 | Unused Line Fee | 31 |
| | | |
| 4. | COLLATERAL; GENERAL TERMS | 31 |
| 4.1 | Security Interest | 31 |
| 4.2 | Disclosure of Security Interest | 32 |
| 4.3 | Special Collateral | 32 |
| 4.4 | Further Assurances | 32 |
| 4.5 | Inspection | 33 |
| 4.6 | Location of Collateral | 33 |
| 4.7 | Lender's Payment of Claims Asserted Against Borrower | 33 |
| 4.8 | Letter of Credit Rights | 33 |
| 4.9 | Commercial Tort Claims | 34 |
| 4.10 | Electronic Chattel Paper and Transferable Records | 34 |

618938-06

i

| 5. | COLLATERAL; ACCOUNTS AND COLLATERAL MAINTENANCE | 34 |
|---|---|---|
| 5.1 | Verification of Accounts | 34 |
| 5.2 | Records of Accounts | 34 |
| 5.3 | Notice Regarding Disputed Accounts | 34 |
| 5.4 | Sale or Encumbrance of Accounts | 35 |
| 5.5 | Equipment | 35 |
| 5.6 | Notice of Loss; Prohibition on Sale or Disposition | 35 |
| | | |
| 6. | WARRANTIES AND REPRESENTATIONS | 35 |
| 6.1 | General Warranties and Representations | 35 |
| 6.2 | Account Warranties and Representations | 38 |
| 6.3 | Automatic Warranty and Representations and Reaffirmation of Warranties and Representations | 39 |
| 6.4 | Survival of Warranties and Representations | 39 |
| | | |
| 7. | COVENANTS AND CONTINUING AGREEMENTS | 39 |
| 7.1 | Financial Covenants | 39 |
| 7.2 | Affirmative Covenants | 40 |
| 7.3 | Negative Covenants | 43 |
| 7.4 | Contesting Charges | 45 |
| 7.5 | Payment of Charges | 45 |
| 7.6 | Insurance; Payment of Premiums | 46 |
| 7.7 | Survival of Obligations Upon Termination of Agreement | 46 |
| | | |
| 8. | EVENTS OF DEFAULT; RIGHTS OF REMEDIES | 47 |
| 8.1 | Event of Default | 47 |
| 8.2 | Effect of Event of Default | 49 |
| 8.3 | Remedies | 49 |
| 8.4 | Notice | 50 |
| 8.5 | Default Interest Rate | 50 |
| 8.6 | Preservation of Rights | 51 |
| 8.7 | Distributions | 51 |
| | | |
| 9. | MISCELLANEOUS | 51 |
| 9.1 | Appointment of Lender as Borrower's Lawful Attorney-In-Fact | 51 |
| 9.2 | Modification of Agreement; Sale of Notes; Participation | 52 |
| 9.3 | Attorneys' Fees and Expenses; Lender's Out-of-Pocket Expenses | 53 |
| 9.4 | No Offset; Right to Charge Accounts | 54 |
| 9.5 | Severability | 54 |
| 9.6 | Parties; Entire Agreement | 54 |
| 9.7 | Conflict of Terms | 55 |
| 9.8 | Waiver by Borrower | 55 |
| 9.9 | Waiver and Governing Law | 55 |
| 9.10 | Notice | 56 |

618938-06

ii

9.11     Section Titles, Etc. .................................................................. 57
9.12     Mutilated, Destroyed, Lost and Stolen Notes ................................ 57

## EXHIBITS

Exhibit A              Financials
Exhibit B              Form of Master Letter of Credit Agreement
Exhibit C-1            Form of Revolving Credit Note
Exhibit C-2            Form of Term Loan Note
Exhibit D              Form of Holding Guaranty
Exhibit E              Form of Holding Pledge Agreement
Exhibit F              Form of Mexico Pledge Agreement
Exhibit G              Form of Patent Security Agreement
Exhibit H              Form of Trademark Security Agreement
Exhibit I              Form of Landlord Waiver and Consent
Exhibit J              Form of Opinion of Borrower's Counsel
Exhibit K              Form of Opinion of Borrower's Mexican Counsel
Exhibit L              Form of Subordination Agreement
Exhibit M              Form of Compliance Certificate
Exhibit N              Form of Borrowing Base Certificate

## SCHEDULES

Schedule 1.1.1         Commercial Tort Claims
Schedule 1.1.3         Existing Permitted Debt
Schedule 1.1.4         Existing Permitted Liens
Schedule 4.6           Eligible Collateral Locations
Schedule 6.1(B)        Fictitious Names
Schedule 6.1(I)        Litigation
Schedule 6.1(J)        Labor Relations
Schedule 6.1(R)        Subsidiaries
Schedule 6.1(U)        Environmental Disclosures
Schedule 6.1(V)        Intellectual Property

618938-06

iii

## LOAN AND SECURITY AGREEMENT

**THIS LOAN AND SECURITY AGREEMENT** (this **"Agreement"**) is made as of the 2nd day of April, 2004 by and between COMAIR ROTRON, INC., a Delaware corporation (**"Borrower"**) and LASALLE BANK NATIONAL ASSOCIATION, a national banking association (**"Lender"**).

**WHEREAS,** Lender and Borrower are parties to that certain Credit Agreement dated as of December 29, 1999 by and among Borrower, Bank of America, N.A. and the other financial institutions party thereto, including Lender, as amended by that certain Amendment to Credit Agreement dated as of August 8, 2002 and that certain Waiver and Amendment to Credit Agreement dated as of July 9, 2003 (the **"Existing Loan Agreement"**);

**WHEREAS,** Borrower desires to (i) refinance the debt owed under the Existing Loan Agreement (the **"Existing Debt"**) and Lender is willing to refinance the Existing Debt upon the terms and conditions set forth in this Agreement and (ii) Borrower desires to enter into one or more interest rate swap transactions (each an **"Interest Rate Swap"**) and Lender is willing to enter into such Interest Rate Swaps on the terms and conditions set forth in this Agreement and in the Swap Documents (defined below);

**WHEREAS,** in conjunction with refinancing the Existing Debt and entering into the Interest Rate Swaps, Borrower desires to borrow additional funds and obtain other financial accommodations from Lender, and Lender is willing to make certain loans and provide other financial accommodations to Borrower upon the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the terms and conditions contained herein, and of any loans or extension of credit previously, now or to be made to or for the benefit of Borrower by Lender, the parties agree as follows:

## 1.   DEFINITIONS AND INTERPRETATIONS.

1.1   **Definitions.**  When used in this Agreement, the following terms shall have the following meanings:

**"Accounts"** shall mean all accounts (including, without limitation, all rights to payment for services rendered or goods sold or leased), contract rights, leases, chattel paper, instruments, life insurance policies, notes and documents, whether now owned or to be acquired by Borrower or its Subsidiaries.

**"Account Debtor"** shall mean any Person who is or who may become obligated to Borrower or its Subsidiaries under, with respect to, or on account of an Account.

**"Accounts Report"** shall mean a report delivered to Lender by Borrower, in accordance with Section 7.2(C)(vi), consisting of (i) a trial balance of all Accounts

618938-06

005

existing as of the last day of the month preceding the date of such Accounts Report, specifying for each Account Debtor obligated on the Accounts, such Account Debtor's name and outstanding balance, (ii) an aging of such Accounts and (iii) any other information reasonably required by Lender.

"**Affiliate**" shall mean any and all Persons which, in the reasonable judgment of Lender, directly or indirectly, own or control, are controlled by or are under common control with, Borrower. For the purpose of this definition and where otherwise applicable herein, "**control**" means the possession, directly or indirectly, of the power to direct or cause the direction of management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"**Ancillary Agreements**" shall mean all Security Documents, Swap Documents and all agreements, instruments, documents and all other written matter whether now or hereafter to be executed by or on behalf of Borrower or any other Person or delivered to Lender with respect to this Agreement, including without limitation, notes, guaranties, mortgages, deeds of trust, chattel mortgages, pledges, powers of attorney, consents, assignments, contracts, notices, security agreements, leases, financing statements and subordination agreements,.

"**Applicable Margin**" shall mean the percentage interest rate per annum, based upon the Leverage Ratio set forth in the most recent Compliance Certificate delivered by Borrower to Lender pursuant to Section 7.2(C)(iii), as indicated in the following chart:

|  | Leverage Ratio | Prime Percentage Rate | LIBOR Percentage Rate | Unused Line Fee Percentage Rate |
|---|---|---|---|---|
| Level I | Less than or equal to 2.50:1.00 | 0% | 2.50% | 0.20% |
| Level II | Greater than 2.50:1.00, but less than or equal to 3.00:1.00 | .50% | 3.00% | .30% |
| Level III | Greater than 3.00:1.00 | 1.00% | 3.50% | .40% |

The initial Applicable Margin shall be based on Level III and shall be adjusted upon the date of receipt of each Compliance Certificate by Lender. In the event Borrower fails to deliver a Compliance Certificate to Lender in a timely manner pursuant to Section 7.2(C)(ii), the Applicable Margin shall be based on Level III until Borrower delivers such Compliance Certificate to Lender, at which point the Applicable Margin will be adjusted based upon the Leverage Ratio set forth in such Compliance Certificate.

"**Availability**" shall mean at any time, the lesser of (i) the Revolving Credit Commitment and (ii) the Borrowing Base, as determined on the basis of the most recent Borrowing Base Certificate delivered to Lender in accordance with Section 7.2(C)(v).

"**Borrowing Base**" shall have the meaning ascribed to it in Section 2.1(A)(ii).

618938-06

2

"**Borrowing Base Certificate**" shall have the meaning ascribed to it in Section 7.2(C)(v).

"**Business Day**" shall mean any day that is not a Saturday, Sunday or other day on which commercial banks in the State of Illinois are required or authorized by law to remain closed; provided that, when used in connection with a LIBOR Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in Dollars in the London interbank market.

"**Capital Expenditures**" shall mean for any period, the sum of all expenditures during that period that are or are to be included in "additions to property, plant or equipment" or a comparable item in the statement of cash flows of Borrower and its Subsidiaries.

"**Capitalized Lease Obligations**" shall mean for any period, the amounts payable with respect to leases of tangible or intangible property of any character, however denoted, which is required by generally accepted accounting principles to be reflected as an asset on the face of the balance sheet.

"**Change in Control**" shall mean:

(i)     Howard Industries ceases to beneficially own and control more than 50% of the issued and outstanding voting securities of Holding;

(ii)     Holding ceases to own of record and beneficially all of the issued and outstanding capital stock of Borrower; or

(iii)     individuals who, on the date of the Closing, constituted the Board of Director of Holding (together with any new directors whose election by such Board or whose nomination for election by the shareholders of Holding was approved by a vote of a majority of the directors then still in office who were either directors on the date of the Closing or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of Holding then in office.

"**Charges**" shall mean all national, federal, state, county, city, municipal, or other governmental (including, without limitation, the Pension Benefit Guaranty Corporation) taxes, levies, assessments, charges, Liens, claims or encumbrances upon or relating to the following, without limitation: (i) the Collateral, (ii) the Liabilities, (iii) Borrower's employees, payroll, income or gross receipts or (iv) Borrower's ownership or use of any of its assets.

"**Closing**" shall have the meaning ascribed to it in Section 2.11(A).

618938-06

3

"**Closing Fee**" shall mean $120,000.

"**Collateral**" shall mean all of the Property and interests in Property described in Section 4.1 and all other Property and interests in Property which shall, from time to time, secure any part of the Liabilities.

"**Comair Mexico**" shall mean Comair Rotron de Mexico, S. de R.L. de C.V., a limited liability company organized under the laws of Mexico and a Subsidiary owned by Borrower and Holding.

"**Commercial Tort Claims**" shall mean commercial tort claims of Borrower, including those specifically identified on Schedule 1.1.1 to this Agreement, as it may be amended from time to time.

"**Compliance Certificate**" shall have the meaning ascribed to it in Section 7.2(C)(iii).

"**Debt Service**" shall mean, with reference to any period, the sum (without duplication) of (i) the aggregate amount of payments required to be made by Borrower in respect of principal on Indebtedness (whether at maturity, as a result of mandatory prepayment, acceleration or otherwise) during such period, plus (ii) the aggregate amount of payments required to be made by Borrower in respect of interest on Indebtedness (whether at maturity, as a result of mandatory prepayment, acceleration or otherwise) during such period.

"**Default**" shall mean any event or condition which, with the passage of time or the giving of notice or both, would constitute an Event of Default.

"**Dollars**" and the symbol "**$**" shall mean the lawful currency of the United States of America.

"**EBITDA**" shall mean with reference to any period (i) the aggregate amount of consolidated net income (or net deficit) of Borrower and its Subsidiaries for such period as computed in accordance with generally accepted accounting principles consistently applied plus (ii) the aggregate amount of (a) Interest Expense for such period without duplication, (b) all amounts deducted in arriving at the consolidated net income (or net deficit) in respect of Taxes for such period (as such amounts are categorized on the books of Borrower) and (c) all amounts properly charged for depreciation of fixed assets, amortization of intangible assets and other non-cash items during such period on the books of Borrower and its Subsidiaries minus (iii) the aggregate amount paid to Borrower in connection with the settlement of the Nidec Litigation.

"**Eligible Collateral Locations**" shall mean the locations identified on Schedule 4.6 attached hereto, together with such other locations as to which Lender may, from time to time, agree, subject to Section 4.6 and such conditions as Lender may determine

618938-06

4

appropriate, including the execution and filing of appropriate financing statements and the obtaining of any lien waivers from any bailee, warehouseman, landlord, mortgagee or similarly situated Person who may have a Lien in or upon any Inventory at such location.

"**Eligible Foreign Accounts**" shall mean those Accounts of Borrowers due from the following Account Debtors: CTS Corp., Nortel Networks, Lucent Technology, San Mina SCI, AvNet, Celestica and C-MAC Electronic Systems, provided that such Accounts meet the definition of "Eligible Receivables" in this Section 1.1 with the exception of clause (iv) thereof.

"**Eligible Receivables**" means the aggregate amount of all Accounts of Borrower arising from the sale by Borrower of any goods or services in the ordinary course of Borrower's business, valued at the lowest of invoice (adjusted for credits, returns or the like), or the amount reasonably expected by Borrower to be collected from the particular Account Debtor(s), less any Accounts and related amounts:

       (i)    which remain fully or partially unpaid for more than ninety (90) days after their respective invoice dates; or

       (ii)    which are owed by a particular Account Debtor if twenty-five percent (25%) or more of the aggregate balance of all Accounts owing by such Account Debtor to Borrower has not been paid within ninety (90) days of the invoice date; or

       (iii)    with respect to which Borrower is liable to the Account Debtor for goods sold or services rendered by such Account Debtor to Borrower to the extent of Borrower's liability to such Account Debtor; or

       (iv)    with respect to which the Account Debtor is not a resident or citizen of or otherwise located in the United States of America, or with respect to which the Account Debtor is not subject to service of process in the United States of America, unless Borrower has furnished Lender with a letter of credit or evidence of account receivable insurance satisfactory to Lender in its sole, but reasonable discretion;

       (v)    with respect to which payment by the Account Debtor is or may be conditional, and accounts commonly known as "bill and hold" or accounts with a similar or like arrangement; or

       (vi)    which are not due and payable in full in accordance with Borrower's credit and collection policy as disclosed by Borrower to Lender; provided that regardless of the terms of such credit and collection policy, no Eligible Receivable shall have a payment term which is greater than ninety (90) days from the date of its related invoice; or

618938-06

5

(vii)    with respect to which the Account Debtor is the United States of America or any department, agency or instrumentality thereof, unless all necessary steps are taken to comply with the Assignment of Claims Act of 1940, as amended, and all other necessary steps to perfect Lender's security interest in such account have been completed to Lender's reasonable satisfaction; or

(viii)    with respect to which the Account Debtor is a state or local government, or a department, agency or instrumentality thereof, unless the Account Receivable is subject to assignment under and pursuant to a state or local law which is analogous to the federal Assignment of Claims Act of 1940, as amended, and all other necessary steps to perfect Lender's security interest in such account have been completed to Lender's reasonable satisfaction; or

(ix)    with respect to which the goods giving rise thereto have not been shipped and delivered to or rejected (in accordance with the applicable provisions of the UCC) by the Account Debtor thereof in the ordinary course of Borrower's business or with respect to which the services performed giving rise thereto have not been completed and accepted as satisfactory by the Account Debtor thereof in the ordinary course of Borrower's business; or

(x)    arising from a "COD" sale, "consignment." "sale on approval" or "sale or return"; or

(xi)    which are subject to any Lien or security interest, except in favor of Lender, Permitted Liens or as otherwise agreed to by Lender, or are "bonded" or similar accounts; or

(xii)    which are owed by an Account Debtor which has a dispute with Borrower, or as to which any adverse claim, dispute or litigation relates (including without limitation any claim that any amounts are not owed to Borrower but except as arise in the ordinary course of Borrower's business), but only in the amount of such adverse claim, dispute or litigation; or

(xiii)    which are owed by an Account Debtor which is located in a state which requires Borrower, as a precondition to commencing or maintaining an action in the courts of that state, either to (a) receive a certificate of authority to do business a n d b e i n good s tanding i n s uch s tate, o r (b) file a notice of business activities or similar report with such state's taxing authority, unless (1) Borrower has taken one of the actions described in clauses (a) or (b), (2) the failure to take one of the actions described in either clause (a) or (b) may be cured retroactively by Borrower at its election without material expense, or (3) Borrower has proven to the satisfaction of Lender that it is exempt from any such requirements under such state's laws; or

(xiv)   which are owed by an Account Debtor which (a) has filed a petition or (b) is subject to an involuntary petition under any section or chapter of the United States Bankruptcy Code or any similar law or regulation or has made a general assignment for the benefit of its creditors, provided that such Accounts may be Eligible Receivables in the event there is a court order for the payment of such Account that has been reviewed and approved by Lender in its sole discretion; or

(xv)   which fails to meet or violates any warranty, representation or covenant contained in this Agreement; or

(xvi)   with respect to which the Account Debtor is a, partner, shareholder, director, officer, employee or agent of Borrower or its Subsidiaries or is a Subsidiary or other Affiliate; or

(xvii)   which are not genuine and in all respects what they purports to be or are not valid, legally enforceable and unconditional obligations of the Account Debtor with respect thereto; or

(xviii)   which Lender deems, in its sole, but reasonable discretion, to be doubtful in their collection.

"**Environmental Laws**" shall mean the Resource Conservation and Recovery Act, 42 U.S.C. section 690, et seq., the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, any so-called "Superfund" or "Superlien" law, the Toxic Substances Control Act, and any successor statute of similar import, together with the regulations thereunder, in each case as in effect from time to time, and any other federal, state or local statute, law, ordinance, code, rule, regulation, guideline, order, decree or other requirement (whether or not having the force of law) regulating or imposing liability or standards of conduct (including, but not limited to, permit requirements, and emission or effluent restrictions) concerning any Hazardous Materials or any hazardous, toxic or dangerous waste, substance or constituent, or any pollutant or contaminant or other substance, whether solid, liquid or gas, or otherwise relating to public health and safety and/or protection of the environment, as now or at any time hereafter in effect. References to sections of any statute or regulations shall be construed to also refer to any successor sections.

"**Equipment**" shall mean all of Borrower's now owned and to be acquired equipment and fixtures, including without limitation, furniture, machinery, vehicles and trade fixtures, together with any and all accessories, parts, appurtenances, substitutions and replacements.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"**Event of Default**" shall mean the occurrence or existence of any one or more of the events described in Section 8.1.

"**Excess Cash Flow**" shall mean, as of the end of each fiscal year of Borrower and its Subsidiaries, EBITDA for the fiscal year then elapsed minus the aggregate amount of (i) cash payments with respect to Taxes made or required to be made by Borrower during or with respect to the fiscal year then elapsed, (ii) Borrower's Capital Expenditures during the fiscal year then elapsed which are not financed by the Loans or any other Indebtedness incurred by Borrower and (iii) cash payments with respect to Debt Service made by Borrower during the fiscal year then elapsed.

"**Financials**" shall mean those financial statements of Borrower and its Subsidiaries described on Exhibit A or delivered to Lender pursuant to Section 7.2(C).

"**General Intangibles**" shall mean all contract rights, choses in action, general intangibles, causes of action and all other intangible personal property of Borrower of every kind and nature (other than Accounts) now owned or to be acquired by Borrower. Without in any way limiting the generality of the foregoing, General Intangibles specifically includes, without limitation, all corporate or other business records, deposit accounts, inventions, designs, patents, patent applications, trademarks, trademark applications, service marks, service mark applications, trade names, trade secrets, goodwill, copyrights, registrations, licenses, leasehold interests, franchises and tax refund claims owned by Borrower and all letters of credit, banker's acceptances, guarantee claims, security interests or other security held by or granted to Borrower to secure payment by an Account Debtor of any Accounts, letter of credit rights, payment intangibles, supporting obligations, Commercial Tort Claims, software and such other assets as constitute General Intangibles under the UCC.

"**Hazardous Materials**" shall mean (i) any "hazardous substance" as defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, (ii) any "hazardous waste" as defined in the Resource Conservation and Recovery Act, as amended, (iii) any petroleum product or (iv) any pollutant, contaminant or hazardous, dangerous or toxic chemical, material or substance, defined or qualifying as such in (or for the purposes of) any Environmental Law, and shall include, but not be limited to, petroleum, including crude oil or any fraction thereof which is liquid at standard conditions of temperature or pressure (60 degrees Fahrenheit and 14.7 pounds per square inch absolute), any radioactive material, including, but not limited to, any source, special nuclear or by-product material as defined at 42 U.S.C. section 2011 et. seq., as amended or hereafter amended, polychlorinated biphenyls, and asbestos in any form or condition.

"**Holding**" shall mean Comair Holding Corp., a Delaware corporation.

"**Howard Industries**" shall mean Howard Industries, Inc., a Delaware corporation.

618938-06

8

"**Indebtedness**" shall mean all of Borrower's and its Subsidiaries' liabilities, obligations and indebtedness to all Persons of any and every kind and nature, whether primary, secondary, direct, indirect, absolute, contingent (as so indicated on Borrower's balance sheet or in the footnotes to Borrower's financial statements), fixed, or otherwise, previously, now or to be owing, due, or payable, however evidenced, created, incurred, acquired or owing and however arising, whether under written or oral agreement, by operation of law, or otherwise. Without in any way limiting the generality of the foregoing, Indebtedness specifically includes (i) the Liabilities, (ii) all obligations or liabilities of any Person that are secured by any Lien, claim, encumbrance, or security interest upon property owned by Borrower or any Subsidiary, even though Borrower or such Subsidiary has not assumed or become liable for the payment thereof, (iii) all obligations or liabilities created or arising under any lease of real or personal property (including Capitalized Lease Obligations), or conditional sale or other title retention agreement with respect to property used or acquired by Borrower or any Subsidiary, even though the rights and remedies of the lessor, seller or lender, thereunder are limited to repossession of such property, (iv) all unfunded pension fund obligations and liabilities and (v) deferred Taxes.

"**Interest Expense**" shall mean for any period the sum of all interest charges on Indebtedness (including imputed interest charges with respect to Capitalized Lease Obligations and all amortization of debt discount and expense) of Borrower and its Subsidiaries for such period determined in accordance with generally accepted accounting principles.

"**Interest Payment Date**" shall mean: (i) (a) with respect to any Prime Rate Loan, the first Business Day of each calendar month and the date of any conversion of such Prime Rate Loan into a LIBOR Loan and (b) with respect to any LIBOR Loan, the last day of the applicable Interest Period, provided that for any LIBOR Loan having an Interest Period longer than three months, accrued interest shall also be payable on the last day of each three-month interval during such Interest Period; and (ii) for Prime Rate Loans and LIBOR Loans accrued interest shall be payable upon (a) the Revolving Credit Termination Date and the Term Loan Maturity Date, as applicable and (b) the date on which each such Loan is paid in full or otherwise satisfied.

"**Interest Period**" shall mean with respect to any LIBOR Loan (a) initially, the period commencing on the initial date of borrowing as set forth in the Notice of Borrowing or the conversion date, as the case may be, with respect to such LIBOR Loan and ending one, two, three or six months thereafter, as selected by Borrower in the Notice of Borrowing or Notice of Conversion, and (b) thereafter, each period commencing on and including the first day of the next Interest Period applicable to such LIBOR Loan and ending one, two, three, or six months thereafter, as selected by Borrower in the Notice of Continuance described in Section 2.7(B); provided that the foregoing provisions relating to Interest Periods are subject to the following:

      (i)      If any Interest Period would otherwise end on a day which is not a Business Day, that Interest Period shall be extended to the next succeeding Business Day except if the result of such extension would be for such Interest Period to end in another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

      (ii)     any Interest Period of a LIBOR Loan made pursuant to the Revolving Credit Facility that would otherwise extend beyond the Revolving Credit Termination Date shall end on the Revolving Credit Termination Date;

      (iii)    if Borrower fails to give notice of the length of the Interest Period it requests with respect to the LIBOR Loan, Borrower shall be deemed to have selected a LIBOR Loan of one month; and

      (iv)    any Interest Period pertaining to a LIBOR Loan that begins on the last Business Day of a calendar month (or a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month.

"**Interest Rate**" shall mean the interest rate determined in accordance with Section 2.4.

"**Inventory**" shall mean all goods, inventory, merchandise, finished goods, component goods, packaging materials and other personal property including, without limitation, goods in transit, wherever located and whether now owned or to be acquired by Borrower which is or may at any time be held for sale or lease, furnished under any contract of service or held as raw materials, work in process, supplies or materials used or consumed in Borrower's business, and all such property the sale or other disposition of which has given rise to Accounts and which has been returned to or repossessed or stopped in transit by Borrower.

"**Issuance Request**" shall have the meaning ascribed to it in Section 2.12(C).

"**Letter of Credit**" shall mean any letter of credit issued by Lender for the account of Borrower in accordance with Section 2.12.

"**Letter of Credit Expiry Date**" shall mean, with respect to any Letter of Credit, not later than one (1) year after the Revolving Credit Termination Date.

"**Letter of Credit Fees**" shall have the meaning ascribed to it in Section 2.12(E).

"**Letter of Credit Obligations**" shall mean, as at the time of determination thereof, the sum of (a) the Reimbursement Obligations then outstanding and (b) the aggregate then undrawn face amount of the then outstanding Letters of Credit.

"**Letter of Credit Sublimit**" shall mean an aggregate amount not to exceed $1,000,000.

"**Leverage Ratio**" shall mean as of any date of measurement, the ratio of (i) the consolidated Indebtedness to (ii) consolidated EBITDA for the twelve-month period immediately preceding the date of measurement of such ratio.

"**Liabilities**" shall mean all of Borrower's and its Subsidiaries' liabilities, obligations and indebtedness to Lender of any and every kind and nature, whether primary, secondary, direct, absolute, contingent (as so indicated on Borrower's balance sheet or in the footnotes to Borrower's financial statements), fixed, or otherwise (including, without limitation, interest, charges, expenses, attorneys' fees and other sums chargeable to Borrower or its Subsidiaries by Lender, future advances made to or for the benefit of Borrower and obligations of performance), whether arising under this Agreement, under any of the Ancillary Agreements, any of the Swap Documents or acquired by Lender from any other source, whether previously, now or to be owing, arising, due, or payable from Borrower or its Subsidiaries to Lender, however evidenced, created, incurred, acquired or owing and however arising, whether under written or oral agreement, operation of law, or otherwise.

"**LIBOR Loan**" shall mean any Loan (or portion thereof) bearing interest at the LIBOR Rate, as designated by Borrower in a Notice of Borrowing, Notice of Conversion or Notice of Continuance.

"**LIBOR Rate**" shall mean a rate of interest equal to the sum of (i) the per annum rate of interest at which United States dollar deposits in an amount comparable to the principal balance of Loans and for a period equal to the relevant Interest Period are offered in the London Interbank Eurodollar market at 11:00 a.m. (London time) two Business Days prior to the commencement of each Interest Period, as displayed in the Bloomberg Financial Markets system, or other authoritative source selected by Lender in its sole discretion plus (ii) the Applicable Margin, such rate to remain fixed for such Interest Period. Lender's determination of the LIBOR Rate shall be conclusive, absent manifest error.

"**Lien**" shall mean any mortgage, pledge or lease of, security interest in or lien, charge, restriction or encumbrance on any Property of the Person involved in favor of or which secures any obligation to, any other Person.

"**Loan**" shall mean any advance made by Lender to Borrower under the Revolving Credit Facility or the Term Loan.

"**Nidec Litigation**" shall mean that certain legal action known as *Comair Rotron, Inc. v. Nidec Corporation and Nidec America Corp.*, Civil Action no. 2:91CV0032 (CFD).

618938-06

11

"**Notes**" shall mean, collectively, the Revolving Credit Note and the Term Note to be executed and delivered by Borrower to Lender on the Closing and which are described in Section 2.2.

"**Notice of Borrowing**" shall mean a Notice of Borrowing described in Section 2.5.

"**Notice of Continuance**" shall mean a Notice of Continuance described in Section 2.7(B).

"**Notice of Conversion**" shall mean a Notice of Conversion described in Section 2.7(A).

"**Permitted Debt**" shall mean:

  (i)    the Liabilities;

  (ii)   current unsecured Indebtedness arising in the ordinary course of business of Borrower and its Subsidiaries, including trade payables, utility costs, payroll and benefit obligations, accrued tax liabilities and other non-extraordinary accounts payable;

  (iii)  provided no Default or Event of Default has occurred and is continuing, Indebtedness incurred by Borrower to any Person constituting Capitalized Expenditures provided that the aggregate amount of such Indebtedness outstanding at any time does not exceed $1,000,000;

  (iv)   the Subordinated Debt; and

  (v)    such other Indebtedness outstanding on the date hereof and described on Schedule 1.1.3 attached hereto.

"**Permitted Liens**" shall mean:

  (i)    Liens and encumbrances in favor of Lender, whether granted under or established by this Agreement, the Ancillary Agreements, or otherwise;

  (ii)   subject to Section 7.4, Liens for taxes, assessments or other governmental charges incurred by Borrower or its Subsidiaries in the ordinary course of business and for which no interest, late charge or penalty is attaching or which are being contested in good faith by appropriate proceedings diligently pursued and for which adequate reserves in accordance with generally accepted accounting principles shall have been set aside on its books;

(iii)    Liens incurred by Borrower or its Subsidiaries in the ordinary course of business created by statute in connection with worker's compensation, unemployment insurance, social security, old age pensions (subject to the applicable provisions of this Agreement) and similar statutory obligations;

(iv)    Liens incurred by Borrower or its Subsidiaries in favor of mechanics, materialmen, carriers, warehousemen, landlords or repairmen or other like statutory or common law Liens securing obligations incurred in good faith in the ordinary course of business that are not overdue for a period of more than thirty (30) days or which are being contested in good faith;

(v)    easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business and encumbrances consisting of zoning restrictions, easements, licenses, restrictions on the use of property or minor imperfections in title thereto which, in the aggregate, are not material in amount, and which do not, in the aggregate, materially detract from the value of the property of Borrower or its Subsidiaries or materially interfere with the ordinary conduct of the business of Borrower or its Subsidiaries;

(vi)    any existing Liens securing the Subordinated Debt; and

(v)    any existing Liens and encumbrances identified in <u>Schedule 1.1.4</u> hereto to secure Indebtedness outstanding as of the date hereof.

"**Person**" shall mean any individual, sole proprietorship, partnership, joint venture, trust, limited liability company, unincorporated organization, association, corporation, institution, entity, party, or government (whether national, federal, state, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

"**Prime Rate**" shall mean the rate per annum equal to the sum of (i) the prime rate of interest announced by Lender from time to time as its "**prime rate**" <u>plus</u> (ii) the Applicable Margin. Changes in interest charged under this Agreement on Prime Rate Loans, shall take effect on the date of each change in the Prime Rate, without further notice from Lender. The Prime Rate is not necessarily the lowest rate of interest charged by Lender in connection with extensions of credit.

"**Prime Rate Loan**" shall mean any Loan (or portion thereof) bearing interest at the Prime Rate, as designated by Borrower in any Notice of Borrowing, Notice of Conversion or Notice of Continuance.

"**Property**" means any and all rights, titles and interests in and to any and all property whether real or personal, tangible (including cash) or intangible, and wherever situated and whether now owned or hereafter acquired.

"**Reimbursement Agreement**" shall mean a Master Letter of Credit Agreement substantially in the form of Exhibit B hereto as such form may be amended by Lender from time to time and a letter of credit application and reimbursement agreement in such form as Lender may from time to time employ in the ordinary course of business.

"**Reimbursement Obligations**" shall mean all amounts owed by Borrower to Lender (whether or not evidenced by any note or instrument), direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, representing the principal of and interest on payments made by Lender under or in connection with any Letter of Credit, including but not limited to, all unpaid drawings, fees, premiums, expenses, attorneys' fees, accountants' fees, capital adequacy charges, increased costs and similar costs and expenses owed or payable under this Agreement or any Letters of Credit, including but not limited to, the fees set forth in Section 2.12 hereof.

"**Reportable Event**" shall have the meaning ascribed to it in Section 6.1(O).

"**Revolving Credit Commitment**" shall mean $5,000,000.

"**Revolving Credit Facility**" shall have the meaning ascribed to it in Section 2.1(A).

"**Revolving Credit Termination Date**" shall mean May 15, 2006.

"**Security Documents**" shall mean this Agreement and all other agreements, instruments, documents, financing statements, warehouse receipts, bills of lading, notices of assignment, schedules, assignments, mortgages, pledges and other written matter necessary or requested by Lender to create, perfect and maintain perfected Lender's security interest in the Collateral.

"**Senior Debt**" shall mean as of any day the aggregate amount of (i) all outstanding Loans under the Revolving Credit Facility, (ii) the outstanding principal balance of the Term Loan and (iii) the Letter of Credit Obligations.

"**Senior Debt Service**" shall mean, with reference to any period, the sum (without duplication) of (i) the aggregate amount of payments required to be made by Borrower in respect of principal on the Liabilities (whether at maturity, as a result of mandatory prepayment, acceleration or otherwise) during such period, plus (ii) the aggregate amount of payments required to be made by Borrower in respect of interest on the Liabilities (whether at maturity, as a result of mandatory prepayment, acceleration or otherwise) during such period.

"**Senior Fixed Charge Coverage Ratio**" shall mean, as of the last day of any fiscal quarter of Borrower and its Subsidiaries, the ratio of (i) EBITDA for such quarter minus cash payments with respect to Taxes made or required to be made by Borrower and its Subsidiaries during such quarter minus Capital Expenditures which are not financed

by the Loans or any other Indebtedness incurred by Borrower made by Borrower and its Subsidiaries during such quarter to (ii) Senior Debt Service.

"**Senior Leverage Ratio**" shall mean as of any date of measurement the ratio of (i) Senior Debt to (ii) EBITDA for the twelve-month period immediately preceding the dated of measurement of such ratio.

"**Solvent**" shall mean with respect to any Person on a particular date, that on such date (a) the fair salable value of its property is greater than the fair present value of its liabilities (including for purposes of this definition all liabilities whether reflected on a balance sheet prepared or otherwise and whether direct or indirect, fixed or contingent, secured or unsecured, disputed or undisputed), (b) the present fair salable value of its assets is not less than the amount that will be required to pay the probable liability on its debts as they become absolute and matured; (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature; and (d) such Person is not engaged in a business or transaction, and is not about to engage in a business or transaction, for which such Person's property would constitute an unreasonably small capital. The amount of contingent liabilities (such as litigation, guarantees and pension plan liabilities) at any time shall be computed as the amount which, in light of all the facts and circumstances existing at the time, represents the amount which can be reasonably be expected to become an actual or matured liability.

"**Special Collateral**" shall have the meaning ascribed to it in Section 4.3.

"**Subordinated Debt**" shall mean Borrower's Indebtedness to Holding pursuant to that certain Junior Subordinated Note in the principal amount of $5,000,000 dated as of August 8, 2002, and all interest due thereunder.

"**Subordinated Notes**" shall mean the notes issued to the purchasers under that certain Subordinated Note and Warrant Purchase Agreement dated as of August 8, 2002 by and among Holding and the purchasers party thereto.

"**Subsidiary**" shall mean any corporation, partnership, limited liability company or other legal entity of which Borrower owns directly or indirectly 50% or more of the outstanding voting stock, beneficial interests or equity, as the case may be, or of which Borrower has effective control by contract or otherwise.

"**Swap Documents**" shall mean any and all documents related to any Interest Rate Swap, including, without limitation, any Master Agreement published by the International Swaps and Derivatives Association, Inc. by and between Lender or an Affiliate of Lender and Borrower, together with any related schedules thereto, as amended from time to time.

618938-06

15

"**Taxes**" shall mean for any fiscal year the federal, state, local and foreign taxes payable by Borrower and its Subsidiaries with respect to the income of Borrower and its Subsidiaries for such fiscal year.

"**Term Loan**" shall have the meaning ascribed to it in Section 2.1(B).

"**Term Loan Commitment**" shall mean $7,000,000.

"**Term Loan Maturity Date**" shall mean April 1, 2009.

"**Total Fixed Charge Coverage Ratio**" shall mean, as of the last day of any fiscal quarter of Borrower and its Subsidiaries, the ratio of (i) EBITDA for such quarter <u>minus</u> cash payments with respect to Taxes made or required to be made by Borrower and its Subsidiaries during such quarter <u>minus</u> Capital Expenditures which are not financed by the Loans or any other Indebtedness incurred by Borrower made by Borrower and its Subsidiaries during such quarter to (ii) Debt Service for such quarter.

"**UCC**" shall have the meaning ascribed to it in Section 1.3.

"**Unused Line Fee**" shall have the meaning ascribed to it in Section 3.6.

**1.2** **Accounting Terms**. Any accounting terms used in this Agreement which are not specifically defined shall have the meanings customarily given them in accordance with generally accepted accounting principles.

**1.3** **Other Terms**. All other terms, whether or not capitalized, contained in this Agreement which are not otherwise defined in this Agreement shall, unless the context indicates otherwise, have the meanings provided for by the Uniform Commercial Code of the State of Illinois (the "**UCC**") in effect from time to time, to the extent the same are used or defined therein.

**1.4** **Interpretation**. In this Agreement and each Ancillary Agreement, unless a clear contrary intention appears:

(i)     the singular number includes the plural number and *vice versa*;

(ii)     reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by such documents, and reference to a Person in a particular capacity excludes such Person in any other capacity;

(iii)     reference to either gender includes the other gender;

(iv)     reference to any agreement (including this Agreement, the Schedules and Exhibits and the Ancillary Agreements), document or instrument means such agreement,

G18938-06

16

document or instrument as amended, modified, supplemented or replaced from time to time in accordance with the terms thereof and, if applicable, the terms hereof and the Ancillary Agreements, and reference to any promissory note includes any promissory note which is an extension or renewal thereof or a substitute or replacement therefor;

(v)    reference to any law, rule, regulation, order, decree, requirement, policy, guideline, directive or interpretation means as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect on the determination date, including rules and regulations promulgated thereunder;

(vi)    reference to any Article, Section, paragraph, clause, other subdivision, Schedule or Exhibit means such Article, Section, paragraph, clause or other subdivision of this Agreement or Schedule or Exhibit to this Agreement;

(vii)    "hereunder," "hereof," "hereto" and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision hereof;

(viii)    "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term;

(ix)    relative to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding"; and

(x)    references herein to any Subsidiary shall apply only during such times as Borrower has any Subsidiary.

**2.    LOANS; GENERAL TERMS.**

**2.1    Credit Facilities.**

(A)    Revolving Line of Credit.  Lender agrees, on the terms and conditions hereinafter set forth, to make available for Borrower's use, from time to time until the Revolving Credit Termination Date, upon request of Borrower in accordance with Section 2.5, certain Loans under a revolving line of credit (the "**Revolving Credit Facility**") in an aggregate amount not to exceed at any time outstanding the Revolving Credit Commitment; provided that the aggregate amount of Loans plus Letter of Credit Obligations under the Revolving Credit Facility outstanding at any one time shall not exceed the lesser of:

(i)    the Revolving Credit Commitment; and

(ii)    the sum of (a) 75% of the Eligible Receivables and (b) 60% of the Eligible Foreign Accounts, but in no event more than $750,000 with respect to the Loans against Eligible Foreign Accounts, all as determined on the basis of the

618938-06

17

most recent Borrowing Base Certificate (such amount referred to herein as the **"Borrowing Base"**).

During such period and subject to Section 3.2(C), the Revolving Credit Facility may be utilized by borrowing, repaying and reborrowing the Loans thereunder.

(B)    Term Loan. Lender agrees, on the terms and conditions hereinafter set forth, to make available for Borrower's use a term loan in the amount of the Term Loan Commitment (the **"Term Loan"**). Repayments and prepayments of the Term Loan shall not be subject to reborrowing.

**2.2    Evidence of Debt.** The Revolving Credit Facility and the Loans made by Lender to Borrower thereunder shall be evidenced by the Revolving Credit Note payable to the order of Lender, which note shall be in the form attached hereto as Exhibit C-1 in an amount equal to the Revolving Credit Commitment. The Term Loan and the Loan made by Lender to Borrower thereunder shall be evidenced by a Term Note payable to the order of Lender, which note shall be in the form attached hereto as Exhibit C-2 in an amount equal to the Term Loan Commitment.

**2.3    Loan Accounts; Amount and Maintenance of Loans; Interest Rate Not Determined.**

(A)    Loan Accounts. Lender shall record on its books and records the amount of each Loan made, the applicable interest rate, all payments of principal and interest thereon and the principal balance thereof from time to time outstanding, and such record shall, absent demonstrable error, be conclusive evidence of the amount of the Loans made by Lender to Borrower and the interest and payments thereon. Any failure to record or any error in doing so shall, however, not limit or otherwise affect the obligation of Borrower hereunder (and under any Note) to pay any amount owing with respect to the Loans.

(B)    Amount and Maintenance of Loans. The Loans under the Revolving Credit Facility may be made and maintained as (i) Prime Rate Loans, (ii) LIBOR Loans, or (iii) a combination of Prime Rate Loans and LIBOR Loans. The Term Loan may be made and maintained as (i) Prime Rate Loans, (ii) LIBOR Loans or (iii) a combination of Prime Rate Loans and LIBOR Loans. The aggregate principal amount of each LIBOR Loan, whether new, converted or continued, shall not be less than $100,000. More than one borrowing may occur on the same date; but at no time shall there be outstanding more than five (5) LIBOR Loans in the aggregate under the Revolving Credit Facility and two (2) LIBOR Loans in the aggregate under the Term Loan. The amount of any Loan is also subject to the limits contained in Section 2.1. No LIBOR Loan shall be made at any time a Default or Event of Default shall exist.

(C)    Inability to Determine Interest Rate. In the event, and on each occasion, that prior to the commencement of any Interest Period for a LIBOR Loan, Lender shall

618938-06

18

have determined in good faith (which determination shall be conclusive and binding upon Borrower) that currency deposits in the amount of such LIBOR Loan are not generally available in the London Interbank market, or that the rate at which such currency deposits are being offered will not adequately and fairly reflect the cost to Lender of maintaining the principal amount of such LIBOR Loan during such Interest Period, any request by Borrower for the making of, conversion to or continuation of a LIBOR Loan shall be deemed to be a request for a Prime Rate Loan. Lender shall use its reasonable efforts to notify Borrower of a change in the circumstances causing the LIBOR Loan to be unavailable but shall not incur any liability for any failure so to notify Borrower.

2.4    **Interest Rate.**    Borrower agrees to pay Lender interest on the outstanding principal balance of the Loans from time to time at a rate equal to (i) with respect to Prime Rate Loans, the Prime Rate and (ii) with respect to LIBOR Loans, the LIBOR Rate. The records of Lender as to the interest rate applicable to a particular advance shall be binding and conclusive absent manifest error. Interest shall be payable from the date of such advance of the Loan to the day of repayment of such advance. Interest shall be computed on the basis of a year of 360 days and actual days elapsed and shall be payable as provided in Section 3.2. Lender reserves the right to charge Borrower's account(s) for accrued interest on the applicable Interest Payment Date. In no contingency or event whatsoever shall the rate or amount of interest paid by Borrower under this Agreement or any of the Ancillary Agreements exceed the maximum amount permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable. In the event that such a court determines that Lender has received interest under this Agreement or under any Ancillary Agreement in excess of the maximum amount permitted by such law, (i) Lender shall apply such excess to any unpaid principal owed by Borrower first, under the Revolving Credit Facility and second under the Term Loan or, if the amount of such excess exceeds the unpaid balance of such principal on both the Revolving Credit Facility and the Term Loan, such Lender shall promptly refund such excess interest to Borrower and (ii) the provisions of this Agreement shall be deemed amended to provide for such permissible rate. All sums paid, or agreed to be paid, by Borrower which are, or to be may be construed to be, compensation for the use, forbearance or detention of money shall, to the extent permitted by applicable law, be amortized, prorated, spread and allocated throughout the term of all such Liabilities until the Liabilities are paid in full.

2.5    **Borrowing Procedures Under the Revolving Credit Facility.**    In order to effect a Loan under the Revolving Credit Facility, an authorized officer of Borrower shall give Lender irrevocable written notice (in form and substance acceptable to Lender) or irrevocable telephone notice (immediately confirmed by such written notice by facsimile) not later than 2:00 p.m., Chicago time, on (i) the proposed borrowing date in the case of Prime Rate Loans, and (ii) the second Business Day prior to the proposed borrowing date in the case of LIBOR Loans (the **"Notice of Borrowing"**). Each Notice of Borrowing shall specify the principal amount of the Loan to be made pursuant to such borrowing and the date of such borrowing (which shall be a Business Day), whether the Loans being made pursuant to such borrowing are to be maintained as Prime Rate Loans or LIBOR Loans and, if LIBOR Loans, the initial Interest Period to be applicable thereto. Not later than 2:30 p.m., Chicago time, on the date of a proposed borrowing,

and subject to receipt by Lender of the documents required under Section 2.11(B) with respect to such borrowing, if any are required, Lender shall pay over such funds to Borrower on the requested borrowing date. Borrower hereby authorizes Lender to extend advances and make Loans to Borrower based on written notice from an authorized officer of Borrower.

### 2.6 General Provisions.

(A)    One Loan.  All Loans and advances by Lender to Borrower under this Agreement and the Ancillary Agreements (whether made under the Revolving Credit Facility, the Term Loan or otherwise) shall constitute one loan and all indebtedness and obligations of Borrower to Lender under this Agreement and the Ancillary Agreements shall constitute one general obligation secured by the Collateral.

(B)    Events of Default.  Lender may, in its sole discretion, refrain from making any Loans or extensions of credit to Borrower under this Agreement or the Ancillary Agreements after the occurrence and during the continuation of a Default or after the occurrence and during the continuation of an Event of Default.

### 2.7 Conversion Options; Continuance.

(A)    Conversion Requirements.  Provided that no Default or Event of Default has occurred and is continuing and subject to the terms and conditions of this Agreement, Borrower may elect from time to time to convert a Prime Rate Loan, or any portion thereof, to a LIBOR Loan by giving Lender at least two (2) Business Days' prior irrevocable written notice of conversion, which notice must be in form and substance acceptable to Lender and received by Lender prior to 2:00 p.m. (Chicago time) (the **"Notice of Conversion"**). If the date on which a Prime Rate Loan is to be converted to a LIBOR Loan is not a Business Day, then such conversion shall be made on the next succeeding Business Day, and during the period from such date to such succeeding Business Day, such Prime Rate Loan shall bear interest as if it were a Prime Rate Loan. All or any part of outstanding borrowings may be converted as provided herein. Subject to the terms and conditions of this Agreement, Borrower may convert a LIBOR Loan into a Prime Rate Loan by Borrower giving Lender a Notice of Conversion not later than 2:00 p.m. (Chicago time) on the desired conversion date.

(B)    Continuance.  Any LIBOR Loan may be continued as such, in whole or in part, upon the expiration of an Interest Period with respect thereto if Borrower gives Lender irrevocable written notice of continuance which notice must be in form and substance acceptable to Lender and received by Lender prior to 2:00 p.m. (Chicago time), at least two (2) Business Days prior to the date of expiration of the Interest Period expiring with respect to the LIBOR Loan which is requested to be continued, specifying (i) the LIBOR Loan, or portion thereof, requested to be continued; (ii) the date of expiration of the Interest Period expiring with respect to the LIBOR Loan, or portion thereof, which is requested to be continued; and (iii) the length of the Interest Period with respect to such LIBOR Loan, or portion thereof, after the continuation thereof (the

"**Notice of Continuance**"); provided that no LIBOR Loans may be continued as such when any Default or Event of Default has occurred and is continuing, or less than 30 days before the Revolving Credit Termination Date, but shall be automatically converted to a Prime Rate Loan on the last day of the Interest Period for such Loan. If Borrower does not comply with the notice provisions of this clause (B), such LIBOR Loan shall be automatically converted to a Prime Rate Loan upon the expiration of the Interest Period with respect thereto.

(C)    Restatement of Representations and Warranties.    Any Notice of Conversion or Notice of Continuance delivered pursuant to this Section 2.7 shall be deemed to be a representation that all of the representations and warranties of Borrower contained in this Agreement shall then be true and correct as if made on such date, except to the extent that such representations and warranties expressly relate to an earlier date, and that no Default or Event of Default shall have occurred and be continuing.

## 2.8    Requirements of Law.

(A)    Increased Costs.    Notwithstanding any other provisions herein, in the event that the introduction of or any change in any law, rule, regulation, treaty or directive or in the interpretation or application thereof, or compliance by Lender with any request or directive (whether or not having the force of law) from any central bank or other governmental authority, agency or instrumentality or regulatory body:

(i)    subjects Lender to any tax or charge of any kind whatsoever with respect to this Agreement, the Notes, the Ancillary Agreements or the Loans made hereunder, or changes the basis of taxation of payments to Lender of principal, interest or any other amount payable hereunder (except for changes in the rate of tax imposed on the overall net income of Lender by the United States, any state or subdivision thereof);

(ii)    imposes, modifies, holds applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Lender (which is not otherwise included in the determination of the LIBOR Rate hereunder); or

(iii)    imposes on Lender or the London interbank market any other condition affecting this Agreement or the LIBOR Loans made by Lender;

and the result of any of the foregoing is to increase the cost to Lender of agreeing to make, making, continuing or maintaining or participating in LIBOR Loans, or to reduce any amount receivable thereunder or to increase the withholding taxes payable then, in any such case, Borrower agrees to pay Lender, within thirty (30) days after written demand by Lender, any additional amounts necessary to compensate Lender on an after-tax basis for such additional cost or reduced amount receivable or increased withholding

618938-06

21

taxes payable which Lender deems to be material as determined by Lender with respect to this Agreement, the Notes, the other Ancillary Agreements or the Loans made hereunder.

(B)    Capital Adequacy.    In the event that Lender shall have determined that the adoption of any law, rule, regulation, treaty or guideline regarding capital adequacy, or any change in any of the foregoing or in the interpretation or application of any of the foregoing or compliance by Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any central bank or other governmental authority, agency or instrumentality or regulatory body, does or shall have the effect of reducing the rate of return on Lender's or its parent's capital as a consequence of its obligations under this Agreement to a level below that which Lender or its parent could have achieved but for such adoption, change, or compliance (taking into consideration Lender's or its parent's policies with respect to capital adequacy) by an amount deemed by Lender to be material, then from time to time, after submission by Lender to Borrower of a written request therefor, Borrower agrees to pay to Lender, within thirty (30) days after its written demand, such additional amount or amounts as will compensate Lender or its parent on an after-tax basis for such reduction.

(C)    Certificate for Claim.    If Lender or its parent becomes entitled to claim any additional amounts pursuant to this Section 2.8, it shall promptly notify Borrower of the event by reason of which it has become so entitled. A certificate setting forth in reasonable detail any additional amounts payable pursuant to the foregoing sentence submitted by Lender or its parent shall be conclusive and binding on Borrower in the absence of manifest error. The provisions of this Section 2.8 shall survive the repayment of the Loans and the termination of this Agreement.

(D)    No Waiver.    Failure on the part of Lender or its parent to demand compensation for any increased costs or reduction in amounts received or receivable or reduction in return on capital with respect to any period shall not constitute a waiver of such party's right to demand compensation with respect to such period or any other period. The protection of this Section 2.8 shall be available to such party regardless of any possible contention of the invalidity or inapplicability of the law, rule, regulation, guideline or other change or condition which shall have occurred or been imposed; provided that if such party shall have recouped any amount therefore paid to it by Borrower under this Section 2.8, Lender shall pay to Borrower an amount equal to the net recoupment so received by such party, as determined in good faith by such party.

2.9    Illegality.    Notwithstanding any other provisions herein, if any law, rule, regulation, treaty or directive or any change therein or in the interpretation or application thereof, shall make it unlawful for Lender to maintain LIBOR Loans as contemplated by this Agreement, the agreement of Lender to make or maintain LIBOR Loans shall terminate and all outstanding LIBOR Loans shall be converted automatically to Prime Rate Loans, on the last day of the then current Interest Period or within such earlier period as required by law.

618938-06

22

**2.10   Indemnity.** Borrower agrees to indemnify and to hold Lender harmless from any cost, loss or expense which Lender may sustain or incur as a consequence of (i) Borrower making a payment or prepayment of principal or interest on any LIBOR Loan (including, without limitation, through a conversion to the same or a different type of Loan or pursuant to Sections 2.3(C) and 2.9 above) on a day which is not the last day of an Interest Period with respect thereto (other than interest paid on the last day of a three month interval in respect of a LIBOR Loan having an Interest Period longer than three months), (ii) any failure by Borrower to borrow or convert any Loan hereunder after a Notice of Borrowing or Notice of Conversion has been given (in the case of LIBOR Loans), (iii) default by Borrower in making any prepayment after Borrower have given a notice of prepayment and (iv) any acceleration of the maturity of the Loans in accordance with the terms of this Agreement, including, but not limited to, any such cost, loss or expense arising in liquidating the Loans and from interest or fees payable by Lender of funds obtained by it in order to maintain the Loans hereunder. The provisions of this Section 2.10 shall survive the repayment of the Loans and the termination of this Agreement.

**2.11   Conditions Precedent.** The obligations of Lender to make Loans hereunder is subject to the following conditions precedent:

(A)   **Initial Loan.** On or prior to the date of the disbursement of the initial Loans (hereinafter called the **"Closing"**), Borrower shall have delivered or caused to be delivered to Lender, each in form and substance satisfactory to Lender, the following:

(i)   The Notes, which shall be duly executed by Borrower;

(ii)   Certified (as of the date of the Closing) copies of resolutions of Borrower authorizing the execution, delivery and performance of this Agreement, the Notes, and each other document to be delivered pursuant hereto;

(iii)   A certificate (dated the date of the Closing) of Borrower's corporate secretary as to the incumbency and signatures of the officers of Borrower signing this Agreement, the Notes, and each other document to be delivered by Borrower pursuant to this Agreement.

(iv)   A copy of Borrower's articles of incorporation and by-laws, together with a certificate (dated the date of the Closing) of Borrower's corporate secretary to the effect that such articles and by-laws have not been amended since the date each document became effective;

(v)   Certificates, as of the most recent dates practicable, of the Secretary of State of Borrower's the State of Delaware and the Secretary of State of each state in which Borrower is qualified as a foreign corporation, or in which it intends to do business following the receipt of proceeds of the Loans, as to the good standing of Borrower;

618938-06

23

(vi)    Financing statements regarding all Collateral, and filed in any and all offices and jurisdictions deemed appropriate by Lender in Lender's sole discretion;

(vii)    Uniform Commercial Code, tax lien, bankruptcy and judgment searches concerning Holding, Borrower and its Subsidiaries from all offices and jurisdictions deemed appropriate by Lender in Lender's sole discretion, showing no other filing of record with respect to the Collateral granted hereunder other than any financing statement filed by Lender;

(viii)    Evidence of insurance in the form set forth in Section 7.6 or otherwise acceptable to Lender, together with a loss payable endorsement respecting Borrower's casualty insurance in the form acceptable to Lender;

(ix)    A Holding Guaranty (the **"Holding Guaranty"**) duly executed by Holding, in the form of Exhibit D attached hereto;

(x)    A Holding Pledge Agreement (the **"Holding Pledge Agreement"**) duly executed by Holding, in the form of Exhibit E attached hereto

(xi)    A Mexico Pledge Agreement (the **"Mexico Pledge Agreement"**) duly executed by Borrower, in the form of Exhibit F attached hereto;

(xii)    A Patent Security Agreement (the **"Patent Security Agreement"**) duly executed by Borrower, in the form of Exhibit G attached hereto;

(xiii)    A Trademark Security Agreement (the **"Trademark Security Agreement"**) duly executed by Borrower, in the form of Exhibit H attached hereto;

(xiv)    A duly and fully executed Landlord Wavier with respect to each Eligible Collateral Location which is subject to a lease, in the form of Exhibit I attached hereto;

(xv)    An opinion of counsel to Borrower in the form of Exhibit J attached hereto;

(xvi)    An opinion of Mexican counsel to Borrower and Comair Mexico in the form of Exhibit K attached hereto;

(xvii)    A Subordination Agreement (the **"Subordination Agreement"**) duly executed by Borrower and Holding in the form of Exhibit L attached hereto;

(xviii)    A duly executed and complete copy of a pay-off letter from Bank of America;

618938-06

24

(xix)   Payment of the Closing Fee;

(xxi)   An authorization to pay proceeds letter executed by Borrower in a form acceptable to Lender;

(xvii)   Such other documents as Lender shall reasonably determine to be necessary or desirable.

(B)   _Additional Advances._   At the time of (1) the Closing and (2) of each disbursement under the Revolving Credit Facility after the Closing:

(i)   Borrower must be in full compliance with all of the terms and conditions of this Agreement and the Ancillary Agreements, and no Default or Event of Default shall have occurred and be continuing;

(ii)   No material adverse change shall have occurred in the business, assets, operations, financial or other condition of Borrower or in Borrower's ability to repay the Loans since the date of this Agreement or since the Closing, as applicable;

(iii)   Borrower shall have good and marketable title to and ownership of the Collateral.   The Collateral shall be free from any security interest, Lien or encumbrance except the Permitted Liens and no financing statement concerning the Collateral, excepting any filed on behalf of Lender and those listed on Schedule 1.1.4, is on file in any public office;

(iv)   Each of the representations and warranties set forth in Section 6 shall be true and correct as of such time; and

(v)   After giving effect to the requested advance, the aggregate principal amount of all Loans outstanding under the Revolving Credit Facility shall not exceed the then current Availability.

**2.12   Letters of Credit.**

(A)   _Issuance of Letters of Credit._

(i)   From and after the date hereof, Lender agrees, upon the terms and conditions set forth in this Agreement, to issue at the request and for the account of Borrower, one or more Letters of Credit; provided that Lender shall not be under any obligation to issue, and shall not issue, any Letter of Credit if (a) any order, judgment or decree of any governmental authority with jurisdiction over Lender shall purport by its terms to enjoin or restrain Lender from issuing such Letter of Credit, or any law or governmental rule, regulation, policy, guideline or

directive from any governmental authority with jurisdiction over Lender shall prohibit, or request that Lender refrain from, the issuance of Letters of Credit in particular or shall impose upon Lender with respect to any Letter of Credit any restriction or reserve or capital requirement (for which Lender is not otherwise compensated) or any unreimbursed loss, cost, or expense which was not applicable, in effect and known to Lender as of the date of this Agreement and which Lender in good faith deems material to it (Lender shall notify Borrower of any event which, in the judgment of Lender, would preclude the issuance of a Letter of Credit pursuant to this clause); (b) one or more of the conditions to such issuance contained in Section 2.11 is not then satisfied; or (c) after giving effect to such issuance, the aggregate outstanding amount of the Letter of Credit Obligations would exceed the Letter of Credit Sublimit.

(ii)    In no event shall: (a) the sum at any time of (1) the aggregate principal balance of all outstanding Loans issued pursuant to the Revolving Credit Facility **plus** (2) the aggregate amount of Letter of Credit Obligations, exceed the then current Availability; or (b) the expiration date of any Letter of Credit (including, without limitation, Letters of Credit issued with an automatic "evergreen" provision providing for renewal absent advance notice by Borrower or Lender), or the date for payment of any draft presented thereunder and accepted by Lender, be later than the Letter of Credit Expiry Date.

(B)    <u>Letter of Credit Reimbursement Obligations</u>.

(i) Borrower agrees to pay to Lender on each date that any amount is drawn under any Letter of Credit a sum (and interest on such sum as provided in Section 2.12(B)(ii) below) equal to the amount so drawn plus all other charges and expenses with respect thereto or as provided in the applicable Reimbursement Agreement. Unless other arrangements satisfactory to Lender in its sole discretion have been made by Borrower, Borrower agrees to pay to Lender the amount of all Reimbursement Obligations owing in respect of any Letter of Credit immediately when due, under all circumstances, including, without limitation, under any of the following circumstances: (a) any lack of validity or enforceability of this Agreement or any Ancillary Agreements executed pursuant hereto; (b) the existence of any claim, set-off, defense or other right which Borrower may have at any time against a beneficiary named in a Letter of Credit, any transferee of any Letter of Credit (or any Person for whom any such transferee may be acting), Lender or any other Person, whether in connection with this Agreement, any Letter of Credit, the transactions contemplated herein or any unrelated transactions (including any underlying transaction between Borrower and the beneficiary named in any Letter of Credit); (c) the validity, sufficiency or genuineness of any document which Lender has determined in good faith complies on its face with the terms of the applicable Letter of Credit, even if such document should later prove to have been forged, fraudulent, invalid or insufficient in any respect or any statement therein shall

have been untrue or inaccurate in any respect; or (d) the surrender or material impairment of any security for the performance or observance of any of the terms hereof.

(ii)    Notwithstanding any provisions to the contrary in any Reimbursement Agreement, Borrower agrees to reimburse Lender for amounts which Lender pays under such Letter of Credit no later than the time specified in this Agreement. If Borrower does not pay any such Reimbursement Obligations when due, Borrower shall be deemed to have immediately requested that Lender make a Prime Rate Loan under the Revolving Credit Facility provided by this Agreement in a principal amount equal to such unreimbursed Reimbursement Obligations. The proceeds of such Loans shall be applied to the account of Borrower in satisfaction of such unreimbursed Reimbursement Obligations, which shall thereupon be deemed satisfied by the proceeds of, and replaced by, such Prime Rate Loan.

(C)    <u>Procedure for Issuance</u>. Prior to the issuance of each Letter of Credit, and as a condition of such issuance, Borrower shall deliver to Lender such documents or items as may be required pursuant to the terms hereof, and the proposed form and content of such Letter of Credit shall be satisfactory to Lender. Each Letter of Credit shall be issued in the ordinary course of Lender's business but in no event earlier than two (2) Business Days after delivery of the foregoing documents, which delivery may be by Borrower to Lender by facsimile transmission, telex or other electronic means followed by delivery of executed originals within five days thereafter. The documents so delivered shall be in compliance with the requirements set forth in Section 2.12(A), and shall specify therein (i) the stated amount of the Letter of Credit requested, (ii) the effective date of issuance of such requested Letter of Credit, which shall be a Business Day, (iii) the date on which such requested Letter of Credit is to expire, (iv) the entity for whose benefit the requested Letter of Credit is to be issued and (v) the aggregate amount of Letter of Credit Obligations which are outstanding and which will be outstanding after giving effect to the requested Letter of Credit issuance. The delivery of the foregoing documents and information shall constitute an **"Issuance Request"** for purposes of this Agreement. Subject to the terms and conditions of Section 2.12(A) and provided that the applicable conditions set forth in Section 2.11 have been satisfied, Lender shall, on the requested date, issue a Letter of Credit on behalf of Borrower in accordance with Lender's usual and customary business practices. In addition, any amendment of an existing Letter of Credit shall be deemed to be an issuance of a new Letter of Credit and shall be subject to the requirements set forth above, and the existing Letter of Credit so amended shall expire on the effective date of such amendment.

(D)    <u>Nature of Lender's Obligations</u>.

(i)    As between Borrower and Lender, Borrower assumes all risks of the acts and omissions of, or misuse of the Letters of Credit by, the respective beneficiaries of the Letters of Credit. In furtherance and not in limitation of the

foregoing, Lender shall not be responsible for (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for an issuance of a Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged; (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) the failure of the beneficiary of a Letter of Credit to comply fully with conditions required to be satisfied by any Person other than Lender in order to draw upon such Letter of Credit (other than a failure to satisfy documentary conditions to drawing where payment of the Letter of Credit despite such failure would constitute gross negligence or willful misconduct of Lender); (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, telegraph, facsimile transmission, telex or otherwise; (v) the misapplication by the beneficiary of a Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (vi) any consequences arising from causes beyond control of Lender.

(ii)    In furtherance and extension and not in limitation of the specific provisions hereinabove set forth (including in Section 2.12(C)), any action taken or omitted by Lender under or in connection with the Letters of Credit or any related certificates, if taken or omitted in good faith, shall not put Lender under any resulting liability to Borrower or relieve Borrower of any of its obligations hereunder to Lender.

(E)    <u>Compensation for Letters of Credit</u>.  Borrower shall pay to Lender, on the last day of each fiscal quarter of each fiscal year of Borrower, in arrears, all letter of credit fees (the **"Letter of Credit Fees"**) due under any Reimbursement Agreement and any processing, issuance, amendment or other similar fees customarily charged in connection with Letters of Credit, together with Lender's out-of-pocket costs of issuing and servicing Letters of Credit.

3.    **PAYMENTS.**

3.1    **Making of Payments.**

(A)    All payments and prepayments of principal of, or interest on, the Notes shall be made by Borrower to Lender in immediately available funds for the account of Lender. All such payments shall be made to Lender at its office in Chicago, not later than 2:00 p.m. Chicago time, on the date due, and funds received after that hour shall be deemed to have been received by Lender on the next following Business Day.

(B)    Unless Borrower notifies Lender prior to the date on which it is scheduled to make payment to Lender of a payment of principal, interest or fees to Lender for the

account of Lender, that Borrower do not intend to make such payment, Lender may assume that such payment has been made.

**3.2    Payment Terms.**

(A)    <u>General</u>.  All of the Liabilities shall be paid to Lender at the address set forth in Section 9.10.  Subject to the remainder of this Section 3.2 and Section 8.2, the Liabilities will be payable as follows:

(i)    accrued interest shall be payable in arrears on the applicable Interest Payment Date;

(ii)    fees, costs, expenses and similar charges shall be payable as and when provided for in this Agreement or the Ancillary Agreements;

(iii)    the then outstanding principal balance of the Revolving Credit Facility shall be payable in full on the Revolving Credit Termination Date; and

(iv)    the then outstanding principal balance of the Term Loan shall be payable in full on the Term Loan Maturity Date.

Except as otherwise set forth herein, Borrower may prepay all or any portion of the Loans upon notice from Borrower to Lender at least two (2) days before the date of prepayment, without penalty or premium, except Borrower must reimburse Lender for any costs associated with the repayment of any LIBOR Loan prior to the termination of the applicable Interest Period, at any time and from time to time; provided that all prepayments of principal shall include interest accrued to the date of prepayment on the principal amount being prepaid.  After maturity (whether upon acceleration or otherwise) of any Liabilities, accrued interest on such Liabilities shall be payable upon demand.

(B)    <u>Scheduled Reductions of Term Loan</u>.  The Term Loan shall be payable in quarterly principal installments on the first Business Day of each of Borrower's fiscal quarters, commencing on July 1, 2004, such that the outstanding unpaid principal balance of the Term Loan shall amortize in twenty (20) equal quarterly installments of principal in the amount of $350,000.00.  The principal amount of the Term Loan outstanding, and all accrued and unpaid interest with respect to the Term Loan, shall be due and payable on the Term Loan Maturity Date.

(C)    <u>Mandatory Prepayment of Revolving Credit Facility</u>.  Borrower shall not permit the aggregate principal amount of Loans plus Letter of Credit Obligations outstanding under the Revolving Credit Facility at any time to exceed the then current Availability.  Borrower agrees to make such payments to Lender on such outstanding Loans which are necessary to cure any such excess within one (1) Business Day after the occurrence thereof.  Lender shall be under no obligation to make Loans under the Revolving Credit Facility during the period that any such excess exists or would result

618938-06

29

from making a Loan.  Any amount repaid under this Section 3.2(C) may, subject to the terms and conditions of this Agreement, be borrowed, repaid and borrowed again.

### 3.3    Lockbox; Collection of Accounts and Payments.

(A)    Lockbox.  Borrower shall maintain an account as a lockbox in Borrower's name with Lender, upon such terms as are required by Lender, to which Borrower will cause all Account Debtors to send all remittances on Accounts.  If received directly by Borrower, Borrower will immediately deposit in such account all remittances and proceeds of the Collateral in the identical form in which such payment was made, whether by cash or check.  Borrower agrees that upon the occurrence and during the continuation of a Default or an Event of Default, all payments made to such account or otherwise received by Lender, whether on the Accounts or as proceeds of other Collateral or otherwise, will be the sole and exclusive property of Lender and will be applied on account of the Liabilities.  So long as no Default or an Event of Default shall have occurred and be continuing, Borrower shall be entitled to direct the use of the funds maintained in such account in accordance with the terms of this Agreement.  Borrower, its Subsidiaries and any Affiliates, shareholders, directors, officers, employees, agents of Borrower and its Subsidiaries and all Persons acting for or in concert with Borrower shall, acting as trustee for Lender, receive, as the sole and exclusive property of Lender, any monies, checks, notes, drafts or any other payments relating to or proceeds of Accounts or other Collateral which come into their possession or under their control and immediately upon receipt, shall remit the same or cause the same to be remitted, in kind, to Lender at Lender's address set forth in Section 9.10.  Borrower agrees to pay to Lender any and all fees, costs and expenses (if any) which Lender incurs in connection with maintaining the special account and depositing for collection by Lender any check or item of payment received or delivered to Lender on account of the Liabilities.

(B)    Limitation of Liability.

(i)    Lender shall have no liability to Borrower other than that imposed upon it by law for its failure to exercise ordinary care with respect to the lockbox established hereunder.  Establishment of and substantial compliance with the procedures set forth herein or in other documents related to the lockbox by Lender shall be deemed to constitute the exercise of ordinary care.  A mere inadvertence or honest mistake of judgment will not constitute a failure to exercise ordinary care, and in no case will be deemed wrongful.  Lender shall not be liable for consequential, indirect or special damages, even if it has been advised of the possibility that they exist.  Lender shall have no liability for mail not bearing a complete and proper address.

(ii)    Lender shall not be liable for failure to perform any services under this Agreement within the time provided therefore in the event and to the extent that such failure arises out of war, civil commotion, an act of God, accident, interruption of power supplies or other utility or service, strikes or lockouts,

618938-06

30

delay in transportation, legislative action, government regulations or interferences, or any other event beyond Lender's control.

(iii)    In the event Lender becomes involved in controversies or litigation with any third party or parties involving or relating to the services provided for herein to Borrower, Borrower agrees to indemnify Lender against any claims, costs, damages and liabilities, including reasonable attorneys' fees and court costs incurred by or asserted against Lender to or by such third party or parties, excluding claims, costs, damages and liabilities resulting from Lender's gross negligence or willful misconduct. This indemnity shall survive the termination of this Agreement.

**3.4    Application of Payments and Collections.** Subject to the rights of Borrower to direct funds under Section 3.3(A), Borrower irrevocably waives the right to direct the application of payments and collections received by Lender from or on behalf of Borrower, and Borrower agrees that Lender shall have the continuing exclusive right to apply and reapply any and all such payments and collections against the Liabilities in such manner as Lender may deem appropriate, notwithstanding any entry by Lender upon any of its books and records. To the extent that Borrower makes a payment or payments to Lender or Lender receives any payment or proceeds of the Collateral for Borrower's benefit, which payment(s) or proceeds are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy act, state or federal law, common law or equitable cause, then to the extent of such payment or proceeds received, the Liabilities intended to be satisfied shall be revived and shall continue in full force and effect, as if such payments or proceeds had not been received by Lender. Interest shall be payable out of the first collections received with respect to any proceeds of Collateral.

**3.5    Records.** All advances to Borrower, and all other debits and credits provided for in this Agreement, shall be evidenced by entries made by Lender in its internal data control systems showing the date, amount and reason for each such debit or credit.

**3.6    Unused Line Fee.** Borrower shall pay to Lender, on the last day of each fiscal quarter of Borrower, in arrears, an unused line fee (the **"Unused Line Fee"**) with respect to an amount equal to the Revolving Credit Commitment minus the average principal balance of all Loans outstanding under the Revolving Credit Facility during such quarter then elapsed, at an annual rate of interest equal to the Applicable Margin. For purposes of calculating the Unused Line Fee, interest shall be computed on the basis of a year of 360 days and actual days elapsed.

**4.    COLLATERAL; GENERAL TERMS.**

**4.1    Security Interest.** To secure the prompt payment to each Lender of the Liabilities and the obligations under the Swap Documents, Borrower grants to Lender, for the benefit of Lender, a continuing security interest in and to all of Borrower's Property including the following Property and interest in Property of Borrower, whether now owned or existing or to be acquired or arising and wherever located: (i) all Accounts, Inventory, Equipment, General

618938-06

31

Intangibles, tax refunds, chattel paper, instruments, letters of credit, investment property, including, without limitation, stocks, bonds, interests in limited liability companies, partnership interests, securities, certificates of deposit, mutual fund shares, securities entitlements, including, without limitation, all of Borrower's rights to any securities account, any free credit balance or other money owing by any securities intermediary with respect to such account, all securities and commodities held by Lender or any of its affiliates, all commodity contracts held by Borrower and all commodity accounts held by Borrower, documents and documents of title evidencing or issued with respect to any of the foregoing; (ii) all of Borrower's deposit accounts (general or special) with and credits and other claims against Lender; (iii) all of Borrower's now owned or to be acquired monies; and any and all other property of Borrower now or to be coming into the actual possession, custody or control of Lender or its affiliates in any way or for any purpose (whether for safekeeping, deposit, custody, pledge, transmission, collection or otherwise); (iv) all insurance proceeds of or relating to any of the foregoing; (v) all of Borrower's books and records, including without limitation customer lists, credit files, computer programs, printouts and other materials, relating to any of the foregoing; and (vi) all accessions and additions to, substitutions for, and replacements, products and proceeds of any of the foregoing.

    **4.2**    <u>Disclosure of Security Interest</u>.  Borrower shall make appropriate entries upon its financial statements and books and records disclosing Lender's security interest in the Collateral of Borrower.

    **4.3**    <u>Special Collateral</u>.  Immediately upon receipt by Borrower of any Collateral that is evidenced or secured by an agreement, chattel paper, instrument or document, including, without limitation, promissory notes, documents of title and warehouse receipts (the **"Special Collateral"**), Borrower shall deliver the original thereof to Lender or to such agent of Lender as Lender shall designate, together with appropriate endorsements, or other specific evidence (in form and substance acceptable to Lender) of assignment thereof to Lender.

    **4.4**    <u>Further Assurances</u>.  Borrower hereby irrevocably authorizes Lender at any time, and from time to time, to file in any jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the Uniform Commercial Code of the jurisdiction wherein such financing statement or amendment is filed, or (ii) as being of an equal or lesser scope or within greater detail, and (b) contain any other information required by Section 5 of Article 9 of the Uniform Commercial Code of the jurisdiction wherein such financing statement or amendment is filed regarding the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether Borrower is an organization, the type of organization and any organization identification number issued to Borrower and (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates.  Borrower agrees to furnish any such information to Lender promptly upon request.  Borrower further ratifies and affirms its authorization for any financing statements and/or amendments thereto, previously

618938-06

filed by Lender in any jurisdiction, provided that such documents conform to the agreement between Borrower and Lender in effect at the time of such filing.

**4.5    Inspection.**    Borrower agrees to permit Lender and its duly authorized representatives and agents, upon prior written notice, during normal business hours, to visit and inspect any of the Collateral of Borrower, the corporate books of Borrower and the financial records of Borrower, to examine and make copies of the books of accounts and other financial records of Borrower, and to discuss the affairs, finances and accounts of Borrower with, and to be advised as to the same by, its officers, employees and independent public accountants (and by this provision Borrower hereby authorizes such accountants to discuss with Lender the finances and affairs of Borrower); provided that after the occurrence of and during the continuance of an Event of Default, such inspections may occur during normal business hours without notice and at such times and intervals as Lender may designate.

**4.6    Location of Collateral.**    Borrower's chief executive office, principal places of business and all other offices and locations of the Collateral and books and records related thereto (including, without limitation, computer programs, printouts and other computer materials and records concerning the Collateral) are set forth on Schedule 4.6. Borrower shall not remove its books and records or the Collateral from any Eligible Collateral Location (except to another Eligible Collateral Location and except for removal of items of Inventory upon sale in accordance with Section 5.6) and shall not change the location of its chief executive office, open any new offices or relocate any of its books and records or the Collateral except within the continental United States of America with at least thirty (30) days' prior written notice thereof to Lender.

**4.7    Lender's Payment of Claims Asserted Against Borrower.**    Lender may, but shall not be obligated to, at any time or times, in its sole discretion, and without waiving any Event of Default or waiving or releasing any obligation, liability or duty of Borrower under this Agreement, the Ancillary Agreements or the Swap Documents, pay, acquire or accept an assignment of any security interest, Lien, claim or other encumbrance asserted by any Person against the Collateral. All sums paid by Lender under this Section 4.7, including all costs, fees (including without limitation reasonable attorney's and paralegals' fees and court costs), expenses and other charges relating thereto, shall be payable by Borrower to Lender on demand and shall be additional Liabilities secured by the Collateral.

**4.8    Letter of Credit Rights.**    If Borrower at any time is a beneficiary under a letter of credit now or hereafter issued in favor of Borrower and (y) Borrower requests that Lender include such rights as Eligible Receivables for purposes of the calculation of the Borrowing Base or (z) an Event of Default has occurred and is continuing, Borrower shall promptly notify Lender thereof and, at the request and option of Lender, Borrower shall, pursuant to an agreement in form and substance satisfactory to Lender, either (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Lender of the proceeds of any drawing under the letter of credit or (ii) arrange for Lender to become the transferee beneficiary of the letter of credit, with Lender agreeing, in each case, that the proceeds of any drawing under the letter of credit are to be applied as provided in this Agreement.

618938-06

33

**4.9.    Commercial Tort Claims.**  If Borrower shall at any time hold or acquire a Commercial Tort Claim, Borrower shall immediately notify Lender in writing signed by Borrower of the details thereof and grant to Lender in such writing a security interest therein and a security interest in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to Lender.

**4.10    Electronic Chattel Paper and Transferable Records.**  If Borrower at any time holds or acquires an interest in any electronic chattel paper or any "transferable record," as that term is defined in Section 201 of the federal Electronic Signatures in Global and National Commerce Act, or in §16 of the Uniform Electronic Transactions Act as in effect in any relevant jurisdiction, Borrower shall promptly notify Lender thereof and, at the request of Lender, shall take such action as Lender may reasonably request to vest in Lender control under Section 9-105 of the UCC of such electronic chattel paper or control under Section 201 of the federal Electronic Signatures in Global and National Commerce Act or, as the case may be, §16 of the Uniform Electronic Transactions Act, as so in effect in such jurisdiction, of such transferable record.  Lender agrees with Borrower that Lender will arrange, pursuant to procedures reasonably satisfactory to Lender and so long as such procedures will not result in Lender's loss of control, for Borrower to make alterations to the electronic chattel paper or transferable record permitted under Section 9-105 of the UCC or, as the case may be, Section 201 of the federal Electronic Signatures in Global and National Commerce Act or §16 of the Uniform Electronic Transactions Act for a party in control to make without loss of control, unless an Event of Default has occurred and is continuing or would occur after taking into account any action by Borrower with respect to such electronic chattel paper or transferable record.

## 5.    COLLATERAL; ACCOUNTS AND COLLATERAL MAINTENANCE.

**5.1    Verification of Accounts.**  Any of Lender's officers, employees or agents shall have the right, at any time or times following the occurrence and during the continuation of a Default or an Event of Default, in Lender's or Borrower's name or in the name of a firm of independent certified public accountants acceptable to Lender, during normal business hours, to verify the validity, amount or any other matters relating to any Accounts and Inventory by mail, telephone, telecopy or otherwise.

**5.2    Records of Accounts.**  Borrower shall keep accurate and complete records of its Accounts.  Borrower shall deliver to Lender, upon demand, a copy of (and after the occurrence of and during the continuance of an Event of Default, the original of) all documents relating to the Accounts and such other matters and information relating to the status of then existing Accounts as Lender shall reasonably request.

**5.3    Notice Regarding Disputed Accounts.**  Borrower shall give Lender prompt notice of any dispute in excess of $25,000 in respect of any Account.  Each such notice shall identify any such disputed Account and disclose with respect thereto, in reasonable detail, the reason for the dispute, all claims related thereto and the amount in controversy.

**5.4    Sale or Encumbrance of Accounts.** Borrower or any of its Subsidiaries shall not, without the prior written c onsent o f L ender, s ell, t ransfer, g rant a s ecurity i nterest i n o r otherwise dispose of or encumber any of its Accounts to any Person other than Lender, except for the Permitted Liens.

**5.5    Equipment.** Borrower shall keep and maintain in good operating condition (normal wear and tear excepted), and repair and make all necessary replacements and renewals to, the Equipment so that the value and operating efficiency shall at all times be maintained and preserved in Borrower's normal course of business. Borrower shall keep such Collateral only at an Eligible Collateral Location.

**5.6    Notice of Loss; Prohibition on Sale or Disposition.** Borrower shall immediately notify Lender of any material loss or depreciation in value of the Collateral. Borrower shall not sell, transfer or otherwise dispose of any Collateral; provided that until notice is given by Lender to Borrower, Borrower may (i) sell Inventory in the ordinary course of business substantially in the same manner as now conducted, (ii) dispose of worn-out or obsolete Equipment and (iii) dispose of other assets up to an aggregate value of $100,000 but a sale in the ordinary course of business shall not include any transfer or sale in satisfaction, partial or complete, of a debt owed by Borrower.

**6.    WARRANTIES AND REPRESENTATIONS.**

**6.1    General Warranties and Representations.** Borrower warrants and represents to Lender that:

(A)    Borrower is a corporation duly organized, v alidly e xisting a nd i n g ood standing under the laws of the State of Delaware and its state issued organizational identification number is 2094201. Borrower is qualified or licensed as a foreign corporation to do business in all other states in which the laws thereof require Borrower to be so qualified or licensed;

(B)    Borrower has not used, during the five (5) year period preceding the date of this Agreement, and on the date hereof does not intend to use, any other corporate or fictitious name, except as disclosed in Schedule 6.1(B);

(C)    Borrower has the right and power and is duly authorized and empowered to enter into, execute, deliver and perform this Agreement, the Ancillary Agreements and the Swap Documents;

(D)    The execution, delivery and performance by Borrower of this Agreement, the Ancillary Agreements and the Swap Documents shall not, by its execution or performance, the lapse of time, the giving of notice or otherwise, constitute a violation of or conflict with any applicable law, rule, regulation, judgment, order or decree applicable to Borrower or its assets or constitute a breach of, or conflict with, any provision contained in Borrower's certificate of incorporation or by-laws or contained in any

618938-06

35

material agreement, instrument, indenture or other document to which Borrower is now a party or by which it or any of its property is bound;

(E)     Borrower's use of the proceeds of any advances made by Lender hereunder are, and will continue to be, legal and proper corporate uses (duly authorized by its board of directors, in accordance with any applicable law, rule or regulation) and such uses are consistent with all applicable laws, rules and regulations, as in effect as of the date hereof;

(F)     Borrower has, and is current and in good standing with respect to, all material governmental approvals, permits, certificates, inspections, consents and franchises necessary to conduct and to continue to conduct its business and its intended business and to own or lease and operate its properties as now owned or leased and operated by it;

(G)     None of such approvals, permits, certificates, consents or franchises contains any term, provision, condition or limitation more burdensome than such as are generally applicable to Persons engaged in the same or similar business as Borrower;

(H)     Borrower now has capital sufficient to carry on its business and transactions and all businesses and transactions in which it is about to engage and is now able to pay its debts as they mature and Borrower now owns property the fair saleable value of which is greater than the amount required to pay Borrower's debts;

(I)     Except as disclosed in Schedule 6.1(I), (i) there is no litigation, suit, action, proceeding, inquiry or investigation pending or, to the best of Borrower's knowledge, threatened against Borrower which if unfavorably determined would materially adversely affect the transactions contemplated hereby, or Borrower's property, assets, operations or condition (financial or otherwise) and (ii) Borrower has no Indebtedness and has not guaranteed the obligations of any other Person (except for Permitted Debt);

(J)     Except as disclosed on Schedule 6.1(J), (i) there are no strikes, work stoppages, labor disputes, decertification petitions, union organizing efforts, grievances or other claims pending or, threatened in writing, between Borrower and any of its employees, other than employee grievances arising in the ordinary course of business which, in the aggregate, would not have a material adverse effect on Borrower, (ii) Borrower has no obligation under any collective bargaining agreement or any employment agreement, (iii) there is no organizing activity pending or threatened in writing by any labor union or group of employees, (iv) there are no representation proceedings pending or threatened with the National Labor Relations Board or other applicable governmental authority, and no labor organization or group of employees has made a pending demand for recognition and (v) there are no material complaints or charges pending or threatened to be filed with any governmental authority or arbitrator based on, arising out of, in connection with or otherwise relating to the employment or

618938-06

36

termination of employment by Borrower of any individual or group of individuals which, if decided adversely to Borrower, would have a material adverse effect on Borrower;

(K)    Borrower has good, indefeasible and merchantable title to and ownership of its Collateral, free and clear of all Liens, claims, security interests and other encumbrances, except those of Lender and Permitted Liens;

(L)    Borrower is not in violation of any applicable statute, rule, regulation or ordinance of any governmental entity, including, without limitation, the United States of America, any state, city, town, municipality, county or of any other jurisdiction, or of any agency thereof, in any respect materially and adversely affecting the Collateral or Borrower's business, property, assets, operations or condition, financial or other;

(M)    Borrower is not in default under any indenture, loan agreement, mortgage, lease, trust deed, deed of trust or other similar agreement relating to the borrowing of monies to which it is a party or by which it or any of its property is bound;

(N)    The Financials fairly present in all material respects the assets, liabilities and financial condition and results of operations of Borrower and such other Persons as are described therein as of the stated dates; there are no omissions or other facts or circumstances which are or may be material and there (i) has been no material and adverse change in the assets, liabilities or financial or other condition of Borrower or any such Person since the date of the Financials and (ii) exists no equity or long term investments in or outstanding advances to any Person not reflected in the Financials;

(O)    Neither Borrower nor any Subsidiary has received a notice to the effect that it is not in full compliance with any of the requirements of ERISA and the regulations promulgated thereunder and, to the best of its knowledge, there exists no event described in Section 4043 of ERISA, excluding subsections 4043(b)(2) and 4043(b)(3) ("**Reportable Event**");

(P)    Borrower has filed all federal, state and local tax returns and other reports, or has been included in consolidated returns or reports filed by an Affiliate, which Borrower is required by law, rule or regulation to file and all Charges that are due and payable have been paid, except for Charges being contested in good faith and for which adequate reserves are being maintained;

(Q)    Borrower's execution and delivery of this Agreement, the Ancillary Agreements and the Swap Documents do not directly or indirectly violate or result in any violation of the Securities Exchange Act of 1934, as amended, or any regulations issued pursuant thereto, including without limitation, Regulation U, T or X of the Board of Governors of the Federal Reserve System (12 CFR 221, 207, 220 and 224, respectively) and Borrower does not own or intend to purchase or carry any "**margin security**," as defined in such Regulations;

(R)    Except as set forth on Schedule 6.1(R), as of the date of this Agreement Borrower has no Subsidiaries and does not own an equity interest in any other Person;

(S)    Borrower has no knowledge of any fact or circumstance which would reasonably be expected to impair the validity or collectability of any material amount of its Accounts or General Intangibles;

(T)    None of Borrower's Collateral has been pledged or sold to any other Person or otherwise encumbered; Borrower is the owner of its Collateral free of all Liens and encumbrances except those of Lender and except for the Permitted Liens and no financing statement concerning the Collateral, except any filed on behalf of Lender and those relating to Permitted Liens;

(U)    Except as disclosed on Schedule 6.1(U), each property (including underlying ground water), operation and facility that Borrower operates or controls is substantially in compliance with all statutes, judicial or administrative orders, licenses, permits and governmental rules and regulations applicable to them, including, without limitation, Environmental Laws, the noncompliance with which is reasonably likely to have a material adverse effect on the financial condition, continued operations or Property of Borrower; and

(V)    Borrower possesses adequate copyrights, patents, trademarks, trade secrets and computer software to conduct its business and all such intellectual property (other than computer software and trade secrets) in the possession of Borrower as of the date of this Agreement as listed on Schedule 6.1(V).

**6.2    Account Warranties and Representations.** Borrower warrants and represents to Lender that Lender may rely on all statements, warranties and representations made by Borrower with respect to its Accounts and, unless otherwise indicated in writing by Borrower, that:

(A)    Borrower's Accounts are genuine, are in all respects what they purport to be, are not reduced to a judgment and, if evidenced by any instrument, item of chattel paper, agreement, contract or documents, are evidenced by only one executed original instrument, item of chattel paper, agreement, contract, or document, which original, if any, has been delivered to Lender by Borrower upon Lender's request;

(B)    Borrower's Accounts represent undisputed, bona fide transactions completed in accordance with the terms and provisions contained in any related documents;

(C)    The amounts shown on any Accounts Report, and all invoices and statements delivered to Lender with respect to any Account, are actually and absolutely owing to Borrower and are not contingent for any reason (except with respect to any warranty Borrower makes in the ordinary course of its business);

618938-06

38

(D)    Except as may be disclosed on such Accounts Report, there are no setoffs, counterclaims or disputes existing or asserted with respect to any Accounts included on an Accounts Report, and Borrower has not made any agreement with any Account Debtor for any deduction from such Account, except for discounts or allowances allowed by Borrower in the ordinary course of its business, which discounts and allowances have been disclosed to Lender and are reflected in the calculation of the invoice related to such Account;

(E)    There are no facts, events or occurrences which in any way materially impair the validity or enforcement of any of the Accounts or tend to reduce the amount payable thereunder from the amount of the invoice shown on any Accounts Report, and on all contracts, invoices and statements delivered to Lender with respect thereto;

(F)    To Borrower's knowledge, all Account Debtors are Solvent and had the capacity to contract at the time any contract or other document giving rise to or evidencing the Accounts was executed; and

(G)    To Borrower's knowledge, there are no proceedings or actions which are threatened in writing or pending against any Account Debtor which might result in any material adverse change in such Account Debtor's financial or other condition.

**6.3    Automatic Warranty and Representation and Reaffirmation of Warranties and Representations.** Each request for a Loan made by Borrower pursuant to this Agreement shall constitute (i) an automatic warranty and representation by Borrower to Lender that there does not then exist a Default or an Event of Default and (ii) a reaffirmation as of the date of such request of all of the warranties and representations of Borrower contained in this Agreement, the Ancillary Agreements and in the Swap Documents.

**6.4    Survival of Warranties and Representations.**    Borrower covenants, warrants and represents to Lender that all representations and warranties of Borrower contained in this Agreement, the Ancillary Agreements and the Swap Documents shall be true at the time of Borrower's execution of this Agreement, the Ancillary Agreements and the Swap Documents, and shall survive the execution, delivery and acceptance by the parties and the closing of the transactions described in this Agreement.    Borrower and Lender expressly agree that any misrepresentation or breach of any representation or warranty whatsoever contained in this Agreement, the Ancillary Agreements or the Swap Documents shall be deemed material.

**7.    COVENANTS AND CONTINUING AGREEMENTS.**

**7.1    Financial Covenants.**

(i)    Senior Fixed Charge Coverage Ratio.    Borrower shall not permit the Senior Fixed Charge Coverage Ratio to be less than: (a) 1:20:1.0 on June 30, 2004 and

618938-06

39

(b) 1.25:1.0 on the last day of each fiscal quarter of Borrower and its Subsidiaries thereafter.

(ii)   Senior Leverage Ratio.  Borrower shall not permit the Senior Leverage Ratio to be more than: (a) 2.75:1.0 on April 1, 2004, (b) 2.50:1.0 on June 30, 2004, (c) 2.25:1.0 on September 30, 2004 and (d) 2.0:1.0 on December 31, 2004 and on the last day of each fiscal quarter of Borrower and its Subsidiaries thereafter.

7.2   **Affirmative Covenants.**  Borrower covenants, unless at any time Lender shall otherwise expressly consent in writing, it shall:

(A)   Fees and Costs.  Pay to Lender on demand, any and all fees, costs or expenses which Lender incurs arising out of or in connection with (i) the forwarding to Borrower or any other Person on behalf of Borrower by Lender of proceeds of Loans made to Borrower pursuant to this Agreement and (ii) the depositing for collection by Lender, of any check or item of payment received or delivered to Lender on account of the Liabilities;

(B)   Insurance.  At its sole cost and expense, keep and maintain the Collateral, its other assets and its business insured in such amounts and against loss or damage by fire, theft, explosion, sprinklers and all other hazards and risks as is ordinarily insured against by other owners or users of such properties in similar businesses and notify Lender promptly of any event or occurrence causing a material loss or decline in value of the Collateral and the estimated (or actual, if available) amount of such loss or decline;

(C)   Financial Reports.  Keep books of account and prepare financial statements and furnish to Lender the following (all of the foregoing and following to be kept and prepared in accordance with generally accepted accounting principles applied on a basis consistent with the Financials, unless Borrower's independent certified public accountants concur in any changes therein and such changes are disclosed to Lender and are consistent with then generally accepted accounting principles):

(i)   as soon as available, but not later than one-hundred fifty (150) days after the close of each fiscal year of Holding and its Subsidiaries, financial statements of Holding and its Subsidiaries prepared on a consolidated basis (including a balance sheet, income statement, statement of retained earnings and cash flow statement, all with supporting footnotes) as at the end of such year and for the year then ended, all in reasonable detail as requested by Lender and audited by Ernst & Young or such other firm of independent certified public accountants of recognized standing selected by Borrower and approved by Lender, together with an unqualified opinion thereon from such certified public accountants;

(ii)   as soon as available, but no later than thirty (30) days after the end of each month of each fiscal year of Holding and its Subsidiaries, internally prepared financial statements of Holding and its Subsidiaries prepared on a

618938-06

40

consolidated basis (including a balance sheet, income statement and statement of cash flow) as at the end of and for the portion of Borrower's fiscal year then elapsed, all in reasonable detail as requested by Lender and certified by an authorized officer of Borrower as prepared in accordance with generally accepted accounting principles and fairly presenting in all material respects the financial position and results of operations of Borrower and its Subsidiaries for such period (subject to normal year-end audit adjustments and omission of footnotes);

(iii)    as soon as available, but no later than thirty (30) days after the end of each fiscal quarter of each fiscal year of Borrower and its Subsidiaries, a properly completed and executed covenant compliance certificate in the form of Exhibit M attached hereto, signed by an authorized officer of Borrower (a "**Compliance Certificate**");

(iv)    as soon as available, but no later than January 31 of each year, internally prepared financial projections of Borrower and its Subsidiaries prepared on a consolidated basis with respect to the year in which such projections are delivered to Lender, in reasonable detail as requested by Lender;

(v)    within thirty (30) days after the last day of each month of each fiscal year of Borrower and its Subsidiaries, Borrower shall furnish to Lender a properly completed and executed certificate ("**Borrowing Base Certificate**"), in the form of Exhibit N hereto, setting forth a calculation of the Borrowing Base as of the last day of the immediately preceding month;

(vi)    within thirty (30) days after the last day of each month of each fiscal year of Borrower, an Accounts Report; and

(vii)    such other data and information (financial and otherwise) as Lender, from time to time, may reasonably request, bearing upon or related to the Collateral, Borrower's or any Subsidiary's financial condition or results of their operations, or the financial condition of any Person who is a guarantor of any of the Liabilities.

(D)    <u>Litigation and Other Events</u>.    Notify Lender promptly upon Borrower's learning of: (i) the institution or threat of any litigation, suit, action, inquiry, investigation or administrative proceeding which, if adversely determined, could reasonably be expected to materially and adversely affect the operations, financial condition or business of Borrower or any Affiliate or which may affect Lender's security interest in the Collateral; (ii) the occurrence of an Event of Default or Default; (iii) Borrower's use of any other corporate or fictitious name other than as currently used; (iv) Borrower's formation of any Subsidiary; or (v) Borrower obtaining any registered copyrights, patents, trademarks and similar intellectual property;

(E)    <u>Bank Accounts</u>.  Maintain all of its primary bank accounts and its primary banking relationship with Lender.  Neither the maintenance of balances nor payment of any fees shall obligate Lender to make any advances under the Revolving Credit Facility or the Term Loan;

(F)    <u>Reserve Costs</u>.  Upon demand by Lender, reimburse Lender for any additional costs incurred by Lender if at any time after the date of this Agreement any law, regulation, treaty or any change in any law, regulation, treaty or the interpretation thereof by any governmental agency, central bank or other fiscal, monetary or other authority having jurisdiction of Lender shall impose, modify or deem applicable any reserve (except reserve requirements taken into account by Lender in calculating the Interest Rate) and/or special deposit requirement against Lender or impose any other condition with respect to the loans or other financial accommodations the result of which is to increase the cost to Lender in making or maintaining the Loans or to reduce the amount of principal or interest received or receivable by Lender with respect to the Liabilities.  Borrower's reimbursement obligation shall apply only to those costs which directly result from the imposition of such requirement and shall begin as of the date of any such change in law, treaty, rule or regulation;

(G)    <u>Existence and Status</u>.  Maintain and preserve and cause each Subsidiary to maintain and preserve its existence as a limited partnership, limited liability company or corporation, as applicable, in its state or country of formation and all rights, privileges, licenses, copyrights, trademarks, trade names, franchises and other authority to the extent material and necessary for the conduct of its business in the ordinary course as conducted from time to time.  Borrower shall not take any action or suffer any action to be taken by others and will not permit any Subsidiary to take any action or suffer any action which will alter, change or destroy its status as a limited partnership, limited liability company or corporation;

(H)    <u>Use of Proceeds</u>.  Use proceeds of the Loans as follows: (a) the proceeds of Loans under the Revolving Credit Facility shall be used to finance working capital of Borrower and its Subsidiaries; and (b) the proceeds of Term Loan shall be used to refinance the Existing Debt;

(I)    <u>Environmental Covenant</u>.  (a) Use and operate and cause each Subsidiary to use and operate all of its facilities and properties in material compliance with all Environmental Laws, keep all necessary permits, approvals, certificates, licenses and other authorizations relating to environmental matters in effect and remain in material compliance therewith, and handle all hazardous substances and waste in material compliance with all applicable Environmental Laws; (b) immediately notify Lender and provide copies upon receipt of all written claims, complaints, notices or inquiries relating to the condition of its or any Subsidiary's facilities and properties or compliance with Environmental Laws; and shall (i) promptly cure and have dismissed with prejudice to the satisfaction of Lender any actions and proceedings relating to compliance with Environmental Laws or (ii) contest any such actions or proceedings in good faith by

618938-06

42

appropriate proceedings and establish adequate reserves therefor as reasonably required by Lender; and (c) provide such information and certifications which Lender may reasonably request from time to time to evidence compliance with this subsection;

    (J)    <u>Excess Cash Flow Recapture</u>.  Until the Term Loan has been repaid in full, Borrower shall, on an annual basis within ninety (90) days of the end of each fiscal year of Borrower, commencing with the fiscal year ending December 31, 2005, make payments of principal outstanding on the Term Loan in an amount equal to forty percent (40%) of Excess Cash Flow (each such payment a **"Recapture Payment"**).  Unless a Default is then in effect, all Recapture Payments shall be applied first against accrued but unpaid interest with respect to the Term Loan and then to the outstanding principal balance of the Term Loan, to be applied in inverse order of maturity.  Each Recapture Payment shall be in addition to the regularly scheduled payments made by Borrower with respect to the Term Loan.

    (K)    <u>Additional Security</u>.  In the event that a portion of Borrower's total revenue attributed to any single Subsidiary is equal to or greater than 15%, Borrower shall cause the equity of such Subsidiary to be pledged to Lender in the manner required by Lender in its sole discretion.

    **7.3**    <u>**Negative Covenants.**</u>  Borrower covenants that, unless at any time the Lender shall otherwise expressly consent in writing, Borrower and its Subsidiaries shall not:

    (A)    <u>Limitations on Payments with Respect to Subordinated Debt</u>.  Make any payments of principal or interest with respect to the Subordinated Debt through and including December 31, 2004.  Provided no Default or Event of Default has occurred and is continuing, Borrower may make (i) regularly scheduled interest payments with respect to the Subordinated Debt on or after January 1, 2005 provided that the Total Fixed Charge Coverage Ratio is not less than 1.10:1.0 as of the day such payment is made after taking into account such payment and (ii) payments to Holding equal to the tax obligations incurred by the holders of the Subordinated Notes as a consequence of their receipt of interest payments in kind in lieu of cash interest, provided such payments made in accordance with this Section 7.3(A)(ii) are recognized as Interest Expense by Borrower;

    (B)    <u>Restriction on Redemptions and Dividend Distributions</u>.  (i) Directly or indirectly purchase, redeem or otherwise acquire or retire any ownership interest of any holder of the ownership interests of Borrower or any Subsidiary or (ii) make or declare any partial or full liquidating distributions to any holder of the ownership interests of Borrower or any Subsidiary with respect to such interest holder's interest in Borrower or in any Subsidiary;

    (C)    <u>Capital Expenditures</u>.  Make Capital Expenditures in an amount greater than $2,500,000 in any fiscal year;

(D)  <u>Mergers and Acquisitions</u>. (i) Liquidate, dissolve or merge or consolidate with or acquire any Person, (ii) permit any Subsidiary to liquidate, dissolve or merge or consolidate with or acquire any Person (other than any inactive Subsidiary) or (iii) lose control (as such term is defined in the definition of **"Affiliate"**) of any Subsidiary;

(E)  <u>Investments</u>. (i) Other than in the ordinary course of its business, make any investment in the securities of any Person other than a Subsidiary; or (ii) use or permit any proceeds of the Loans to be used, either directly or indirectly, for the purpose, whether immediate, incidental or ultimate, of "purchasing or carrying" any margin stock (Borrower will furnish to Lender upon request, a statement in conformity with the requirements of Federal Reserve Form U-1 referred to in Regulation U of the Federal Reserve Board);

(F)  <u>Loans</u>. Make any loans or other advances of money (other than salary) to any Affiliate, officers, directors, employees or agent of Affiliates or to any other Person in excess of the aggregate sum of $50,000;

(G)  <u>Capital Structure and Business</u>. Make any material change in Borrower's capital structure or in any of its business objectives, purposes and operations or permit any Subsidiary to make any material change in such Subsidiary's capital structure or in any of its business objectives, purposes and operations;

(H)  <u>Affiliate Transactions</u>. Enter into, or be a party to, any transaction with any Affiliate or partner, shareholder, director or officer of Borrower or an Affiliate, except in the ordinary course of and pursuant to the reasonable requirements of Borrower's business and upon fair and reasonable terms which are fully disclosed to Lender and are no less favorable to Borrower than could be obtained in a comparable arm's length transaction with a Person not an Affiliate or partner, shareholder, director or officer of Borrower or an Affiliate;

(I)  <u>Adverse Transactions</u>. (i) Enter or permit any Subsidiary to enter into any transaction which materially and adversely affects the Collateral or Borrower's ability to repay Lender the Liabilities or (ii) permit or agree to any extension, compromise or settlement or make any change or modification of any kind or nature with respect to any Account, including any of the terms relating thereto, except in accordance with Borrower's current credit collection policy as disclosed to Lender;

(J)  <u>Guarantees</u>. Guarantee or otherwise, in any way, become liable or permit any Subsidiary to become liable with respect to the obligations or liabilities of any other Person, except by endorsement of instruments or items of payment for deposit to the general account of Borrower or for delivery to Lender on account of the Liabilities;

(K)  <u>Other Liens; Transfer of Assets</u>. Except for Permitted Liens and as otherwise expressly permitted in this Agreement or in the Ancillary Agreements, pledge, mortgage, grant a security interest in or permit to exist a Lien on, encumber, assign, sell,

lease, license or otherwise dispose of or transfer, whether by sale, merger, consolidation, liquidation, dissolution, or otherwise, any of Borrower's assets or permit any Subsidiary to pledge, mortgage, grant a security interest in or permit to exist a Lien on, encumber, assign, sell or otherwise dispose of or transfer, whether by sale, merger, consolidation, liquidation, dissolution or otherwise, any of such Subsidiary's assets;

    (L)    <u>Other Indebtedness</u>.  Incur or permit any Subsidiary to incur any Indebtedness other than Permitted Debt;

    (M)    <u>Asset Purchase</u>.  Purchase or otherwise acquire or permit any Subsidiary to acquire all or substantially all or a substantial portion of the assets of any Person (or any division or line of business of any Person) in the event the purchase price of such assets is in excess of $500,000;

    (N)    <u>Organic Documents</u>.  Amend or otherwise modify or permit any Subsidiary to amend or otherwise modify any material term of its certificate of limited partnership or agreement of limited partnership or charter and by-laws or other organic document, as applicable, in effect on the date hereof or on the date of its later formation except for amendments, modifications or waivers that are not adverse in any way to Lender; or

    (O)    <u>Negative Pledge of Ownership Interests</u>.  Pledge, mortgage, grant a security interest in or permit to exist a Lien on, encumber, assign, sell, lease, license or otherwise dispose of or transfer, whether by sale, merger, consolidation, liquidation, dissolution, or otherwise, any of Borrower's or its Subsidiaries' respective ownership interests (whether in the form of shares of stock, limited liability company interests, or otherwise) in its Subsidiaries.

    **7.4**    **Contesting Charges.**  Notwithstanding anything to the contrary in this Agreement, Borrower may dispute any Charges without prior payment thereof, so long as such non-payment will not cause a Lien except a Permitted Lien to attach to Borrower's assets, and provided that Borrower shall give Lender prompt notice of such dispute and shall be diligently contesting the same in good faith and by an appropriate proceeding and there is no danger of a loss or forfeiture of any of the Collateral.

    **7.5**    **Payment of Charges.**  Subject to the provisions of Section 7.4, Borrower shall pay promptly when due all of the Charges. In the event Borrower, at any time or times, shall fail to pay the Charges or to promptly obtain the satisfaction of such Charges, Borrower shall promptly so notify Lender and Lender may, without waiving or releasing any obligation or liability of Borrower under this Agreement or any Event of Default, in its sole discretion, at any subsequent time or times, make such payment or any part thereof (but shall not be obligated to do so), or obtain such satisfaction and take any other action which Lender or such Lender deems advisable. All sums so paid by Lender and any expenses, including reasonable attorneys' fees, court costs, expenses and other related charges, shall be payable by Borrower to Lender upon demand and shall be additional Liabilities.

618938-06

**7.6    Insurance; Payment of Premiums.** All policies of insurance on the Collateral or otherwise required under this Agreement shall be in form and amount satisfactory to Lender in its sole discretion and with insurers reasonably recognized as adequate by Lender. Borrower shall deliver to Lender the original (or a certified copy) of each policy of insurance, or, in lieu thereof, certificates of such policies of insurance satisfactory to Lender, and evidence of payment of all premiums therefor and shall deliver renewals of all such policies to Lender at least thirty (30) days prior to their expiration dates. Such policies of insurance shall contain an endorsement, in form and substance acceptable to Lender, showing Lender as the "lender loss payee". Such endorsement shall provide that the insurance companies will give Lender at least thirty (30) days' prior written notice before any such policy shall be altered or canceled and that no act or default of Borrower or any other Person shall affect the right of Lender to recover under such policy in case of loss or damage. Borrower hereby directs all insurers under such policies to pay all proceeds directly to Lender after the occurrence and continuation of an Event of Default and Lender shall apply such proceeds to the outstanding balance of the Loans in accordance with this Agreement. Borrower irrevocably makes, constitutes and appoints Lender (and all officers, employees or agents designated by Lender) as Borrower's true and lawful attorney and agent-in-fact for the purpose of, after the occurrence and during the continuation of and Event of Default, making, settling and adjusting claims under such policies, endorsing the name of Borrower in writing or by stamp on any check, draft, instrument or other item of payment for the proceeds of such policies and for making all determinations and decisions with respect to such policies. If Borrower shall fail to obtain or maintain any of the policies required by this Section 7.6 or to pay any premium relating thereto, then Lender, without waiving or releasing any obligation or Event of Default by Borrower hereunder, may (but shall be under no obligation to do so) obtain and maintain such policies of insurance and pay such premiums and take any other action which Lender deems advisable. All sums so disbursed by Lender, including reasonable attorneys' fees, court costs, expenses and other charges relating thereto, shall be payable by Borrower to Lender upon demand and shall be additional Liabilities.

**7.7    Survival of Obligations Upon Termination of Agreement.** Except as otherwise expressly provided for in this Agreement, in the Ancillary Agreements and in the Swap Documents, no termination or cancellation (regardless of cause or procedure) of this Agreement, the Ancillary Agreements or the Swap Documents shall in any way affect or impair the powers, obligations, duties, rights, and liabilities of Borrower or Lender in any way with respect to (i) any transaction or event occurring prior to such termination or cancellation, (ii) the Collateral, or (iii) any of the undertakings, agreements, covenants, warranties and representations of Borrower or Lender contained in this Agreement, the Ancillary Agreements or the Swap Documents. All such undertakings, agreements, covenants, warranties and representations shall survive such termination or cancellation.

## 8.    EVENTS OF DEFAULT; RIGHTS AND REMEDIES.

8.1    **Event of Default.**  The occurrence of any one or more of the following events shall constitute an Event of Default under this Agreement:

(A)    (i) Borrower fails to pay, within three (3) days after the same shall be due and payable or be declared due and payable, any part of the Liabilities; or (ii) Borrower is in default in the payment of Indebtedness in an aggregate amount in excess of $250,000 beyond any applicable c ure p eriod a nd t he h older o f s uch I ndebtedness h as accelerated the maturity thereof; or (iii) any Subsidiary is in default on its indebtedness in an aggregate amount in excess of $250,000 beyond any applicable cure period and the holder of such Indebtedness has accelerated the maturity thereof; or

(B)    Borrower or any Subsidiary or any guarantor of the Liabilities, including Holding, fails or neglects to perform, keep or observe (i) any term, provision, condition or covenant contained in Sections 7.1, 7.2 or 7.3 of this Agreement or (ii) any other term, provision, condition or covenant contained in this Agreement, the Ancillary Agreements or the Swap Documents which is required to be performed, kept or observed by Borrower or such Subsidiary or guarantor and such failure continues unremedied for a period of thirty (30) days; or

(C)    The occurrence of any default (subject to any applicable cure periods) under (i) any of the Ancillary Agreements, (ii) any of the Swap Documents or (iii) any document evidencing or securing the Subordinated Debt; or

(D)    Any statement, warranty, representation, report, financial statement, or certificate made or delivered by Borrower, any of its officers, employees or agents, to Lender is not true and correct in any material respect on the date it was made or delivered or deemed re-made; or

(E)    There shall occur any material uninsured damage to or loss, theft, or destruction of any of the Collateral in excess of $250,000 in the aggregate; or

(F)    The Collateral or any of Borrower's other assets or any assets of any Subsidiary are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors and the same is not cured within thirty (30) days; or an application is made by any Person for the appointment of a receiver, trustee, or custodian for any of the Collateral or any of Borrower's other assets or any assets of any Subsidiary and the same is not dismissed within sixty (60) days after such application; or

(G)    An application is made by Borrower for the appointment of a receiver, trustee or custodian for any of the Collateral or any of Borrower's other assets; or an application is made by any Subsidiary or any guarantor of the Liabilities, for the appointment of a receiver, trustee or custodian for any of such Subsidiary's or such

618938-06

47

guarantor's assets; or any case or proceeding is filed by or against Borrower, any Subsidiary or any guarantor for its dissolution, liquidation, or termination and the same is not dismissed within sixty (60) days of such application; or Borrower or any Subsidiary ceases to conduct its business as now conducted or is enjoined, restrained or in any way prevented by court order from conducting all or any material part of its business affairs; or

(H)    A notice of Lien, levy or assessment is filed of record with respect to all or any substantial portion of Borrower's assets or any Subsidiary's assets by the United States, or any department, agency or instrumentality thereof, or by any state, county, municipal or other governmental agency including, without limitation, the Pension Benefit Guaranty Corporation, or any taxes or debts owing to any of the foregoing becomes a Lien or encumbrance upon the Collateral or any of Borrower's other assets or upon any Subsidiary's assets and such Lien or encumbrance is not released within thirty (30) days after its creation; or

(I)    Judgment(s) is or are rendered against Borrower or any Subsidiary in the aggregate in excess of $250,000 and such Person fails to either discharge the judgment or commence appropriate proceedings to appeal such judgment(s) within the applicable appeal period or, after such appeal is filed, such Person fails to diligently prosecute such appeal or such appeal is denied; or

(J)    A petition under any section or chapter of the United States Bankruptcy Code or any similar law or regulation is filed by or against Borrower, any Subsidiary or any guarantor of the Liabilities, and, if filed against Borrower, such Subsidiary or such guarantor, is not dismissed within sixty (60) days after filing; or Borrower, any Subsidiary or any guarantor makes an assignment for the benefit of its creditors; or Borrower, any Subsidiary or any guarantor becomes insolvent, fails generally to pay its debts as they become due or admits in writing its inability to pay its debts as they become due; or

(K)    Borrower fails, within ten (10) Business Days after the occurrence of any of the following events, to furnish Lender with appropriate notice thereof:  (i) the happening of a Reportable Event with respect to any profit sharing or pension plan governed by ERISA (such notice shall contain the statement of the chief financial officer of Borrower setting forth details as to such Reportable Event and the action which Borrower or the applicable Subsidiary proposes to take with respect thereto and a copy of the notice of such Reportable Event to the Pension Benefit Guaranty Corporation), (ii) the termination of any such plan, (iii) the appointment of a trustee by an appropriate United States District Court to administer any such plan, or (iv) the institution of any proceedings by the Pension Benefit Guaranty Corporation to terminate any such plan or to appoint a trustee to administer any such plan; or

(L)    Borrower fails to: (i) notify Lender promptly upon receipt by Borrower or any Subsidiary of any notice of the institution of any proceeding or other actions which

618938-06

48

may result in the termination of any profit sharing or pension plan; or (ii) acquire and maintain or cause any Subsidiary to acquire and maintain, when available, the contingent employer liability coverage insurance provided for under Section 4023 of ERISA in an amount satisfactory to Lender; or

(M)   This Agreement, any Ancillary Agreement or any Swap Document shall be repudiated or become unenforceable or incapable of performance, in whole or in part; or

(N)   Any Change in Control occurs.

**8.2**   **Effect of Event of Default.**   If (a) any Event of Default described in Section 8.1(J) shall occur, the Revolving Credit Commitment (if it has not theretofore terminated) shall immediately terminate and all Notes shall become immediately due and payable, all without presentment, demand, protest or notice of any kind, or any action by Lender; and (b) any other Event of Default shall occur (other than an Event of Default described in Section 8.1(J)), Lender may declare the Revolving Credit Commitment (if it has not theretofore terminated) to be terminated and all Notes to be due and payable, whereupon the Revolving Credit Commitment (if it has not theretofore terminated) shall immediately terminate and all Notes shall become immediately due and payable, all without presentment, demand, protest or notice of any kind. Lender shall promptly advise Borrower of any such declaration, but failure to do so shall not impair the effect of such declaration.

**8.3**   **Remedies.**   Upon and after the occurrence and continuation of an Event of Default, and written notice to Borrower specifying such Event of Default, Lender shall have all of the following rights and remedies:

(A)   All of the rights and remedies of a secured party under the UCC or other applicable law, all of which rights and remedies shall be cumulative and non-exclusive, to the greatest extent permitted by law, and in addition to any other rights and remedies contained in this Agreement, in any of the Ancillary Agreements and in any of the Swap Documents;

(B)   The right to (i) peacefully enter upon the premises of Borrower or any other place or places where the Collateral is located and kept, without any obligation to pay rent to Borrower or any other person, through self-help and without judicial process or first obtaining a final judgment or giving Borrower notice and opportunity for a hearing on the validity of Lender's claim, and remove the Collateral from such premises and places, for such time as Lender may require to collect or liquidate the Collateral, and/or (ii) require Borrower to assemble and deliver the Collateral to Lender at a place to be designated by Lender;

(C)   The right to (i) open Borrower's mail and collect any and all amounts due from Account Debtors, (ii) notify Account Debtors that the Accounts have been assigned to Lender and that Lender has a security interest therein and (iii) direct such Account

Debtors to make all payments due from them upon the Accounts, including the Special Collateral, directly to Lender or to a lockbox designated by Lender. Lender shall promptly furnish Borrower with a copy of any such notice sent and Borrower hereby agrees that any such notice in Lender's sole discretion, may be sent on Lender's stationery, in which event, Borrower shall, upon demand, co-sign such notice with Lender; and

(D)    The right to sell, lease or to otherwise dispose of all or any Collateral in its then current condition, or after any further manufacturing or processing thereof, at public or private sale or sales, with such notice as provided in Section 8.4, in lots or in bulk, for cash or on credit, all as Lender, in its sole discretion, may deem advisable. At any such sale or sales of the Collateral, the Collateral need not be in view of those present and attending the sale, nor at the same location at which the sale is being conducted. Lender shall have the right to conduct such sales on Borrower's premises or elsewhere and shall have the right to use Borrower's premises without charge by Borrower or its Affiliates for such sales for such time or times as Lender may see fit, subject to the rights of any landlord to such premises. Lender is granted a license or other right to use, without charge, Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in advertising for sale and selling any Collateral and Borrower's rights under all licenses and all franchise agreements shall inure to Lender's benefit but Lender shall have no obligations thereunder. Lender may purchase all or any part of the Collateral at public or, if permitted by law, private sale and, in lieu of actual payment of such purchase price, may setoff the amount of such price against the Liabilities. The proceeds realized from the sale of any Collateral shall be applied as set forth in Section 8.7. If any deficiency shall arise, Borrower shall remain liable to Lender for the amount of such deficiency.

**8.4**    **Notice.**   Borrower agrees that any notice required to be given by Lender of a sale, lease, other disposition of any of the Collateral or any other intended action by Lender, which is personally delivered to Borrower or which is deposited in the United States mail, postage prepaid and duly addressed to Borrower at the address set forth in Section 9.10, at least ten (10) days prior to any such public sale, lease or other disposition or other action being taken, or prior to the time after which any private sale of the Collateral is to be held, shall constitute commercially reasonable and fair notice to Borrower.

**8.5**    **Default Interest Rate.**   To compensate Lender for additional unreimbursed costs resulting from the occurrence of an Event of Default, including without limitation, acts associated with the uncertainty of future funding and additional supervisory and administrative efforts, upon the occurrence of and during the continuance of an Event of Default and after notice thereof is given to Borrower at the direction of Lender, the Liabilities shall continue to bear interest, calculated daily on the basis of a 360-day year at the per annum rate set forth in Section 2.4 above, plus additional post-default interest of two percent (2%) per year until the Liabilities are paid in full.

618938-06

50

**8.6    Preservation of Rights.**  No delay or omission of Lender to exercise any right under this Agreement , any Ancillary Agreement or any Swap Document shall impair such right or be construed to be a waiver of any Event of Default or an acquiescence therein, and the making of a Loan notwithstanding the existence of an Event of Default or the inability of Borrower to satisfy the conditions precedent to such Loan shall not constitute any waiver or acquiescence. Any single or partial exercise of any such right shall not preclude other or further exercise thereof or the exercise of any other right, and no waiver, amendment or other variation of the terms, conditions or provisions of this Agreement, any Ancillary Agreement or any Swap Agreement whatsoever shall be valid unless in writing signed by Lender, and then only to the extent in such writing specifically set forth.  All remedies contained in this Agreement, any Ancillary Agreement or any Swap Document or by law afforded shall be cumulative and all shall be available to Lender until the Liabilities have been paid in full.

**8.7    Distributions.**  Lender shall distribute all proceeds and other amounts received by it with respect to Collateral:

First, to the payment of any amounts owed to it under Section 9.3, under any Ancillary Agreement or any Swap Document executed pursuant hereto and any expenses incurred by Lender in connection with the maintenance, preservation, protection or sale of any Collateral;

Second, to Lender according to the then outstanding amount of Liabilities; and

Third, if any balance remains after the Liabilities have been paid in full, to Borrower.

Lender shall apply any payment so received from Borrower,

First, to unpaid accrued interest, if any, on the Liabilities until paid in full;

Second, to the unpaid principal of the Loans until paid in full; and

Third, to any other Liabilities;

provided that in the event Lender receives any payment on account of Borrower's contingent obligations under a Letter of Credit, Lender shall hold such payment as cash collateral for such contingent obligation, and, following any reduction of the stated amount of such Letter of Credit or termination thereof, shall distribute pursuant to this Section 8.7 any amounts in excess of Borrower's contingent obligations not used to reimburse Lender.

**9.    MISCELLANEOUS.**

**9.1    Appointment of Lender as Borrower's Lawful Attorney-In-Fact.**  Borrower irrevocably designates, makes, constitutes and appoints Lender (and all persons designated by

Lender) as Borrower's true and lawful attorney and agent-in-fact and Lender, or Lender's agent, may, without notice to Borrower:

      (A)    At any time after the occurrence of and during the continuance of an Event of Default, endorse by writing or stamp Borrower's name on any checks, notes, drafts or any other payment relating to and/or proceeds of the Collateral which come into the possession of Lender or under Lender's control and deposit the same to the account of Lender for application to the Liabilities;

      (B)    At any time after the occurrence of and during the continuance of an Event of Default, in Borrower's or Lender's name:  (i) demand payment of the Collateral; (ii) enforce payment of the Collateral, by legal proceedings or otherwise; (iii) exercise all of Borrower's rights and remedies with respect to the collection of the Collateral; (iv) settle, adjust, compromise, extend or renew the Accounts and the Special Collateral; (v) settle, adjust or compromise any legal proceedings brought to collect the Collateral; (vi) if permitted by applicable law, sell or assign the Collateral upon such terms, for such amounts and at such time or times as Lender deems advisable; (vii) satisfy and release the Accounts and Special Collateral; (viii) take control, in any manner, of any item of payment or proceeds referred to in Section 3.3; (ix) prepare, file and sign Borrower's name on any proof of claim in bankruptcy or similar document against any Account Debtor; (x) prepare, file and sign Borrower's name on any notice of Lien, assignment or satisfaction of Lien or similar document in connection with the Collateral; (xi) do all acts and things necessary, in Lender's sole discretion, to fulfill Borrower's obligations under this Agreement, the Ancillary Agreements or the Swap Documents; (xii) endorse by writing or stamp the name of Borrower upon any chattel paper, document, instrument, invoice, freight bill, bill of lading or similar document or agreement relating to the Collateral; and (xiii) use the information recorded on or contained in any data processing equipment and computer hardware and software relating to the Collateral to which Borrower has access; and

      (C)    At any time after the occurrence of and during the continuance of an Event of Default, notify the post office authorities to change the address for delivery of Borrower's mail to an address designated by Lender and receive, open and dispose of all mail addressed to Borrower.

    **9.2**    **Modification of Agreement; Sale of Notes; Participations.**  No amendment, modification or waiver of, or consent with respect to, any provision of this Agreement or the Notes shall in any event be effective unless the same shall be in writing and signed and delivered by Lender, and then any such amendment, modification, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No amendment, modification, waiver or consent shall extend or increase the amount of the Revolving Credit Commitment, extend the final maturity of the Notes, reduce the principal thereof, reduce the fees hereunder or the rate of interest payable with respect to the Notes (other than pursuant to Section 2.1), reduce the amount of or extend the date for the mandatory payments on the Notes, modify the definition of Borrowing Base, amend this Section 9.2 or

permit any assignment by Borrower of its obligations or rights hereunder or amend any covenants contained in Sections 7.1, 7.2 or 7.3, without the consent of Lender in each instance. No provision of Section 2.12 shall be amended, modified or waived without the consent of Lender. Borrower may not sell, assign, transfer or otherwise dispose of all or any portion of this Agreement, the Ancillary Agreements or the Swap Documents, including, without limitation, Borrower's right, title, interest, remedies, powers, or duties except by payment in full of the Liabilities. Borrower consents to Lender's participation, sale, assignment, transfer or other disposition, at any time or times, of this Agreement, the Ancillary Agreements and the Swap Documents, including, without limitation, Lender's right, title, interest, remedies, powers, or duties. Lender shall have the right to sell, assign or transfer any part of any Note to one or more banks or other financial institutions, or to grant participations to one or more banks or other financial institutions, in or to any Loan hereunder and any Note held by Lender upon prior written consent of Borrower, which consent shall not be unreasonably withheld, together with, in the case of assignments only, execution and delivery to Lender and the Borrower of an assignment agreement in a form acceptable to Lender, provided that if a Default or Event of Default has occurred and is continuing, no consent of Borrower shall be required. Borrower consents to Lender's pledge of its rights under this Agreement, any Note issued hereunder, any Ancillary Agreement or any Swap Document to the Federal Reserve Bank. Borrower hereby consents to the disclosure of any information obtained by Lender in connection herewith to any bank or other financial institution to which Lender now or hereafter has sold, assigned or transferred, or sold or proposed to sell, assign or transfer, all or any part of any Note or any participation interest in any Loan or Note. Upon the sale, transfer or assignment of all or a portion of any Note pursuant to one or more assignment agreements, Borrower shall, upon the request of the assigning Lender, execute a new note or notes in a form substantially similar to the Note or Notes so replaced. Each such transferee shall be deemed to be a Lender under this Agreement. Each transferee of any Note shall take such Note subject to the provisions of this Agreement and to any request made, waiver or consent given or other action taken hereunder prior to the receipt by Borrower of written notice of such transfer. Lender represents that it is the present intention of Lender to acquire each Note drawn to its order for its own account and not with a view to the distribution or sale thereof, subject, nevertheless, to the necessity that Lender remains in control at all times of the disposition of property held by it for its own account; it being understood that the foregoing representation shall not affect the character of the Loans as commercial lending transactions.

    **9.3**   **Attorneys' Fees and Expenses; Lender's Out-of-Pocket Expenses.** If, at any time or times, whether prior or subsequent to the date of this Agreement and regardless of the existence of a Default or an Event of Default, Lender incurs legal or other costs and expenses or employs counsel, accountants or other professionals for advice or other representation or services in connection with:

        (A)   The preparation, negotiation and execution of this Agreement, all Ancillary Agreements, any amendment of or modification of this Agreement, the Ancillary Agreements or the Swap Documents;

(B)    Any litigation, contest, dispute, suit, proceeding or action (whether instituted by Lender, Borrower or any other Person) in any way relating to the Collateral, this Agreement, the Ancillary Agreements, the Swap Documents or Borrower's affairs;

(C)    Any attempt to enforce any rights of Lender against Borrower or any other Person which may be obligated to Lender by virtue of this Agreement, the Ancillary Agreements or the Swap Documents, including, without limitation, the Account Debtors;

(D)    Any attempt to inspect, verify, protect, collect, sell, liquidate or otherwise dispose of any of the Collateral; or

(E)    Any inspection, verification, protection, collection, sale, liquidation or other disposition of any of the Collateral, including without limitation, Lender's periodic field audits and audits of Borrower's books and records;

then, in any such event, the reasonable attorneys' and paralegals' fees and expenses arising from such services and all reasonably incurred expenses, costs, charges and other fees of or paid by Lender in any way or respect arising in connection with or relating to any of the events or actions described in this Section 9.3 shall be payable by Borrower to Lender upon demand and shall be additional Liabilities. Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include accountants' fees, costs and expenses; court costs, fees and expenses; photocopying and duplicating expenses; court reporter fees, costs and expenses; long distance telephone charges; courier charges; telegram and telecopy charges.

**9.4    No Offset; Right to Charge Accounts.**  All payments due to Lender shall be made in immediately available funds, without setoff or counterclaim.  At Lender's sole discretion, Lender may charge against any demand account of Borrower all or any part of the Liabilities which are due and payable.

**9.5    Severability.**  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**9.6    Parties; Entire Agreement.**  This Agreement and the Ancillary Agreements shall be binding upon and inure to the benefit of the respective successors and assigns of Borrower and Lender.  Borrower's successors and assigns shall include, without limitation, a trustee, receiver or debtor-in-possession of or for Borrower.  Nothing contained in this Section 9.6 shall be deemed to modify Section 9.2. This Agreement is the complete statement of the agreement by and between Borrower and Lender and supersedes all prior negotiations, understandings and representations between them with respect to the subject matter of this Agreement.

618938-06

54

9.7    **Conflict of Terms**. The provisions of the Ancillary Agreements are incorporated in this Agreement by this reference. Except as otherwise provided in this Agreement and except as otherwise provided in the Ancillary Agreements, by specific reference to the applicable provision of this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision in any Ancillary Agreement, the provision contained in this Agreement shall govern and control.

9.8    **Waiver by Borrower**. Except as otherwise provided for in this Agreement, Borrower waives (i) presentment, demand and protest, notice of protest, notice of presentment, default, non-payment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrower may in any way be liable and hereby ratifies and confirms whatever Lender may do in this regard; (ii) all rights to notice and a hearing prior to Lender's taking possession or control of, or Lender's replevy, attachment or levy upon the Collateral or any bond or security which might be required by any court prior to allowing Lender to exercise any of Lender's remedies; and (iii) the benefit of all valuation, appraisement, extension and exemption laws. Borrower acknowledges that it has been advised by its own counsel with respect to this Agreement and the transactions evidenced by this Agreement.

9.9    **Waiver and Governing Law**. THE LOANS EVIDENCED HEREBY HAVE BEEN MADE, AND THIS AGREEMENT HAS BEEN DELIVERED, AT CHICAGO, ILLINOIS, AND SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS (WITHOUT REGARD TO THE CONFLICTS OF LAWS PROVISIONS) OF THE STATE OF ILLINOIS. BORROWER (i) WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION TO ENFORCE OR DEFEND ANY MATTER ARISING FROM OR RELATED TO THIS AGREEMENT, ANY OF THE ANCILLARY AGREEMENTS OR ANY OF THE SWAP DOCUMENTS; (ii) IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN COOK COUNTY, ILLINOIS, OVER ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY MATTER ARISING FROM OR RELATED TO THIS AGREEMENT, ANY OF THE ANCILLARY AGREEMENTS OR ANY OF THE RELATED AGREEMENTS; (iii) IRREVOCABLY WAIVES, TO THE FULLEST EXTENT BORROWER MAY EFFECTIVELY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF ANY SUCH ACTION OR PROCEEDING; (iv) AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW; AND (v) AGREES NOT TO INSTITUTE ANY LEGAL ACTION OR PROCEEDING AGAINST LENDER OR ANY OF LENDER'S DIRECTORS, OFFICERS, EMPLOYEES, AGENTS OR PROPERTY, CONCERNING ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OF THE ANCILLARY AGREEMENTS OR ANY OF THE SWAP DOCUMENTS IN ANY COURT OTHER THAN ONE LOCATED IN COOK COUNTY, ILLINOIS. BORROWER WAIVES PERSONAL SERVICE OF THE SUMMONS AND

618938-06

55

COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY MATTER ARISING FROM OR RELATED TO THIS AGREEMENT, ANY OF THE ANCILLARY AGREEMENTS OR ANY OF THE SWAP DOCUMENTS, AND AGREES THAT SERVICE OF SUCH SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO BORROWER AT THE ADDRESS SET FORTH IN SECTION 9.10. SHOULD BORROWER FAIL TO APPEAR OR ANSWER ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SERVED WITHIN THIRTY (30) DAYS AFTER THE RECEIPT THEREOF, IT SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED AGAINST IT AS DEMANDED OR PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS. NOTHING IN THIS PARAGRAPH SHALL AFFECT OR IMPAIR LENDER'S RIGHT TO SERVE LEGAL PROCESS IN ANY MANNER PERMITTED BY LAW OR LENDER'S RIGHT TO BRING ANY ACTION OR PROCEEDING AGAINST BORROWER OR ITS PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION.

   9.10    **Notice.** Except as otherwise provided in this Agreement, any notice required shall be in writing and shall be deemed to have been validly served, given or delivered upon (i) delivery in person, by messenger or overnight courier service, (ii) the day after transmission by facsimile, (iii) or five (5) Business Days after deposit in the United States certified or registered mails, with proper postage prepaid, addressed to the party to be notified as follows:

   (a)    If to Lender, at:

           LaSalle Bank National Association
           135 South LaSalle
           Chicago, Illinois 60603
           Attention: Travis Burns
           Fax: (312) 904-4364

   with a copy to:

           Ungaretti & Harris
           3500 Three First National Plaza
           Chicago, Illinois 60602
           Attention: Gary I. Levenstein
           Fax: (312) 977-4405

618938-06

56

(b)    If to Borrower, at:

        Comair Rotron, Inc.
        2675 Customhouse Court
        San Diego, California 92154
        Attention: Steve Pellegrini
        Fax: (619) 661-6057

with a copy to:

        Katten Muchin Zavis Rosenman
        525 West Monroe Street
        Chicago, Illinois 60661
        Attention: Jeffrey L. Elegant
        Fax: (312) 577-4676

and

        Howard Industries, Inc.
        136 Main Street
        Westport, Connecticut 06880
        Attention: Peter Howard
        Fax: (203) 227-3314

**9.11    Section Titles, Etc.** The section titles and table of contents, if any, contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties hereto. All Exhibits and Schedules which are referred to herein or attached hereto are incorporated by reference.

**9.12    Mutilated, Destroyed, Lost and Stolen Notes.** If any mutilated Note is surrendered to Borrower, Borrower shall execute therefor a new Note with the same principal amount, containing identical terms and provisions. If there shall be delivered to Borrower (a) evidence to its satisfaction of the destruction, loss or theft of any Note and (b) such security or indemnity as may be required by them to hold Borrower and any agent of Borrower harmless, then, in the absence of notice to Borrower that such Note has been acquired by a bona fide purchaser, Borrower shall execute and deliver, in lieu of any such destroyed, lost or stolen Note or in exchange for such Note, a new Note with the same principal amount, containing identical terms and provisions. Upon the issuance of any new Note under this Section 9.12, Borrower may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses connected therewith. Every new Note issued pursuant to this Section 9.12 in lieu of any destroyed, lost or stolen Note, shall constitute an original contractual obligation of Borrower, whether or not the destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all the benefits of this Agreement.

[signature page follows]

618938-06

57

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first written above.

**BORROWER**:

COMAIR ROTRON, INC.

By: _____
Name: STEPHEN L. KALLGREN
Title: VICE PRESIDENT FINANCE

**LENDER**:

LASALLE BANK NATIONAL ASSOCIATION

By: _____
Name:          Travis Burns
Title:          Vice President

Loan and Security Agreement

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first written above.

**BORROWER**:

COMAIR ROTRON, INC.

By:_____
Name:_____
Title:_____


**LENDER**:

LASALLE BANK NATIONAL ASSOCIATION

By:_____
Name:        Travis Burns
Title:        Vice President

FIRST AMENDMENT

TO

LOAN AND SECURITY AGREEMENT

FROM

LASALLE BANK NATIONAL ASSOCIATION

TO

COMAIR ROTRON, INC.

AND

THERMAFLO, INC.

Effective as of December 9, 2005

725285-1

FINAL

## FIRST AMENDMENT TO LOAN AND SECURITY AGREEMENT

This FIRST AMENDMENT TO LOAN AND SECURITY AGREEMENT dated as of December 9, 2005 (the "**First Amendment**"), is entered into by and between COMAIR ROTRON, INC., a Delaware corporation ("**Comair**") whose address is 2675 Customhouse Court, San Diego, California 92154, Thermaflo, Inc., a California corporation ("**Subsidiary**" and together with Comair, the "**Borrowers**" and each, a "**Borrower**") whose address is 3817 Old Conejo Rd., Newbury Park, California 91320, and LASALLE BANK NATIONAL ASSOCIATION, a national banking association ("**Lender**"), whose address is 135 South La Salle Street, Chicago, Illinois 60603.

### R E C I T A L S:

A.      Comair and Lender are parties to that certain Loan and Security Agreement dated as of April 2, 2004 (the "**Original Loan Agreement**" and together with this First Amendment, the "**Loan Agreement**"), pursuant to which Lender agreed to provide Revolving Loans to Comair evidenced by that certain Revolving Note dated as of April 2, 2004 in the maximum principal amount of Five Million and 00/100 Dollars ($5,000,000.00), executed by Comair and made payable to the order of Lender (the "**Original Revolving Note**"), and a Term Loan to Comair evidenced by that certain Term Note dated as of April 2, 2004 in the principal amount of Seven Million and 00/100 Dollars ($7,000,000.00), executed by the Borrower and made payable to the order of Lender (the "**Original Term Note**").

B.      Comair has entered into that certain Stock Purchase Agreement dated December 9, 2005 and by and among Comair, Subsidiary and Gary Kuzmin, the sole stockholder of Subsidiary (the "**Purchase Agreement**"), pursuant to which Comair will acquire 100% of the outstanding capital stock of Subsidiary from Mr. Kuzmin (the "**Acquisition**").

C.      Comair is requesting that Lender increase its Revolving Credit Commitment and Term Loan Commitment so that Comair may use the additional proceeds to fund a portion of the purchase price of the Acquisition and related costs and expenses.

D.      Comair is further requesting, in additional to an increase in the maximum principal amount of the Revolving Credit Commitment to Six Million Dollars and Term Loan Commitment to Nine Million Dollars: (i) that Subsidiary, following the Acquisition, become a Borrower under the Loan Agreement secured by a lien upon all of Subsidiary's personal and real property, (ii) an extension of the Revolving Credit Termination Date and Term Loan Maturity Date, (iii) consent of Lender to the prepayment of a portion of the Subordinated Debt, and (iv) changes to various loan covenants and interest rates post-Acquisition, and Lender is agreeable to Comair's requests subject to the terms and conditions hereinafter set forth.

E.      As a result of, among other things, the common business enterprise between the Borrowers post-Acquisition, Borrowers acknowledge that each Borrower will derive advantage from each and every financial accommodation made by Lender to each of them, and that Lender would be unwilling to increase the Term Loan Commitment for the Acquisition without each Borrower agreeing to this Agreement and remaining or becoming borrowers hereunder.

721181-5

**065**

NOW THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Borrowers and Lender hereby agree as follows:

## A G R E E M E N T S:

1.     **RECITALS**. The foregoing Recitals are hereby made a part of this First Amendment.

2.     **DEFINITIONS**. Capitalized words and phrases used herein without definition shall have the respective meanings ascribed to such words and phrases in the Loan Agreement.

3.     **AMENDMENTS TO THE LOAN AGREEMENT**.

3.1     Joinder to Agreement; Global Reference Changes; Grant of Security Interest.

(a)     Subsidiary, by execution of this Agreement, agrees to become a "Borrower" under the Loan Agreement as amended hereby and understands that the obligations applicable to Comair and rights and remedies of Lender against Comair are applicable to Subsidiary as if Subsidiary was an original borrower under the Loan Agreement and any Ancillary Agreement

(b)     All references to "Borrower" in the Loan Agreement and any Ancillary Agreements shall hereinafter be amended in their entirety to mean "Borrowers" and where applicable, "each Borrower". The Loan Agreement and all Ancillary Agreements are hereby further amended to reflect any corresponding grammatical changes that may be necessary or desirable as a result of the foregoing change.

(c)     Without limiting the generality of the foregoing, to secure the prompt payment to Lender of the Liabilities and the obligations under the Swap Documents, Subsidiary hereby grants to Lender, for the benefit of Lender, a continuing security interest in and to the same Collateral as granted to Lender by Comair, whether now owned or existing or to be acquired or arising and wherever located,

3.2     Permitted Liens. The definition of "Permitted Liens" in Section 1.1 of the Loan Agreement is amended to include the following:

"     (viii)   liens incurred by Borrower in favor of equipment lessors identified on Schedule 3.2 attached hereto."

The parties acknowledge a typographical error in the definitions of "Permitted Liens" with respect to numbering of items.

3.3     Revolving Credit Commitment. The definition of "Revolving Credit Commitment Maturity Date" in Section 1.1 of the Loan Agreement is hereby amended in its entirety to read as follows:

"      "Revolving Credit Commitment" shall mean $6,000,000."

3.4    Revolving Credit Termination Date.  The definition of "Revolving Credit Termination Date" in Section 1.1 of the Loan Agreement is hereby amended in its entirety to read as follows:

"      "Revolving Credit Termination Date" shall mean December 9, 2007, unless extended by Lender pursuant to any modification, extension or renewal note executed by the Borrowers and accepted by Lender in its sole and absolute discretion in substitution for the Revolving Note."

3.5    Subordinated Debt.  The definition of "Subordinated Debt" in Section 1.1 of the Loan Agreement is hereby amended in its entirety to read as follows:

"      "Subordinated Debt" shall mean (i) Comair Rotron, Inc.'s Indebtedness to Holding pursuant to that certain Junior Subordinated Note dated as of August 8, 2002 in the principal amount of $5,000,000, and all interest due thereunder, and (ii) Comair Rotron, Inc.'s Indebtedness to Gary Kuzmin pursuant to that certain Promissory Note dated as of December 9, 2005 in the principal amount of $1,300,000, and all interest due thereunder."

3.6    Term Loan Commitment.  The definition of "Term Loan Commitment" in Section 1.1 of the Loan Agreement is hereby amended in its entirety to read as follows:

"      "Term Loan Commitment" shall mean Nine Million and 00/100 Dollars ($9,000,000.00)."

3.7    Term Loan Maturity Date.  The definition of "Term Loan Maturity Date" in Section 1.1 of the Loan Agreement is hereby amended in its entirety to read as follows:

"      "Term Loan Maturity Date" shall mean December 9, 2010, unless extended by Lender pursuant to any modification, extension or renewal note executed by the Borrowers and accepted by Lender in its sole and absolute discretion in substitution for the Term Note."

3.8    Applicable Margin.  The definition of "Applicable Margin" in Section 1.1 of the Loan Agreement is hereby amended in its entirety to read as follows:

"      "Applicable Margin" shall mean (i) with respect to Prime Rate Loans, zero percent (0%) and (ii) with respect to LIBOR Loans, two and one-half percent (2.50%)."

3.9    Letter of Credit Expiry Date.  The definition of "Letter of Credit Expiry Date" in Section 1.1 of the Loan Agreement is hereby amended in its entirety to read as follows:

"      "Letter of Credit Expiry Date" shall mean, with respect to any Letter of Credit, a date no later than the Revolving Credit Termination Date."

721181-5                                    3

3.10    <u>Scheduled Reductions of Term Loan</u>.    Section 3.2(B) of the Loan Agreement is hereby amended in its entirety to read as follows:

"    (B)    <u>Scheduled Reductions of Term Loan</u>.    The Term Loan shall be payable in quarterly principal installments on the first Business Day of each Borrower's fiscal quarters, with the next scheduled payment due on January 1, 2006, such that the outstanding unpaid principal balance of the Term Loan shall amortize in twenty (20) equal quarterly installments of principal in the amount of $450,000.00.    The principal amount of the Term Loan outstanding, and all accrued and unpaid interest with respect to the Term Loan, shall be due and payable on the Term Loan Maturity Date."

3.11    <u>Unused Line Fee</u>.    Section 3.6 of the Loan Agreement is hereby amended in its entirety to read as follows:

"    3.6    <u>Unused Line Fee</u>.    Borrower shall pay to Lender, on the last day of each fiscal quarter of Borrower, in arrears, an unused line fee (the "**Unused Line Fee**") with respect to an amount equal to the Revolving Credit Commitment <u>minus</u> the average principal balance of all Loans outstanding under the Revolving Credit Facility during such quarter then elapsed, multiplied by an annual interest rate equal to one fifth of one percent (0.20%).    For purposes of calculating the Unused Line Fee, interest shall be computed on the basis of a year of 360 days and actual days elapsed.

3.12    <u>Cash Flow Recapture Cancellation</u>.    Section 7.2(J) is hereby deleted in its entirety.

3.13    <u>Subordinated Debt Payments</u>.    Section 7.3(A) of the Loan Agreement is hereby amended in its entirety to read as follows:

"    (A)    <u>Limitations on Payments with Respect to Subordinated Debt</u>.    Provided no Default or Event of Default has occurred and is continuing, (i) with respect to the Subordinated Debt owed to Holding, Comair Rotron may make regularly scheduled interest payments from and after the date hereof and (ii) with respect to the Subordinated Debt owed to Gary Kuzmin, Comair Rotron may make regularly scheduled principal and interest payments from and after the date hereof, <u>provided</u>, <u>that</u> the Total Fixed Charge Coverage Ratio is not less than 1.10:1.0 as of the day any such payment is made after taking into account such payment.    From and after the occurrence of an Event of Default, all permitted payments under this Section 7.3(A) will cease until such Event of Default is cured."

Notwithstanding the foregoing restriction, Lender hereby consents to Comair's repayment of an aggregate of $428,649.12 of the Junior Subordinated Note, of which $417,911.12 is principal, to Holding for repayment in full by Holding of those certain Subordinated Notes held by Eric Jakel, Gordon Jakel, Michael Barr, Sterling Jakel and Jeffrey From using Loans proceeds.    Borrowers will provide Lender with evidence satisfactory to Lender that such Subordinated Notes have been repaid and canceled.

3.14    Capital Expenditures.  Section 7.3(C) of the Loan Agreement is hereby amended in its entirety to read as follows:

"    (C)    Capital Expenditures.  Make Capital Expenditures in an amount greater than $3,000,000 in any fiscal year;"

3.15    Revolving Note.  All references in the Loan Agreement to the "Revolving Note" in the form of Exhibit A to the Loan Agreement shall be deemed to be references to the Revolving Note in the form of Exhibit A attached hereto and made a part hereof (the "Replacement Revolving Note").

3.16    Term Note.  All references in the Loan Agreement to "Term Note" in the form of Exhibit B to the Loan Agreement shall be deemed to be references to the Term Note in the form of Exhibit B attached hereto and made a part hereof (the "Replacement Term Note").

3.17    Cross-Guaranty.  A new Section 10 shall be added to the Loan Agreement which states as follows:

"10.    CROSS-GUARANTY.

10.1    Cross-Guaranty.  Each Borrower hereby agrees that such Borrower is jointly and severally liable for, and hereby absolutely and unconditionally guarantees to Lender and its successors and assigns, the full and prompt payment (whether at stated maturity, by acceleration or otherwise) and performance of, all Liabilities owed or hereafter owing to Lender by each other Borrower.  Each Borrower agrees that its guaranty obligation hereunder is a continuing guaranty of payment and performance and not of collection, that its obligations under this Section 10 shall not be discharged until payment and performance, in full, of the Liabilities has occurred, and that its obligations under this Section 10 shall be absolute and unconditional, irrespective of, and unaffected by, the genuineness, validity, regularity, enforceability or any future amendment of, or change in, this Agreement, any Ancillary Agreement or any other agreement, document or instrument to which any Borrower is or may become a party; the absence of any action to enforce this Agreement (including this Section 10) or any Ancillary Agreement or the waiver or consent by Lender with respect to any of the provisions thereof; the existence, value or condition of, or failure to perfect its Lien against, any security for the Liabilities or any action, or the absence of any action, by Lender in respect thereof (including the release of any such security); the insolvency of any Borrower; or any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor. Each Borrower shall be regarded, and shall be in the same position, as principal debtor with respect to the Liabilities guaranteed hereunder.

10.2    Waivers by Borrowers.  Each Borrower expressly waives all rights it may have now or in the future under any statute, or at common law, or at law or in equity, or otherwise, to compel Lender to marshal assets or to proceed in respect of the Liabilities guaranteed hereunder, against any other party or against any security for the payment and performance of the Liabilities before proceeding

721181-5                                    5

against, or as a condition to proceeding against, such Borrower. It is agreed among each Borrower and Lender that the foregoing waivers are of the essence of the transaction contemplated by this Agreement and the Ancillary Agreements and that, but for the provisions of this Section 10.2 and such waivers, Lender would decline to enter into this Agreement.

10.3  Benefit of Guaranty.  Each Borrower agrees that the provisions of this Section 10 are for the benefit of Lender and its successors, transferees, endorsees and assigns, and nothing herein contained shall impair, as between any other Borrower and Lender, the obligations of such other Borrower under this Agreement and the Ancillary Agreements.

10.4  Subordination of Subrogation, Etc.. Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreement, and except as set forth in Section 10.7, each Borrower hereby expressly and irrevocably subordinates to payment of the Liabilities any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off and any and all defenses available to a surety, guarantor or accommodation co-obligor until the Liabilities are indefeasibly paid in full in cash. Each Borrower acknowledges and agrees that this subordination is intended to benefit Lender and shall not limit or otherwise affect such Borrower's liability hereunder or the enforceability of this Section 10, and that Lender and its successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this Section 10.4.

10.5  Election of Remedies.  If Lender may, under applicable law, proceed to realize its benefits under this Agreement or any Ancillary Agreement giving Lender a Lien upon any Collateral, whether owned by any Borrower or by any other Person, either by judicial foreclosure or by non-judicial sale or enforcement, Lender may, at its sole option, determine which of its remedies or rights it may pursue without affecting any of its rights and remedies under this Section 10. If, in the exercise of any of its rights and remedies, Lender shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against any Borrower or any other Person, whether because of any applicable laws pertaining to "election of remedies" or the like, each Borrower hereby consents to such action by Lender and waives any claim based upon such action, even if such action by Lender shall result in a full or partial loss of any rights of subrogation that each Borrower might otherwise have had but for such action by Lender. Any election of remedies that results in the denial or impairment of the right of Lender to seek a deficiency judgment against any Borrower shall not impair any other Borrower's obligation to pay the full amount of the Liabilities. In the event Lender shall bid at any foreclosure or trustee's sale or at any private sale permitted by law or this Agreement or any Ancillary Agreements, Lender may bid all or less than the amount of the Liabilities and the amount of such bid need not be paid by Lender but shall be credited against the Liabilities. The amount of the successful bid at any such sale, whether Lender or any other party is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral and the difference between such bid amount

and the remaining balance of the Liabilities shall be conclusively deemed to be the amount of the Liabilities guaranteed under this Section 10, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which Lender might otherwise be entitled but for such bidding at any such sale.

10.6    Limitation. Notwithstanding any provision herein contained to the contrary, each Borrower's liability under this Section 10 (which liability is in any event in addition to amounts for which such Borrower is primarily liable under Section 2) shall be limited to an amount not to exceed as of any date of determination the greater of: (i) the net amount of all Loans advanced to any other Borrower under this Agreement and then re-loaned or otherwise transferred to, or for the benefit of, such Borrower; and (ii) the amount that could be claimed by Lender from such Borrower under this Section 10 without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law after taking into account, among other things, such Borrower's right of contribution and indemnification from each other Borrower under Section 10.6.

10.7    Contribution with Respect to Guaranty Obligations. To the extent that any Borrower shall make a payment under this Section 10 of all or any of the Liabilities (other than Loans made directly to that Borrower) (a "Guarantor Payment") that exceeds the amount such Borrower would otherwise have paid if each Borrower had paid the aggregate Liabilities satisfied by such Guarantor Payment in the same proportion that such Borrower's Allocable Amount (as defined below) (as determined immediately prior to such Guarantor Payment) bore to the aggregate Allocable Amounts of each of the Borrowers as determined immediately prior to the making of such Guarantor Payment, then, following indefeasible payment in full in cash of the Liabilities and termination of the Commitments) such Borrower shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Borrower for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Guarantor Payment. As of any date of determination, the "Allocable Amount" of any Borrower shall be equal to the maximum amount of the claim that could then be recovered from such Borrower under this Section 10 without rendering such claim voidable or avoidable under Section 548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law. This Section 10.7 is intended only to define the relative rights of Borrowers and nothing set forth in this Section 10.7 is intended to or shall impair the obligations of Borrowers, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement. Nothing contained in this Section 10.7 shall limit the liability of any Borrower to pay the Loans made directly or indirectly to that Borrower and accrued interest, fees and expenses with respect thereto for which such Borrower shall be primarily liable. The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of the

Borrower to which such contribution and indemnification is owing. The rights of the indemnifying Borrowers against any other Borrower under this Section 10.7 shall be exercisable upon the full and indefeasible payment of the Liabilities and the termination of the Revolving Loan Commitment or Term Loan Commitment.

       10.8    Liability Cumulative.    The liability of Borrowers under this Section 10 is in addition to and shall be cumulative with all liabilities of each Borrower to Lender under this Agreement and the Ancillary Agreements to which such Borrower is a party or in respect of any Liabilities or obligation of the other Borrowers, without any limitation as to amount, unless the instrument or agreement evidencing or creating such other liability specifically provides to the contrary."

    4.    REPRESENTATIONS AND WARRANTIES.    To induce Lender to enter into this First Amendment, each Borrower hereby certifies, represents and warrants to Lender that:

       4.1    Organization.    Such Borrower is a corporation duly organized, existing and in good standing under the laws of the state of its incorporation, with full and adequate corporate power to carry on and conduct its business as presently conducted. Each Borrower is duly licensed or qualified in all foreign jurisdictions wherein the nature of its activities require such qualification or licensing, except where the failure to so qualify would not have a material adverse effect on such Borrower. The Articles of Incorporation, Borrowing Resolutions and Incumbency Certificate of such Borrower have not been changed or amended since the most recent date that certified copies thereof were delivered to Lender. The exact legal name of such Borrower is as set forth in the preamble of this First Amendment, and the Borrower currently does not conduct, nor has it during the last five (5) years conducted, business under any other name or trade name. Each Borrower will not change its name, its organizational identification number, if it has one, its type of organization, its jurisdiction of organization or other legal structure.

       4.2    Authorization.    Each Borrower is duly authorized to execute and deliver this First Amendment and is and will continue to be duly authorized to borrow monies under the Loan Agreement, as amended hereby, and to perform its obligations under the Loan Agreement, as amended hereby.

       4.3    No Conflicts.    The execution and delivery of this First Amendment and the performance by each Borrower of its obligations under the Loan Agreement, as amended hereby, do not and will not conflict with any provision of law, any agreement to which such Borrower is a party or to which such Borrower is subject, any agreement with any stockholders of such Borrower, or of the Articles of Incorporation or Bylaws of such Borrower.

       4.4    Validity and Binding Effect.    The Loan Agreement, as amended hereby, is a legal, valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or other similar laws of general application affecting the enforcement of creditors' rights or by general principles of equity limiting the availability of equitable remedies.

8

4.5    Compliance with Loan Agreement.

(a)    With respect to Comair, the representation and warranties set forth in Section 6 of the Loan Agreement, as amended hereby, are true and correct with the same effect as if such representations and warranties had been made on the date hereof, with the exception that all references to the financial statements shall mean the financial statements most recently delivered to Lender and except for such changes as are specifically permitted under the Loan Agreement. In addition, Comair has complied with and is in compliance with all of the covenants set forth in the Loan Agreement, as amended hereby, including, but not limited to, those set forth in Section 7 thereof.

(b)    With respect to Subsidiary, except as set forth on Schedule 4.5(b), the representations and warranties set forth in Section 6 of the Loan Agreement, as amended hereby, are true and correct as of the date hereof and Subsidiary agrees to comply with all of the covenants set forth in the Loan Agreement, as amended hereby, including, but not limited to, those set forth in Section 7 thereof.

4.6    No Event of Default.  As of the date hereof, no Event of Default under Section 8 of the Loan Agreement, as amended hereby, or event or condition which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, has occurred or is continuing.  Notwithstanding the foregoing, the Lender hereby waives the asset purchase restriction set forth in Section 7.3(M) of the Loan Agreement with respect to the Acquisition only.

5.    CONDITIONS PRECEDENT.  This First Amendment shall become effective as of the date above first written after receipt by Lender of the following:

5.1    First Amendment.  This First Amendment, duly executed by the Borrowers and Lender.

5.2    Replacement Revolving Note.  A Revolving Note dated as of December 9, 2005 in the maximum principal amount of Six Million and 00/100 Dollars ($6,000,000.00), executed by the Borrowers and made payable to the order of Lender, in the form of Exhibit A attached hereto.

5.3    Replacement Term Note.  A Replacement Term Note dated as of December 9, 2005 in the maximum principal amount of Nine Million and 00/100 Dollars ($9,000,000.00), executed by the Borrowers and made payable to the order of Lender, in the form of Exhibit B attached hereto.

5.4    Subsidiary Stock Pledge Agreement.  A Subsidiary Stock Pledge Agreement, duly executed by Comair in the form attached hereto as Exhibit C.

5.5    Reaffirmation of Guaranty.  A Reaffirmation of Guaranty for all Borrowers, duly executed by Comair Holding Corp., a Delaware corporation, Comair's parent company, in the form attached hereto as Exhibit D.

5.6    <u>Reaffirmation of Subordination</u>.    A Reaffirmation of Subordination (Intercreditor) Agreement, duly executed by Holding in the form attached hereto as <u>Exhibit E</u>.

5.7    <u>Reaffirmation of Pledges</u>.    A Reaffirmation of Pledge Agreements for equity interest in Comair and Holding, duly executed by Comair and Holding in the form attached hereto as <u>Exhibit F</u>.

5.8    <u>Subordination Agreement</u>.    A Subordination (Intercreditor) Agreement, duly executed by Gary Kuzmin, a creditor of Subsidiary, in the form attached hereto as <u>Exhibit G</u>.

5.9    <u>Landlord Waiver</u>. A Landlord Waiver, duly executed by Subsidiary's landlord in Newbury Park, California property in the form of <u>Exhibit H</u> attached hereto.

5.10    <u>Opinion of Counsel</u>.    An opinion of counsel to Borrowers in the form of <u>Exhibit I</u> attached hereto.

5.11    <u>Corporate Documents</u>.

(i)    A certificate (dated the date of the Closing) of each Borrower's corporate secretary certifying as to (A) the articles of incorporation and bylaws, (B) the incumbency and signatures of the officers of such Borrower signing this Agreement, the Notes, and each other document to be delivered by such Borrower pursuant to this Agreement, and (C) the resolutions of the Board of Directors of such Borrower authorizing the execution, delivery and performance of this First Amendment and the related loan documents.

(ii)    Certificates, as of the most recent dates practicable, of the Secretary of State of each Borrower's state of incorporation and the Secretaries of State of each state in which each Borrower is qualified as a foreign corporation, or in which it intends to do business following the receipt of proceeds of the Loans, as to the good standing of each Borrower.

5.12    <u>Financing Statements</u>.    Financing statements regarding all Collateral of Comair and Subsidiary as co-borrowers and filed in any and all offices and jurisdictions deemed appropriate by Lender in Lender's sole discretion.

5.13    <u>Due Diligence</u>.    Uniform Commercial Code, tax lien, bankruptcy and judgment searches from all offices and jurisdictions deemed appropriate by Lender in Lender sole discretion concerning (i) Subsidiary and (ii) Comair showing no other filing of record with respect to the Collateral granted hereunder other than any financing statement filed by Lender;

5.14    <u>Fee</u>.    The Borrowers agree to pay to Lender a fee of $15,500 due and payable upon the execution and delivery of this First Amendment by the Borrowers.

5.15    <u>Other Documents</u>.    Such other documents, instruments or certificates as Lender may request, including, without limitation, evidence of repayment of $428,649.12 of the Junior Subordinated Note, of which $417,911.12 is principal, for repayment in full of the Subordinated Notes permitted to repaid and listed in the Reaffirmation of Subordination (Intercreditor) Agreement.

721181-5

10

5.16   Events.

(i)   Comair shall have been in full compliance with all of the terms and conditions of the Loan Agreement, and no Default or Event of Default shall have occurred and be continuing;

(ii)   No material adverse change shall have occurred in the business, assets, operations, financial or other condition of either Borrower or in any Borrower's ability to repay the Loans;

(iii)   Each of the representations and warranties set forth herein by each Borrower and in Section 6 of the Loan Agreement hall be true and correct as of such time; and

(iv)   The aggregate principal amount of all Loans outstanding under the Revolving Credit Facility shall not exceed the then current Availability or the Term Loan Commitment.

6.   GENERAL.

6.1   Governing Law; Severability.  This First Amendment shall be construed in accordance with and governed by the internal laws of the State of Illinois.  Wherever possible each provision of the Loan Agreement and this First Amendment shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Loan Agreement and this First Amendment shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of the Loan Agreement and this First Amendment.

6.2   Successors and Assigns.  This First Amendment shall be binding upon each Borrower and Lender and their respective successors and assigns, and shall inure to the benefit of each Borrower and Lender and the successors and assigns of Lender.

6.3   Continuing Force and Effect of Loan Documents.  Except as specifically modified or amended by the terms of this First Amendment, all other terms and provisions of the Loan Agreement and the other Loan Documents are incorporated by reference herein, and in all respects, shall continue in full force and effect.  Comair, by execution of this First Amendment, hereby reaffirms, assumes and binds itself to all of the obligations, duties, rights, covenants, terms and conditions that are contained in the Loan Agreement and the other Loan Documents. Subsidiary, by execution of this First Amendment, agrees to bind itself to all of the obligations, duties, rights, covenants, terms and conditions that are contained in the Loan Agreement and the other Loan Documents.

6.4   References to Loan Agreement.  Each reference in the Loan Agreement to "this Agreement", "hereunder", "hereof", or words of like import, and each reference to the Loan

721181-5                                          11

Agreement in any and all instruments or documents delivered in connection therewith, shall be deemed to refer to the Loan Agreement, as amended hereby.

6.5    Expenses.  Borrowers shall pay all costs and expenses in connection with the preparation of this First Amendment and other related loan documents, including, without limitation, reasonable attorneys' fees and time charges of attorneys who may be employees of Lender or any affiliate or parent company of Lender.  The Borrowers shall pay any and all stamp and other taxes, UCC search fees, filing fees and other costs and expenses in connection with the execution and delivery of this First Amendment and the other instruments and documents to be delivered hereunder, and agrees to save Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such costs and expenses.

6.6    Counterparts.  This First Amendment may be executed in any number of counterparts, all of which shall constitute one and the same agreement.  Facsimile signatures shall be treated the same as originals.

6.7    Customer Identification—USA Patriot Act Notice.  Lender hereby notifies the Borrowers that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 (the "Patriot Act"), it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of each Borrower and other information that will allow Lender to identify each Borrower in accordance with the Patriot Act.  In addition, and without limiting the foregoing sentence, the Borrowers shall (a) ensure that no Person who owns a controlling interest in or otherwise controls the Borrowers is or shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (b) not use or permit the use of the proceeds of the Loans to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto, and (c) comply, and cause each Subsidiary, if applicable, to comply, with all applicable Bank Secrecy Act ("BSA") laws and regulations, as amended.

[signature page attached]

721181-5                                    12

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment to Loan and Security Agreement as of the date first above written.

**BORROWERS:**

COMAIR ROTRON, INC.

By: _____
Name: Steve Pellegrini
Title: President

THERMAFLO, INC.

By: _____
Name: Steve Pellegrini
Title: President

**LENDER:**

LASALLE BANK NATIONAL ASSOCIATION,
a national banking association

By: _____
Name: _____
Title: _____

721181-4

13

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment to Loan and Security Agreement as of the date first above written.

BORROWERS:

COMAIR ROTRON, INC.

By:_____
Name:_____
Title:_____

THERMAFLO, INC.

By:_____
Name:_____
Title:_____

LENDER:

LASALLE BANK NATIONAL ASSOCIATION,
a national banking association

By:       _____
Name:  Travis J. Burns
Title:   First Vice President

721181-5

13

FINAL

## SECOND AMENDMENT TO LOAN AND SECURITY AGREEMENT

This SECOND AMENDMENT TO LOAN AND SECURITY AGREEMENT dated as of July 5, 2006 (the "**Second Amendment**"), is entered into by and between COMAIR ROTRON, INC., a Delaware corporation ("**Comair**") whose address is 2675 Customhouse Court, San Diego, California 92154, Thermaflo, Inc., a California corporation ("**Subsidiary**" and together with Comair, the "**Borrowers**" and each, a "**Borrower**") whose address is 3817 Old Conejo Rd., Newbury Park, California 91320, and LASALLE BANK NATIONAL ASSOCIATION, a national banking association ("**Lender**"), whose address is 135 South La Salle Street, Chicago, Illinois 60603.

R E C I T A L S:

A.    Comair and Lender are parties to that certain Loan and Security Agreement dated as of April 2, 2004 (the "**Original Loan Agreement**"), pursuant to which Lender agreed to provide Revolving Loans to Comair evidenced by that certain Revolving Note dated as of April 2, 2004 in the maximum principal amount of Five Million and 00/100 Dollars ($5,000,000.00), executed by Comair and made payable to the order of Lender (the "**Original Revolving Note**"), and a Term Loan to Comair evidenced by that certain Term Note dated as of April 2, 2004 in the principal amount of Seven Million and 00/100 Dollars ($7,000,000.00), executed by the Borrower and made payable to the order of Lender (the "**Original Term Note**").

B.    In connection with the purchase of stock of Subsidiary pursuant to that certain Stock Purchase Agreement dated December 9, 2005 by and among Comair, Subsidiary and Gary Kuzmin, the sole stockholder of Subsidiary, Comair and Subsidiary entered into that certain First Amendment to Loan and Security Agreement with Lender dated December 9, 2005 (the "**First Amendment**") pursuant to which the Borrowers agreed to make various changes to the Original Loan Agreement, including adding Subsidiary as a Borrower.

C.    The Borrowers are requesting that Lender make additional financial accommodations as set forth in this Second Amendment, including, among other things, (A) reducing the existing Revolving Credit Facility from $6,000,000 to $5,000,000, (B) increasing the existing term loan facility by $5,000,0000 to $14,000,000 and (C) creating a new term loan facility in the principal amount of $5,000,000, all for the purpose of (i) repurchasing approximately $1,500,000 in stock from certain minority shareholders, (ii) making approximately $2,500,000 in PIK payments in cash on its Subordinated Debt, and (iii) paying a dividend of approximately $4,700,000 to remaining shareholders.

D.    Lender is willing to make such accommodations subject to the terms and conditions contained herein.

NOW THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Borrowers and Lender hereby agree as follows:

744921-4

**078**

# AGREEMENTS:

**1.    RECITALS.**  The foregoing Recitals are hereby made a part of this Second Amendment.

**2.    DEFINITIONS.**  Capitalized words and phrases used herein without definition shall have the respective meanings ascribed to such words and phrases in the Original Loan Agreement, as amended by the First Amendment and this Second Amendment (collectively, the "**Loan Agreement**").

**3.    AMENDMENTS TO THE LOAN AGREEMENT.**

**3.1    Definitional Changes.**  The following definitions contained in Section 1.1 of the Loan Agreement are hereby amended in their entirety to read as follows:

(a)    *Applicable Margin*

"    "Applicable Margin" shall mean the percentage interest rate per annum, based upon the Leverage Ratio set forth in the most recent Compliance Certificate delivered by Borrower to Lender pursuant to Section 7.2(C)(iii), as indicated in the following chart:

|  |  | Revolver and Term Loan A | | | Term Loan B | |
|---|---|---|---|---|---|---|
|  | **Leverage Ratio** | **Prime Percentage Rate** | **LIBOR Percentage Rate** | **Unused Line Fee Percentage Rate** | **Prime Percentage Rate** | **LIBOR Percentage Rate** |
| **Level I** | Less than or equal to 1.75:1.00 | 0% | 2.50% | .20% | .50% | 3.00% |
| **Level II** | Greater than 1.75:1.00, but less than or equal to 2.25:1.00 | .25% | 2.875% | .30% | .75% | 3.25% |
| **Level III** | Greater than 2.25:1.00 | .50% | 3.25% | .40% | 1.00% | 3.75% |

In the event Borrower fails to deliver a Compliance Certificate to Lender in a timely manner pursuant to Section 7.2(C)(ii), the Applicable Margin shall be based on Level III until Borrower delivers such Compliance Certificate to Lender, at which point the Applicable Margin will be adjusted based upon the Leverage Ratio set forth in such Compliance Certificate."

The Borrowers acknowledge that until the date the September 30, 2006 Compliance Certificate is delivered, Level III pricing will apply.

(b)    *Debt Service.*

"    "Debt Service" shall mean, with reference to any period, the sum (without duplication) of (i) the aggregate amount of payments required to be made

by Borrower in respect of principal on Indebtedness (whether at maturity, as a result of mandatory prepayment, acceleration or otherwise) during such period, plus (ii) the aggregate amount of payments required to be made and paid in cash by Borrower in respect of interest on Indebtedness (whether at maturity, as a result of mandatory prepayment, acceleration or otherwise) during such period."

(c)    *Eligible Foreign Accounts*

"      "Eligible Foreign Accounts" shall mean those Accounts of Borrowers due from the following Account Debtors: CTS Corp., Nortel Networks, Lucent Technology, Sanmina SCI, AvNet, Celestica, Flextronics International, Solectron and C-MAC Electronic Systems, provided that such Accounts meet the definition of "Eligible Receivables" in this Section 1.1 with the exception of clause (iv) thereof.

(d)    *Letters of Credit*

"      "Letter of Credit" shall mean any letter of credit issued by Lender for the account of Borrower in accordance with Section 2.12 or on behalf of or for the benefit of the Borrowers, including, without limitation, standby letters of credit and commercial letters of credit."

(e)    *Revolving Credit Commitment*

"      "Revolving Credit Commitment" shall mean $5,000,000."

(f)    *Revolving Credit Termination Date*

"      "Revolving Credit Termination Date" shall mean May 31, 2008, unless extended by Lender pursuant to any modification, extension or renewal note executed by the Borrowers and accepted by Lender in its sole and absolute discretion in substitution for the Revolving Note."

3.2    Definitional Additions.    The following definitions are hereby added to Section 1.1 of the Loan Agreement:

(a)    *Approved Uses of Proceeds*

"      "Approved Uses of Proceeds" shall mean (i) the repurchase by Borrower of approximately $1,500,000 in equity held by minority shareholders, (ii) the making of approximately $2,500,000 in PIK interest payments in cash on the Subordinated Notes, and (iii) the paying of approximately $4,700,000 in dividends to certain shareholders of Borrowers remaining after the redemption in subsection (i) of this definition above."

744921-4

3

    (b)    *Total Leverage Ratio*

"    "Total Leverage Ratio" shall mean as of any date of measurement the ratio of (i) Senior Debt plus Subordinated Debt to (ii) EBITDA for the twelve-month period immediately preceding the date of measurement of such ratio."

    3.3    Term Loans. The parties agree that Lender will be increasing the initial term loan from $9,000,000 to $14,000,000 and creating a new term loan in the principal amount of $5,000,000. Since the current Loan Agreement does not provide for two term loans, the Loan Agreement shall be amended as follows:

    (a)    The definition of "Term Loan Commitment" in Section 1.1 of the Loan Agreement shall be bifurcated into two definitions and be amended in its entirety to read as follows:

"    "Term Loan A Commitment" shall mean Fourteen Million and 00/100 Dollars ($14,000,000.00)."

"    Term Loan B Commitment" shall mean Five Million and 00/100 Dollars ($5,000,000)

AND all references to "Term Loan Commitment" throughout the Loan Agreement shall be interpreted to mean Term Loan A Commitment and Term Loan B Commitment.

    (b)    The definition of "Term Loan Maturity Date" in Section 1.1 of the Loan Agreement shall be bifurcated into two definitions and be amended in its entirety to read as follows:

"    "Term Loan A Maturity Date" shall mean May 31, 2011, unless extended by Lender pursuant to any modification, extension or renewal note executed by the Borrowers and accepted by Lender in its sole and absolute discretion in substitution for the Term Note."

"    "Term Loan B Maturity Date" shall mean May 31, 2011, unless extended by Lender pursuant to any modification, extension or renewal note executed by the Borrowers and accepted by Lender in its sole and absolute discretion in substitution for the Term Note."

AND all references to "Term Loan Maturity Date" throughout the Loan Agreement shall be interpreted to mean Term Loan A Maturity Date and Term Loan B Maturity Date.

    (c)    Section 2.1(B) of the Loan Agreement is hereby amended in its entirety to read as follows:

"    (B)    Term Loans. Lender agrees, on the terms and conditions hereinafter set forth, to make available for Borrower's use two term loans, one in the principal amount of the Term Loan A Commitment ("Term Loan A") and one in the principal amount of the Term Loan B Commitment ("Term Loan B"

and together with Term Loan A, the **"Term Loans"**). Repayments and prepayments of the Term Loans shall not be subject to reborrowing."

**AND** except as otherwise specific to Term Loan A (such as scheduled principal reductions described in Section 3.2(B)), all references to the "Term Loan" throughout the Loan Agreement shall be interpreted to mean the Term Loans.

3.4    Evidence of Debt. Section 2.2 of the Loan Agreement is hereby amended in its entirety to read as follows:

"    2.2    Evidence of Debt. The Revolving Credit Facility and the Loans made by Lender to Borrower thereunder shall be evidenced by the Replacement Revolving Note payable to the order of Lender, which note shall be in the form attached hereto as Exhibit C-1 in an amount equal to the Revolving Credit Commitment. Term Loan A and the Loan made by Lender to Borrower thereunder shall be evidenced by a Term Note A payable to the order of Lender, which note shall be in the form attached hereto as Exhibit C-2 in an amount equal to the Term Loan A Commitment. Term Loan B and the Loan made by Lender to Borrower thereunder shall be evidenced by a Term Note B payable to the order of Lender, which note shall be in the form attached hereto as Exhibit C-3 in an amount equal to the Term Loan B Commitment."

The Replacement Revolving Note referred to as Exhibit C-1 in Section 2.2 of the Loan Agreement shall be in the form attached hereto as Exhibit A. The "Replacement Term Note" defined in the First Amendment, which was replacing the term "Term Note" throughout the Loan Documents and Exhibit C-2 in Section 2.2 of the Loan Agreement shall now be referred to throughout the Loan Documents as "Term Note A" and shall be in the form attached hereto as Exhibit B. Term Note B, a new concept to the Loan Documents and referred to as Exhibit C-3 in Section 2.2 of the Loan Agreement shall be in the form attached hereto as Exhibit C.

3.5    Letters of Credit Fees. Section 2.12(E) of the Loan Agreement is hereby amended in its entirety to read as follows:

"    Compensation for Letters of Credit. Borrower shall pay to Lender, on the last day of each fiscal quarter of each fiscal year of Borrower, in arrears, the following Letter of Credit fees (the **"Letter of Credit Fees"**): (i) with respect to standby Letters of Credit, a yearly fee equal to the face amount of such Letters of Credit multiplied by the Applicable Margin for LIBOR Loans under the Revolving Credit Facility, and (ii) with respect to commercial Letters of Credit, those fees set forth under any Reimbursement Agreement plus, with respect to both, any processing, issuance, amendment or other similar fees customarily charged in connection with any of the Letters of Credit, together with Lender's out-of-pocket costs of issuing and servicing the applicable Letters of Credit."

3.6    Unused Line Fee. Section 3.6 of the Loan Agreement is hereby amended in its entirety to read as follows:

"     3.6    Unused Line Fee.  Borrower shall pay to Lender, on the last day of each fiscal quarter of Borrower, in arrears, an unused line fee (the "**Unused Line Fee**") with respect to an amount equal to the Revolving Credit Commitment minus the average principal balance of all Loans outstanding under the Revolving Credit Facility during such quarter then elapsed, multiplied by an annual interest rate equal to the Applicable Margin.  For purposes of calculating the Unused Line Fee, interest shall be computed on the basis of a year of 360 days and actual days elapsed."

3.7    Scheduled Reductions of Term Loan A.  Section 3.2(B) of the Loan Agreement is hereby amended in its entirety to read as follows:

"     (B)    Scheduled Reductions of Term Loan A.  Term Loan A shall be payable in quarterly principal installments on the last Business Day of each calendar quarter, with the next scheduled payment due on September 30, 2006, such that the outstanding unpaid principal balance of Term Loan A shall amortize in twenty (20) quarterly installments of principal in the amount of (i) $525,000.00 due on September 30, 2006, December 31, 2006, March 31, 2007 and June 30, 2007, (ii) $630,000 due on September 30, 2007, December 31, 2007, March 31, 2008 and June 30, 2008, (iii) $700,000 due on September 30, 2008, December 31, 2008, March 31, 2009 and June 30, 2009, (iv) $770,000 due on September 30, 2009, December 31, 2009, March 31, 2010 and June 30, 2010 and (v) $875,000 due on September 30, 2010, December 31, 2010, March 31, 2011 and May 31, 2011.  The outstanding principal amount of Term Loan A, and all accrued and unpaid interest thereon, shall be due and payable on the Term Loan A Maturity Date."

3.8    Financial Covenants.  Section 7.1 of the Loan Agreement is hereby amended in its entirety to read as follows:

"7.1    Financial Covenants.

(i)    Total Fixed Charge Coverage Ratio.  The Borrowers shall not permit the Total Fixed Charge Coverage Ratio to be less than 1.10:1.0 on the last day of each fiscal quarter of the Borrowers and their Subsidiaries.

(ii)    Senior Leverage Ratio.  The Borrowers shall not permit the Senior Leverage Ratio to be more than (i) 2.75:1.0 on the last day of each fiscal quarter of the Borrowers and their Subsidiaries from June 30, 2006 until December 31, 2006, (ii) 2.50:1.0 on the last day of each fiscal quarter of the Borrowers and their Subsidiaries from January 1, 2007 until June 30, 2007, (iii) 2.25:1.0 on the last day of each fiscal quarter of the Borrowers and their Subsidiaries from July 1, 2007 until June 30, 2008, (iv) 2.00:1.0 on the last day of each fiscal quarter of the Borrowers and their Subsidiaries from July 1, 2008 until June 30, 2009; (v) 1.75:1.0 on the last day of each fiscal quarter of the Borrowers and their Subsidiaries, from July 1, 2009 until June 30, 2010; (vi) 1.50:1.0 on the last day of each

fiscal quarter of the Borrowers and their Subsidiaries from July 1, 2010 and thereafter;"

(iii)    Total Leverage Ratio.  The Borrowers shall not permit the Total Leverage Ratio to be more than (i) 3.25:1.0 on the last day of each fiscal quarter of the Borrowers and their Subsidiaries from June 30, 2006 until December 31, 2006, (ii) 3.00:1.0 on the last day of each fiscal quarter of the Borrowers and their Subsidiaries from January 1, 2007 until June 30, 2007, (iii) 2.75:1.0 on the last day of each fiscal quarter of the Borrowers and their Subsidiaries from July 1, 2007 until June 30, 2008, (iv) 2.50:1.0 on the last day of each fiscal quarter of the Borrowers and their Subsidiaries from July 1, 2008 until June 30, 2009; (v) 2.25:1.0 on the last day of each fiscal quarter of the Borrowers and their Subsidiaries, from July 1, 2009 until June 30, 2010; (vi) 2.00:1.0 on the last day of each fiscal quarter of the Borrowers and their Subsidiaries from July 1, 2010 and thereafter;"

3.9    Use of Proceeds. Section 7.2(H) of the Loan Agreement is hereby amended in its entirety to read as follows:

"    (H)    Use of Proceeds.  Use proceeds of the Loans as follows: (a) the proceeds of Loans under the Revolving Credit Facility shall be used to finance working capital of the Borrowers and their Subsidiaries; and (b) the proceeds of Term Loans shall be used to refinance the Existing Debt and other Approved Uses of Proceeds;"

3.10    Recapture Payments to Term Loan B.    Section 7.2(J) of the Loan Agreement is hereby re-inserted to read as follows:

"    (J)    Excess Cash Flow Recapture to Term Loans.  Until the Term Loans have been repaid in full, if at the end of any fiscal year of the Borrowers, the Total Leverage Ratio is:

(i)    greater than 2.00:1.00, then the Borrowers will be required to pay 75% of the Excess Cash Flow towards the principal amount owed under Term Loan B;

(ii)    equal to or between 2.00:1.00 and 1.50:1.00, then the Borrowers will be required to pay 50% of the Excess Cash Flow towards the principal amount owed under Term Loan B;

(iii)    less than 1.50:1.00, then the Borrowers will not be required to pay any Excess Cash Flow towards the principal amount owed under Term Loan B.

Once Term Loan B has been repaid in full, which shall be no later than the Term Loan B Maturity Date, each payment made under this Section 7.2(J) (a "Recapture Payment") shall be applied towards repayment of principal of Term Loan A. Each Recapture Payment shall be made within one hundred sixty-five

(165) days after the end of a fiscal year. Unless a Default is then in effect, all Recapture Payments shall be applied first against accrued and past due interest with respect to applicable Term Loan and then to the outstanding principal balance of applicable Term Loan, to be applied in inverse order of maturity. Each Recapture Payment shall be in addition to the regularly scheduled payments made by Borrower or becoming due with respect to the applicable Term Loan."

    3.11   Negative Covenants One-Time Exception. Notwithstanding Sections 7.3(A) and 7.3(B) and the Intercreditor (Subordination) Agreement, the Borrowers may use the proceeds from the increase to Term Loan A and the proceeds of Term Loan B for the Approved Uses of Proceeds and the holders of the Subordinated Notes may receive and retain such payments. The Borrowers shall provide the Bank as soon as practicable with evidence reasonably acceptable to it that such payments have been made.

    4.   REPRESENTATIONS AND WARRANTIES. To induce Lender to enter into this Second Amendment, each Borrower hereby certifies, represents and warrants to Lender that:

    4.1   Organization. Such Borrower is a corporation duly organized, existing and in good standing under the laws of the state of its incorporation, with full and adequate corporate power to carry on and conduct its business as presently conducted. Each Borrower is duly licensed or qualified in all foreign jurisdictions wherein the nature of its activities require such qualification or licensing, except where the failure to so qualify would not have a material adverse effect on such Borrower. The Articles of Incorporation, Borrowing Resolutions and Incumbency Certificate of such Borrower have not been changed or amended since the most recent date that certified copies thereof were delivered to Lender. The exact legal name of such Borrower is as set forth in the preamble of this Second Amendment, and the Borrower currently does not conduct, nor has it during the last five (5) years conducted, business under any other name or trade name. Each Borrower will not change its name, its organizational identification number, if it has one, its type of organization, its jurisdiction of organization or other legal structure.

    4.2   Authorization. Each Borrower is duly authorized to execute and deliver this Second Amendment and is and will continue to be duly authorized to borrow monies under the Loan Agreement, as amended hereby, and to perform its obligations under the Loan Agreement, as amended hereby.

    4.3   No Conflicts. The execution and delivery of this Second Amendment and the performance by each Borrower of its obligations under the Loan Agreement, as amended hereby, do not and will not conflict with any provision of law, any agreement to which such Borrower is a party or to which such Borrower is subject, any agreement with any stockholders of such Borrower, or of the Articles of Incorporation or Bylaws of such Borrower.

    4.4   Validity and Binding Effect. The Loan Agreement, as amended hereby, is a legal, valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency or other similar laws of general application affecting the enforcement of creditors' rights or by general principles of equity limiting the availability of equitable remedies.

744921-4

8

4.5    Compliance with Loan Agreement.    With respect to each Borrower, the representation and warranties set forth in Section 6 of the Loan Agreement, as amended hereby, are true and correct with the same effect as if such representations and warranties had been made on the date hereof, with the exception that all references to the financial statements shall mean the financial statements most recently delivered to Lender and except for such changes as are specifically permitted under the Loan Agreement. In addition, each Borrower has complied with and is in compliance with all of the covenants set forth in the Loan Agreement, as amended hereby, including, but not limited to, those set forth in Section 7 thereof.

4.6    No Event of Default.    As of the date hereof, no Event of Default under Section 8 of the Loan Agreement, as amended hereby, or event or condition which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, has occurred or is continuing.

5.    CONDITIONS PRECEDENT.    This Second Amendment shall become effective as of the date above first written after receipt by Lender of the following:

5.1    Second Amendment.    This Second Amendment, duly executed by the Borrowers and Lender.

5.2    Replacement Revolving Note.    A Revolving Note in the maximum principal amount of Five Million and 00/100 Dollars ($5,000,000.00), executed by the Borrowers and made payable to the order of Lender, in the form of Exhibit A attached hereto.

5.3    Term Note A.    Term Note A in the maximum principal amount of Fourteen Million and 00/100 Dollars ($14,000,000.00), executed by the Borrowers and made payable to the order of Lender, in the form of Exhibit B attached hereto.

5.4    Term Note B.    Term Note B in the maximum principal amount of Five Million and 00/100 Dollars ($5,000,000.00), executed by the Borrowers and made payable to the order of Lender, in the form of Exhibit C attached hereto.

5.5    Reaffirmation of Guaranty.    A Reaffirmation of Guaranty for all Borrowers, duly executed by Comair Holding Corp., a Delaware corporation, Comair's parent company, in the form attached hereto as Exhibit D.

5.6    Reaffirmation of Cross-Guaranty.    A Reaffirmation of Cross-Guaranty, duly executed by all Borrowers, in the form attached hereto as Exhibit E.

5.7    Reaffirmation of Note Subordination.    A Reaffirmation of Intercreditor (Subordination) Agreement, duly executed by Holding in the form attached hereto as Exhibit F.

5.8    Reaffirmation of Kuzmin Subordination.    A Reaffirmation of Subordination Agreement, duly executed by Gary Kuzmin in the form attached hereto as Exhibit G.

744921-4                                     9

**086**

5.9    Reaffirmation of Pledges.    A Reaffirmation of Pledge Agreements for equity interest in Comair and Holding, duly executed by Comair and Holding in the form attached hereto as Exhibit H.

5.10    Opinion of Counsel.    An opinion of counsel to Borrowers in the form of Exhibit I attached hereto.

5.11    Corporate Documents.

(i)    A certificate (dated the date of the Closing) of each Borrower's corporate secretary certifying as to (A) no changes in the articles of incorporation and bylaws previously delivered, (B) the incumbency and signatures of the officers of such Borrower signing this Agreement, the Notes, and each other document to be delivered by such Borrower pursuant to this Agreement, and (C) the resolutions of the Board of Directors of such Borrower authorizing the execution, delivery and performance of this Second Amendment and the related loan documents.

(ii)    Certificates, as of the most recent dates practicable, of the Secretary of State of each Borrower's state of incorporation and the Secretaries of State of each state in which each Borrower is qualified as a foreign corporation, or in which it intends to do business following the receipt of proceeds of the Loans, as to the good standing of each Borrower; and

(iii)    Such other documents, instruments or certificates as Lender may request.

5.12    Fee.    The Borrowers agree to pay to Lender a fee of $99,000 due and payable upon the execution and delivery of this Second Amendment by the Borrowers.

5.13    Events.

(i)    Each Borrower shall have been in full compliance with all of the terms and conditions of the Loan Agreement, and no Default or Event of Default shall have occurred and be continuing;

(ii)    No material adverse change shall have occurred in the business, assets, operations, financial or other condition of either Borrower or in any Borrower's ability to repay the Loans; and

(iii)    Each of the representations and warranties set forth herein by each Borrower and in Section 6 of the Loan Agreement hall be true and correct as of such time.

6.    POST-CLOSING.

6.1    Derivative Contract.    Within one hundred twenty (120) days following the closing and disbursement of the funds described hereunder, each Borrower will have entered into an interest rate derivative contract for at least fifty percent (50%) of the principal amount of the Term Loans for a period of at least three (3) years.

744921-4                                    10

7.    GENERAL.

7.1    Governing Law; Severability.    This Second Amendment shall be construed in accordance with and governed by the internal laws of the State of Illinois. Wherever possible each provision of the Loan Agreement and this Second Amendment shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Loan Agreement and this Second Amendment shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of the Loan Agreement and this Second Amendment.

7.2    Successors and Assigns.    This Second Amendment shall be binding upon each Borrower and Lender and their respective successors and assigns, and shall inure to the benefit of each Borrower and Lender and the successors and assigns of Lender.

7.3    Continuing Force and Effect of Loan Documents.    Except as specifically modified or amended by the terms of this Second Amendment, all other terms and provisions of the Loan Agreement and the other Loan Documents are incorporated by reference herein, and in all respects, shall continue in full force and effect. Each Borrower, by execution of this Second Amendment, hereby reaffirms, assumes and binds itself to all of the obligations, duties, rights, covenants, terms and conditions that are contained in the Loan Agreement and the other Loan Documents.

7.4    References to Loan Agreement.    Each reference in the Loan Agreement to "this Agreement", "hereunder", "hereof", or words of like import, and each reference to the Loan Agreement in any and all instruments or documents delivered in connection therewith, shall be deemed to refer to the Loan Agreement, as amended hereby.

7.5    Expenses.    Borrowers shall pay all costs and expenses in connection with the preparation of this Second Amendment and other related loan documents, including, without limitation, attorneys' fees and time charges of attorneys who may be employees of Lender or any affiliate or parent company of Lender. The Borrowers shall pay any and all stamp and other taxes, UCC search fees, filing fees and other costs and expenses in connection with the execution and delivery of this Second Amendment and the other instruments and documents to be delivered hereunder, and agrees to save Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such costs and expenses.

7.6    Counterparts.    This Second Amendment may be executed in any number of counterparts, all of which shall constitute one and the same agreement. Facsimile and electronic signatures shall be treated the same as originals.

7.7    Customer Identification—USA Patriot Act Notice.    Lender hereby notifies the Borrowers that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56, signed into law October 26, 2001 (the "Patriot Act"), it is required to obtain, verify and record information that identifies each Borrower, which information includes the name and address of each Borrower and other information that will allow Lender to identify each Borrower in accordance with the Patriot Act. In addition, and without limiting the foregoing sentence, the

744921-4                                              11

Borrowers shall (a) ensure that no Person who owns a controlling interest in or otherwise controls the Borrowers is or shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("**OFAC**"), the Department of the Treasury or included in any Executive Orders, (b) not use or permit the use of the proceeds of the Loans to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto, and (c) comply, and cause each Subsidiary, if applicable, to comply, with all applicable Bank Secrecy Act ("**BSA**") laws and regulations, as amended.

[signature page attached]

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment to Loan and Security Agreement as of the date first above written.

**BORROWERS:**

COMAIR ROTRON, INC.

By: *Steve M Shamoun*
Name: Steve M. Shamoun
Title: Treasurer

THERMAFLO, INC.

By: *Steve M Shamoun*
Name: Steve M. Shamoun
Title: Treasurer

**LENDER:**

LASALLE BANK NATIONAL ASSOCIATION, a national banking association

By: *Travis J. Burns*
Name: TRAVIS J. BURNS
Title: FIRST VICE PRESIDENT

744921-4

13

EXHIBIT B

TERM NOTE A

No. _____

$14,000,000.00                                                Date: June 27, 2006
Chicago, Illinois                                        Due Date: May 31, 2011

FOR VALUE RECEIVED, COMAIR ROTRON, INC., a Delaware corporation whose address is 2675 Customhouse Court, San Diego, California 92154 ("Comair"), and THERMAFLO, INC., a California corporation whose address is 3817 Old Conejo Rd., Newbury Park, CA 91320 ("Subsidiary" and together with Comair, the "Borrowers"), promise to pay to the order of LASALLE BANK NATIONAL ASSOCIATION, a national banking association (hereinafter, together with any holder hereof, the "Lender"), whose address is 135 South LaSalle Street, Chicago, Illinois 60603, on or before May 31, 2011 (the "Term Loan A Maturity Date"), the principal sum of FOURTEEN MILLION and 00/100 DOLLARS ($14,000,000.00), which amount is the principal amount of Term Loan A made by the Lender to Comair under and pursuant to that certain Loan and Security Agreement effective as of April 2, 2004 executed by and between Comair and the Lender, as amended by that certain First Amendment to Loan and Security Agreement executed by and between the Borrowers and the Lender dated December 9, 2005, as further amended by that certain Second Amendment to Loan and Security Agreement dated the date hereof (collectively, the "Loan Agreement"), together with interest (computed on the actual number of days elapsed on the basis of a 360 day year) on the principal amount of Term Loan A outstanding from time to time as provided in the Loan Agreement. Capitalized words and phrases not otherwise defined herein shall have the meanings assigned thereto in the Loan Agreement.

The outstanding principal of this Term Note A, and all accrued interest thereon, shall be payable as provided in the Loan Agreement, and the outstanding principal balance of this Term Note A, and all accrued and unpaid interest thereon, shall be due and payable in full on the Term Loan A Maturity Date, unless payable sooner pursuant to the provisions of the Loan Agreement.

This Term Note A evidences Term Loan A incurred by the Borrowers under and pursuant to the Loan Agreement, to which reference is hereby made for a statement of the terms and conditions under which the Term Loan A Maturity Date or any payment hereon may be accelerated. The holder of this Term Note A is entitled to all of the benefits and security provided for in the Loan Agreement.

Principal and interest shall be paid to the Lender at its address set forth above, or at such other place as the holder of this Term Note A shall designate in writing to the Borrowers. Term Loan A made by the Lender, and all payments on account of the principal and interest thereof shall be recorded on the books and records of the Lender and the principal balance as shown on such books and records, or any copy thereof certified by an officer of the Lender, shall be rebuttably presumptive evidence of the principal amount owing hereunder.

Except for such notices as may be required under the terms of the Loan Agreement, the Borrowers waive presentment, demand, notice, protest, and all other demands, or notices, in connection with the delivery, acceptance, performance, default, or enforcement of this Term

745098-2



091

Note A , and assents to any extension or postponement of the time of payment or any other indulgence.

Term Loan A evidenced hereby has been made and this Term Note A has been delivered at the Lender's main office set forth above. This Term Note A shall be governed and construed in accordance with the laws of the State of Illinois, in which state it shall be performed, and shall be binding upon the Borrowers, and its legal representatives, successors, and assigns. Wherever possible, each provision of the Loan Agreement and this Term Note A shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Loan Agreement or this Term Note A shall be prohibited by or be invalid under such law, such provision shall be severable, and be ineffective to the extent of such prohibition or invalidity, without invalidating the remaining provisions of the Loan Agreement or this Term Note A. The term "Borrower" as used herein shall mean all parties signing this Term Note A, and each one of them, and all such parties, their respective successors and assigns, shall be jointly and severally obligated hereunder.

This Term Note A constitutes a renewal and restatement of, and replacement and substitution for, that certain Replacement Term Note effective as of December 9, 2005 in the principal amount of Nine Million and 00/100 Dollars ($9,000,000.00), executed by the Borrowers only and made payable to the order of the Lender (the "Prior Note"). The indebtedness evidenced by the Prior Note is continuing indebtedness evidenced hereby, and nothing herein shall be deemed to constitute a payment, settlement or novation of the Prior Note, or to release or otherwise adversely affect any lien, mortgage or security interest securing such indebtedness or any rights of the Lender against any guarantor, surety or other party primarily or secondarily liable for such indebtedness.

IN WITNESS WHEREOF, the Borrowers have executed this Term Note A as of the date set forth above.

COMAIR ROTRON, INC.,
a Delaware corporation

By: _Steve M. Khamoun_
Name: _Steve M Shamoun_
Title: _Treasurer_

THERMAFLO, INC.,
a California corporation

By: _Steve M Shamoun_
Name: _Steve M. Shamoun_
Title: _Treasurer_

EXHIBIT C

TERM NOTE B

No. _____

$5,000,000.00                                                          Date: June 21, 2006
Chicago, Illinois                                                 Due Date: May 31, 2011

FOR VALUE RECEIVED, COMAIR ROTRON, INC., a Delaware corporation whose address is 2675 Customhouse Court, San Diego, California 92154 ("Comair"), and THERMAFLO, INC., a California corporation whose address is 3817 Old Conejo Rd., Newbury Park, CA 91320 ("Subsidiary" and together with Comair, the "Borrowers"), promise to pay to the order of LASALLE BANK NATIONAL ASSOCIATION, a national banking association (hereinafter, together with any holder hereof, the "Lender"), whose address is 135 South LaSalle Street, Chicago, Illinois 60603, on or before May 31, 2011 (the "Term Loan B Maturity Date"), the principal sum of FIVE MILLION and 00/100 DOLLARS ($5,000,000.00), which amount is the principal amount of Term Loan B made by the Lender to Comair under and pursuant to that certain Loan and Security Agreement effective as of April 2, 2004 executed by and between Comair and the Lender, as amended by that certain First Amendment to Loan and Security Agreement executed by and between the Borrowers and the Lender dated December 9, 2005, as further amended by that certain Second Amendment to Loan and Security Agreement dated the date hereof (collectively, the "Loan Agreement"), together with interest (computed on the actual number of days elapsed on the basis of a 360 day year) on the principal amount of Term Loan B outstanding from time to time as provided in the Loan Agreement. Capitalized words and phrases not otherwise defined herein shall have the meanings assigned thereto in the Loan Agreement.

The outstanding principal of this Term Note B, and all accrued interest thereon, shall be payable as provided in the Loan Agreement, and the outstanding principal balance of this Term Note B, and all accrued and unpaid interest thereon, shall be due and payable in full on the Term Loan B Maturity Date, unless payable sooner pursuant to the provisions of the Loan Agreement.

This Term Note B evidences Term Loan B incurred by the Borrowers under and pursuant to the Loan Agreement, to which reference is hereby made for a statement of the terms and conditions under which the Term Loan B Maturity Date or any payment hereon may be accelerated. The holder of this Term Note B is entitled to all of the benefits and security provided for in the Loan Agreement.

Principal and interest shall be paid to the Lender at its address set forth above, or at such other place as the holder of this Term Note B shall designate in writing to the Borrowers. Term Loan B made by the Lender, and all payments on account of the principal and interest thereof shall be recorded on the books and records of the Lender and the principal balance as shown on such books and records, or any copy thereof certified by an officer of the Lender, shall be rebuttably presumptive evidence of the principal amount owing hereunder.

Except for such notices as may be required under the terms of the Loan Agreement, the Borrowers waive presentment, demand, notice, protest, and all other demands, or notices, in connection with the delivery, acceptance, performance, default, or enforcement of this Term

745121-2

Note B, and assents to any extension or postponement of the time of payment or any other indulgence.

Term Loan B evidenced hereby has been made and this Term Note B has been delivered at the Lender's main office set forth above. This Term Note B shall be governed and construed in accordance with the laws of the State of Illinois, in which state it shall be performed, and shall be binding upon the Borrowers, and its legal representatives, successors, and assigns. Wherever possible, each provision of the Loan Agreement and this Term Note B shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Loan Agreement or this Term Note B shall be prohibited by or be invalid under such law, such provision shall be severable, and be ineffective to the extent of such prohibition or invalidity, without invalidating the remaining provisions of the Loan Agreement or this Term Note B. The term "Borrower" as used herein shall mean all parties signing this Term Note B, and each one of them, and all such parties, their respective successors and assigns, shall be jointly and severally obligated hereunder.

IN WITNESS WHEREOF, the Borrowers have executed this Term Note B as of the date set forth above.

COMAIR ROTRON, INC.,
a Delaware corporation

By: _Steve M Shamoun_____
Name: _Steve M. Shamoun_____
Title: _Treasurer_____

THERMAFLO, INC.,
a California corporation

By: _Steve M Shamoun_____
Name: _Steve M. Shamoun_____
Title: _Treasurer_____

2

EXHIBIT A

REPLACEMENT REVOLVING NOTE

|  | No. _____ |
|---|---|
| $5,000,000.00 | Start Date: June 27, 2006 |
| Chicago, Illinois | Due Date: May 31, 2008 |

FOR VALUE RECEIVED, COMAIR ROTRON, INC., a Delaware corporation whose address is 2675 Customhouse Court, San Diego, California 92154 ("Comair"), and THERMAFLO, INC., a California corporation whose address is 3817 Old Conejo Rd., Newbury Park, California 91320 ("Subsidiary" and together with Comair, the "Borrowers"), promise to pay to the order of LASALLE BANK NATIONAL ASSOCIATION, a national banking association (hereinafter, together with any holder hereof, the "Lender"), whose address is 135 South La Salle Street, Chicago, Illinois 60603, on or before May 31, 2008 (the "Revolving Loan Maturity Date"), the lesser of (i) FIVE MILLION and 00/100 DOLLARS ($5,000,000.00), or (ii) the aggregate principal amount of all Revolving Loans outstanding under and pursuant to that certain Loan and Security Agreement effective as of April 2, 2004, executed by and between Comair and the Lender, as amended by that certain First Amendment to Loan and Security Agreement executed by and between the Borrowers and the Lender dated December 9, 2005, as further amended by that certain Second Amendment to Loan and Security Agreement dated the date hereof (collectively, the "Loan Agreement"), and made available by the Lender to the Borrowers at the maturity or maturities and in the amount or amounts stated on the records of the Lender, together with interest (computed on the actual number of days elapsed on the basis of a 360 day year) on the aggregate principal amount of all Revolving Loans outstanding from time to time as provided in the Loan Agreement. Capitalized words and phrases not otherwise defined herein shall have the meanings assigned thereto in the Loan Agreement.

This Revolving Note evidences the Revolving Loans, Letters of Credit and other indebtedness incurred by the Borrowers under and pursuant to the Loan Agreement, to which reference is hereby made for a statement of the terms and conditions under which the Revolving Loan Maturity Date or any payment hereon may be accelerated. The holder of this Revolving Note is entitled to all of the benefits and security provided for in the Loan Agreement. All Revolving Loans shall be repaid by the Borrowers on the Revolving Loan Maturity Date, unless payable sooner pursuant to the provisions of the Loan Agreement.

Principal and interest shall be paid to the Lender at its address set forth above, or at such other place as the holder of this Revolving Note shall designate in writing to the Borrowers. Each Revolving Loan made, and all Letters of Credit issued by, the Lender, and all payments on account of the principal and interest thereof shall be recorded on the books and records of the Lender and the principal balance as shown on such books and records, or any copy thereof certified by an officer of the Lender, shall be rebuttably presumptive evidence of the principal amount owing hereunder.

Except for such notices as may be required under the terms of the Loan Agreement, the Borrowers waive presentment, demand, notice, protest, and all other demands, or notices, in

745097-2

connection with the delivery, acceptance, performance, default, or enforcement of this Revolving Note, and assents to any extension or postponement of the time of payment or any other indulgence.

The Revolving Loans and the Letters of Credit evidenced hereby have been made and/or issued and this Revolving Note has been delivered at the Lender's main office set forth above. This Revolving Note shall be governed and construed in accordance with the laws of the State of Illinois, in which state it shall be performed, and shall be binding upon the Borrowers, and its legal representatives, successors, and assigns. Wherever possible, each provision of the Loan Agreement and this Revolving Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of the Loan Agreement or this Revolving Note shall be prohibited by or be invalid under such law, such provision shall be severable, and be ineffective to the extent of such prohibition or invalidity, without invalidating the remaining provisions of the Loan Agreement or this Revolving Note. The term "Borrower" as used herein shall mean all parties signing this Revolving Note, and each one of them, and all such parties, their respective successors and assigns, shall be jointly and severally obligated hereunder.

This Revolving Note constitutes a renewal and restatement of, and replacement and substitution for, that certain Revolving Note effective as of April 2, 2004 in the maximum principal amount of Five Million and 00/100 Dollars ($5,000,000.00), executed by Comair only and made payable to the order of the Lender (the "**Prior Note**"). The indebtedness evidenced by the Prior Note is continuing indebtedness evidenced hereby, and nothing herein shall be deemed to constitute a payment, settlement or novation of the Prior Note, or to release or otherwise adversely affect any lien, mortgage or security interest securing such indebtedness or any rights of the Lender against any guarantor, surety or other party primarily or secondarily liable for such indebtedness.

IN WITNESS WHEREOF, the Borrowers have executed this Revolving Note as of the date set forth above.

COMAIR ROTRON, INC.,
a Delaware corporation

By: _Steve M Shamoun_
Name: _Steve M. Shamoun_
Title: _Treasurer_

THERMAFLO, INC.,
a California corporation

By: _Steve M Shamoun_
Name: _Steve M. Shamoun_
Title: _Treasurer_

745097-2                          2

**EXHIBIT C**

# EQUITY QUOTAS PLEDGE AGREEMENT

among

## Comair Rotron, Inc. and Comair Holding Corp.

as Pledgors,

and

## LaSalle Bank National Association

as Pledgee,

and

## Comair Rotron de México, S. de R.L. de C.V.

as the Company

April 2, 2004

622700-02

EQUITY QUOTAS PLEDGE AGREEMENT (THE "AGREEMENT") DATED AS OF APRIL __, 2004, ENTERED INTO BY AND AMONG COMAIR ROTRON, INC. ("PLEDGOR A") AND COMAIR HOLDING CORP. ("PLEDGOR B"), AS PLEDGORS (PLEDGOR A AND PLEDGOR B WILL BE HEREINAFTER JOINTLY REFERRED TO AS THE "PLEDGORS"), LASALLE BANK NATIONAL ASSOCIATION, AS PLEDGEE (THE "PLEDGEE"); AND COMAIR ROTRON DE MÉXICO, S. DE R.L. DE C.V. (THE "COMPANY").

IN ACCORDANCE WITH THE FOLLOWING RECITALS, REPRESENTATIONS AND CLAUSES:

## RECITALS

**WHEREAS**, Pledgee and Pledgor A are parties to that certain Loan and Security Agreement dated as of April 2, 2004 (such Loan and Security Agreement as the same hereafter may be amended, modified, supplemented or restated from time to time hereinafter, together with any documents related thereto, are referred to as the "Loan Agreement") pursuant to which the Pledgee has agreed to make loans and other financial accommodations to Pledgor A from time to time;

**WHEREAS**, Pledgor B owns 100% of the outstanding capital stock of Pledgor A and has guaranteed the obligations of Pledgor A under the Loan Agreement pursuant to that certain Holding Guaranty dated as of April 2, 2004 executed by Pledgor B in favor of Pledgee (the "Holding Guaranty"),

**WHEREAS**, Pledgor A owns 99.96% of the Company and Pledgor B owns 0.04% of the Comapny; and

**WHEREAS**, as a condition to the making of loans and the issuance of letters of credit under the Loan Agreement and as security for (i) all of the liabilities of Pledgor A under the Loan Agreement and (ii) all of the obligations of Pledgor B under the Holding Guaranty, Pledgee is requiring that Pledgor A and Pledgor B enter into this Agreement and grant the security interests contemplated hereby.

**NOW, THEREFORE**, in consideration of the premises and the covenants hereinafter contained and to induce the Pledgee to make loans and issue letters of credit under the Loan Agreement, Pledgor A and Pledgor B agree as follows:

## REPRESENTATIONS AND WARRANTIES

I.      Pledgor A through its attorney-in-fact represents and warrants that:

(a)     It is a corporation duly organized and validly existing under the laws of the State of Delaware, United States of America;

1

(b)   It is the legal and beneficial owner of 1 (one) equity quota, with a value of $2'560,424.00 (TWO MILLION FIVE HUNDRED SIXTY THOUSAND FOUR HUNDRED AND TWENTY FOUR PESOS 00/100 Mexican Currency); of which $3,000.00 (THREE THOUSAND PESOS 00/100 Mexican Currency) represent the fixed capital and $2'557,424.00 (TWO MILLION FIVE HUNDRED FIFTY SEVEN THOUSAND FOUR HUNDRED AND TWENTY FOUR PESOS 00/100 Mexican Currency, which represent the variable capital, the sum of which represents 99.96% (ninety nine and ninety six hundredths of one percent) of the total capital stock of the Company (the "Pledged A Equity Quota"). The Pledged A Equity Quota has full voting rights, is duly authorized, validly issued and has been totally subscribed and paid;

(c)   It is willing to enter into this Pledge Agreement in order to create a first priority lien in favor of the Pledgee, thereby creating a first priority security interest (*prenda*) upon the Pledged A Equity Quota in favor of the Pledgee, as provided herein, in accordance with Article 334 of the General Law of Negotiable Instruments and Credit Transactions (*Ley General de Títulos y Operaciones de Crédito*) (the "Negotiable Instruments Law"), to secure the due and punctual payment and performance of Pledgor A's obligations under the Loan Agreement, the debt of which is evidenced by that certain Revolving Credit Note for $5,000,000 USD and that certain Term Note for $7,000,000 USD (hereinafter, the "Secured Obligations");

(d)   Neither the execution nor the delivery by the Pledgor A of this Agreement, the lien created on the Pledged A Equity Quota in favor of the Pledgee, nor compliance by the Pledgor A with its obligations hereunder, will breach or conflict with or result in a violation of (i) its corporate by-laws (*estatutos sociales*), (ii) any credit agreement, indenture, contract or obligation to take money in the form of loans or any other agreement, contract, license, permit or other instrument to which Pledgor A is party or to which Pledgor A or its properties are subject to, or (iii) any law, rule, regulation, norm, decree, order, resolution of any court, administrative or governmental agency applicable to Pledgor A or any of its properties or assets;

(e)   It is fully authorized to enter into this Agreement and to comply with its obligations hereunder, which obligations are valid and enforceable obligations of Pledgor A, enforceable against it in accordance with their terms;

(f)   This Equity Quota Pledge Agreement and the lien created on the Pledged A Equity Quota creates a valid and perfected security interest (*prenda*) over the Pledged A Equity Quota, securing full and punctual payment and performance of the Secured Obligations, and all other actions necessary or desirable to perfect and protect such security interest (*prenda*) have been duly taken;

(g)   Pledgor A does not require any corporate, governmental or other consent or authorization in order to (i) execute or deliver this Agreement, (ii) create, perfect and maintain a first priority lien on the Pledged A Equity Quota, or (iii) comply with

2

its obligations hereunder, except for such authorizations which it has already obtained;

(h)     The Pledged A Equity Quota is free and clear of all liens, encumbrances, leases, defenses or other claims or restrictions or security interests of any nature whatsoever and no guaranties, options or other rights have been granted in regards to the Pledged A Equity Quota except for those set forth in this Agreement; and

(i)     Its attorney-in-fact, Jeffrey Edward From, has sufficient authority to represent it in the terms of this Agreement, and such authority has not been revoked or modified as of the date of this Agreement.

II.     Pledgor B through its attorney-in-fact represents and warrants that:

(a)     It is a corporation duly organized and validly existing under the laws of the State of Delaware, United States of America;

(b)     It is the legal and beneficial owner of 1 (one) equity quota representing 0.04% (four hundredths of one percent) of the total capital stock of the Company (the "Pledged B Equity Quota"). The Pledged B Equity Quota has full voting rights, is duly authorized, validly issued and has been totally subscribed and paid. The Pledged A Equity Quota and the Pledged B Equity Quota will be hereinafter jointly referred to as the "Pledged Equity Quotas";

(c)     It is willing to enter into this Pledge Agreement in order to create a first priority lien in favor of the Pledgee, for the benefit of the Pledgee, thereby creating a first priority security interest (*prenda*) upon the Pledged B Equity Quota in favor of the Pledgee, as provided herein, in accordance with Article 334 of the Negotiable Instruments Law, to secure the due and punctual payment and performance of the Secured Obligations;

(d)     Neither the execution nor the delivery by Pledgor B of this Agreement, the lien created on the Pledged B Equity Quota in favor of the Pledgee, nor compliance by Pledgor B with its obligations hereunder, will breach or conflict with or result in a violation of (i) its corporate by-laws (*estatutos sociales*), (ii) any credit agreement, indenture, contract or obligation to take money in the form of loans or any other agreement, contract, license, permit or other instrument to which Pledgor B is party or to which Pledgor B or its properties are subject to, or (iii) any law, rule, regulation, norm, decree, order, resolution of any court, administrative or governmental agency applicable to Pledgor B or any of its properties or assets;

(e)     It is fully authorized to enter into this Agreement and to comply with its obligations hereunder, which obligations are valid and enforceable obligations of Pledgor B, enforceable against it in accordance with their terms;

(f)     This Equity Quotas Pledge Agreement and the lien created on the Pledged B Equity Quota creates a valid and perfected security interest (*prenda*) over the Pledged B

3



Equity Quota, securing full and punctual payment and performance of the Secured Obligations, and all other actions necessary or desirable to perfect and protect such security interest (*prenda*) have been duly taken;

(g)    Pledgor B does not require any corporate, governmental or other consent or authorization in order to (i) execute or deliver this Agreement, (ii) create, perfect and maintain a first priority lien on the Pledged B Equity Quota, or (iii) comply with its obligations hereunder, except for such authorizations which it has already obtained;

(h)    The Pledged B Equity Quota is free and clear of all liens, encumbrances leases, defenses or other claims or restrictions or security interests of any nature whatsoever and no guaranties, options or other rights have been granted in regards to the Pledged B Equity Quota except for those set forth in this Agreement; and

(i)    Its attorney-in-fact, Jeffrey E. From, has sufficient authority to represent it in the terms of this Agreement, and such authority has not been revoked or modified as of the date of this Agreement.

III.    The Company through its attorney-in-fact represents and warrants that:

(a)    It is a limited liability corporation (*sociedad de responsablidad limitada*) duly organized and validly existing under the laws of the United Mexican States, fully authorized in accordance with its corporate purpose to enter into this Agreement and assume all the obligations herein set forth, as evidenced by Public Deed No. 21,046, dated October 27, 1984 granted before Mr. Eduardo Illades Moreno, appointed to the Notary Public No. 6, of the City of Tijuana, State of Baja California, the first notarial copy of which was registered on January 30, 1985 under entry 16,186, pages 20-36 in the Public Registry of Property and Commerce of the City of Tijuana, State of Baja California.

(b)    That it changed it corporate name to Comair Rotron de Mexico, S.A. de C.V. as evidenced in Public Deed No. 99249, dated April 4, 1987 granted before Mr. Gabriel Moreno Henriquez, Notary Public No. 2, of the City of Tijuana, State of Baja California, the first notarial copy of which was registered on May 21, 1987 under entry 18,858, page 463, book XXVI, Commerce Section in the Public Registry of Property and Commerce of the City of Tijuana, State of Baja California.

(c)    That the Company was transformed under Mexican Law from a Sociedad Anonima de Capital Variable (stock corporation) to a Sociedad de Responsabilidad Limitada de Capital Variable (limited liability company), as evidenced in Public Deed No. 41,474, dated June 25, 1993 granted before Mr. Eduardo Illades Moreno Notary Public No. 6, of the City of Tijuana, State of Baja California, the first notarial copy of which was registered on August 3, 1993 under entry 27913, book 75, Commerce Section in the Public Registry of Property and Commerce of the City of Tijuana, State of Baja California.

4

(d)     Neither the execution nor delivery by the Company of this Agreement, the lien created on the Pledged Equity Quotas in favor of the Pledgee, nor compliance by the Company with its obligations hereunder, will breach or conflict with or result in a violation of (i) its corporate by-laws (*estatutos sociales*), (ii) any credit agreement, indenture, contract or obligation to take money in the form of loans or any other agreement, contract, license, permit or other instrument to which the Company is party or to which the Company or its properties are subject to, or (iii) any law, rule, regulation, norm, decree, order, resolution of any court, administrative or governmental agency applicable to the Company or any of its properties or assets;

(e)     It is fully authorized to enter into this Agreement and to comply with its obligations hereunder, which obligations are valid and enforceable obligations of the Company, enforceable against it in accordance with their terms;

(f)     The Company does not require any corporate, governmental or other consent or authorization in order to: (i) execute or deliver this Agreement, or (ii) comply with its obligations hereunder, except for such authorizations, which it has already obtained;

(g)     Its attorneys-in-fact, Jeffrey Edward From as Chairman of the Board of Managers, Peter H. Howard as Secretary of the Board of Managers and Stephen Lee Pellegrini in his capacity as Treasurer of the Board of Managers, jointly have sufficient authority to represent it in the terms of this Agreement, as is evidenced by Public Deed No. 22,412 dated August 12, 2003, granted before Mr. Gerardo M. Sosa Olachea, Notary Public No. 2, of the City of Tecate, Baja California, the first notarial copy of which was registered on August 20, 2003 under entry 5332047 in the Public Registry of Property and Commerce of the City of Tijuana, State of Baja California and that such authority has not been revoked or modified as of the date of this Agreement; and

(h)     It hereby grants its acknowledgement, consent and approval for the execution of this Agreement.

IV.     The Pledgee through its attorney-in-fact represents and warrants that:

(a)     It is a national banking association duly organized and validly existing under the laws of the United States of America;

(b)     It intends to enter into this Agreement and accept the first priority security interest (*prenda*) over the Pledged Equity Quotas, created on the Collateral (as defined below) in its favor in order to secure the full and punctual payment and performance of the Secured Obligations

(c)     Its attorney-in-fact, Travis Burns, has sufficient authority to represent it in the terms of this Agreement, and such authority has not been revoked or modified as of the date of this Agreement.

5

IN VIRTUE OF THE FOREGOING, and in light of the preceding Recitals and Representations, the parties hereto agree on the following:

## CLAUSES

FIRST. Creation of the Pledge.

(a) In order to secure the full and punctual payment and performance of the Secured Obligations, the Pledgors hereby pledge (*pignoran*) and grant to the Pledgee, a first priority duly perfected lien and create a security interest (*prenda*) (i) on all of their ownership rights over the Pledged Equity Quotas, which represent 100% (one hundred percent) of the capital stock of the Company, and (ii) on all dividends, cash, cash equivalents, instruments, shares, equity quotas and other properties or assets from time to time received, receivable, paid, payable or otherwise delivered to the Pledgors in respect of or in exchange for any or all of the Pledgors interest in the Pledged Equity Quotas (such properties, collectively, the "Collateral").

(b) The security interest (*prenda*) created hereunder is perfected pursuant to the terms of Article 334 of the Negotiable Instruments Law, on the date hereof, by the registration of the security interest (prenda) created hereby in the Equity Quota Holders' Registry Book (*libro de registro de socios*) of the Company. A copy, certified by the Secretary of the Board of Managers of the Company, of the Equity Quota Holders' Registry Book of the Company, containing a notation duly certified by the Secretary of the Board of Managers, stating that the Pledged Equity Quotas have been pledged in favor of the Pledgee pursuant to the provisions hereof shall be deliver to the Pledgee within the 5 (five) Business Days (as defined below) immediately following the date hereof.

(c) The Pledgors shall deliver to the Pledgee within the 5 (five) Business Days (as defined below) immediately following the date hereof, a copy, certified by a Notary Public of the Equity Quota Holders' Registry Book of the Company pursuant to the First Clause of section (b) above.

(d) The Company hereby acknowledges and accepts the creation of the security interest (*prenda*) over the Pledged Equity Quotas pursuant to the terms of this Agreement:

For purposes of this Agreement "Business Day" shall mean any day, other than a Saturday or Sunday, on which banking institutions in Mexico City, Mexico, are open for business and are not authorized or required by law to close.

SECOND.    Voting Rights.

(a) So long as the Pledgors do not default on their obligations under the Loan Agreement (each such default, an "Event of Default"), the Pledgors will be entitled to exercise all voting rights pertaining to the Pledged Equity Quotas in a manner that does not result in a breach of or conflicts with the terms and conditions of this Agreement, the Loan

6

Agreement, and other related documents. If an Event of Default or any such event or circumstance has occurred, the Pledgors will be unable to exercise such voting rights or to adopt such resolutions, as the case may be.

(b) (i) Should an Event of Default or an event or circumstance that with the passing of time or giving of notice would constitute an Event of Default, has occurred and is continuing or (ii) upon written notice to the Pledgors by the Pledgee following the occurrence and during the existence of an Event of Default, the Pledgee may exercise its rights pursuant to Clause Seventh hereof and all of the rights of the Pledgors to exercise or refrain from exercising the voting rights pertaining to the Pledged Equity Quotas, that they would otherwise be entitled to exercise pursuant to Clause Second (a) above shall cease, and all such rights shall thereupon become vested in the Pledgee, which shall thereupon have the sole right to exercise or refrain from exercising such voting rights (in accordance with, but not limited to, Article 338 of the Negotiable Instruments Law). If the Event of Default, event or circumstance is corrected or resolved, the exercise of the voting rights shall again correspond to the Pledgors. For such purpose, the Pledgors hereby grant to the Pledgee an irrevocable power of attorney according to the *Protocolo sobre Uniformidad del Regimen Legal de los Poderes*, Article 192 of the General Corporations Law (*Ley General de Sociedades Mercantiles*) and Article 2596 of the Federal Civil Code (*Código Civil Federal*) and the corresponding articles of the civil codes of the states of Mexico in order to allow the Pledgee to attend any equity holders' meeting and/or exercise such voting rights in respect of the Pledged Equity Quotas. The granting of such power shall be evidenced by a separate notarized document and the same shall be delivered to the Pledgee within a 5 (five) business day term following the date hereof. The Pledgee will not be held responsible for its exercise of the voting rights pertaining to the Pledged Equity Quotas in the above mentioned terms. The exercise of the voting rights set forth herein by the Pledgee shall not impair the exercise of any other rights of the Pledgee provided in this Agreement. Such

THIRD.    Distributions.

(a) The Pledgors will have the right to receive any cash dividends paid in respect of the Pledged Equity Quotas only as long as no Event of Default shall have occurred and is continuing. All distributions made in respect of or in exchange for the Pledged Equity Quotas in any form other than cash, regardless of whether an Event of Default has occurred and is continuing, will become a part of the Collateral hereunder and, if received by the Pledgors, shall forthwith be delivered to the Pledgee (together with, if appropriate, proper instruments of assignment, notations on the relevant registries and/or powers executed by the Pledgors) to be held in pledge hereunder, subject to the terms of this Agreement.

(b) If an Event of Default has occurred and is continuing, the rights of the Pledgors to receive cash dividends as set forth in Clause Third (a) above will cease and the Pledgee will be entitled to receive any and all dividends on the Pledged Equity Quotas and any and all distributions made on or in respect of the Collateral (whether in cash, cash equivalents, in kind, or in any other form); and any and all cash or other property received in exchange for or in respect of any Pledged Equity Quotas shall be and become part of the Collateral and, if received by the Pledgors, shall forthwith be delivered to the Pledgee (together with, if appropriate, proper instruments of assignment, notations on the relevant registries and/or

powers executed by the Pledgors) to be held in pledge hereunder, subject to the terms of this Agreement. If such Event of Default ceases to exist, the right to receive the distributions in cash in respect of the Pledged Equity Quotas shall again correspond, automatically and without the need of any additional action, to the Pledgors.

FOURTH.  Term.

The security interest (*prenda*) created hereunder shall remain in full force and effect until all of the Secured Obligations have been paid and satisfied in full. The number of the Pledged Equity Quotas subject to this Agreement shall not be reduced, notwithstanding the payment of any portion of the Secured Obligations.

FIFTH.  Covenants.

I.      Covenants of the Pledgors.

As long as the Secured Obligations remain outstanding, the Pledgors must:

(a) Abstain from selling, assigning, exchanging, pledging or otherwise transferring, encumbering, diminishing or impairing their rights, including, without limitation, voting rights in respect of the Pledged Equity Quotas or the Collateral, without the prior written authorization of the Pledgee;

(b) Abstain from taking any action or omitting to take any action (other than with the prior written consent of the Pledgee), which acts or omissions may result in a decline in the value of the Pledged Equity Quotas or the Collateral or may otherwise adversely affect the Pledged Equity Quotas or the Collateral, including, without limitation, mergers, spin-offs, liquidation and increases or reductions of the Company's capital stock;

(c) Exercise the voting rights pertaining to the Pledged Equity Quotas or refrain from exercising such voting rights or permit the Pledgee to exercise such voting rights, in accordance with the terms of Clause Second hereof;

(d) Deliver to the Pledgee such information concerning the Pledged Equity Quotas and the Collateral as the Pledgee may from time to time reasonably request, and allow the Pledgee and its designees, from time to time, to inspect, audit, and make copies of and extracts from all records and all other documents in the possession of the Pledgors which pertain to the Pledged Equity Quotas and the Collateral generally, and upon the request of the Pledgee, deliver to the Pledgee certified copies of all such records and papers;

(e) Promptly deliver or cause to be delivered to the Pledgee upon the subscription and payment of any capital increase in the capital stock of the Company, or upon the payment of a dividend in equity quotas paid by the Company the copy, certified by the Secretary of the Board of Managers of the Company, of the Company's equity quota holders' registry book containing a notation, duly certified by the Secretary of the Board of Managers, stating that such equity quotas have been pledged in favor of the Pledgee pursuant to the provisions hereof; and

8



(f) At any time, and from time to time, at the expense of the Pledgors, promptly execute and deliver any further agreements, contracts, instruments or other documents, and take all further action as may be necessary or desirable, or that the Pledgee may reasonably request, in order to perfect and protect the security interest *(prenda)* created hereby, or to enable the Pledgee to exercise its rights and remedies hereunder.

II.    Covenants of the Company.

As long as the Secured Obligations remain outstanding, the Company must:

(a) Abstain from making any notations in the equity quota holders' registry book or other registries maintained by the Company evidencing sales, assignments, exchanges, pledges, transfers, encumbrances or other restrictions or limitations in connection with the Pledged Equity Quotas or the Collateral, without the prior written authorization of the Pledgee;

(b) Deliver to the Pledgee such information concerning the Pledged Equity Quotas and the Collateral as the Pledgee may from time to time reasonably request, and allow the Pledgee and its designees, from time to time, to inspect, audit, and make copies of and extracts from all records and all other documents in the possession of the Company which pertain to the Pledged Equity Quotas and the Collateral generally, and upon the request of the Pledgee, deliver to the Pledgee certified copies of all such records and papers; and

(c) At any time, and from time to time, at the expense of the Company, promptly execute and deliver any further agreements, contracts, instruments or other documents, and take all further action as may be necessary or desirable, or that the Pledgee may reasonably request, in order to perfect and protect the security interest *(prenda)* created hereby, or to enable the Pledgee to exercise its rights and remedies hereunder.

SIXTH.    Novation, Modification, etc.

Neither the execution of this Agreement, nor the lien and security interest *(prenda)* created herein shall constitute any novation, modification or payment of the Secured Obligations.

SEVENTH.    Enforcement.

(a) If an Event of Default has occurred and is continuing, then the Pledgee, may enforce, at the expense of any of the Pledgors, the security interest *(prenda)* created hereunder, following the appropriate procedures available under Mexican law.

(b) The Pledgors hereby expressly waive, to the fullest extent permitted by applicable law, any and all, notifications, publication, notice or hearings in respect of the exercise by the Pledgee of any of its rights and remedies for the duration of any default.

(c) The proceeds resulting from the enforcement of the security interest *(prenda)* created in favor of the Pledgee hereunder, shall be applied (i) to pay all reasonable and documented costs and expenses incurred by the Pledgee in connection with such enforcement, including,

9

without limitation, all court costs and expenses and the fees and expenses of its counsel (including fees and expenses of internal counsel), and (ii) to the payment of any amounts outstanding under the Secured Obligations. The balance after applying such proceeds as set forth in the immediately preceding sentences, if any, will be paid to the Pledgors or to the persons legally empowered to receive such balance, within the 5 (five) Business Days immediately following the date on which the Secured Obligations were paid in full.

EIGHTH. Indemnity.

(a) The Pledgors agree to indemnify, reimburse and hold the Pledgee and its respective successors, permitted assignees, directors, officers, employees and agents (hereinafter in this Clause referred to individually as an "Indemnified Party" and collectively as the "Indemnified Parties") harmless from any and all liabilities, obligations, losses, damages, penalties, claims, actions, suits, judgments and any and all reasonable costs and expenses (including reasonable attorneys' fees and expenses) of whatever kind and nature imposed on, asserted against or incurred by any of the Indemnified Parties in any way relating to or arising out of the execution or delivery of this Agreement, the Loan Agreement, or the documents executed in connection herewith and therewith, the performance by the Pledgors of this Agreement, the Loan Agreement or the documents executed in connection herewith and therewith or in any way relating to the Collateral; provided that no Indemnified Party will be indemnified pursuant to this paragraph (a) for expenses, losses, damages or liabilities to the extent caused by the negligence or willful misconduct of such Indemnified Party. The Pledgors agree that upon written notice by any Indemnified Party asserting such liability, obligation, loss, damage, penalty, claim, action, judgment or suit, the Pledgors will assume full responsibility for the defense thereof. Each Indemnified Party agrees to use its best efforts to promptly notify the Pledgors of any such assertion of which such Indemnified Party has knowledge.

(b) Without limiting the application of paragraph (a) of this Clause Eighth, the Pledgors agree to pay, or reimburse the Pledgee, in accordance with the terms of this Agreement for (if the Pledgee shall have incurred fees, costs or expenses derived from the Pledgors' failure to comply with their obligations under this Agreement or under the Secured Obligations), any and all reasonable fees, costs and expenses of whatever kind or nature incurred in connection with the creation, preservation or protection of the security interest (*prenda*) on the Collateral, including, without limitation, all fees and taxes in connection with the recording or filing of instruments and documents in public offices, payment or discharge of any taxes or liens upon or in respect of the Collateral, insurance premiums with respect to the Collateral and all other reasonable fees, costs and expenses in connection with protecting, maintaining or preserving the Collateral and the Pledgee's interest therein, whether through judicial proceedings or otherwise, or in defending or prosecuting any actions, suits or proceedings arising out of or relating to the Collateral.

(c) Any amounts paid by any Indemnified Party as to which such Indemnified Party has the right to reimbursement under this Agreement, shall constitute Secured Obligations secured by the Collateral. The indemnity obligations of the Pledgors contained in this Clause shall continue in full force and effect notwithstanding the termination of the Secured Obligations.

NINTH. Expenses, Costs and Taxes.  The Pledgors will pay all costs, expenses, taxes, rights and levies derived from the execution and delivery of this Agreement.  Likewise, they will pay to the Pledgee, any traveling expenses and reasonable fees of counsel to the Pledgee, including reasonable costs and expenses of internal counsel to the Pledgee for the preparation and execution of this Agreement. In addition, the Pledgors will pay the Pledgee when and as requested by the Pledgee all traveling expenses and reasonable fees of counsel to the Pledgee, including reasonable costs and expenses of internal counsel to the Pledgee, incurred in relation to any amendment hereto as well as any cost or expense in regard to the enforcement of the security interest (*prenda*) created hereby.

TENTH.      Severability.

Any provision of this Pledge Agreement that is annulled or otherwise rendered unenforceable in any jurisdiction, will not be valid or enforceable in accordance with such resolution in such jurisdiction but will in no way annul the remaining provisions of this Agreement, and such annulment or unenforceability will not affect the validity or enforceability of the provision in any other jurisdiction.

ELEVENTH. Counterparts.

This Agreement may be executed in any number of counterparts and by the parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but such counterparts together shall constitute one and the same instrument.

TWELFTH. Notices.

All notices and other communications made hereunder, unless otherwise mandated herein, will be in writing (including facsimile notices) and delivered to each of the parties hereto, to the addresses set forth below:

Pledgor A:

2675 Customhouse Court
San Diego, California 92154
Tel: (619) 661-5853
Fax: (619) 661-5863
Attention: Steve Pelligrini

Pledgor B:

2675 Customhouse Court
San Diego, California 92154
United States of America
Tel: (619) 661-5853
Fax: (619) 661-5863
Attention: Steve Pelligrini

11

Pledgee:

135 South LaSalle
Chicago, Illinois 60603
United States of America
Tel: (312) 977-6239
Fax: (312) 904-4364
Attention: Travis Burns

The Company:

Calle Uno Poniente No. 109,
Esquina Uno Norte
Ciudad Industrial Nueva Tijuana
CP 22500, Tijuana, Baja California
Mexico.
Tel: (664) 623-3233
Fax: (664) 623-3020/ 623-3025
Attention: Jeffrey E. From

Notices made in accordance with the provisions of this Agreement, shall be deemed made when delivered to the parties, or when such notices are sent by facsimile, provided however, in the event of facsimile transmissions, that the notifying party must obtain confirmation of transmission.

As long as no change of domicile is notified by a party hereto to the other parties, all notices and other proceedings, whether judicial or non-judicial that are made, given or conducted at the domicile set forth above, will be fully effective.

THIRTEENTH. Unconditional Rights; Waiver. All rights of the Pledgee hereunder, the granting of the lien and the creation of the security interest (*prenda*) on the Collateral and all obligations of the Pledgors hereunder shall be absolute and unconditional irrespective of any perfection, exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to or departure from any guaranty, for all or any of the Secured Obligations. The Pledgors hereby waive any present or future right they may have to demand the total or partial release of the security interest (*prenda*) created hereby or of any other collateral that the Pledgors or any other party may have created, acquired or designated to secure the Secured Obligations.

FOURTEENTH.    Waivers; Amendments.

(a) The terms and conditions of this Agreement may not be modified unless such amendment is authorized in writing by the Pledgee.

(b) No delay on the part of the Pledgee in exercising any of its rights, remedies, powers or privileges hereunder nor any partial or single exercise thereof, will constitute a waiver

12

**109**



thereof. The giving of notice to or the filing of a claim against the Pledgors will not constitute a waiver of any rights of the Pledgee in regards to any other or further action in regards to which no notice is made or no claim is filed, as long as such an action is permitted to the Pledgee.

FIFTEENTH. Assignments.

The Pledgee may transfer or assign all or part of its rights hereunder to any third party, by means of the delivery of a written notice to the Pledgors. Upon such a transfer or assignment and as of the date of the relevant notice, the transferee or assignee will be deemed as the Pledgee hereunder. The Pledgors and the Company agree that if the Pledgee transfers or assigns all or part of its rights hereunder, they will execute any agreement, instrument or document, and carry out any and all actions as are reasonably requested by the Pledgee in order for such third party to acquire the Pledgees' rights hereunder (including making the necessary notations in the Company's equity quota holders' registry book and executing an amendment to this Agreement). The Pledgors may not transfer or assign their rights hereunder without the prior written consent of the Pledgee.

SIXTEENTH. Novation of the Secured Obligations.

The parties hereto acknowledge that under the terms of the Loan Agreement transfers of the rights corresponding to the Secured Obligations may result in the release of the Secured Obligations and the cancellation of the rights of the Pledgee thereunder, and in the assumption of new obligations and granting of new rights thereto by virtue of novation or otherwise. The parties agree that this Pledge Agreement, the first priority lien in favor of the Pledgee and the security interest (*prenda*) upon the Collateral, will remain in full force and effect regardless of such novation, and any new obligations resulting from such novation will constitute Secured Obligations for all purposes hereunder.

SEVENTEENTH. Applicable Law and Jurisdiction.

This Agreement will be governed and construed in accordance with the laws of the United Mexican States. For purposes of interpretation, compliance and enforcement of this Agreement, the parties hereto irrevocably submit to the jurisdiction of the competent courts in Mexico City, Federal District and waive any rights to any other jurisdiction to which they may be entitled as a consequence of their present or future domicile or otherwise.

THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK

13

**IN WITNESS WHEREOF**, The Pledgors and the Pledgee have caused this Agreement to be executed by their respective duly authorized representatives, as of April 2, 2004.

**PLEDGORS**

**Comair Rotron, Inc.**

_(signature)_

Name: Jeffrey Edward From
Title: Attorney-in-fact


**Comair Holding Corp.**

_(signature)_

Name: Jeffrey Edward From
Title: Attorney-in-fact


**PLEDGEE**

**LaSalle Bank National Association**


Name: Travis Burns
Title: Attorney-in-fact

14

111

**IN WITNESS WHEREOF,** The Pledgors and the Pledgee have caused this Agreement to be executed by their respective duly authorized representatives, as of April 2, 2004.

## PLEDGORS

### Comair Roiron, Inc.

Name: Jeffrey Edward From
Title: Attorney-in-fact

### Comair Holding Corp.

Name: Jeffrey Edward From
Title: Attorney-in-fact

## PLEDGEE

### LaSalle Bank National Association

Name: Travis Burns
Title: Attorney-in-fact

14

**THE COMPANY**

**Comair Rotron de México, S. de R.L. de C.V.**

By: Jeffrey Edward From
Title: Chairman of the Board of Managers

By: Peter H. Howard
Title: Secretary of the Board of Managers

By: Stephen Lee  Pellegrini
Title: Treasurer of the Board of Managers

15

**THE COMPANY**

**Comair Rotron de México, S. de R.L. de C.V.**

By: Jeffrey Edward From
Title: Chairman of the Board of Managers

By: Peter H. Howard
Title: Secretary of the Board of Managers

By: Stephen Lee Pellegrini
Title: Treasurer of the Board of Managers

15

# HOLDING PLEDGE AGREEMENT

**THIS HOLDING PLEDGE AGREEMENT** (this "**Agreement**") is made as of April 2, 2004 by and between Comair Holding Corp., a Delaware corporation ("**Pledgor**") and LaSalle Bank National Association ("**Lender**").

**WHEREAS**, Comair Rotron, Inc., a Delaware corporation (the "**Subsidiary**"), and Lender are parties to that certain Loan and Security Agreement of even date herewith (such Loan and Security Agreement as the same hereafter may be amended, modified, supplemented or restated from time to time hereinafter, together with any documents related thereto, are referred to as the "**Loan Agreement**") pursuant to which the Lender has agreed to make Loans and other financial accommodations to the Subsidiary from time to time;

**WHEREAS**, Pledgor owns 100% of the outstanding capital stock of Subsidiary and has executed that certain Holding Guaranty (the "**Guaranty**") of even date herewith in favor of Lender; and

**WHEREAS**, as a condition to the making of Loans and the issuance of Letters of Credit under the Loan Agreement and as security for (i) all of the Liabilities of the Subsidiary under the Loan Agreement and (ii) all of Pledgor's obligations under the Guaranty, Lender is requiring that Pledgor enter into this Agreement and grant the security interests contemplated hereby; and

**NOW, THEREFORE**, in consideration of the premises and the covenants hereinafter contained and to induce the Lender to make Loans and issue Letters of Credit under the Loan Agreement, Pledgor agrees as follows:

1.    **DEFINED TERMS.**

Terms not defined herein shall have the meaning ascribed to such terms in the Loan Agreement, and the following shall have (unless otherwise provided elsewhere in this Agreement) the following respective meanings (such meanings being equally applicable to both the singular and plural form of the terms defined):

"**Bankruptcy Code**" shall mean Title 11, United States Code, as amended from time to time, and any successor statute thereto.

"**Pledged Shares**" shall mean 1,000 shares of the common stock of the Subsidiary.

2.    **PLEDGE OF COLLATERAL.**

Pledgor hereby pledges and grants to Lender, for its benefit, a first priority security interest in all of the following (collectively, the "**Pledged Collateral**"):

619159-05

**115**

(i)    the Pledged Shares and the certificates representing the Pledged Shares, if any, together with a stock power accompanying each such certificates, and all dividends, distributions, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Pledged Shares of Pledgor; and

(ii)    such portion, as determined by Lender as provided in Section 6(iv) below, of any additional shares of capital stock of the Subsidiary from time to time acquired by Pledgor in any manner (which shares shall be deemed to be part of the Pledged Shares), and the certificates representing such additional shares, and all dividends, distributions, cash, instruments and other property or proceeds from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares; and

In the event that, during the term of this Pledge, any reclassification, readjustment or other change is declared or made in the capital structure of the Company, all new, substituted and additional shares, or other securities which are issued, or which would be issued by reason of such change if the Pledged Shares were outstanding shall be delivered to and held by Pledgee under the terms of this Pledge in the same manner as the Pledged Collateral originally pledged hereunder. To the extent any new class of capital stock is issued to Pledgor, irrespective of any reclassification, readjustment or otherwise, such new shares of capital stock shall also be subject to subject to this Pledge.

3.    **SECURITY FOR LIABILITIES.**

This Agreement secures, and the Pledged Collateral is security for, (i) the prompt payment in full when due, whether at stated maturity, by acceleration or otherwise, the Liabilities of the Subsidiary under the Loan Agreement, (ii) all of Pledgor's obligations under the Guaranty, (iii) performance of all obligations now or hereafter existing under the Loan Agreement and (iv) all obligations of Pledgor now or hereafter existing under this Agreement including, without limitation, for all fees, costs and expenses whether in connection with collection actions hereunder or otherwise (collectively, the **"Secured Liabilities"**).

4.    **DELIVERY OF PLEDGED COLLATERAL; RECORDING OF PLEDGE.**

All certificates representing or evidencing the Pledged Shares shall be delivered to and held by or on behalf of Lender for its benefit pursuant hereto and shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance satisfactory to Lender. Pledgor shall cause this pledge to be noted on the share registry of the Subsidiary.

5.    **REPRESENTATIONS AND WARRANTIES.**

Pledgor represents and warrants to Lender that:

(i)    Pledgor is, and at the time of delivery of the Pledged Shares to Lender pursuant to Section 4 hereof will be, the sole holder of record and the sole beneficial owner of the Pledged Collateral free and clear of any Lien thereon or affecting the title

619159-05

2

116

thereto, except for any Lien created by this Agreement and a junior and subordinate Lien pursuant to that certain Intercreditor (Subordination) Agreement of even date herewith by and among Guarantor, Lender, Borrower, Comair Rotron de Mexico, S. de R.L. de C.V., note holders party to that certain Subordinated Note and Warrant Purchase Agreement dated as of August 8, 2002 (the "Note Purchase Agreement") and Howard Industries, Inc., a note holder and as agent for the note holders.

(ii)    All of the Pledged Shares have been duly authorized, validly issued and are fully paid and non-assessable.

(iii)    Pledgor has the right and requisite authority to pledge, assign, transfer, deliver, deposit and set over the Pledged Collateral to Lender, for its benefit and the benefit of Lender, as provided herein, and the pledge of the Pledged Collateral to Lender pursuant to this Agreement does not conflict with Pledgor's certificate of incorporation or by-laws or give rise to any default under any material agreement to which Pledgor is a party.

(iv)    None of the Pledged Shares have been issued or transferred in violation of the securities registration, securities disclosure or similar laws of any jurisdiction to which such issuance or transfer may be subject.

(v)    All of the Pledged Shares are presently owned by Pledgor.

(vi)    No consent, approval, authorization or other order of any Person and no consent, authorization, approval, or other action by, and no notice to or filing with, any governmental authority is required (a) for the pledge by Pledgor of the Pledged Collateral pursuant to this Agreement or for the execution, delivery or performance of this Agreement by Pledgor or (b) for the exercise by Lender for its benefit of the voting or other rights provided for in this Agreement or the remedies in respect of the Pledged Collateral pursuant to this Agreement, except as may be required in connection with such disposition by laws affecting the offering and sale of securities generally.

(vii)    The pledge, assignment and delivery of the Pledged Collateral pursuant to this Agreement will create a valid first priority Lien on and a first priority perfected security interest in the Pledged Collateral, and the proceeds thereof, securing the payment of the Secured Liabilities.

(viii)    This Agreement has been duly authorized, executed and delivered by Pledgor and constitutes a legal, valid and binding obligation of Pledgor enforceable against Pledgor in accordance with its terms.

(ix)    The Pledged Shares held by Pledgor constitute 100% of the issued and outstanding shares of capital stock of the Subsidiary.

619159-05

3

(x)    There are no options, warrants, calls or commitments of any character whatsoever relating to the Pledged Shares or any other securities of the Subsidiary other than those warrants issued pursuant to the Note Purchase Agreement.

The representations and warranties set forth in this Section 5 shall survive the execution and delivery of this Agreement.

6.    **COVENANTS.**

Pledgor covenants and agrees that until the termination of this Agreement:

(i)    Without the prior written consent of Lender, Pledgor will not sell, assign, transfer, pledge, or otherwise encumber any of its rights in or to the Pledged Collateral or any other shares of capital stock of the Subsidiary, or any unpaid dividends or other distributions or payments with respect to the Pledged Collateral or any other shares of capital stock of the Subsidiary or grant a Lien in the Pledged Collateral or any other shares of capital stock of the Subsidiary except as otherwise permitted by the Loan Agreement.

(ii)    Pledgor will, at its expense, promptly execute, acknowledge and deliver all such instruments and take all such action as Lender from time to time may request in order to ensure to Lender the benefits of the Liens in and to the Pledged Collateral intended to be created by this Agreement, including authorizing the Lender's filing of any necessary financing statements, which may be filed by Lender without the signatures of Pledgor, and will cooperate with Lender, at its expense, in obtaining all necessary approvals and making all necessary filings under federal or state law in connection with such Liens or any sale or transfer of the Pledged Collateral.

(iii)    Pledgor has and will defend the title to the Pledged Collateral and any other shares of capital stock of the Subsidiary and the Liens of Lender in the Pledged Collateral against the claim of any Person and will maintain and preserve such Liens until the termination of all Commitments and indefeasible payment in full of the Secured Liabilities.

(iv)    Pledgor will, upon obtaining any additional shares of stock of the Subsidiary which shares are not already Pledged Collateral, promptly (and in any event within five (5) Business Days) deliver to Lender a Pledge Amendment, duly executed by Pledgor, in the form prescribed by Lender (a **"Pledge Amendment"**) in respect of any such additional shares pledging to Lender for its benefit all of such additional shares.

(v)    Pledgor will not permit or suffer the Subsidiary to retire, redeem, repurchase, call or otherwise come to own any shares of capital stock of the Subsidiary.

(vi)    Except pursuant to outstanding warrants, Pledgor will not permit or suffer the Subsidiary to issue additional shares of capital stock of the Subsidiary so as to increase the number of shares of capital stock that are issued and outstanding.

619159:05

4

7.    **RIGHTS OF PLEDGOR.**

As long as no Default or Event of Default shall have occurred and be continuing and until written notice shall be given to Pledgor in accordance with Section 8(i) hereof;

(i)    Pledgor shall have the right, from time to time, to vote and give consents with respect to the Pledged Collateral, or any part thereof for all purposes not inconsistent with the provisions of this Agreement, the Loan Agreement and any Ancillary Agreement; provided that no vote shall be cast, and no consent shall be given or action taken, which would have the effect of impairing the position or interest of Lender in respect of the Pledged Collateral or which would authorize or effect (except as and to the extent expressly permitted by the Loan Agreement) (a) the dissolution or liquidation, in whole or in part, of the Subsidiary, (b) the consolidation or merger of the Subsidiary with any other Person, (c) the sale, disposition or encumbrance of all or substantially all of the assets of the Subsidiary, (d) any change in the authorized number of shares, the stated capital or the authorized share capital of the Subsidiary or (e) the alteration of the voting rights with respect to the stock of the Subsidiary;

(ii)    (a)    Pledgor shall be entitled, from time to time, to collect and receive for its own use all cash dividends paid in respect of the Pledged Shares to the extent not in violation of the Loan Agreement other than any and all (x) dividends paid or payable other than in cash in respect of, and instruments and other property received, receivable or otherwise distributed in respect of, or in exchange for, any Pledged Collateral, (y) dividends and other distributions paid or payable in cash in respect of any Pledged Collateral in connection with a partial or total liquidation or dissolution of the Subsidiary and (z) cash paid, payable or otherwise distributed in redemption of, or in exchange for, any Pledged Collateral; provided that until actually paid, all rights to such distributions shall remain subject to the Lien created by this Agreement; and

(b)    all dividends (other than such cash dividends as are permitted to be paid to Pledgor in accordance with clause (a) above) and all other distributions in respect of any of the Pledged Shares, whenever paid or made, shall be delivered to Lender to hold as Pledged Collateral and shall, if received by Pledgor, be received in trust for the benefit of Lender, be segregated from the other property or funds of Pledgor, and be forthwith delivered to Lender as Pledged Collateral in the same form as so received (with any necessary indorsement).

8.    **DEFAULTS AND REMEDIES.**

(i)    Upon the occurrence of an Event of Default and during the continuation of such Event of Default, then on or at any time after such occurrence and upon written notice to Pledgor, Lender (personally or through an agent) is hereby authorized and empowered to transfer and register in its name or in the name of its nominee the whole or any part of the Pledged Collateral, to exchange certificates or instruments representing or

619159-05

5

evidencing Pledged Shares for certificates or instruments of smaller or larger denominations, to exercise the voting and all other rights as a stockholder with respect thereto, to collect and receive all cash dividends and other distributions made thereon, to sell in one or more sales after ten (10) days' notice to Pledgor of the time and place of any public sale or of the time after which a private sale is to take place (which notice Pledgor agrees is commercially reasonable) the whole or any part of the Pledged Collateral and to otherwise act with respect to the Pledged Collateral as though Lender was the outright owner thereof, Pledgor hereby irrevocably constitutes and appoints Lender as the proxy and attorney-in-fact of Pledgor, with full power of substitution to do so, and which appointment shall remain in effect until the Liabilities are indefeasibly paid in full; provided that Lender shall not have any duty to exercise any such right or to preserve the same and shall not be liable for any failure to do so or for any delay in doing so. Any sale shall be made at a public or private sale at Lender's place of business, or at any place to be named in the notice of sale, either for cash or upon credit or for future delivery at such price as Lender may deem fair, and Lender may be the purchaser of the whole or any part of the Pledged Collateral so sold and hold the same thereafter in its own right free from any claim of Pledgor or any right of redemption. Each sale shall be made to the highest bidder, but Lender reserves the right to reject any and all bids at such sale which, in its discretion, it shall deem inadequate. Demands of performance, except as otherwise herein specifically provided for, notices of sale, advertisements and the presence of property at sale are hereby waived and any sale hereunder may be conducted by an auctioneer or any officer or agent of Lender.

(ii)    If, at the original time or times appointed for the sale of the whole or any part of the Pledged Collateral, the highest bid, if there be but one sale, shall be inadequate to discharge in full all the Secured Liabilities, or if the Pledged Collateral be offered for sale in lots, if at any of such sales, the highest bid for the lot offered for sale would indicate to Lender, in its sole discretion, the unlikelihood of the proceeds of the sales of the whole of the Pledged Collateral being sufficient to discharge all the Secured Liabilities, Lender may, on one or more occasions and in its discretion, postpone any of said sales by public announcement at the time of sale or the time of previous postponement of sale, and no other notice of such postponement or postponements of sale need be given, any other notice being hereby waived; provided that any sale or sales made after such postponement shall be after ten (10) days' notice to Pledgor.

(iii)    The proceeds of any sale, disposition or other realization upon all or any part of the Pledged Collateral shall be distributed by Lender, upon receipt, in the following order of priorities.

First, to Lender in an amount sufficient to pay in full the expenses of Lender in connection with such sale, disposition or other realization, including all expenses, liabilities and advances incurred or made by Lender in connection therewith, including attorneys' fees and expenses;

Second, in accordance with Section 8.7 of the Loan Agreement; and

619159-05

6

**Third**, upon indefeasible payment in full of all of the Secured Liabilities, to Pledgor or its representatives or to whomsoever may be lawfully entitled to receive the same, or as a court of competent jurisdiction may direct.

(iv)    If, at any time when Lender shall determine to exercise its right to sell the whole or any part of the Pledged Collateral hereunder, such Pledged Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Securities Act of 1933, as amended (or any similar statute then in effect)(the "Act"), Lender may, in its discretion (subject only to applicable requirements of law), sell such Pledged Collateral or part thereof by private sale in such manner and under such circumstances as Lender may deem necessary or advisable. Without limiting the generality of the foregoing, in any such event, Lender in its discretion (a) may, in accordance with applicable securities laws, proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Pledged Collateral or part thereof could be or shall have been filed under said Act (or similar statute), (b) may approach and negotiate with a single possible purchaser to effect such sale and (c) may restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment and not with a view to the distribution or sale of such Pledged Collateral or part thereof. In addition to a private sale as provided above in this Section 8, if any of the Pledged Collateral shall not be freely distributable to the public without registration under the Act (or similar statute) at the time of any proposed sale pursuant to this Section 8, then Lender shall not be required to effect such registration or cause the same to be effected but, in its discretion (subject only to applicable requirements of law), may require that any sale hereunder (including a sale at auction) be conducted subject to restrictions (a) as to the financial sophistication and ability of any Person permitted to bid or purchase at any such sale, (b) as to the content of legends to be placed upon any certificates representing the Pledged Collateral sold in such sale, including restrictions on future transfer thereof, (c) as to the representations required to be made by each Person bidding or purchasing at such sale relating to that Person's access to financial information about Pledgor and such Person's intentions as to the holding of the Pledged Collateral so sold for investment for its own account and not with a view to the distribution thereof and (d) as to such other matters as Lender may, in its discretion, deem necessary or appropriate in order that such sale (notwithstanding any failure so to register) may be effected in compliance with the Bankruptcy Code and other laws affecting the enforcement of creditors' rights and the Act and all applicable state securities laws.

(v)    Pledgor acknowledges that notwithstanding the legal availability of a private sale or a sale subject to the restrictions described above in paragraph (iv), Lender may, in its sole discretion, elect to register any or all the Pledged Collateral under the Act (or any applicable state securities law) in accordance with its rights hereunder. Pledgor, however, recognizes that Lender may be unable to effect a public sale of any or all the Pledged Collateral and may be compelled to resort to one or more private sales thereof. Pledgor also acknowledges that any such private sale may result in prices and other terms less favorable to the seller than if such sale were a public sale and, notwithstanding such circumstances, agree that any such private sale shall be deemed to have been made in a

commercially reasonable manner. Lender shall be under no obligation to delay a sale of any of the Pledged Collateral for the period of time necessary to permit the registrant to register such securities for public sale under the Act, or under applicable state securities laws, even if Pledgor would agree to do so.

(vi)    Pledgor agrees to the maximum extent permitted by applicable law that following the occurrence and during the continuance of an Event of Default, Pledgor will not at any time plead, claim or take the benefit of any appraisal, valuation, stay, extension, moratorium or redemption law now or hereafter in force in order to prevent or delay the enforcement of this Agreement, or the absolute sale of the whole or any part of the Pledged Collateral or the possession thereof by any purchaser at any sale hereunder, and Pledgor waives the benefit of all such laws to the extent Pledgor lawfully may do so. Pledgor agrees that Pledgor will not interfere with any right, power and remedy of Lender provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise, or the exercise or beginning of the exercise by Lender of any one or more of such rights, powers or remedies. No failure or delay on the part of Lender to exercise any such right, power or remedy and no notice or demand which may be given to or made upon Pledgor by Lender with respect to any such remedies shall operate as a waiver thereof, or limit or impair Lender's right to take any action or to exercise any power or remedy hereunder, without notice or demand, or prejudice its rights as against Pledgor in any respect.

9.    **TERMINATION.**

Upon the indefeasible payment in full of all Secured Liabilities and termination of the Commitments under the Loan Agreement, Lender shall deliver to Pledgor the Pledged Collateral pledged by Pledgor at the time subject to this Agreement and all instruments of assignment executed in connection therewith, free and clear of the Liens hereof and, except as otherwise provided herein, all obligations of Pledgor hereunder shall at such time terminate.

10.    **LIEN ABSOLUTE.**

All rights of Lender hereunder, and all obligations of Pledgor hereunder, shall be absolute and unconditional irrespective of:

(i)    any lack of validity or enforceability of the Loan Agreement, the Notes, the Guaranty, any Ancillary Agreement or any other agreement or instrument governing or evidencing any Secured Liabilities;

(ii)    any change in the time, manner or place of payment of, or in any other term of, all or any part of the Secured Liabilities, or any other amendment or waiver of or any consent to any departure from the Loan Agreement, the Notes, the Guaranty, any other Ancillary Agreement or any other agreement or instrument governing or evidencing any Secured Liabilities;

(iii)    any exchange, release or non-perfection of any other collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Secured Liabilities; or

(iv)    any other circumstance which might otherwise constitute a defense available to, or a discharge of, Pledgor.

## 11.  RELEASE.

Pledgor consents and agrees that Lender may at any time, or from time to time, in its discretion (i) renew, extend or change the time of payment, and/or the manner, place or terms of payment of all or any part of the Secured Liabilities and (ii) exchange, release and/or surrender all or any of the Pledged Collateral, or any part thereof, by whomsoever deposited, which is now or may hereafter be held by Lender in connection with all or any of the Secured Liabilities; all in such manner and upon such terms as Lender may deem proper, and without notice to or further assent from Pledgor, it being hereby agreed that Pledgor shall be and remain bound upon this Agreement, irrespective of the value or condition of any of the Pledged Collateral, and notwithstanding any such change, exchange, settlement, compromise, surrender, release, renewal or extension, and notwithstanding also that the Secured Liabilities may, at any time, exceed the aggregate principal amount thereof set forth in the Loan Agreement, or any other agreement governing any Secured Liabilities.  Pledgor hereby waives notice of acceptance of this Agreement, and also presentment, demand, protest and notice of dishonor of any and all of the Secured Liabilities, and promptness in commencing suit against any party hereto or liable hereon, and in giving any notice to or of making any claim or demand hereunder upon Pledgor.  No act or omission of any kind on Lender's part shall in any event affect or impair this Agreement.

## 12.  MISCELLANEOUS.

12.1    **Expenses.**  Pledgor agrees to promptly reimburse Lender for actual out-of-pocket expenses, including, without limitation, reasonable attorney's fees, incurred by Lender in connection with the negotiation and enforcement of this Agreement.

12.2    **No Liability.**  Neither Lender nor any of its respective officers, directors, employees, agents or counsel shall be liable for any action lawfully taken or omitted to be taken by it or them hereunder or in connection herewith, except for its or their own gross negligence or willful misconduct.

12.3    **Governing Law.**  This Agreement shall be construed in accordance with and governed by the internal laws of the State of Illinois.

12.4    **Assignment.**  Lender may assign, indorse or transfer any instrument evidencing all or any part of the Secured Liabilities as provided in, and in accordance with, the Loan Agreement, and the holder of such instrument shall be entitled to the benefits of this Agreement.

619159-05

9

**12.5    Reinstatement.**    This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against Pledgor or the Subsidiary for liquidation or reorganization, should Pledgor or the Subsidiary become insolvent or make an assignment for the benefit of creditors or should a receiver or trustee be appointed for all or any significant part of Pledgor's or the Subsidiary's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment and performance of the Secured Liabilities, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Liabilities, whether as a "voidable preference," "fraudulent conveyance" or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Secured Liabilities shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

**12.6    Severability.**    Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective an valid under applicable law, but the provisions of this Agreement are severable, and if any clause or provision shall be held invalid and unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction, and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision of this Agreement in any jurisdiction.

**12.7    Notices.**    Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon any of the parties by any other party, or whenever any of the parties desires to give or serve upon any other a communication with respect to this Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and either shall be delivered in person with receipt acknowledged or sent by registered or certified mail, return receipt requested, postage prepaid, or by telecopy and confirmed by telecopy answerback addressed as follows:

    (a)    If to Lender, at:
        135 South LaSalle Street
        Chicago, Illinois
        Attention: Travis Burns
        Fax No.: (312) 904-4364

        With copies to:
        Ungaretti & Harris
        3500 Three First National Plaza
        Chicago, Illinois 60602
        Attention: Gary I. Levenstein
        Fax No.: (312) 977-4405

619159-05

10

(b)    If to Pledgor, at:
2675 Customhouse Court
San Diego, California 92154
Attention: Steve Pellegrini
Fax No.: (619) 661-6057

With copies to:
Katten Muchin Zavis Rosenman
525 West Monroe Street
Chicago, Illinois 60661
Attention: Jeffrey L. Elegant
Fax No.: (312) 577-4676

or at such other address as may be substituted by notice given as herein provided. The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice. Every notice, demand, request, consent, approval, declaration or other communication hereunder shall be deemed to have been duly given or served on the date on which personally delivered, with receipt acknowledged, transmitted and confirmed by facsimile transmission answerback or five (5) Business Days after the same shall have been deposited in the United States mail. Failure or delay in delivering copies of any notice, demand, request, consent, approval, declaration or other communication to the persons designated above to receive copies shall in no way adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.

    **12.8**   **Section Titles.** The Section titles herein are for convenience of reference only, and shall not affect in any way the interpretation of any of the provisions hereof.

    **12.9**   **Execution in Counterparts.** This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

[signature page attached]

619159-05

11

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first written above.

**PLEDGOR:**

COMAIR HOLDING CORP.
a Delaware corporation

By: _____
Name: *STEPHEN L. PELLEGRINI*
Title: *VICE PRESIDENT FINANCE*

Accepted and Acknowledged by:
LASALLE BANK NATIONAL ASSOCIATION,
as Lender

By: _____
Name:      Travis Burns
Title:      Vice President

Holding Pledge Agreement

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first written above.

PLEDGOR:

COMAIR HOLDING CORP.
a Delaware corporation

By: _____
Name:_____
Title:_____

Accepted and Acknowledged by:
LASALLE BANK NATIONAL ASSOCIATION,
as Lender

By: _____
Name:      Travis Burns
Title:      Vice President

## ASSIGNMENT SEPARATE FROM CERTIFICATE

FOR VALUE RECEIVED, the undersigned does hereby sell, assign and transfer to
_____, Federal Identification No. _____, _____
share(s) of the capital stock of Comair Rotron, Inc., a Delaware corporation, represented by
certificate no. _____, standing in the name of the undersigned on the books of said
corporation. The undersigned does hereby irrevocably constitute and appoint
_____ attorney to transfer the shares of said corporation, with full power of
substitution in the premises.

Dated: _____, 20___.

                              COMAIR HOLDING CORP., a Delaware
                              corporation

                              By:    _____
                              Name:  STEPHEN K PELLEGRINI
                              Title: VP FINANCE

Assignment Separate From Certificate
Comair Rotron, Inc.

Doc.#:CHB02 (206254-00002) 60267056v1;03/31/2004/Time:12:26

128

FINAL

## SUBSIDIARY STOCK PLEDGE AGREEMENT

This SUBSIDIARY STOCK PLEDGE AGREEMENT dated as of December 9, 2005 (the "**Pledge Agreement**") is executed by COMAIR ROTRON, INC., a Delaware corporation (the "**Borrower**"), whose address is 2675 Customhouse Court, San Diego, California 92154 to and for the benefit of LASALLE BANK NATIONAL ASSOCIATION, a national banking association (the "**Lender**"), whose address is 135 South La Salle Street, Chicago, Illinois 60603.

### RECITALS:

A.    The Lender has made loans (the "**Loans**") to the Borrower arising under and pursuant to that certain Loan and Security Agreement effective as of April 2, 2004, as may be amended, supplemented or modified from time to time, including, without limitation, by that certain First Amendment to Loan and Security Agreement dated the date hereof and executed by and among the Borrower, the Lender and the Issuer who became a borrower thereunder (the "**First Amendment**" and collectively, the "**Loan Agreement**"), and as evidenced by (i) that certain Replacement Revolving Note dated the date hereof in the maximum principal amount of Six Million and 00/100 Dollars ($6,000,000.00) executed by the Borrower and Issuer and made payable to the order of the Lender; and (ii) that certain Replacement Term Note dated the date hereof in the maximum principal amount of Nine Million and 00/100 Dollars ($9,000,000.00) executed by the Borrower and Issuer and made payable to the order of the Lender, including any extensions, renewals or modifications thereof or substitutions or replacements therefor (each, a "**Note**" and together, the "**Notes**"). Capitalized terms used herein, unless otherwise defined herein, shall have the meanings provided therefor in the Loan Agreement.

B.    As a condition to the Lender's entering into the First Amendment and all instruments and documents contemplated thereby and, among other things, increasing the Term Loan Commitment, the Lender requires that the Borrower enter into this Pledge Agreement in order to secure the obligations and performance of the Borrower hereunder under the Loan Agreement and the Notes.

NOW, THEREFORE, for and in consideration of the foregoing premises, which are hereby incorporated herein as true, and the mutual promises and agreements contained herein, the Borrower and the Lender hereby agree as follows:

### AGREEMENTS:

1.    <u>Grant of Security Interest</u>. To secure the Obligations described in Paragraph 2, the Borrower hereby assigns, pledges and grants to the Lender, as a secured party and a secured creditor under the Uniform Commercial Code of Illinois, in effect from time to time (the "**UCC**"), a security interest in and to the following (collectively, the "**Collateral**"):

(a)    together with all voting rights thereto, one thousand (1,000) shares of the common stock of Thermaflo, Inc., a California corporation (the "**Issuer**") as evidenced by Certificate No(s). _____ (collectively, the "**Certificates**"), together with any Stock of the Issuer delivered to the Lender pursuant to Section 4(b) hereof or otherwise in the possession of the Lender and any and all other shares of the capital stock of the Issuer

721185-4

**129**

hereafter owned or acquired by the Borrower by reason of a stock dividend or a sale or other transfer of the capital stock of the Issuer by the Borrower, as a result of or in connection with any increase or reduction of capital, reclassification, merger, consolidation, sale of assets, combination of shares, stock split, spin-off or split-off, together with all substitutions or replacements of any of the foregoing (together with any other stock in the Issuer required to be pledged and delivered hereunder being collectively referred to herein as the "**Stock**");

(b)     the Certificates and any and all other certificates now or hereinafter in the possession of the Borrower or the Lender evidencing the Stock, together with any stock powers therefor;

(c)     all payments, income and dividends (whether in cash, stock or other property), liquidating dividends, stock warrants, stock options, stock rights, subscription rights, securities of the Issuer or any other distributions of any other property which the Borrower is now or may hereafter be entitled to receive on account of the Stock (collectively, the "**Distributions**"); and

(f)     any and all products and proceeds of any kind of any and all of the foregoing Collateral, including the proceeds of any insurance thereon, now or hereafter owned or acquired by the Borrower.

2.     <u>Obligations.</u>     The obligations secured by this Pledge Agreement (the "**Obligations**") are the following:

(a)     any and all obligations and liabilities of the Borrower to the Lender whether direct or indirect, joint or several, absolute or contingent, now or hereafter existing, and however created, evidenced or arising, including, but not limited to, the obligations and liabilities of the Borrower arising under and pursuant to the Loan Agreement and as evidenced by the Notes and any and all extensions or renewals thereof or replacements or substitutions therefor;

(b)     any and all sums advanced by Lender in order to preserve the Collateral or to perfect its security interest in the Collateral; and

(c)     in the event of any proceeding to enforce the collection of the Obligations, the reasonable expenses of retaking, holding, preparing for sale or lease, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by Lender of its rights in the event of a default under any agreement between the Borrower and the Lender, together with reasonable attorneys' fees and court costs.

3.     <u>Representations and Warranties.</u>  The Borrower represents and warrants to the Lender as follows:

(a)     The Borrower is a corporation duly organized, existing and in good standing under the laws of the State of Delaware, with full and adequate power to carry on and conduct its business as presently conducted, and is duly licensed or qualified in all foreign jurisdictions wherein the nature of its activities require such qualification or

licensing except where the failure to so qualify would not have a material adverse effect on such Borrower.

(b)     The Borrower's state issued organizational identification number is 2094201. The exact legal name of the Borrower is as set forth in the preamble of this Agreement, and the Borrower currently does not conduct, nor has it during the last five (5) years conducted, business under any other name or trade name. The Borrower will not change its name, its organizational identification number, if it has one, its type of organization, its jurisdiction of organization or other legal structure.

(c)     The Borrower has full right, power and authority, without obtaining the consent of any other person, body or governmental agency, to enter into and deliver this Pledge Agreement, to pledge, assign and grant a security interest in and deliver the Collateral to the Lender, and to perform all of its duties and obligations under this Pledge Agreement.

(d)     All necessary and appropriate action has been taken on the part of the Borrower to authorize the execution and delivery of this Pledge Agreement. This Pledge Agreement is a valid and binding agreement and contract of the Borrower in accordance with its terms. No basis presently exists for any claim against the Lender under this Pledge Agreement or with respect to the enforcement thereof, and this Pledge Agreement is subject to no defenses of any kind.

(e)     The execution, delivery and performance by the Borrower of this Pledge Agreement and any other documents or instruments to be executed and delivered by the Borrower in connection therewith is valid, binding and enforceable against the Borrower, and shall not: (i) violate or contravene the articles of incorporation or bylaws of the Borrower or any existing law or regulation or any order, writ, injunction or decree of any court or governmental authority, or (ii) conflict with, be inconsistent with, or result in any breach or default of any of the terms, covenants, conditions, or provisions of any indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind to which the Borrower is a party, or by which the Borrower or any of its property or assets may be bound, and will not result in the creation or imposition of any security interest in any properties pursuant to the provisions of any such mortgage, indenture, contract or other agreement.

(f)     To the best of the Borrower's knowledge, no condition, circumstance, document, restriction, litigation or proceeding (or threatened litigation or proceeding or basis therefor) exists which could adversely affect the validity or priority of the liens and security interests granted the Lender hereunder, which could materially adversely affect the ability of the Borrower to perform the obligations under this Pledge Agreement, which would constitute a default hereunder or thereunder or which would constitute such a default with the giving of notice or lapse of time or both.

(g)     None of the actions contemplated by this Pledge Agreement are in violation of or restricted by any restrictive agreement, stop transfer order, any legend appearing on the certificates evidencing any of the Collateral consisting of Stock, the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended,

721185-4                                   3

131

any state blue-sky or securities law, any Canadian federal or provincial blue-sky or securities law, or any rule or regulation issued under the foregoing acts and laws.

(h)     The nature and transaction of the business and operations of the Borrower, and the use of its properties and assets will not materially violate or conflict with any applicable law, statute, ordinance, rule, regulation or order of any kind including without limitation zoning, building, environmental, land use, noise abatement, occupational health and safety or other laws, any building permit or any condition, grant, easement, covenant, condition or restriction, whether recorded or not.

(i)     The Borrower is the beneficial and record owner of the Collateral. All of the Collateral is free of all pledges, hypothecation, mortgages, security interests, charges or other encumbrances, except those in favor of the Lender and Permitted Liens. The Stock held by the Borrower constitutes 100% of the issued and outstanding shares of capital stock of the Issuer. There are no options, warrants, calls or commitments of any character whatsoever relating to the Stock or any other securities of the Issuer.

(j)     All of the Stock pledged hereunder has been and continues to be duly and validly authorized and issued, fully paid and nonassessable shares of the Issuer of such stock, and was not issued in violation of any preemptive rights or any agreement by which the Issuer is bound.

(k)     The Borrower has either previously or simultaneously herewith delivered to the Lender the Certificates for all of the Stock, together with appropriate stock powers therefor executed in blank by the Borrower.

(l)     Upon delivery of the duly executed Pledge Agreement and any Certificates evidencing all of the Stock, together with stock powers therefor, the Lender shall have a valid first lien and security interest in all of the Collateral hereunder, free and clear of all other Liens, and subject to no pledges, hypothecation, mortgages, security interest, charges or other encumbrances, except in favor of the Lender and Permitted Liens.

(m)     The market value of the Stock delivered and pledged to the Lender as of the date hereof equals or exceeds Four Million Six Hundred Thousand and 00/100 Dollars ($4,600,000.00). The term "market value" for purposes of this Pledge Agreement means the purchase price paid for the Stock by the Borrower pursuant to that certain Stock Purchase Agreement dated the date hereof and entered into by and among the Borrower, Issuer and the sole stockholder of the Issuer.

4.     Covenants.  Until the Obligations have been satisfied and discharged in full, the Borrower covenants to and agrees with the Lender as follows:

(a)     The Borrower shall not: (i) sell, assign, deliver, convey or otherwise dispose of or transfer, or create, grant, incur or permit to exist any pledge, mortgage, lien, security interest, charge or other encumbrance whatsoever (except in favor of the Lender and Permitted Liens) in or with respect to the Collateral hereunder or any interest therein, (ii) approve the issuance of any securities, options, warrants or rights to acquire securities

721185-4                                            4

of the Issuer, or (iii) permit the Issuer to issue any additional securities, options, warrants or rights to acquire securities in the Issuer.

(b)    If, at any time following an Event of Default (as defined in Section 5) hereunder, the Borrower receives or is entitled to receive into its possession any payments, checks, instruments, chattel paper, dividends on account of or in respect of the Collateral, or any other Collateral or proceeds thereof, such Borrower shall accept such Collateral as the Lender's agent, in trust for the Lender without commingling such Collateral with any other property of such Borrower and shall, upon receipt, immediately deliver such Collateral to the Lender in the exact form so received, with any necessary endorsement of the Borrower or stock powers executed by the Borrower in blank.

(c)    The Borrower will, at all times and from time to time, defend the Collateral against any and all claims of any person or party whose claims are adverse to the claims, rights or interest of the Lender, and the Borrower shall indemnify and hold the Lender harmless from any and all such adverse claims. The Borrower shall bear all risk of loss, damage and diminution in value with respect to the Collateral, and the Borrower agrees that the Lender shall have no liability or obligation to the Borrower with respect to, and is hereby released by the Borrower from any of, the foregoing.

(d)    At any time and from time to time after the occurrence of an Event of Default or a default under any of the Obligations which is continuing uncured and unwaived, the Borrower shall, upon request of the Lender, execute and deliver to the Lender any proxies, stock powers or assignments with respect to any of the Stock, or endorse any instruments or chattel paper with respect to the Collateral as so requested.

5.    <u>Events of Default</u>.  The Borrower shall be in default under this Pledge Agreement upon the occurrence of any one or more of the following events or conditions (an "**Event of Default**"):

(a)    any misrepresentation or breach of any warranty by the Borrower in this Pledge Agreement; and

(b)    the occurrence of an Event of Default under the Loan Agreement or any Ancillary Agreement.

6.    <u>Rights and Remedies of Lender</u>.  Upon the happening or occurrence of an Event of Default hereunder which is continuing uncured and unwaived, and at any time thereafter and from time to time, the Lender shall have all of the rights and remedies of a secured party under the UCC as enacted in and then in effect in Illinois. In addition, the Lender shall also have the following rights and remedies:

(a)    Without further notice to the Borrower, the Lender shall have the right and be entitled to notify the Issuer of any of the Stock to make payment to the Lender and to receive all Distributions to be applied toward the satisfaction of the Obligations and to exercise all voting, conversion, exchange, subscription or other corporate rights, privileges or options pertaining to such Stock.

(b)    The Lender shall have the right, at its discretion, to transfer to or register in the name of the Lender or any nominee of the Lender any of the Collateral.

(c)    Without demand, notice or advertisement, all of which are hereby expressly waived to the extent permitted by applicable law, the Lender may sell, pledge, transfer or otherwise dispose of, or enter into an agreement with respect to the foregoing, or otherwise realize on the Collateral and any other Collateral, or any part thereof, at any broker's board or on any exchange or at public or private sale or sales, held at such place or places in the City of Chicago, Illinois or otherwise, and at such time or times within ordinary business hours, for a purchase price or prices in cash or, without assuming any credit risk or thereby discharging the Obligations to the extent of said purchase price until paid in cash and reserving the right to resell the Collateral upon the failure of said purchaser to so pay the purchase price therefor, upon credit or future delivery, and upon such other terms and conditions as the Lender deems satisfactory, and, if required by law, as set forth in any applicable notice. The Lender shall not be obligated to make any such sale pursuant to any such applicable notice required by law. The Lender may, without notice or publication, adjourn any such sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale maybe made at any time or place to which the same may be so adjourned. The Lender, for its own account, may purchase any or all of the Collateral at any public sale and, in lieu of payment of the purchase price therefor, may set off or apply the purchase price against the Obligations. The Lender is authorized, at any sale, if it deems it advisable so to do, to restrict the prospective bidders or purchasers to financially reputable persons who will represent and agree that they are purchasing for their own account, for investment, and not with a view to the distribution or sale of any of the Collateral. Upon any such sale, the Lender shall have the right to deliver, assign, and transfer to the purchaser thereof, including the Lender, that portion of the Collateral so sold. Each purchaser, including the Lender, at any sale shall hold the property sold absolutely free from any claim or right of whatsoever kind, including any equity or right of redemption of the Borrower, and the Borrower hereby specifically waives and releases all rights of redemption, stay or appraisal which it has or may have under any rule or law or statute now existing or hereafter adopted. The Lender, however, instead of exercising the power of disposition herein conferred upon it, may proceed by a suit or suits at law or in equity to foreclose the pledge and sell the Collateral, or any portion thereof, under a judgment or decree of a court or courts of competent jurisdiction. After deducting from the proceeds of the foregoing sale or other disposition of said Collateral, all expenses incurred by the Lender in connection therewith (including reasonable attorneys' fees), the Lender shall apply such proceeds towards the satisfaction of the Obligations and shall account to the Borrower for any surplus of such proceeds.

(d)    If at any time after the occurrence and during the continuance of an Event of Default without cure or waiver, in the opinion of counsel for the Lender, any proposed disposition of Collateral hereunder requires registration, qualification, notification, or other action under or compliance with any state blue sky or securities law or the Federal Securities Act of 1933, as amended, or any rules or regulations thereunder (collectively, the "Securities Laws"), the Borrower, at the request of the Lender, will as expeditiously as possible use its best efforts to take such action or cause such action to be taken, comply or cause compliance with such Securities Laws and maintain such compliance or

cause such compliance to be maintained for such period as may be necessary to permit such disposition. The Borrower acknowledges that a breach of the above covenant contained in this Section 6 may cause irreparable injury to the Lender and that the Lender will have no adequate remedy at law with respect to such breach, and consequently, the Borrower agrees that the above covenant shall be specifically enforceable and the Borrower hereby waives, to the extent such waiver is enforceable under law, and agrees not to assert any defenses against an action for specific performance of such covenant. In connection with the foregoing, the Borrower will (i) pay all expenses imposed on or demanded of the Lender under the Securities Laws in connection with such compliance, including the expense of furnishing to the Lender an adequate number of copies of the prospectus contained in any such registration statement, (ii) indemnify and hold the Lender harmless from and against any and all claims and liabilities caused by any untrue statement of a material fact or omission to state a material fact required to be stated in any registration statement, offering circular or prospectus used in connection with such compliance, or necessary to make the statements therein not misleading, and (iii) pay all expenses (including reasonable attorneys' fees) incurred by the Lender in specifically enforcing the above covenant.

The rights and remedies provided herein, in the Loan Agreement, in the Notes and in any other agreements between the Borrower and the Lender are cumulative and are in addition to and not exclusive of the rights and remedies of a secured party under the UCC and any other rights or remedies provided by applicable law. The Borrower hereby (i) names, constitutes and appoints the Lender as the Borrower's proxy and attorney-in-fact in the Borrower's name, place and stead, (ii) authorizes the Lender to take, at any time without the appropriate signature of the Borrower, any action to take any action for and on behalf of the Borrower which is required of the Borrower or permitted to be taken by the Lender hereunder, including, without limitation, voting any and all of the Stock or other securities, as such proxy may elect, for and in the name, place and stead of the Borrower, as to all matters coming before shareholders, and (iii) acknowledges that the constitution and appointment of such proxy and attorney-in-fact are coupled with an interest and are irrevocable. The rights, powers and authority of said proxy and attorney-in-fact shall remain in full force and effect, and shall not be rescinded, revoked, terminated, amended or otherwise modified, until all Obligations have been fully satisfied.

7.    **No Duty Concerning Collection on Collateral.**  The Lender shall not be liable for its failure to give notice to the Borrower of a default under the Note or under any other agreement between the Borrower and the Lender. The Lender shall not be liable for its failure to use diligence to collect any amount payable in respect to the Collateral, but shall be liable only to account to the Borrower for what the Lender may actually collect or receive thereon.

8.    **Further Assurances.**  The Borrower hereby irrevocably authorizes the Lender at any time and from time to time to file in any jurisdiction any initial Uniform Commercial Code financing statements and/or amendments thereto naming the Lender, as Secured Party, and the Borrower, as Debtor, that (a) describe the Collateral, and (b) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, and which shall evidence the Lender's perfection of a security interest in such Collateral as security for the Obligations. The Borrower, upon demand, shall furnish to the Lender such further information, execute and deliver such other documents and do all such other acts and things as the Lender may at any time, or from time to time,

721185-4;                                              7

reasonably request as being necessary or appropriate to establish and maintain a perfected first security interest in the Collateral or to otherwise evidence, document or conclude the transactions contemplated hereby, including, without limitation, registering any Stock pledged hereunder with the Issuer of the Stock in the event such Stock is at any time uncertificated. The Borrower shall pay all costs and expenses of registering such Stock or of filing such financing statements, of all searches of records, wherever filing or recording or searching of records is deemed by the Lender to be necessary and desirable, or otherwise incurred by the Lender or its agents in carrying out the provisions of this Assignment. A photographic, carbon or other reproduction of this Assignment shall be sufficient as a financing statement.

9.    Ascertaining Maturities, Calls, etc.   Without limiting the foregoing, it is specifically understood and agreed that the Lender shall have no responsibility for ascertaining any maturities, calls, conversations, exchanges, offers, tenders, or similar matters relating to any of the Collateral or for informing the Borrower with respect to any of such matters (irrespective of whether the Lender actually has, or may be deemed to have, knowledge thereof). The foregoing provisions of this paragraph shall be fully applicable to all securities or similar property held in pledge hereunder, irrespective of whether the Lender may have exercised any right to have such securities or similar property registered in its name or in the name of a nominee.

10.    Care in Custody.   The Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral and in protecting any rights with respect to the Collateral against prior parties, if the Lender takes such action for that purpose as the Borrower shall request in writing, but failure of the Lender to comply with any such request shall not of itself be deemed a failure to exercise reasonable care, provided, however, that in any event the Lender's responsibility for the safekeeping of the Collateral shall not extend to matters beyond the control of the Lender, including, without limitation, acts of God, war, insurrection, riot, governmental actions or acts of any corporate or other depository.

11.    Waiver of Defenses.   No renewal or extension of the time of payment of the Obligations; no release or surrender of, or failure to perfect or enforce any security interest for the Obligations; no release of any person primarily or secondarily liable on the Obligations (including any maker, indorser, or guarantor); no delay in enforcement of payment of the Obligations; and no delay or omission in exercising any right or power with respect of the Obligations or any security agreement securing the Obligations shall affect the rights of the Lender in the Collateral. Except as otherwise provided in the Loan Agreement, the Borrower hereby waives presentment, protest, demand, notice of dishonor or default, notice of any loans made, extensions granted, or other action taken in reliance hereon and all demands and notices of any kind in connection with the Obligations.

12.    Waiver of Borrower's Subrogation Rights.   In case of the insolvency (howsoever evidenced) of the Borrower, or in case of any bankruptcy, reorganization, debt arrangement or other proceeding under any bankruptcy or insolvency law, or any dissolution, liquidation or receivership proceeding is instituted by or against the Borrower, all Obligations then existing shall, without notice to anyone, immediately become due or accrued and be payable, jointly and severally, from the Borrower. If bankruptcy or reorganization proceedings at any time are instituted by or against the Borrower under the United States Bankruptcy Code, the Borrower hereby: (a) expressly and irrevocably waives, to the fullest extent possible, on behalf of himself

and his heirs and administrators (including any surety) and any other person, any and all rights at law or in equity to subrogation, to reimbursement, to exoneration, to contribution, to indemnification, to set off or to any other rights that could accrue to a surety against a principal, to a guarantor against a maker or obligor, to an accommodation party against the party accommodated, to a holder or transferee against a maker, or to the holder of a claim against any person, and which the Borrower may have or hereafter acquire against any person in connection with or as a result of the Borrower's execution, delivery and/or performance of this Pledge Agreement, or any other documents to which the Borrower is a party or otherwise; (b) expressly and irrevocably waives any "claim" (as such term is defined in the United States Lenderruptcy Code) of any kind against the Borrower, and further agrees that he shall not have or assert any such rights against any person (including any surety), either directly or as an attempted set off to any action commenced against the Borrower by the Lender or any other person; and (c) acknowledges and agrees that (i) this waiver is intended to benefit the Lender and shall not limit or otherwise effect the Borrower's liability hereunder or the enforceability of this Pledge Agreement, (ii) the Borrower and its successors and assigns are intended third party beneficiaries of this waiver, and (iii) the agreements set forth in this Section and the Lender's rights under this Section shall survive payment in full of the Obligations.

13.    **Waiver by Lender.** No course of dealing between the Borrower and the Lender, nor any failure to exercise, nor any delay in exercising any right, remedy, power or privilege of the Lender hereunder, under the Note or under any other agreement entered into between the Borrower and the Lender, shall operate as a waiver thereof. No waiver by the Lender of any Event of Default or any right or remedy hereunder, under the Loan Agreement, the Notes or under any document or agreement shall constitute a waiver of any other event of default, right or remedy of the Lender, nor of the same event of default, right or remedy on a future occasion.

14.    **Governing Law; Severability.** This Pledge Agreement has been made and entered into in Illinois and shall be governed by and construed in accordance with the laws of the State of Illinois. Wherever possible each provision of this Pledge Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Pledge Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Pledge Agreement.

15.    **Successors and Assigns.** This Pledge Agreement and all rights and liabilities hereunder and in and to any and all Collateral shall inure to the benefit of the Lender and its successors and assigns, and shall be binding on the Borrower and its successors and assigns.

16.    **Notice.** Any notice of any sale, lease, other disposition, or other intended action by the Lender shall be deemed reasonable if in writing, addressed to the Borrower at the address set forth above, or any other address designated in a written notice by the Borrower previously received by the Lender and deposited, first class postage prepaid, in the United States mails five (5) days in advance of the intended disposition or other intended action, provided, however, that the foregoing shall not preclude the fact that failure to give such notice or notice by other means may be reasonable under the particular circumstances involved.

17.    **Duration and Effect.** This Pledge Agreement shall remain and continue in full force and effect (notwithstanding, without limitation, the dissolution of the Borrower) from the

721185-4                                           9

137

date hereof until all of the Obligations have been fully and completely paid, satisfied and discharged. Thereupon, this Pledge Agreement shall terminate and the Lender shall release any Collateral still held by it which has not been sold or otherwise disposed of in accordance with Section 6 hereof and applied toward the satisfaction of the Obligations hereunder, and the Lender shall deliver any such Collateral to the Borrower, together with any necessary stock powers or assignment executed by the Lender in blank, at the Borrower's expense. The Borrower acknowledges that this Pledge Agreement is and shall be effective upon execution by the Borrower and delivery to and acceptance hereof by the Lender, and it shall not be necessary for the Lender to execute any acceptance hereof or otherwise to signify or express its acceptance hereof to the Borrower.

[signature page attached]

721185-4

10

IN WITNESS WHEREOF, the Borrower and the Lender have duly executed and delivered this Pledge Agreement as of the date first above written.

BORROWER:

COMAIR ROTRON, INC.,
a Delaware corporation

By: _____
Name: Steve Pellegrino
Title: President

ATTEST:

By: _____
Name: Steve M. Shamoun
Title: Director of Finance

BANK:

LASALLE BANK NATIONAL ASSOCIATION,
a national banking association

By: _____
Name: _____
Title: _____

721185-4

11

IN WITNESS WHEREOF, the Borrower and the Lender have duly executed and delivered this Pledge Agreement as of the date first above written.

BORROWER:

COMAIR ROTRON, INC.,
a Delaware corporation

By: _____
Name: _____
Title: _____

ATTEST:

By: _____
Name: _____
Title: _____

BANK:

LASALLE BANK NATIONAL ASSOCIATION,
a national banking association

By: _____
Name: Travis J. Burns
Title:   First Vice President

721185-4

11

140

## ISSUER ACKNOWLEDGEMENT

The undersigned hereby acknowledges receipt of the foregoing Stock Pledge Agreement dated as of December 8, 2005, executed by Comair Rotron, Inc. (the "**Borrower**") to and for the benefit of LaSalle Lender National Association (the "**Lender**"), and agrees, upon notification by the Lender as a result of an Event of Default on the part of the Borrower which is continuing, to pay all payments, income and dividends (whether in cash, stock or other property), liquidating dividends, stock warrants, stock options, stock rights, subscription rights, securities of the undersigned and any other distributions of any other property which the Borrower may be entitled to receive on account of the Stock directly to the order of the Lender.

Dated this 8th day of December, 2005.

THERMAFLO, INC.,
a California corporation

By: _____
Name: Steve Pellegrin
Title: President

721185-4

12

141



**ASSIGNMENT SEPARATE FROM CERTIFICATE**

FOR VALUE RECEIVED, the undersigned does hereby sell, assign and transfer to _____, Federal Identification No. _____, _____ share(s) of the capital stock of Thermaflo, Inc., a California corporation, represented by certificate no. _____, standing in the name of the undersigned on the books of said corporation. The undersigned does hereby irrevocably constitute and appoint _____ attorney to transfer the shares of said corporation, with full power of substitution in the premises.

Dated: December 9, 2005

COMAIR ROTRON, INC., a Delaware corporation

By: _____
Name: Steve P_____
Title: President

Doc #:CHI02 (206254-00009) 60426253v1;12/06/2005/Time:11:58

143

## REAFFIRMATION OF PLEDGE AGREEMENTS

THIS REAFFIRMATION OF PLEDGE AGREEMENTS (this **"Reaffirmation"**) is made as of December 9, 2005 by and between the undersigned pledgors, COMAIR HOLDING CORP., a Delaware corporation ("Holding"), and COMAIR ROTRON, INC., a Delaware corporation ("Comair" and together with Holding, the **"Pledgors"**), who pledged all of their equity interests in Comair and Comair Rotron de Mexico, S. de R.L. de C.V., pursuant to that certain Holding Pledge Agreement effective as of April 2, 2004 and that certain Equity Quotas Pledge Agreement effective as of April 2, 2004 (herein, as the same may be amended, modified or supplemented from time to time, the **"Pledges"**). The undersigned hereby consents to the execution and delivery by Comair and Thermaflo, Inc., a California corporation ("Subsidiary" and together with Comair, the **"Borrowers"**) to the Lender of that certain First Amendment to Loan and Security Agreement dated as of the date hereof (the **"First Amendment"**) and all other documents, instruments and agreements to be executed and delivered in connection with the First Amendment, which amends that certain Loan and Security Agreement effective as of April 2, 2004 by and between Comair and Lender (the **"Existing Loan Agreement"** and together with the First Amendment, the **"Loan Agreement"**) to, among other things, (i) add Subsidiary as a borrower, (ii) extend the Revolving Loan Maturity Date and Term Loan Maturity Date, (iii) increase in the maximum principal amount of the Revolving Credit Commitment and the Term Loan Commitment, and (iv) make certain changes to various loan covenants.

Pledgors hereby acknowledge and affirm to Lender that: (a) all such obligations and liabilities under the Pledges shall continue in full force and that the execution and delivery of this First Amendment to, and its acceptance by, the Lender shall not in any manner whatsoever (i) impair or affect the liability of the Pledgors to the Lender under the Pledges, (ii) prejudice, waive, or be construed to impair, affect, prejudice or waive the rights and abilities of the Lender at law, in equity or by statute, against the Pledgors pursuant to the Pledges, and/or (iii) release or discharge, nor be construed to release or discharge, any of the obligations and liabilities owing to the Lender by the Pledgors under the Pledges; and (d) that, except as modified by the First Amendment, each of the representations and warranties made by the Pledgors in any of the documents executed in connection with the Loans, including, without limitation, the Pledges, remain true and correct as of the date hereof in all material respects.

722965-1

**144**

FINAL

IN WITNESS WHEREOF, this Reaffirmation of Pledges has been executed as of the date first above written.

PLEDGORS:

COMAIR HOLDING CORP., a Delaware corporation

By: _____
Name: _____
Title: _____

COMAIR ROTRON, INC., a Delaware corporation

By: _____
Name: _____
Title: _____

722965-1

145

FINAL

IN WITNESS WHEREOF, this Reaffirmation of Pledges has been executed as of the date first above written.

PLEDGORS:

COMAIR HOLDING CORP., a Delaware corporation

By:_____
Name:_____
Title:_____


COMAIR ROTRON, INC., a Delaware corporation

By:_____
Name: Steve Pellegrini
Title: President

722965-1

146

## REAFFIRMATION OF PLEDGE AGREEMENTS

THIS REAFFIRMATION OF PLEDGE AGREEMENTS (this "**Reaffirmation**") is made as of June __, 2006 by and between the undersigned pledgors, COMAIR HOLDING CORP., a Delaware corporation ("**Holding**"), and COMAIR ROTRON, INC., a Delaware corporation ("**Comair**" and together with Holding, the "**Pledgors**"), who pledged (i) all of their equity interests in Comair and Comair Rotron de Mexico, S. de R.L. de C.V., pursuant to that certain Holding Pledge Agreement effective as of April 2, 2004, that certain Equity Quotas Pledge Agreement effective as of April 2, 2004, and (ii) all of the capital stock in Subsidiary pursuant to that certain Subsidiary Stock Pledge Agreement effective as of December 9, 2005 (as the same may be amended, modified or supplemented from time to time, the "**Pledges**"). The undersigned hereby consents to the execution and delivery by Comair and Thermaflo, Inc., a California corporation ("**Subsidiary**" and together with Comair, the "**Borrowers**") to the Lender of that certain Second Amendment to Loan and Security Agreement dated as of the date hereof (the "**Second Amendment**"), and all other documents, instruments and agreements to be executed and delivered in connection with the Second Amendment, which amends that certain Loan and Security Agreement effective as of April 2, 2004, as amended by that certain First Amendment effective as of December 9, 2005 by and between the Borrowers and Lender (the "**Existing Loan Agreement**" and together with the Second Amendment, the "**Loan Agreement**") to, among other things, (i) reduce the existing revolving credit facility by $1,000,000 to $5,000,000, (ii) increase the existing term loan commitment from $9,000,000 to $14,000,000, (iii) create a new term loan in the principal amount of $5,000,000, and (iv) make certain changes to various loan covenants.

Pledgors hereby acknowledge and affirm to Lender that: (a) all such obligations and liabilities under the Pledges shall continue in full force and that the execution and delivery of this Second Amendment to, and its acceptance by, the Lender shall not in any manner whatsoever (i) impair or affect the liability of the Pledgors to the Lender under the Pledges, (ii) prejudice, waive, or be construed to impair, affect, prejudice or waive the rights and abilities of the Lender at law, in equity or by statute, against the Pledgors pursuant to the Pledges, and/or (iii) release or discharge, nor be construed to release or discharge, any of the obligations and liabilities owing to the Lender by the Pledgors under the Pledges; and (d) that, except as modified by the Second Amendment, each of the representations and warranties made by the Pledgors in any of the documents executed in connection with the Loans, including, without limitation, the Pledges, remain true and correct as of the date hereof in all material respects.

745198-2

147

IN WITNESS WHEREOF, this Reaffirmation of Pledges has been executed as of the date first above written.

PLEDGORS:

COMAIR HOLDING CORP., a Delaware corporation

By: _____
Name: Stephen Pellegrini
Title: Vice President

COMAIR ROTRON, INC., a Delaware corporation

By: Steve M Shamoun
Name: Steve (M) Shamoun
Title: Treasurer

745198-2

148

FROM CT WILMINGTON - 302_655_____    GROUP 6    (MON) 4. 5'04 18:50/ST. :46/NO. 4260103881 P  2

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

    Please Return To:
    **CT CORPORATION SYSTEM**
    Attn: Robert Lane
    208 S. LaSalle Street, Ste. 814
    Chicago, IL 60604

*DELAWARE DEPARTMENT OF STATE*
*U.C.C. FILING SECTION*
*FILED 06:31 PM 04/05/2004*
*INITIAL FILING NUM: 4095480 2*
*AMENDMENT  NUMBER: 0000000*
*SRV: 040250165*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Comair Rotron, Inc. | | | |
| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 1675 Customhouse Court | San Diego | CA | 92154 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | Corporation | Delaware | 2094201 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| LaSalle Bank National Association | | | |
| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 135 South LaSalle Street | Chicago | IL | 60603 | USA |

4. This FINANCING STATEMENT covers the following collateral:

**SEE DESCRIPTION OF COLLATERAL ON EXHIBIT A ATTACHED HERETO
AND INCORPORATED HEREIN**

| 5. ALTERNATIVE DESIGNATION [if applicable] | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Attach Addendum  [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]  [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

To Be Filed with the Delaware Secretary of State        *6075908 S0 - 01*

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)
(1UCC1PRAT · 12/1/2002 C T System Online


D        **149**

FROM CT WILMINGTON - 302_655_____    GROUP 6    (MON) 4. 5'04 18:50/ST___8:46/NO. 4260103881 P  3

**EXHIBIT A**
to
**Financing Statement**

Debtor:              Comair Rotron, Inc. ("Debtor")

Secured Party:       LaSalle Bank National Association ("Secured Party")

All of Debtor's right, title and interest in the following property or types of property whether now existing or hereafter arising or acquired, wherever located (the "Collateral"):

(a).   Accounts (including without limitation all right to payment for services rendered or goods sold or leased), contract rights, leases, chattel paper, instruments, life insurance policies, notes and documents whether now owned or to be acquired by Debtor;

(b)   All goods, inventory, merchandise, finished goods, component goods, packaging materials and other personal property including, without limitation, goods in transit, wherever located and whether now owned or to be acquired by Debtor which is or may at any time be held for sale or lease, furnished under any contract of service or held as raw materials, work in process, supplies or materials used or consumed in Debtor's business, and all such property the sale or other disposition of which has given rise to accounts and which has been returned to or repossessed or stopped in transit by Debtor;

(c)   All of Debtor's now owned and to be acquired equipment and fixtures, including without limitation, furniture, machinery, vehicles and trade fixtures, together with any and all accessories, parts, appurtenances, substitutions and replacements;

(d)   All contract rights, choses in action, general intangibles, causes of action and all other intangible personal property of Debtor of every kind and nature (other than accounts) now owned or to be acquired by Debtor. Without in any way limiting the generality of the foregoing, general intangibles specifically includes, without limitation, all corporate or other business records, deposit accounts, inventions, designs, patents, patent applications, trademarks, trademark applications, service marks, service mark applications, trade names, trade secrets, goodwill, copyrights, registrations, licenses, leasehold interests, franchises and tax refund claims owned by Debtor and all letters of credit, banker's acceptances, guarantee claims, security interests or other security held by or granted to Debtor to secure payment by an account debtor of any accounts, letter of credit rights, payment intangibles, supporting obligations, commercial tort claims, software and such other assets as Secured Party determines to be intangible in its sole absolute discretion;

(e)   All tax refunds, chattel paper, instruments, letters of credit, investment property, including, without limitation, stocks, bonds, interests in limited liability companies, partnership interests, securities, certificates of deposit, mutual fund shares, securities entitlements, including, without limitation, all of Debtor's rights to any securities account, any free credit balance or other money owing by any securities intermediary with respect to such account, all securities and

612007-01

150

FROM CT WILMINGTON - 302_655_4936    GROUP 6    (MON) 4. 5'04 18:50/ST. 8:46/NO. 4260103881 P 4

commodities held by Secured Party, all commodity contracts held by Debtor and all commodity accounts held by Debtor, documents and documents of title evidencing or issued with respect to any of the foregoing;

(f)    All of Debtor's deposit accounts (general or special) with and credits and other claims against Secured Party;

(g)    All of Debtor's now owned or to be acquired monies and any and all other property of Debtor now or to be coming into the actual possession, custody or control of Secured Party or any agent or affiliate of Secured Party in any way or for any purpose (whether for safekeeping, deposit, custody, pledge, transmission, collection or otherwise);

(h)    All insurance proceeds of or relating to any of the foregoing;

(i)    All of Debtor's books and records, including without limitation customer lists, credit files, computer programs, printouts, and other materials relating to any of the foregoing; and

(j)    All accessions and additions to, substitutions for, and replacements, products and proceeds of any of the foregoing.

Unless otherwise defined herein or the context otherwise requires, terms for which meanings are provided in the Uniform Commercial Code as in effect on the date of the filing hereof in the State of Delaware are used herein with such meanings.

622007-01

**151**

## UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 09:09 AM 12/15/2005
INITIAL FILING NUM: 4095480 2
AMENDMENT NUMBER: 5389658 7
SRV: 051022984

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |
|---|---|
| 4095480 2 (filed 04/05/2004) | |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 6.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☒ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.  ☐ DELETE name: Give record name to be deleted in item 6a or 6b.  ☒ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Comair Rotron, Inc. | | | |
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

7. CHANGED (NEW) or ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Thermaflo, Inc. | | | |
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3817 Old Conejo Road | Newbury Park | CA | 91320 | USA |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | Corporation | California | C2134814 | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| LaSalle Bank National Association | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA
To be filed with the Delaware Secretary of State

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)
ILUCC3PNAT - 12/7/2002 C T System Online

152

## UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
DELAWARE DEPARTMENT OF STATE
    U.C.C. FILING SECTION
FILED 09:10 AM 12/15/2005
INITIAL FILING NUM: 4095480 2
AMENDMENT  NUMBER: 5389665 2
        SRV: 051022985
```

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE #

**4095480 2 (filed 04/05/2004)**

1b. This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party. | ☐ DELETE name: Give record name to be deleted in item 6a or 6b. | ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **Comair Rotron, Inc.** | | | |
| OR 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

7. CHANGED (NEW) or ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| OR 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any | ☐ NONE |
|---|---|---|---|---|---|
| | | | | | |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☐ deleted or ☐ added, or give entire ☒ restated collateral description, or describe collateral ☐ assigned.

**SEE EXHIBIT A ATTACHED**

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| **LaSalle Bank National Association** | | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

10. OPTIONAL FILER REFERENCE DATA

**To be filed with the Delaware Secretary of State**

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)
ILUCC3PNAT - 12/17/2004 C T System Online

**EXHIBIT A**
to
**Financing Statement**

**Debtor:**          Comair Rotron, Inc. ("Debtor")

**Secured Party:**      LaSalle Bank National Association ("Secured Party")

All of Debtor's right, title and interest in and to all of Debtor's property, whether now existing or hereafter arising or acquired, wherever located, including, without limitation, the following property (the "Collateral"):

(a) Accounts (including without limitation all right to payment for services rendered or goods sold or leased), contract rights, leases, chattel paper, instruments, life insurance policies, notes and documents whether now owned or to be acquired by Debtor;

(b) All goods, inventory, merchandise, finished goods, component goods, packaging materials and other personal property including, without limitation, goods in transit, wherever located and whether now owned or to be acquired by Debtor which is or may at any time be held for sale or lease, furnished under any contract of service or held as raw materials, work in process, supplies or materials used or consumed in Debtor's business, and all such property the sale or other disposition of which has given rise to accounts and which has been returned to or repossessed or stopped in transit by Debtor;

(c) All of Debtor's now owned and to be acquired equipment and fixtures, including without limitation, furniture, machinery, vehicles and trade fixtures, together with any and all accessories, parts, appurtenances, substitutions and replacements;

(d) All contract rights, choses in action, general intangibles, causes of action and all other intangible personal property of Debtor of every kind and nature (other than accounts) now owned or to be acquired by Debtor. Without in any way limiting the generality of the foregoing, general intangibles specifically includes, without limitation, all corporate or other business records, deposit accounts, inventions, designs, patents, patent applications, trademarks, trademark applications, service marks, service mark applications, trade names, trade secrets, goodwill, copyrights, registrations, licenses, leasehold interests, franchises and tax refund claims owned by Debtor and all letters of credit, banker's acceptances, guarantee claims, security interests or other security held by or granted to Debtor to secure payment by an account debtor of any accounts, letter of credit rights, payment intangibles, supporting obligations, commercial tort claims, software and such other assets as Secured Party determines to be intangible in its sole absolute discretion;

(e) All tax refunds, chattel paper, instruments, letters of credit, investment property, including, without limitation, stocks, bonds, interests in limited liability companies, partnership interests, securities, certificates of deposit, mutual fund shares, securities entitlements, including, without limitation, all of Debtor's rights to any securities account, any free credit balance or other

722647-1

154

money owing by any securities intermediary with respect to such account, all securities and commodities held by Secured Party, all commodity contracts held by Debtor and all commodity accounts held by Debtor, documents and documents of title evidencing or issued with respect to any of the foregoing;

(f)    All of Debtor's deposit accounts (general or special) with and credits and other claims against Secured Party;

(g)    All of Debtor's now owned or to be acquired monies and any and all other property of Debtor now or to be coming into the actual possession, custody or control of Secured Party or any agent or affiliate of Secured Party in any way or for any purpose (whether for safekeeping, deposit, custody, pledge, transmission, collection or otherwise);

(h)    All insurance proceeds of or relating to any of the foregoing;

(i)    All of Debtor's books and records, including without limitation customer lists, credit files, computer programs, printouts, and other materials relating to any of the foregoing; and

(j)    All accessions and additions to, substitutions for, and replacements, products and proceeds of any of the foregoing.

Unless otherwise defined herein or the context otherwise requires, terms for which meanings are provided in the Uniform Commercial Code as in effect on the date of the filing hereof in the State of Delaware are used herein with such meanings.

723649-1

**05-7051888709**
**12/13/2005 15:44**

**FILED**
CALIFORNIA
SECRETARY OF STATE
SOS

6158800004    UCC 1 FILING

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY
A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

**\*\*\*PLEASE RETURN TO\*\*\***

CSC
2730 Gateway Oaks Drive, Suite 100
Sacramento, CA 95833
Acct. #10011306

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME | | | | |
| Thermafie, Inc. | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3899 Old Conejo Road | Newbury Park | CA | 92154 | USA |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION Corporation | 1f. JURISDICTION OF ORGANIZATION California | 1g. ORGANIZATIONAL ID #, if any C2134814 | ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| Conair Rotron, Inc. | | | | |
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2675 Customhouse Court | San Diego | CA | 92154 | USA |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION Corporation | 2f. JURISDICTION OF ORGANIZATION Delaware | 2g. ORGANIZATIONAL ID #, if any 2094201 | ☐ NONE |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME | | | | |
| LaSalle Bank National Association | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 135 South LaSalle Street | Chicago | IL | 60603 | USA |

4. This FINANCING STATEMENT covers the following collateral:

SEE EXHIBIT A ATTACHED

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|

6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.    Check to REQUEST SEARCH REPORT(S) on Debtor(s)    ☐ All Debtors  ☐ Debtor 1  ☐ Debtor 2

8. OPTIONAL FILER REFERENCE DATA
To be filed with the California Secretary of State    754744-003 HWM $31

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

EXHIBIT A

to

Financing Statement

Debtor:              Thermaflo, Inc. ("Debtor")

Secured Party:       LaSalle Bank National Association ("Secured Party")

All of Debtor's right, title and interest in and to all of Debtor's property, whether now existing or hereafter arising or acquired, wherever located, including, without limitation, the following property (the "Collateral"):

(a)    Accounts (including without limitation all right to payment for services rendered or goods sold or leased), contract rights, leases, chattel paper, instruments, life insurance policies, notes and documents whether now owned or to be acquired by Debtor;

(b)    All goods, inventory, merchandise, finished goods, component goods, packaging materials and other personal property including, without limitation, goods in transit, wherever located and whether now owned or to be acquired by Debtor which is or may at any time be held for sale or lease, furnished under any contract of service or held as raw materials, work in process, supplies or materials used or consumed in Debtor's business, and all such property the sale or other disposition of which has given rise to accounts and which has been returned to or repossessed or stopped in transit by Debtor;

(c)    All of Debtor's now owned and to be acquired equipment and fixtures, including without limitation, furniture, machinery, vehicles and trade fixtures, together with any and all accessories, parts, appurtenances, substitutions and replacements;

(d)    All contract rights, choses in action, general intangibles, causes of action and all other intangible personal property of Debtor of every kind and nature (other than accounts) now owned or to be acquired by Debtor. Without in any way limiting the generality of the foregoing, general intangibles specifically includes, without limitation, all corporate or other business records, deposit accounts, inventions, designs, patents, patent applications, trademarks, trademark applications, service marks, service mark applications, trade names, trade secrets, goodwill, copyrights, registrations, licenses, leasehold interests, franchises and tax refund claims owned by Debtor and all letters of credit, banker's acceptances, guarantee claims, security interests or other security held by or granted to Debtor to secure payment by an account debtor of any accounts, letter of credit rights, payment intangibles, supporting obligations, commercial tort claims, software and such other assets as Secured Party determines to be intangible in its sole absolute discretion;

(e)    All tax refunds, chattel paper, instruments, letters of credit, investment property, including, without limitation, stocks, bonds, interests in limited liability companies, partnership interests, securities, certificates of deposit, mutual fund shares, securities entitlements, including, without limitation, all of Debtor's rights to any securities account, any free credit balance or other

722647-1

money owing by any securities intermediary with respect to such account, all securities and commodities held by Secured Party, all commodity contracts held by Debtor and all commodity accounts held by Debtor, documents and documents of title evidencing or issued with respect to any of the foregoing;

(f)    All of Debtor's deposit accounts (general or special) with and credits and other claims against Secured Party;

(g)    All of Debtor's now owned or to be acquired monies and any and all other property of Debtor now or to be coming into the actual possession, custody or control of Secured Party or any agent or affiliate of Secured Party in any way or for any purpose (whether for safekeeping, deposit, custody, pledge, transmission, collection or otherwise);

(h)    All insurance proceeds of or relating to any of the foregoing;

(i)    All of Debtor's books and records, including without limitation customer lists, credit files, computer programs, printouts, and other materials relating to any of the foregoing; and

(j)    All accessions and additions to, substitutions for, and replacements, products and proceeds of any of the foregoing.

Unless otherwise defined herein or the context otherwise requires, terms for which meanings are provided in the Uniform Commercial Code as in effect on the date of the filing hereof in the State of California are used herein with such meanings.

722647-1

05-7051888820
12/13/2005 15:44

FILED
CALIFORNIA
SECRETARY OF STATE

SOS

6158800005          UCC 1 FILING

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY
A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

    ***PLEASE RETURN TO***
    *CSC*
    *2730 Gateway Oaks Drive, Suite 100*
    *Sacramento, CA 95833*
    *Acct. #10011306*

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Thermafio, Inc. | | | | |

| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3875 Old Conejo Road | Newbury Park | CA | 92154 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | Corporation | California | C2134814  ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Comair Rotron, Inc. | | | | |

| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2675 Customhouse Court | San Diego | CA | 92154 | USA |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | Corporation | Delaware | 2094201  ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| LaSalle Bank National Association | | | | |

| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 135 South LaSalle Street | Chicago | IL | 60603 | USA |

4. This FINANCING STATEMENT covers the following collateral:

SEE EXHIBIT A ATTACHED

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS.   Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA:
To be filed with the California Secretary of State     754 744 003  AWM  $31

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

**EXHIBIT A**
to
**Financing Statement**

Debtor:                    **Thermaflo, Inc. ("Debtor")**

Secured Party:          **LaSalle Bank National Association ("Secured Party")**

All of Debtor's right, title and interest in and to all of Debtor's property, whether now existing or hereafter arising or acquired, wherever located, including, without limitation, the following property (the "Collateral"):

(a)    Accounts (including without limitation all right to payment for services rendered or goods sold or leased), contract rights, leases, chattel paper, instruments, life insurance policies, notes and documents whether now owned or to be acquired by Debtor;

(b)    All goods, inventory, merchandise, finished goods, component goods, packaging materials and other personal property including, without limitation, goods in transit, wherever located and whether now owned or to be acquired by Debtor which is or may at any time be held for sale or lease, furnished under any contract of service or held as raw materials, work in process, supplies or materials used or consumed in Debtor's business, and all such property the sale or other disposition of which has given rise to accounts and which has been returned to or repossessed or stopped in transit by Debtor;

(c)    All of Debtor's now owned and to be acquired equipment and fixtures, including without limitation, furniture, machinery, vehicles and trade fixtures, together with any and all accessories, parts, appurtenances, substitutions and replacements;

(d)    All contract rights, choses in action, general intangibles, causes of action and all other intangible personal property of Debtor of every kind and nature (other than accounts) now owned or to be acquired by Debtor. Without in any way limiting the generality of the foregoing, general intangibles specifically includes, without limitation, all corporate or other business records, deposit accounts, inventions, designs, patents, patent applications, trademarks, trademark applications, service marks, service mark applications, trade names, trade secrets, goodwill, copyrights, registrations, licenses, leasehold interests, franchises and tax refund claims owned by Debtor and all letters of credit, banker's acceptances, guarantee claims, security interests or other security held by or granted to Debtor to secure payment by an account debtor of any accounts, letter of credit rights, payment intangibles, supporting obligations, commercial tort claims, software and such other assets as Secured Party determines to be intangible in its sole absolute discretion;

(e)    All tax refunds, chattel paper, instruments, letters of credit, investment property, including, without limitation, stocks, bonds, interests in limited liability companies, partnership interests, securities, certificates of deposit, mutual fund shares, securities entitlements, including, without limitation, all of Debtor's rights to any securities account, any free credit balance or other

722647-1

money owing by any securities intermediary with respect to such account, all securities and commodities held by Secured Party, all commodity contracts held by Debtor and all commodity accounts held by Debtor, documents and documents of title evidencing or issued with respect to any of the foregoing;

(f)    All of Debtor's deposit accounts (general or special) with and credits and other claims against Secured Party;

(g)    All of Debtor's now owned or to be acquired monies and any and all other property of Debtor now or to be coming into the actual possession, custody or control of Secured Party or any agent or affiliate of Secured Party in any way or for any purpose (whether for safekeeping, deposit, custody, pledge, transmission, collection or otherwise);

(h)    All insurance proceeds of or relating to any of the foregoing;

(i)    All of Debtor's books and records, including without limitation customer lists, credit files, computer programs, printouts, and other materials relating to any of the foregoing; and

(j)    All accessions and additions to, substitutions for, and replacements, products and proceeds of any of the foregoing.

Unless otherwise defined herein or the context otherwise requires, terms for which meanings are provided in the Uniform Commercial Code as in effect on the date of the filing hereof in the State of California are used herein with such meanings.

615089/0005

722647-1

05-7051889073
12/13/2005 15:44

FILED
CALIFORNIA
SECRETARY OF STATE
SOS

6158800006    UCC 1 FIL2MD

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY
A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

***PLEASE RETURN TO***
CSC
2730 Gateway Oaks Drive, Suite 100
Sacramento, CA 95833
Acct. #10011306

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Thermaflo, Inc. | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3817 Old Conejo Road | Newbury Park | CA | 92154 | USA |
| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION Corporation | 1f. JURISDICTION OF ORGANIZATION California | 1g. ORGANIZATIONAL ID #, if any C2134814 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Conair Rotron, Inc. | | | | |
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 2675 Customhouse Court | San Diego | CA | 92154 | USA |
| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION Corporation | 2f. JURISDICTION OF ORGANIZATION Delaware | 2g. ORGANIZATIONAL ID #, if any 2094201 | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| LaSalle Bank National Association | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 135 South LaSalle Street | Chicago | IL | 60603 | USA |

4. This FINANCING STATEMENT covers the following collateral:

SEE EXHIBIT A ATTACHED

| 5. ALTERNATIVE DESIGNATION [if applicable]: | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | | ☐ Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
| 8. OPTIONAL FILER REFERENCE DATA To be filed with the California Secretary of State | | 154744-003  AWM  $31 | | | | |

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

**EXHIBIT A**
to
**Financing Statement**

Debtor:          Thermaflo, Inc. ("Debtor")

Secured Party:   LaSalle Bank National Association ("Secured Party")

All of Debtor's right, title and interest in and to all of Debtor's property, whether now existing or hereafter arising or acquired, wherever located, including, without limitation, the following property (the "Collateral"):

(a)    Accounts (including without limitation all right to payment for services rendered or goods sold or leased), contract rights, leases, chattel paper, instruments, life insurance policies, notes and documents whether now owned or to be acquired by Debtor;

(b)    All goods, inventory, merchandise, finished goods, component goods, packaging materials and other personal property including, without limitation, goods in transit, wherever located and whether now owned or to be acquired by Debtor which is or may at any time be held for sale or lease, furnished under any contract of service or held as raw materials, work in process, supplies or materials used or consumed in Debtor's business, and all such property the sale or other disposition of which has given rise to accounts and which has been returned to or repossessed or stopped in transit by Debtor;

(c)    All of Debtor's now owned and to be acquired equipment and fixtures, including without limitation, furniture, machinery, vehicles and trade fixtures, together with any and all accessories, parts, appurtenances, substitutions and replacements;

(d)    All contract rights, choses in action, general intangibles, causes of action and all other intangible personal property of Debtor of every kind and nature (other than accounts) now owned or to be acquired by Debtor. Without in any way limiting the generality of the foregoing, general intangibles specifically includes, without limitation, all corporate or other business records, deposit accounts, inventions, designs, patents, patent applications, trademarks, trademark applications, service marks, service mark applications, trade names, trade secrets, goodwill, copyrights, registrations, licenses, leasehold interests, franchises and tax refund claims owned by Debtor and all letters of credit, banker's acceptances, guarantee claims, security interests or other security held by or granted to Debtor to secure payment by an account debtor of any accounts, letter of credit rights, payment intangibles, supporting obligations, commercial tort claims, software and such other assets as Secured Party determines to be intangible in its sole absolute discretion;

(e)    All tax refunds, chattel paper, instruments, letters of credit, investment property, including, without limitation, stocks, bonds, interests in limited liability companies, partnership interests, securities, certificates of deposit, mutual fund shares, securities entitlements, including, without limitation, all of Debtor's rights to any securities account, any free credit balance or other

722647-1

163

money owing by any securities intermediary with respect to such account; all securities and commodities held by Secured Party, all commodity contracts held by Debtor and all commodity accounts held by Debtor, documents and documents of title evidencing or issued with respect to any of the foregoing;

(f)    All of Debtor's deposit accounts (general or special) with and credits and other claims against Secured Party;

(g)    All of Debtor's now owned or to be acquired monies and any and all other property of Debtor now or to be coming into the actual possession, custody or control of Secured Party or any agent or affiliate of Secured Party in any way or for any purpose (whether for safekeeping, deposit, custody, pledge, transmission, collection or otherwise);

(h)    All insurance proceeds of or relating to any of the foregoing;

(i)    All of Debtor's books and records, including without limitation customer lists, credit files, computer programs, printouts, and other materials relating to any of the foregoing; and

(j)    All accessions and additions to, substitutions for, and replacements, products and proceeds of any of the foregoing.

Unless otherwise defined herein or the context otherwise requires, terms for which meanings are provided in the Uniform Commercial Code as in effect on the date of the filing hereof in the State of California are used herein with such meanings.

723647-1

**164**

EXHIBIT E

# PATENT SECURITY AGREEMENT

THIS PATENT SECURITY AGREEMENT (this "**Agreement**") is made as of April 2, 2004 by and among Comair Rotron, Inc., a Delaware corporation (the "**Grantor**"), and LaSalle Bank National Association ("**Lender**").

**WHEREAS**, Grantor and Lender are parties to that certain Loan and Security Agreement of even date herewith (such Loan and Security Agreement as the same hereafter may be amended, modified, supplemented or restated from time to time hereinafter, together with any documents related thereto, are referred to as the "**Loan Agreement**"); and

**WHEREAS**, Lender is requiring Grantor to execute and deliver this Agreement (i) in order to secure the prompt and complete payment, observance and performance of all of the obligations of Grantor under the Loan Agreement (the "**Obligations**") and (ii) as a condition precedent to the Loan Agreement.

**NOW, THEREFORE**, in consideration of the terms and conditions set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor agrees as follows:

1. **DEFINED TERMS.**

Terms not defined herein shall have the meaning ascribed to such terms in the Loan Agreement.

2. **SECURITY INTEREST IN PATENTS.**

To secure the complete and timely payment, performance and satisfaction of all of the Obligations, Grantor hereby grants to Lender, a security interest in, with power of sale to the extent permitted by applicable law and the provisions of this Agreement, all of Grantor's United States and foreign patents and patent applications, any of the foregoing now or hereafter owned and/or used by Grantor and all licenses that allow the use of any patents or applications of others (collectively, the "**Intellectual Property Rights**") now owned or existing and hereafter acquired or arising consisting of:

    (i) patents and patent applications, and the inventions and improvements described and claimed therein, including, without limitation, those patents and patent applications listed on Schedule A attached hereto and made a part hereof, and (a) the reissues, divisions, continuations, renewals, extensions and continuations-in-part thereof, (b) all income, royalties, damages and payments now and hereafter due and/or payable under and with respect thereto, including, without limitation, payments under all licenses entered into in connection therewith and damages and payments for past or future infringements hereof, (c) the right to sue for past, present and future infringements thereof and (d) all of Grantor's rights corresponding thereto throughout the world (all of the foregoing patents and applications, together with the items described in clauses (a)-(d) in

this Section 2(i) are hereinafter individually and/or collectively referred to as the **"Patents")**; and

(ii) rights under or interest in any patent license agreements with any other party, whether Grantor is a licensee or licensor under any such license agreement, including without limitation, those patent license agreements listed on Schedule B attached hereto and made a part hereof, and the right to prepare for sale and sell any and all Inventory now or hereafter owned by Grantor and now or hereafter covered by such licenses (all of the foregoing are hereinafter referred to collectively as the **"Licenses"**). Notwithstanding the foregoing provisions of this Section 2, the Licenses shall not include any license agreement in effect as of the date hereof which by its terms prohibits the grant of the security contemplated by this Agreement; provided that upon the termination of such prohibitions for any reason whatsoever, the provisions of this Section 2 shall be deemed to apply thereto automatically.

3.    **NEW PATENTS AND LICENSES.**

If, prior to the termination of this Agreement, Grantor shall (i) obtain rights to any new patentable inventions, (ii) become entitled to the benefit of any patent, patent application, license or any reissue, division, continuation, renewal, extension or continuation-in-part of any Patent or any improvement on any Patent or License or (iii) enter into any new patent license agreement, which in any such case, shall involve or constitute Intellectual Property Rights, the provisions of Section 2 above shall automatically apply thereto. Grantor shall give to Lender written notice of events described in clauses (i), (ii) and (iii) of the preceding sentence promptly after the occurrence thereof, but in any event not less frequently than on an annual basis. Grantor hereby authorizes Lender to modify this Agreement unilaterally (i) by amending Schedule A to include any future Intellectual Property Rights consisting of patents and patent applications and by amending Schedule B to include any future Intellectual Property Rights consisting of patent license agreements, which are Patents or Licenses under Section 2 above or under this Section 3 and (ii) by filing with the appropriate government agency, in addition to and not in substitution for this Agreement, a duplicate original of this Agreement containing on Schedule A or B thereto, as the case may be, such future patents, patent applications and license agreements.

4.    **REPRESENTATIONS AND WARRANTIES.**

Grantor represents and warrants as of the date hereof that: (i) the Patents listed on Schedule A include all of the Intellectual Property Rights consisting of patents and patent applications; (ii) the Licenses listed on Schedule B include all of the Intellectual Property Rights consisting of patent license agreements under which Grantor is the licensee or licensor; and (iii) no liens, claims or security interests in such Patents and Licenses have been granted by Grantor to any Person other than Lender, except as permitted under the Loan Agreement.

**5.    DUTIES OF GRANTOR.**

Grantor shall, to the extent material to the normal conduct of Grantor's business, have the duty to: (i) prosecute diligently any patent application that is part of the Patents pending as of the date hereof or hereafter until the termination of this Agreement; (ii) make applications on unpatented but patentable inventions; (iii) not abandon any Patent or License without the prior written consent of Lender; and (iv) maintain in full force and effect the Patents and the Licenses in connection with the operation of Grantor's business. Any expenses incurred in connection with the foregoing shall be borne by Grantor. Lender shall not have any duty with respect to the Patents and Licenses. Without limiting the generality of the foregoing, Lender shall not be under any obligation to take any steps necessary to preserve rights in the Patents or Licenses against any other parties, but Lender may do so at its option from and after the occurrence of an Event of Default, and all expenses incurred in connection therewith shall be for the sole account of Grantor and shall be added to the Obligations secured hereby.

**6.    ROYALTIES.**

Grantor hereby agrees that the use by Lender of the Patents and Licenses as authorized hereunder in connection with Lender's exercise of its rights and remedies under Section 10 shall be coextensive with Grantor's rights thereunder and with respect thereto and without any liability for royalties or other related charges from Lender to Grantor.

**7.    FURTHER ASSIGNMENTS AND SECURITY INTERESTS.**

From and after the occurrence of, and during the continuation of, an Event of Default, Grantor agrees that Lender, or a conservator appointed by Lender, shall have the right to establish such reasonable additional product quality controls as Lender or such conservator, in its sole and absolute discretion, may deem necessary to assure maintenance of the quality of products sold by Grantor under the Patents and the Licenses or in connection with which such Patents and Licenses are used. Grantor agrees (i) not to sell or assign its respective interests in, or grant any license under, the Patents or the Licenses without the prior and express written consent of Lender, (ii) to maintain the quality of such products as of the date hereof and (iii) not to change the quality of such products in any material respect without Lender's prior and express written consent. Grantor acknowledges that Lender, in its sole and absolute discretion, may withhold its consent for any or for no reason.

**8.    NATURE AND CONTINUATION OF LENDER'S SECURITY INTEREST; TERMINATION OF LENDER'S SECURITY INTEREST.**

This Agreement is made for collateral security purposes only. This Agreement shall create a continuing security interest in the Patents and Licenses and shall terminate only when the Obligations (other than contingent indemnity obligations) have been paid in full. When this Agreement has terminated, Lender shall promptly execute and deliver to Grantor, at Grantor's expense, all termination statements and other instruments as may be necessary or proper to terminate Lender's security interest in the Patents and the Licenses, subject to any disposition

619035-05

3

thereof which may have been made by Lender pursuant to this Agreement or the Loan Agreement.

## 9.    LENDER'S RIGHT TO SUE.

From and after the occurrence and during the continuance of an Event of Default, Lender shall have the right, but shall not be obligated, to bring suit in its own name to enforce the Patents and the Licenses and, if Lender shall commence any such suit, Grantor shall, at the request of Lender, do any and all lawful acts and execute any and all proper documents required by Lender in aid of such enforcement, Grantor shall, upon demand, promptly reimburse Lender for all costs and expenses incurred by Lender in the exercise of its rights under this Section 9 (including, without limitation, reasonable fees and expenses of attorneys and paralegals for Lender).

## 10.    CUMULATIVE REMEDIES; POWER OF ATTORNEY.

Grantor hereby irrevocably designates, constitutes and appoints Lender (and all Persons designated by Lender in its sole and absolute discretion) as Grantor's true and lawful attorney-in-fact, and authorize Lender and any of Lender's designees, in Grantor's or Lender's names after the occurrence and during the continuance of an Event of Default, to: (i) endorse Grantor's names on all applications, documents, papers and instruments necessary or desirable for Lender in the use of the Patents or the Licenses; (ii) assign, pledge, convey or otherwise transfer title in or dispose of the Patents or the Licenses to anyone on commercially reasonable terms; (iii) grant or issue any exclusive or nonexclusive license under the Patents or, to the extent permitted, under the Licenses, to anyone on commercially reasonable terms; and (iv) take any other actions with respect to the Patents or the Licenses as Lender deems in its best interest. Grantor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof. This power of attorney is coupled with an interest and shall be irrevocable until all of the Obligations shall have been paid in full. Grantor acknowledges and agrees that this Agreement is not intended to limit or restrict in any way the rights and remedies of Lender under the Loan Agreement, but rather is intended to facilitate the exercise of such rights and remedies.

Subject to the limitations set forth herein, or in the Loan Agreement, Lender shall have, in addition to all other rights and remedies given it by the terms of this Agreement, all rights and remedies allowed by law and the rights and remedies of a secured party under the Uniform Commercial Code as enacted in any jurisdiction in which the Patents or the Licenses may be located or deemed located. Upon the occurrence of an Event of Default and the election by Lender to exercise any of its remedies under Part 6 of Article 9 of the Uniform Commercial Code with respect to the Patents and Licenses, Grantor agrees to assign, convey and otherwise transfer title in and to the Patents and the Licenses to Lender or any transferee of Lender and to execute and deliver to Lender or any such transferee all such agreements, documents and instruments as may be necessary, in Lender's sole and absolute discretion, to effect such assignment, conveyance and transfer. All of Lender's rights and remedies with respect to the Patents and the Licenses, whether established hereby, by the Loan Agreement, by any other agreements or by law, shall be cumulative and may be exercised separately or concurrently. Notwithstanding

619035-05

4

anything set forth herein to the contrary, it is hereby expressly agreed that upon the occurrence and during the continuation of an Event of Default, Lender may exercise any of the rights and remedies provided in this Agreement, the Loan Agreement and any of the other documents between Grantor and Lender. Grantor agrees that any notification of intended disposition of any of the Patents and Licenses required by law shall be deemed reasonably and properly given if given at least ten (10) days before such disposition; provided that Lender may give any shorter notice that is commercially reasonable under the circumstances.

11.    **MISCELLANEOUS.**

    **11.1    Incorporation of the Loan Agreement.** The Loan Agreement and the terms and provisions thereof are hereby incorporated herein in their entirety by this reference thereto.

    **11.2    Waivers.** Lender's failure, at any time or times hereafter, to require strict performance by Grantor of any provision of this Agreement shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith nor shall any course of dealing between Grantor and Lender have such effect. No single or partial exercise of any right hereunder shall preclude any other or further exercise thereof or the exercise of any other right. None of the undertakings, agreements, warranties, covenants and representations of Grantor contained in this Agreement shall be deemed to have been suspended or waived by Lender unless such suspension or waiver is in writing signed by an officer of Lender and directed to Grantor specifying such suspension or waiver.

    **11.3    Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but the provisions of this Agreement are severable, and if any clause or provision shall be held invalid and unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction, and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision of this Agreement in any jurisdiction.

    **11.4    Modification.** Except as provided for in Section 3, this Agreement cannot be altered, amended or modified in any way, except as by a writing signed by the parties hereto.

    **11.5    Successors and Assigns.** This Agreement shall be binding upon Grantor and its successors and assigns, and shall inure to the benefit of Lender and its nominees, successors and assigns. Grantor's successors and assigns shall include, without limitation, a receiver, trustee or debtor-in-possession of or for Grantor; provided that Grantor shall not voluntarily assign or transfer its rights or obligations hereunder without Lender's prior written consent.

    **11.6    Governing Law.** This Agreement shall be construed and enforced and the rights and duties of the parties shall be governed by in all respects in accordance with the internal laws (as opposed to conflict of laws provisions) and decisions of the State of Illinois.

619035-05

5

11.7    Notices.  All notices or other communications hereunder shall be given in the manner and to the addresses set forth in the Loan Agreement.

11.8    Section Titles.  The section titles herein are for convenience of reference only, and shall not affect in any way the interpretation of any of the provisions hereof.

11.9    Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

11.10    Merger.  This Agreement represents the final agreement of Grantor with respect to the matters contained herein and may not be contradicted by evidence of prior or contemporaneous agreements, or subsequent oral agreements, between Grantor and Lender.

11.11    No Strict Construction.   The parties hereto have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

[signature page attached]

619035-05

6

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

GRANTOR:

Comair Rotron, Inc., a Delaware corporation

By: _____
Name: STEPHEN L PELLEGRINI
Title: VICE PRESIDENT FINANCE

Accepted and agreed to as of the day and year first above written.

LENDER:

LaSalle Bank National Association

By: _____
Name: Travis Burns
Title:   Vice President

Patent Security Agreement

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**GRANTOR:**

Comair Rotron, Inc., a Delaware corporation

By:_____

Name:_____

Title:_____

Accepted and agreed to as of the day and year first above written.

**LENDER:**

LaSalle Bank National Association

By:_____

Name: Travis Burns

Title:   Vice President

Patent Security Agreement

**172**

## Schedule A

### Patents

#### U.S. – Pending

| Attorney Docket | Country | Status | Application Number | Filing Date | Patent Number | Issue Date | Expiration Date | Title |
|---|---|---|---|---|---|---|---|---|
| 0917.A02 | US | Pending | 60/499,844 | 03-Sep-2003 | | | | Dynamic Draft Inducer |
| 0917.A03 | US | Pending | 10/655,534 | 04-Sep-2003 | | | | Draft Inducer System |
| 0917.A01 | US | Published | 10/616,499 | 09-Jul-2003 | | | | Energy Store Circuit for Controlling Rotor Rotation |
| 0917.127 | US | Let Abandon | 08/977,104 | 24-Nov-1997 | | | | Two Pulses Per Revolution Tachometer Sensor |
| 0917.184 | US | Allowed | 10/150,887 | 17-May-2002 | | | | Efficient Stator |
| 0917.185 | US | Pending | 10/116,329 | 04-Apr-2002 | | | | Balanced Rotor |
| 0917.186 | US | Pending | 60/390,261 | 20-Jun-2002 | | | | Motor With Dynamic Current Draw |
| 0917.188 | US | Published | 10/262,628 | 01-Oct-2002 | | | | Low Profile Motor |
| 0917.191 | US | Published | 10/443,295 | 22-May-2003 | | | | Motor With Dynamic Current Draw |
| 0917.192 | US | Pending | 10/666,525 | 18-Sep-2003 | | | | Magnetizing Fixture With Insulated Core |
| 0917.193 | US | Pending | 10/642,433 | 15-Aug-2003 | | | | Electric Motor Stator Current Controller |
| 0917.198 | US | Pending | 10/797,901 | 10-Mar-2004 | | | | Motor With Raised Rotor |

#### U.S. – Issued (including Expired)

| Attorney Docket | Country | Status | Application Number | Filing Date | Patent Number | Issue Date | Expiration Date | Title |
|---|---|---|---|---|---|---|---|---|
| 0917.101 | US | Expired | 683,185 | 15-Nov-1967 | 3,510,179 | 05-May-1970 | | Journal Bearing System |
| 0917.102 | US | Expired | 814,253 | 08-Apr-1969 | 3,592,517 | 13-Jul-1971 | | Bearing Mounting Arrangement |
| 0917.103 | US | Expired | 599,855 | 07-Dec-1966 | 3,513,339 | 19-May-1970 | | Electric Motor Construction |
| 0917.104 | US | Expired | 790,345 | 10-Jan-1969 | 3,597,117 | 03-Aug-1971 | 03-Aug-1988 | Fan for Narrow Environments |
| 0917.105 | US | Expired | 428,081 | 26-Dec-1973 | 3,919,572 | 11-Nov-1975 | 11-Nov-1992 | Electrical Motor Construction |
| 0917.106 | US | Expired | 655,550 | 05-Feb-1976 | 4,089,618 | 16-May-1978 | 16-May-1995 | Fan with Noise Reduction |
| 0917.107 | US | Expired | 150,202 | 15-May-1980 | 4,365,187 | 21-Dec-1982 | 15-May-2000 | Brushless DC Motor |

619035-05

| Attorney Docket | Country | Status | Application Number | Filing Date | Patent Number | Issue Date | Expiration Date | Title |
|---|---|---|---|---|---|---|---|---|
| 0917.108 | US | Expired | 409,712 | 19-Aug-1982 | 4,438,362 | 20-Mar-1984 | 19-Aug-2002 | Self-Starting Direct Current Motor with Permanent Magnets of Varied Magnetic Strength |
| 0917.109 | US | Expired | 428,828 | 30-Sep-1982 | 4,494,028 | 15-Jan-1985 | 30-Sep-2002 | Integral Coaxial Commutation & Rotor Magnets... |
| 0917.110 | US | Expired | 224,126 | 12-Jan-1981 | 4,506,218 | 19-Mar-1985 | 19-Mar-2002 | Condition Sensing Arrangement for AC Machines |
| 0917.111 | US | Expired | 536,885 | 28-Sep-1983 | 4,564,793 | 14-Jan-1986 | 14-Jan-2003 | Brushless DC Motor with Improved Starting |
| 0917.112 | US | Issued | 520,154 | 04-Aug-1983 | 4,553,075 | 12-Nov-1985 | 04-Aug-2003 | Simple Brushless DC Fan Motor with Reversing Field |
| 0917.114 | US | Issued | 700,670 | 11-Feb-1985 | 4,618,806 | 21-Oct-1986 | 11-Feb-2005 | Ironless, Brushless DC Motor with Wave-Winding |
| 0917.115 | US | Issued | 714,099 | 20-Mar-1985 | 4,633,110 | 30-Dec-1986 | 20-Mar-2005 | Motor w/ Stator on Printed Circuit Assembly |
| 0917.117 | US | Issued | 821,059 | 21-Jan-1986 | 4,656,553 | 07-Apr-1987 | 21-Jan-2006 | Electronically Programmable Universal Brushless DC Fan with Integral Tracking and Locked Rotor Protection |
| 0917.118 | US | Expired | 083,678 | 03-Feb-1965 | 205,639 | 30-Aug-1966 | 30-Aug-1980 | Fan - DESIGN |
| 0917.124 | US | Issued | 420,128 | 11-Apr-1995 | 5,547,339 | 20-Aug-1996 | 11-Apr-2015 | Turbulator for a Fluid Impelling Device |
| 0917.125 | US | Issued | 08/703,652 | 27-Aug-1996 | 5,823,068 | 20-Oct-1998 | 27-Aug-2016 | Rotating System with Reduced Transference of Vibration and Acoustics and Method for Reducing Same |
| 0917.128 | US | Issued | 08/960,192 | 29-Oct-1997 | 5,947,691 | 07-Sep-1999 | 29-Oct-2017 | Winding Supply Circuit with Current and Thermal Protective Elements |
| 0917.153 | US | Issued | 09/072,242 | 04-May-1998 | 6,437,529 | 20-Aug-2002 | 04-May-2018 | Multi-Stator with Independent Stator Circuits |
| 0917.157 | US | Issued | 698,000 | 09-May-1991 | 5,188,508 | 23-Feb-1993 | 09-May-2011 | Compact Fan and Impeller (amended) |
| 0917.160 | US | Issued | 08/993,266 | 18-Dec-1997 | 5,867,005 | 02-Feb-1999 | 18-Dec-2017 | Simple Dual Voltage PSC Motor With Internal Fixed Capacitor and Common Torque |
| 0917.161 | US | Issued | 09/016,386 | 30-Jan-1998 | 6,136,250 | 24-Oct-2000 | 30-Jan-2018 | Apparatus and Method of Encapsulating Motors |
| 0917.163 | US | Issued | 09/065,386 | 23-Apr-1998 | 5,983,750 | 16-Nov-1999 | 27-Aug-2016 | Rotating System with Reduced Transference of Vibration and |

9.

619035-05

| Attorney Docket | Country | Status | Application Number | Filing Date | Patent Number | Issue Date | Expiration Date | Title |
|---|---|---|---|---|---|---|---|---|
| 0917.171 | US | Issued | 09/234,649 | 21-Jan-1999 | 6,509,704 | 21-Jan-2003 | 21-Jan-2019 | Acoustics and Method for Reducing Same<br>Low Profile Motor |
| 0917.177 | US | Issued | 09/827,356 | 05-Apr-2001 | 6,646,396 | 11-Nov-2003 | 15-Jan-2021 | Apparatus for Motor Synchronization (CIP of 917/176) |
| 0917.182 | US | Issued | 09/931,502 | 16-Aug-2001 | 6,577,090 | 10-Jun-2003 | 16-Aug-2021 | DC Voltage Level Shifter |
| 0917.104.1 | US | Expired | 853,298 | 27-Aug-1969 | 3,601,507 | 24-Aug-1971 | 24-Aug-1988 | Compact Fluid Compressor |
| 0917.115.1 | US | Issued | 940,031 | 10-Dec-1986 | 4,779,330 | 25-Oct-1988 | 25-Oct-2005 | Motor with Stator on Printed Circuit Assembly |
| 0917.116.1 | US | Issued | 085,301 | 07-Aug-1987 | 4,779,069 | 18-Oct-1988 | 18-Oct-2005 | Apparatus & Method for Making Integral Coaxial Commutation & Rotor Magnets |
| 0917.113.2 | US | Expired | 690,401 | 10-Jan-1985 | 4,563,622 | 07-Jan-1986 | 07-Jan-2003 | Simple Brushless DC Fan Motor |

## Foreign – Pending

| Attorney Docket | Country | Status | App. Number | Filing Date | Patent Number | Issue Date | Expiration Date | Title |
|---|---|---|---|---|---|---|---|---|
| 0917.A01 | WO | Published | 03/21284 | 09-Jul-2003 | | | | Energy Store Circuit for Controlling Rotor Rotation |
| 0917.A03 | WO | Published | 03/27814 | 04-Sep-2003 | | | | Draft Inducer System |
| 0917.153 | EP | Published | 99921469.5 | 23-Apr-1999 | | | | Multi-Stator with Independent Stator Circuits |
| 0917.177 | CA | Pending | 2,406,127 | 30-Sep-2002 | | | | Apparatus for Motor Synchronization (CIP of 917/176) |
| 0917.182 | CA | Pending | 2,406,135 | 30-Sep-2002 | | | | DC Voltage Level Shifter |
| 0917.182 | EP | Pending | 01964095.2 | 16-Aug-2001 | | | | DC Voltage Level Shifter |
| 0917.183 | CA | Let Abandon | 2,406,123 | 30-Sep-2002 | | | | Stator with Molded Insulator |
| 0917.184 | CA | Pending | 2,447,880 | 17-May-2002 | | | | Efficient Stator |
| 0917.184 | EP | Pending | 02744159.1 | 17-May-2002 | | | | Efficient Stator |
| 0917.184 | WO | Published | 02/15779 | 17-May-2002 | | | | Efficient Stator |
| 0917.191 | WO | Published | 03/19650 | 20-Jun-2003 | | | | Motor With Dynamic Current Draw |

10

619035-05

**Foreign — Issued/Granted (including Expired)**

| Attorney Docket | Country | Status | Application Number | Filing Date | Patent Number | Issue Date | Expiration Date | Title |
|---|---|---|---|---|---|---|---|---|
| 0917.101 | CA | Expired | 035.170 | 14-Nov-1968 | 881,994 | 28-Sep-1971 | 28-Sep-1988 | Journal Bearing System |
| 0917.101 | FR | Expired | 173.577 | 13-Nov-1968 | 1,592,641 | 19-May-1970 | 13-Nov-1988 | Journal Bearing System |
| 0917.101 | GB | Expired | 54039 | 14-Nov-1968 | 1,199,820 | 14-Nov-1968 | 14-Nov-1988 | Journal Bearing System |
| 0917.101 | IT | Expired | 41159A/68 | 13-Nov-1968 | 846 745 | 15-Jul-1969 | 13-Nov-1988 | Journal Bearing System |
| 0917.101 | JP | Expired | 43-83700 | 15-Nov-1968 | 625,205 | 18-Nov-1971 | 15-Nov-1988 | Journal Bearing System |
| 0917.102 | CA | Expired | 079,432 | 07-Apr-1970 | 914,736 | 14-Nov-1972 | 14-Nov-1989 | Bearing Mounting Arrangement |
| 0917.102 | DE | Expired | P 20 16 802.9 | 08-Apr-1970 | 20 16 802 | 22-Dec-1978 | 31-Dec-1987 | Bearing Mounting Arrangement |
| 0917.102 | FR | Expired | 70 12379 | 06-Apr-1970 | 70 12379 | 01-Feb-1971 | | Bearing Mounting Arrangement |
| 0917.102 | GB | Expired | 1669070 | 08-Apr-1970 | 1232958 | 08-Apr-1970 | | Bearing Mounting Arrangement |
| 0917.102 | IT | Expired | 49778A/70 | 06-Apr-1970 | 903960 | 15-Jan-1982 | | Bearing Mounting Arrangement |
| 0917.102 | JP | Expired | 45-30061 | 08-Apr-1970 | 864,506 | 13-Jun-1977 | | Bearing Mounting Arrangement |
| 0917.103 | CA | Expired | 998,151 | 18-Aug-1967 | 836,125 | 03-Mar-1970 | 03-Mar-1987 | Electric Motor Construction |
| 0917.103 | DE | Expired | P 16 13 357.6 | 01-Sep-1967 | 16 13 357 | 10-Aug-1978 | 02-Sep-1985 | Electric Motor Construction |
| 0917.103 | FR | Expired | 118.544 | 22-Aug-1967 | 1,535,130 | 24-Jun-1968 | 22-Aug-1987 | Electric Motor Construction |
| 0917.103 | GB | Expired | 38126/67 | 18-Aug-1967 | 1154812 | | | Electric Motor Construction |
| 0917.103 | IT | Expired | 40862A/67 | 21-Nov-1967 | 819372 | 15-Jul-1968 | 21-Nov-1987 | Electric Motor Construction |
| 0917.103 | JP | Expired | 47-79156 | 04-Jul-1972 | UM 1,125,3 | 23-Apr-1976 | 10-Nov-1982 | Electric Motor Construction |
| 0917.104 | CA | Expired | 071,692 | 08-Jan-1970 | 918,620 | 09-Jan-1973 | 09-Jan-1990 | Fan for Narrow Environments |
| 0917.104 | DE | Expired | P 20 00 844.0 | 09-Jan-1970 | UM 7000589 | 10-Jan-1970 | 10-Jan-1990 | Fan for Narrow Environments |
| 0917.104 | FR | Expired | 70 00803 | 09-Jan-1970 | 70 00803 | 23-Oct-1972 | 09-Jan-1990 | Fan for Narrow Environments |
| 0917.104 | GB | Expired | 1219/70 | 09-Jan-1970 | 1,279,912 | 09-Jan-1970 | 09-Jan-1990 | Fan for Narrow Environments |
| 0917.104 | JP | Expired | 47-106960 | 09-Jan-1970 | UM 1,231.4 | 27-Jun-1978 | 09-Jan-1985 | Fan for Narrow Environments |
| 0917.105 | CA | Expired | 213,822 | 15-Nov-1974 | 1,022.224 | 06-Dec-1977 | 06-Dec-1994 | Electrical Motor Construction |
| 0917.105 | DE | Expired | P 24.52 444.5 | 05-Nov-1974 | 24 52 444 | 04-Dec-1980 | 05-Nov-1992 | Electrical Motor Construction |
| 0917.105 | FR | Expired | 74 42750 | 24-Dec-1974 | 74 42750 | 11-Apr-1980 | 24-Dec-1994 | Electrical Motor Construction |
| 0917.105 | GB | Expired | 49544 | 15-Nov-1974 | 1,436,298 | 15-Sep-1976 | 15-Nov-1990 | Electrical Motor Construction |
| 0917.105 | IT | Expired | 54095A/74 | 18-Nov-1974 | 1,023,295 | 10-May-1978 | 18-Nov-1989 | Electrical Motor Construction |
| 0997.105 | JP | Expired | 50-3035 | 26-Dec-1974 | 1,013,440 | 06-Feb-1980 | 26-Dec-1994 | Electrical Motor Construction |
| 0917.105 | NL | Expired | 74.14508 | 07-Nov-1974 | 158333 | 17-Feb-1979 | 07-Nov-1994 | Electrical Motor Construction |
| 0917.106 | FR | Expired | 75 20644 | 01-Jul-1975 | 75 20644 | | 01-Jul-1995 | Fan with Noise Reduction |
| 0917.106 | GB | Expired | | | 1,478,069 | | 20-Jun-1995 | Fan with Noise Reduction |
| 0917.106 | IT | Expired | | | 1,036,993 | | 13-Jun-1995 | Fan with Noise Reduction |

11

619035-05

| Ref | Country | Status | Application No. | Filing Date | Patent No. | Issue Date | Expiry Date | Title |
|---|---|---|---|---|---|---|---|---|
| 0917.106 | JP | Expired | | | 998,218 | 26-Mar-1985 | 12-May-1988 | Fan with Noise Reduction |
| 0917.106 | NL | Expired | | | 155,923 | 16-Aug-1983 | 16-Aug-2000 | Fan with Noise Reduction |
| 0917.107 | BR | Expired | PI 8102939 | 12-May-1981 | PI 8102939 | | 01-May-1990 | Brushless DC Motor |
| 0917.107 | CA | Expired | 374,739 | 06-Apr-1981 | 1,152,142 | 30-Oct-1985 | 01-May-2001 | Brushless DC Motor |
| 0917.107 | DE | Expired | | 01-May-1981 | 31 72 747 | | 01-May-2001 | Brushless DC Motor |
| 0917.107 | DE | Expired | 84 113 102 | 01-May-1981 | 0 148 347 | 01-Apr-1987 | 01-May-2001 | Brushless DC Motor |
| 0917.107 | EP | Expired | 81 301 930.4 | 01-May-1981 | 0 040 484 | | 01-May-2001 | Brushless DC Motor |
| 0917.107 | EP | Expired | 84 113 102 | 01-May-1981 | 0 148 347 | 01-Apr-1987 | 01-May-1990 | Brushless DC Motor |
| 0917.107 | FR | Expired | | 01-May-1981 | 0 148 347 | 01-Apr-1987 | 01-May-2001 | Brushless DC Motor |
| 0917.107 | FR | Expired | 84 113 102 | 01-May-1981 | 00 40484 | | 01-May-1990 | Brushless DC Motor |
| 0917.107 | GB | Expired | | 01-May-1981 | 0 148 347 | 01-Apr-1987 | 01-May-2001 | Brushless DC Motor |
| 0917.107 | GB | Expired | 84 113 102 | 01-May-1981 | 0040484 | | 01-May-2001 | Brushless DC Motor |
| 0917.107 | IT | Expired | | 01-May-1981 | 0 148 347 | 01-Apr-1987 | 01-May-2001 | Brushless DC Motor |
| 0917.107 | IT | Expired | 84 113 102 | 01-May-1981 | 0040484 | | 11-May-2001 | Brushless DC Motor |
| 0917.107 | JP | Expired | 56-70592 | 11-May-1981 | 1,695,292 | 17-Sep-1992 | 01-May-2001 | Brushless DC Motor |
| 0917.107 | NL | Expired | 84 113 102 | 01-May-1981 | 0148 347 | 01-Apr-1987 | 01-May-2001 | Brushless DC Motor |
| 0917.108 | CA | Expired | 432,479 | 14-Jul-1983 | 1,196,366 | 05-Nov-1985 | 05-Nov-2002 | Self-Starting Direct Current Motor with Permanent Magnets of Varied Magnetic Strength |
| 0917.108 | DE | Expired | P 33 29 887.4 | 18-Aug-1983 | 33 29 887 | 18-Feb-1993 | 18-Aug-2003 | Self-Starting Direct Current Motor with Permanent Magnets of Varied Magnetic Strength |
| 0917.108 | FR | Expired | 83 13461 | 18-Aug-1983 | 83 13461 | 03-Jun-1994 | 18-Aug-2003 | Self-Starting Direct Current Motor with Permanent Magnets of Varied Magnetic Strength |
| 0917.110 | BR | Expired | PI 8200114 | 11-Jan-1982 | PI 8200114 | 27-Oct-1987 | 18-May-1988 | Condition Sensing Arrangement for AC Machines |
| 0917.110 | CA | Expired | 391,935 | 10-Dec-1981 | 1,197,291 | 26-Nov-1985 | 26-Nov-2002 | Condition Sensing Arrangement for AC Machines |
| 0917.110 | DE | Expired | 82 300 003.9 | 04-Jan-1982 | P3270912.9 | 07-May-1986 | 04-Jan-2002 | Condition Sensing Arrangement for AC Machines |
| 0917.110 | EP | Expired | 82 300 003.9 | 04-Jan-1982 | 0 056 294 | 07-May-1986 | 04-Jan-2002 | Condition Sensing Arrangement for AC Machines |
| 0917.110 | FR | Expired | 82 300 003.9 | 04-Jan-1982 | 0 056 294 | 07-May-1986 | 04-Jan-2002 | Condition Sensing Arrangement for AC Machines |
| 0917.110 | GB | Expired | 82 300 003.9 | 04-Jan-1982 | 0 056 294 | 07-May-1986 | 04-Jan-2002 | Condition Sensing Arrangement for AC Machines |
| 0917.110 | IT | Expired | 82 300 003.9 | 04-Jan-1982 | 0 056 294 | 07-May-1986 | 04-Jan-2002 | Condition Sensing Arrangement for AC Machines |

12.

619035-05

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 0917.110 | JP | Expired | 57-003241 | 12-Jan-1982 1742159 | 15-Mar-1993 | 12-Jan-2002 | Condition Sensing Arrangement for AC Machines |
| 0917.110 | NL | Expired | 82 300 003.9 | 04-Jan-1982 0 056 294 | 07-May-1986 | 04-Jan-2002 | Condition Sensing Arrangement for AC Machines |
| 0917.111 | CA | Issued | 445,584 | 19-Jan-1984 1,206,508 | 24-Jun-1986 | 24-Jun-2003 | Brushless DC Motor with Improved Starting |
| 0917.111 | DE | Issued | 84.300856.6 | 10-Feb-1984 0 141 479 | 01-Jun-1988 | 10-Feb-2004 | Brushless DC Motor with Improved Starting |
| 0917.111 | EP | Issued | 84 300 856.6 | 10-Feb-1984 0 141 479 | 01-Jun-1988 | 10-Feb-2004 | Brushless DC Motor with Improved Starting |
| 0917.111 | FR | Issued | 84.300856.6 | 10-Feb-1984 0 141 479 | 01-Jun-1988 | 10-Feb-2004 | Brushless DC Motor with Improved Starting |
| 0917.111 | GB | Issued | 84.300856.6 | 10-Feb-1984 0 141 479 | 01-Jun-1988 | 10-Feb-2004 | Brushless DC Motor with Improved Starting |
| 0917.112 | CA | Expired | 445,972 | 25-Jan-1984 1,208,272 | 22-Jul-1986 | 22-Jul-2003 | Simple Brushless DC Fan Motor with Reversing Field |
| 0917.112 | DE | Issued | 84 300 855.8 | 10-Feb-1984 0 140 461 | 31-May-1989 | 10-Feb-2004 | Simple Brushless DC Fan Motor with Reversing Field |
| 0917.112 | EP | Issued | 84 300 855.8 | 10-Feb-1984 0 140 461 | 31-May-1989 | 10-Feb-2004 | Simple Brushless DC Fan Motor with Reversing Field |
| 0917.112 | FR | Issued | 84 300 855.8 | 10-Feb-1984 0 140 461 | 31-May-1989 | 10-Feb-2004 | Simple Brushless DC Fan Motor with Reversing Field |
| 0917.112 | GB | Issued | 84 300 855.8 | 10-Feb-1984 0 140 461 | 31-May-1989 | 10-Feb-2004 | Simple Brushless DC Fan Motor with Reversing Field |
| 0917.113 | CA | Expired | 435,800 | 31-Aug-1983 1,205,115 | 27-May-1986 | 27-May-2003 | Simple Brushless DC Fan Motor |
| 0917.113 | DE | Issued | P.33 32 659.2 | 09-Sep-1983 33 32 659 | 20-Apr-1989 | 09-Sep-2003 | Simple Brushless DC Fan Motor |
| 0917.113 | FR | Issued | 83 14412 | 09-Sep-1983 83 14412 | 16-Sep-1994 | 09-Sep-2003 | Simple Brushless DC Fan Motor |
| 0917.114 | CA | Issued | 499,041 | 06-Jan-1986 1,267,690 | 10-Apr-1990 | 10-Apr-2007 | Ironless, Brushless DC Motor with Wave-Winding |
| 0917.114 | DE | Issued | P 36 02 138.5 | 24-Jan-1986 36 02 138 | 11-Dec-1997 | 24-Jan-2006 | Ironless, Brushless DC Motor with Wave-Winding |
| 0917.114 | FR | Issued | 86 01768 | 10-Feb-1986 86 01768 | 24-May-1995 | 10-Feb-2006 | Ironless, Brushless DC Motor with Wave-Winding |
| 0917.117 | CA | Issued | 527,566 | 19-Jan-1987 1,281,769 | 19-Mar-1991 | 19-Mar-2008 | Electronically Programmable Universal Brushless DC Fan with Integral Tracking and Locked Rotor Protection |
| 0917.117 | DE | Issued | 87 300 371.9 | 16-Jan-1987 0 241 105 | 28-Jul-1993 | 16-Jan-2007 | Electronically Programmable Universal Brushless DC Fan with |

13

619035-05

| Docket | Country | Status | App. No. | Filing Date | Patent No. | Grant Date | Expiry Date | Title |
|---|---|---|---|---|---|---|---|---|
| 0917.117 | EP | Issued | 87 300 371.9 | 16-Jan-1987 | 0 241 105 | 28-Jul-1993 | 16-Jan-2007 | Electronically Programmable Universal Brushless DC Fan with Integral Tracking and Locked Rotor Protection |
| 0917.117 | FR | Issued | 87 300 371.9 | 16-Jan-1987 | 0 241 105 | 28-Jul-1993 | 16-Jan-2007 | Electronically Programmable Universal Brushless DC Fan with Integral Tracking and Locked Rotor Protection |
| 0917.117 | GB | Issued | 87 300 371.9 | 16-Jan-1987 | 0 241 105 | 28-Jul-1993 | 16-Jan-2007 | Electronically Programmable Universal Brushless DC Fan with Integral Tracking and Locked Rotor Protection |
| 0917.117 | IT | Issued | 87 300 371.9 | 16-Jan-1987 | 0 241 105 | 28-Jul-1993 | 16-Jan-2007 | Electronically Programmable Universal Brushless DC Fan with Integral Tracking and Locked Rotor Protection |
| 0917.118 | CA | Expired | | | 27396/209 | 19-Jul-1965 | 19-Jul-1982 | Fan - DESIGN |
| 0917.118 | DE | Expired | | | 3 373 | | 30-Apr-1983 | Fan - DESIGN |
| 0917.118 | GB | Expired | | | 921,763 | 03-Feb-1965 | 03-Feb-1980 | Fan - DESIGN |
| 0917.118 | IT | Expired | | | 114,369 | 14-Mar-1967 | 14-Mar-1971 | Fan - DESIGN |
| 0917.118 | JP | Expired | 2002/41965 | | 285,074 | 29-May-1968 | 29-May-1983 | Fan - DESIGN |
| 0917.118 | JP | Expired | 30874/1967 | | 302,920 | 23-Jul-1969 | 23-Jan-1984 | Fan - DESIGN |
| 0917.156 | FR | Expired | 30,279 | 07-May-1965 | | 07-May-1965 | 07-May-1990 | Design for Skipper Fan (Deux modeles de ventilateur) |
| 0917.171 | BE | Granted | 99903304.6 | 21-Jan-1999 | 1049877 | 02-Jan-2004 | 21-Jan-2019 | Low Profile Motor |
| 0917.171 | DE | Granted | 99903304.6 | 21-Jan-1999 | 69913939.2 | 02-Jan-2004 | 21-Jan-2019 | Low Profile Motor |
| 0917.171 | EP | Granted | 99903304.6 | 21-Jan-1999 | 1049877 | 02-Jan-2004 | 21-Jan-2019 | Low Profile Motor |
| 0917.171 | FR | Granted | 99903304.6 | 21-Jan-1999 | 1049877 | 02-Jan-2004 | 21-Jan-2019 | Low Profile Motor |
| 0917.171 | GB | Granted | 99903304.6 | 21-Jan-1999 | 1049877 | 02-Jan-2004 | 21-Jan-2019 | Low Profile Motor |
| 0917.171 | IT | Granted | 99903304.6 | 21-Jan-1999 | 1049877 | 02-Jan-2004 | 21-Jan-2019 | Low Profile Motor |
| 0917.104.1 | FR | Expired | | | 7,031,211 | 15-Jun-1971 | 28-Aug-1986 | Compact Fluid Compressor |
| 0917.104.1 | GB | Expired | | | 1,287,557 | 27-Aug-1970 | | Compact Fluid Compressor |
| 0917.104.1 | JP | Expired | 45-72310 | 18-Aug-1970 | 774,833 | | | Compact Fluid Compressor |
| 0917.114.1 | CA | Issued | 615,627 | 23-Jan-1990 | 1,281,066 | 05-Mar-1991 | 05-Mar-2008 | Ironless; Brushless DC Motor with Wave-Winding |

14

619035-05

<u>**Schedule B**</u>

License Agreements

619035-05

**EXHIBIT F**

# TRADEMARK SECURITY AGREEMENT

**THIS TRADEMARK SECURITY AGREEMENT** (this **"Agreement"**) is made as of April 2, 2004 by and among Comair Rotron, Inc., a Delaware corporation (the **"Grantor"**) and LaSalle Bank National Association (**"Lender"**).

**WHEREAS,** Grantor and Lender are parties to that certain Loan and Security Agreement of even date herewith (such Loan and Security Agreement as the same hereafter may be amended, modified, supplemented or restated from time to time hereinafter, together with any documents related thereto, are referred to as the **"Loan Agreement"**); and

**WHEREAS,** Lender is requiring Grantor to execute and deliver this Agreement (i) in order to secure the prompt and complete payment, observance and performance of all of the obligations of Grantor under the Loan Agreement (the **"Obligations"**) and (ii) as a condition precedent to the Loan Agreement.

**NOW, THEREFORE,** in consideration of the terms and conditions set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Grantor agrees as follows:

1. **DEFINED TERMS.**

   Terms not defined herein shall have the meaning ascribed to such terms in the Loan Agreement.

2. **SECURITY INTEREST IN TRADEMARKS.**

   To secure the complete and timely payment, performance and satisfaction of all of the Obligations, Grantor hereby grants to Lender, a security interest in, with power of sale to the extent permitted by applicable law and the provisions of this Agreement, all of Grantor's United States and foreign, trademarks, tradenames, service marks and applications, any of the foregoing now or hereafter owned and/or used by Grantor and all licenses that allow the use of any, trademarks, service marks, copyrights or applications of others (collectively, the **"Intellectual Property Rights"**) now owned or existing and hereafter acquired or arising consisting of:

   (i)   trademarks, registered trademarks, trademark applications, service marks, registered service marks and service mark applications, including, without limitation, trademarks, registered trademarks, trademark applications, service marks, registered service marks and service mark applications listed on Schedule A attached hereto and made a part hereof, and (a) all renewals thereof, (b) all income, royalties, damages and payments now and hereafter due and/or payable under and with respect thereto, including, without limitation, payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (c) the right to sue for past, present and future infringements and dilutions thereof, (d) the goodwill of

Grantor's business symbolized by the foregoing and connected therewith and (e) all of Grantor's rights corresponding thereto throughout the world (all of the foregoing trademarks, registered trademarks and trademark applications and service marks, registered service marks and service mark applications, together with the items described in clauses (a)-(e) in this Section 2(i), together with any goodwill connected with and symbolized thereby, are hereinafter individually and/or collectively referred to as the "**Trademarks**"); and

(ii)   rights under or interest in trademark license agreements or service mark license agreements with any other party, whether Grantor is a licensee or licensor under any such license agreement, including without limitation, those trademark license agreements and service mark license agreements listed on Schedule B attached hereto and made a part hereof, together with any goodwill connected with and symbolized by any such trademark license agreements or service mark license agreements, and the right to prepare for sale and sell any and all Inventory now or hereafter owned by Grantor and now or hereafter covered by such licenses (all of the foregoing are hereinafter referred to collectively as the "**Licenses**"). Notwithstanding the foregoing provisions of this Section 2, the Licenses shall not include any license agreement in effect as of the date hereof which by its terms prohibits the grant of the security contemplated by this Agreement; provided that upon the termination of such prohibitions for any reason whatsoever, the provisions of this Section 2 shall be deemed to apply thereto automatically.

3.   **NEW TRADEMARKS AND LICENSES.**

If, prior to the termination of this Agreement, Grantor shall (i) obtain rights to any new trademarks, registered trademarks, trademark applications, service marks, registered service marks or service mark applications, (ii) become entitled to the benefit of any trademarks, registered trademarks, trademark applications, trademark licenses, trademark license renewals, service marks, registered service marks, service mark applications, service mark licenses or service mark license renewals whether as licensee or licensor or (iii) enter into any new trademark license agreement or service mark license agreement, which in any such case, shall involve or constitute Intellectual Property Rights, the provisions of Section 2 above shall automatically apply thereto. Grantor shall give to Lender written notice of events described in clauses (i), (ii) and (iii) of the preceding sentence promptly after the occurrence thereof, but in any event not less frequently than on an annual basis. Grantor hereby authorizes Lender to modify this Agreement unilaterally (i) by amending Schedule A to include any future Intellectual Property Rights consisting of trademarks, registered trademarks, trademark applications, service marks, registered service marks and service mark applications and by amending Schedule B to include any future Intellectual Property Rights consisting of trademark license agreements and/or service mark license agreements, which are Trademarks or Licenses under Section 2 above or under this Section 3 and (ii) by filing with the appropriate government agency, in addition to and not in substitution for this Agreement, a duplicate original of this Agreement containing on Schedule A or B thereto, as the case may be, such future trademarks, registered trademarks, trademark applications, service marks, registered service marks and service mark applications, and trademark license agreements and service mark license agreements.

619046-05

2

**182**

4.    **REPRESENTATIONS AND WARRANTIES.**

Grantor represents and warrants as of the date hereof that: (i) the Trademarks listed on Schedule A include all of the Intellectual Property Rights consisting of trademarks, registered trademarks, trademark applications, service marks, registered service marks and service mark applications; (ii) the Licenses listed on Schedule B include all of the Intellectual Property Rights consisting of trademark license agreements and service mark license agreements under which Grantor is the licensee or licensor; and (iii) no liens, claims or security interests in such Trademarks and Licenses have been granted by Grantor to any Person other than Lender, except as permitted under the Loan Agreement.

5.    **DUTIES OF GRANTOR.**

Grantor shall, to the extent material to the normal conduct of Grantor's business, have the duty to: (i) prosecute diligently any trademark application or service mark application that is part of the Trademarks pending as of the date hereof or hereafter until the termination of this Agreement; (ii) make application for registration of material not registered as trademarks or service marks, which is capable of being registered as trademarks or service marks; (iii) not abandon any Trademark or License without the prior written consent of Lender; and (iv) maintain in full force and effect the Trademarks and the Licenses in connection with the operation of Grantor's business. Any expenses incurred in connection with the foregoing shall be borne by Grantor. Lender shall not have any duty with respect to the Trademarks and Licenses. Without limiting the generality of the foregoing, Lender shall not be under any obligation to take any steps necessary to preserve rights in the Trademarks or Licenses against any other parties, but Lender may do so at its option from and after the occurrence of an Event of Default, and all expenses incurred in connection therewith shall be for the sole account of Grantor and shall be added to the Obligations secured hereby.

6.    **ROYALTIES.**

Grantor hereby agrees that the use by Lender of the Trademarks and Licenses as authorized hereunder in connection with Lender's exercise of its rights and remedies under Section 10 shall be coextensive with Grantor's rights thereunder and, with respect thereto and without any liability for royalties or other related charges from Lender to Grantor.

7.    **FURTHER ASSIGNMENTS AND SECURITY INTERESTS.**

From and after the occurrence of, and during the continuation of, an Event of Default, Grantor agrees that Lender, or a conservator appointed by Lender, shall have the right to establish such reasonable additional product quality controls as Lender or such conservator, in its sole and absolute discretion, may deem necessary to assure maintenance of the quality of products sold by Grantor under the Trademarks and the Licenses or in connection with which such Trademarks and Licenses are used. Grantor agrees (i) not to sell or assign its respective interests in, or grant any license under, the Trademarks or the Licenses without the prior and express written consent

619046-05

3

of Lender, (ii) to maintain the quality of such products as of the date hereof and (iii) not to change the quality of such products in any material respect without Lender's prior and express written consent. Grantor acknowledges that Lender, in its sole and absolute discretion, may withhold its consent for any or for no reason.

8. **NATURE AND CONTINUATION OF LENDER'S SECURITY INTEREST; TERMINATION OF LENDER'S SECURITY INTEREST.**

This Agreement is made for collateral security purposes only. This Agreement shall create a continuing security interest in the Trademarks and Licenses and shall terminate only when the Obligations (other than contingent indemnity obligations) have been paid in full. When this Agreement has terminated, Lender shall promptly execute and deliver to Grantor, at Grantor's expense, all termination statements and other instruments as may be necessary or proper to terminate Lender's security interest in the Trademarks and the Licenses, subject to any disposition thereof which may have been made by Lender pursuant to this Agreement or the Loan Agreement.

9. **LENDER'S RIGHT TO SUE.**

From and after the occurrence and during the continuance of an Event of Default, Lender shall have the right, but shall not be obligated, to bring suit in its own name to enforce the Trademarks and the Licenses and, if Lender shall commence any such suit, Grantor shall, at the request of Lender, do any and all lawful acts and execute any and all proper documents required by Lender in aid of such enforcement. Grantor shall, upon demand, promptly reimburse Lender for all costs and expenses incurred by Lender in the exercise of its rights under this Section 9 (including, without limitation, reasonable fees and expenses of attorneys and paralegals for Lender).

10. **CUMULATIVE REMEDIES; POWER OF ATTORNEY.**

Grantor hereby irrevocably designates, constitutes and appoints Lender (and all Persons designated by Lender in its sole and absolute discretion) as Grantor's true and lawful attorney-in-fact, and authorize Lender and any of Lender's designees, in Grantor's or Lender's names after the occurrence and during the continuance of an Event of Default, to: (i) endorse Grantor's names on all applications, documents, papers and instruments necessary or desirable for Lender in the use of the Trademarks or the Licenses; (ii) assign, pledge, convey or otherwise transfer title in or dispose of the Trademarks or the Licenses to anyone on commercially reasonable terms; (iii) grant or issue any exclusive or nonexclusive license under the Trademarks or, to the extent permitted, under the Licenses, to anyone on commercially reasonable terms; and (iv) take any other actions with respect to the Trademarks or the Licenses as Lender deems in its best interest. Grantor hereby ratifies all that such attorney shall lawfully do or cause to be done by virtue hereof. This power of attorney is coupled with an interest and shall be irrevocable until all of the Obligations shall have been paid in full. Grantor acknowledges and agrees that this Agreement is not intended to limit or restrict in any way the rights and remedies of Lender under the Loan Agreement, but rather is intended to facilitate the exercise of such rights and remedies.

619046-05

4

**184**

Subject to the limitations set forth herein, or in the Loan Agreement, Lender shall have, in addition to all other rights and remedies given it by the terms of this Agreement, all rights and remedies allowed by law and the rights and remedies of a secured party under the Uniform Commercial Code as enacted in any jurisdiction in which the Trademarks or the Licenses may be located or deemed located. Upon the occurrence of an Event of Default and the election by Lender to exercise any of its remedies under Part 6 of Artilce 9 of the Uniform Commercial Code with respect to the Trademarks and Licenses, Grantor agrees to assign, convey and otherwise transfer title in and to the Trademarks and the Licenses to Lender or any transferee of Lender and to execute and deliver to Lender or any such transferee all such agreements, documents and instruments as may be necessary, in Lender's sole and absolute discretion, to effect such assignment, conveyance and transfer. All of Lender's rights and remedies with respect to the Trademarks and the Licenses, whether established hereby, by the Loan Agreement, by any other agreements or by law, shall be cumulative and may be exercised separately or concurrently. Notwithstanding anything set forth herein to the contrary, it is hereby expressly agreed that upon the occurrence and during the continuation of an Event of Default, Lender may exercise any of the rights and remedies provided in this Agreement, the Loan Agreement and any of the other documents between Grantor and Lender. Grantor agrees that any notification of intended disposition of any of the Trademarks and Licenses required by law shall be deemed reasonably and properly given if given at least ten (10) days before such disposition; provided that Lender may give any shorter notice that is commercially reasonable under the circumstances.

11.   **MISCELLANEOUS.**

   **11.1   Incorporation of the Loan Agreement.** The Loan Agreement and the terms and provisions thereof are hereby incorporated herein in their entirety by this reference thereto.

   **11.2   Waivers.** Lender's failure, at any time or times hereafter, to require strict performance by Grantor of any provision of this Agreement shall not waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith nor shall any course of dealing between Grantor and Lender have such effect. No single or partial exercise of any right hereunder shall preclude any other or further exercise thereof or the exercise of any other right. None of the undertakings, agreements, warranties, covenants and representations of Grantor contained in this Agreement shall be deemed to have been suspended or waived by Lender unless such suspension or waiver is in writing signed by an officer of Lender and directed to Grantor specifying such suspension or waiver.

   **11.3   Severability.** Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but the provisions of this Agreement are severable, and if any clause or provision shall be held invalid and unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such clause or provision, or part thereof, in such jurisdiction, and shall not in any manner affect such clause or provision in any other jurisdiction, or any other clause or provision of this Agreement in any jurisdiction.

619046-05

5

**11.4    Modification.**  Except as provided for in Section 3, this Agreement cannot be altered, amended or modified in any way, except as by a writing signed by the parties hereto.

**11.5    Successors and Assigns.**  This Agreement shall be binding upon Grantor and its successors and assigns, and shall inure to the benefit of Lender and its nominees, successors and assigns. Grantor's successors and assigns shall include, without limitation, a receiver, trustee or debtor-in-possession of or for Grantor; provided that Grantor shall not voluntarily assign or transfer its rights or obligations hereunder without Lender's prior written consent.

**11.6    Governing Law.**  This Agreement shall be construed and enforced and the rights and duties of the parties shall be governed by in all respects in accordance with the internal laws (as opposed to conflict of laws provisions) and decisions of the State of Illinois.

**11.7    Notices.**  All notices or other communications hereunder shall be given in the manner and to the addresses set forth in the Loan Agreement.

**11.8    Section Titles.**  The section titles herein are for convenience of reference only, and shall not affect in any way the interpretation of any of the provisions hereof.

**11.9    Execution in Counterparts.**  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

**11.10    Merger.**  This Agreement represents the final agreement of Grantor with respect to the matters contained herein and may not be contradicted by evidence of prior or contemporaneous agreements, or subsequent oral agreements, between Grantor and Lender.

**11.11    No Strict Construction.**  The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Agreement.

[signature page attached].

619046-05

6

186

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

GRANTOR:

Comair Rotron, Inc., a Delaware corporation

By: *Sig. Pelleg*
Name: STEPHEN VL. PELLEGRINI
Title: VICE PRESIDENT FINANCE


Accepted and agreed to as of the day and year first above written.

LENDER:

LaSalle Bank National Association

By:_____
Name: Travis Burns
Title:   Vice President

Trademark Security Agreement

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**GRANTOR:**

Comair Rotron, Inc., a Delaware corporation

By:_____
Name:_____
Title:_____

Accepted and agreed to as of the day and year first above written.

**LENDER:**

LaSalle Bank National Association

By:_____
Name:  Travis Burns
Title:   Vice President

Trademark Security Agreement

## Schedule A

### Trademarks

| CaseNumber | Country | Trademark Name | Application | Filing Date | Status | Registration | Reg. Date |
|---|---|---|---|---|---|---|---|
| 0917.201 | BR | CARAVEL | 816949760 | 01-Jan-1111 | Registered | 816949760 | 08-Mar-1994 |
| 0917.201 | JP | CARAVEL | 35145/83 | 19-Apr-1983 | Registered | 1918813 | 24-Dec-1986 |
| 0917.201 | US | CARAVEL | 187,338 | 24-Feb-1964 | Registered | 785,914 | 02-Mar-1965 |
| 0917.202 | GB | SPRITE | 1,515,194 | | Registered | 1,515,194 | 14-Apr-1992 |
| 0917.202 | IT | SPRITE | 35584C/85 | 18-Oct-1985 | Registered | 465 534 | 16-Feb-1987 |
| 0917.202 | FR | SPRITE | | | Registered | 1,571,155 | 09-Jun-1980 |
| 0917.202 | DE | SPRITE | | 15-Jun-1965 | Registered | 832,351 | 25-Apr-1967 |
| 0917.202 | CA | SPRITE | | 17-Jun-1965 | Registered | 146,501 | 05-Aug-1966 |
| 0917.202 | BX | SPRITE | | | Registered | 058.091 | 13-Sep-1971 |
| 0917.202 | US | SPRITE | 74/265,826 | 14-Apr-1992 | Registered | 1,756,673 | 09-Mar-1993 |
| 0917.202 | JP | SPRITE | 5-6821 | 28-Jan-1993 | Registered | 4,059,974 | 26-Sep-1997 |
| 0917.203 | US | SPINNAKER | 042,645 | 26-Mar-1990 | Registered | 1,652,304 | 30-Jul-1991 |
| 0917.204 | US | SPRINT | 464,780 | 08-Feb-1984 | Registered | 1,373,630 | 03-Dec-1985 |
| 0917.205 | US | MODULAIR | 74/268,485 | 23-Apr-1992 | Registered | 1,756,675 | 09-Mar-1993 |
| 0917.208 | FR | FEATHER | | 15-Dec-1992 | Expired | 92,446,144 | 15-Dec-1992 |
| 0917.208 | BR | FEATHER | | | Inactive | | |
| 0917.208 | ZA | FEATHER | | | Expired | B66/2380 | 14-Jun-1966 |
| 0917.208 | IT | FEATHER | 35586C/85 | 18-Oct-1985 | Let Expire | 465 536 | 16-Feb-1987 |
| 0917.208 | GB | FEATHER | 1 515 331 | | Let Expire | 1.515.331 | 09-Oct-1992 |
| 0917.208 | DE | FEATHER | | | Let Expire | 819,076 | 03-May-1966 |
| 0917.208 | CA | FEATHER | 290,164 | 17-Jun-1965 | Let Expire | 143,947 | 11-Feb-1966 |
| 0917.208 | BX | FEATHER | | | Let Expire | 058.090 | 13-Sep-1971 |
| 0917.208 | US | FEATHER | 153,819 | 24-Sep-1962 | Expired | 749,414 | 14-May-1963 |
| 0917.208(A) | BR | FEATHER | 026,816 | 22-Sep-1980 | Expired | 800 268 164 | 24-May-1983 |
| 0917.208(B) | BR | FEATHER | 026 816/A | 22-Sep-1980 | Expired | 800 504 518 | 24-May-1983 |
| 0917.209 | GB | WHISPER | | 28-May-1969 | Registered | 868 095 | 14-Aug-1964 |
| 0917.209 | JP | WHISPER | | | Inactive | | |
| 0917.209 | FR | WHISPER | 523 422 | 29-Jul-1979 | Registered | 1 563 982 | 07-Dec-1989 |
| 0917.209 | DE | WHISPER | | | Registered | 805 873 | 24-Jun-1965 |
| 0917.209 | US | WHISPER | 153,820 | 24-Sep-1962 | Registered | 751,288 | 18-Jun-1963 |

619046-05

| CaseNumber | Country | Trademark Name | Application | Filing Date | Status | Registration | Reg. Date |
|---|---|---|---|---|---|---|---|
| 0917.209 | IT | WHISPER | MR94C003594 | 08-Aug-1984 | Registered | 689311 | 14-Oct-1996 |
| 0917.209 | CA | WHISPER | 284.368 | 01-Sep-1964 | Registered | 140,476 | 28-May-1965 |
| 0917.209 | BR | WHISPER | 802681AO | 22-Sep-1980 | Expired | 800 504 496 | 03-Jan-1984 |
| 0917.209(A) | JP | WHISPER | 62-010365 | 05-Feb-1987 | Registered | 2263202 | 21-Sep-1990 |
| 0917.209(B) | JP | WHISPER | | | Expired | 702 401 | 25-Mar-1966 |
| 0917.210 | JP | PATRIOT | 58-035146 | | Expired | 1858739 | 23-Apr-1986 |
| 0917.210 | US | PATRIOT | 075,980 | 02-Feb-1976 | Registered | 1,046,764 | 24-Aug-1976 |
| 0917.210 | BR | PATRIOT | | | Inactive | | |
| 0917.210(A) | BR | PATRIOT | 026 806 | | Expired | 800 268 067 | 28-Jun-1983 |
| 0917.210(B) | BR | PATRIOT | | 22-Sep-1980 | Expired | 800 504 453 | 30-Aug-1983 |
| 0917.211 | BR | MAJOR | 800 268 091 | 22-Sep-1980 | Expired | 800 268 091 | 22-Jul-1986 |
| 0917.211 | CA | MAJOR | 356516 | 28-Aug-1972 | Registered | 191295 | 25-May-1973 |
| 0917.211 | US | MAJOR | 369,134 | 26-Aug-1970 | Registered | 921,485 | 05-Oct-1971 |
| 0917.212 | BR | BISCUIT | | | Inactive | | |
| 0917.212 | US | BISCUIT | 335,060 | 11-Aug-1969 | Registered | 892,900 | 16-Jun-1970 |
| 0917.212(A) | BR | BISCUIT | 026 805 | 22-Sep-1980 | Expired | 800 268 059 | 28-Jun-1983 |
| 0917.212(B) | BR | BISCUIT | 800 504 445 | 22-Sep-1980 | Expired | 800 504 445 | 30-Aug-1983 |
| 0917.213 | JP | MUFFIN | 5-6822 | 28-Jan-1993 | Registered | 3143347 | 30-Apr-1996 |
| 0917.213 | IT | MUFFIN | RM94C003596 | 11-Aug-1994 | Registered | 689313 | 14-Oct-1996 |
| 0917.213 | BR | MUFFIN | | | Inactive | | |
| 0917.213 | GB | MUFFIN | | 09-Mar-1968 | Registered | 868 093 | 11-Aug-1964 |
| 0917.213 | BX | MUFFIN | | | Registered | 371913 | 12-Mar-1981 |
| 0917.213 | CA | MUFFIN | 284.367 | 01-Sep-1964 | Registered | 140,475 | 28-May-1965 |
| 0917.213 | FR | MUFFIN | 522.923 | 17-Jul-1979 | Registered | 1 563 983 | 07-Dec-1989 |
| 0917.213 | US | MUFFIN | 72/045,759 | 12-Feb-1958 | Registered | 671,482 | 23-Dec-1958 |
| 0917.213(A) | JP | MUFFIN | | | Expired | 718541 | 02-Sep-1966 |
| 0917.213(A) | BR | MUFFIN | 026 812 | 22-Sep-1980 | Expired | 800 268 121 | 07-Jun-1983 |
| 0917.213(B) | BR | MUFFIN | 800 504 488 | 22-Sep-1980 | Expired | 800 504 488 | 30-Aug-1983 |
| 0917.213(B) | JP | MUFFIN | | | Inactive | | |
| 0917.214 | JP | SKIPPER | | | Expired | 743947 | |
| 0917.214 | FR | SKIPPER | 84.688 | 19-Feb-1965 | Expired | 1.121.325 | 29-Jan-1980 |
| 0917.214 | US | SKIPPER | 185,813 | 31-Jan-1964 | Expired | 776,611 | 08-Sep-1964 |
| 0917.214 | BX | SKIPPER | | | Expired | 058,092 | |

9

619046-05

**190**

| CaseNumber | Country | Trademark Name | Application | Filing Date | Status | Registration | Register Date |
|---|---|---|---|---|---|---|---|
| 0917.214 | GB | SKIPPER | | 28-May-1969 | Terminated | 874771 | 26-Jan-1965 |
| 0917.214 | IT | SKIPPER | | | Expired | 204,285 | |
| 0917.215 | JP | SENTINEL | | | Expired | 702,969 | |
| 0917.215 | IT | SENTINEL | | | Expired | 199,607 | |
| 0917.215 | FR | SENTINEL | | | Expired | 1 102 932 | 20-Jul-1979 |
| 0917.215 | DE | SENTINEL | | | Expired | 803,972 | |
| 0917.215 | US | SENTINEL | 167,325 | 22-Apr-1963 | Expired | 766,277 | 10-Mar-1964 |
| 0917.215 | BX | SENTINEL | | | Expired | 058.094 | |
| 0917.216 | DE | TARZAN | | | Terminated | 836 095 | 24-Aug-1966 |
| 0917.216 | BX | TARZAN | | | Terminated | 058,074 | 13-Sep-1971 |
| 0917.216 | IT | TARZAN | | | Terminated | 214,815 | |
| 0917.216 | GB | TARZAN | | | Expired | 898,144 | 09-Aug-1966 |
| 0917.216 | FR | TARZAN | | | Expired | 962,715 | 22-Jul-1976 |
| 0917.216 | JP | TARZAN | | | Expired | 788260 | 02-Aug-1968 |
| 0917.216 | CA | TARZAN | | | Expired | 153,859 | 27-Oct-1967 |
| 0917.216 | US | TARZAN | 227,333 | 07-Sep-1965 | Registered | 829,773 | 06-Jun-1967 |
| 0917.216 | BR | TARZAN | | | Inactive | | |
| 0917.216(A) | BR | TARZAN | | 22-Sep-1980 | Terminated | 800 504 461 | |
| 0917.216(B) | BR | TARZAN | | 22-Sep-1980 | Terminated | 800 268 075 | 03-Jan-1984 |
| 0917.217 | DE | CENTAUR | | | Expired | 846.885 | |
| 0917.217 | IT | CENTAUR | | | Expired | 212.725 | |
| 0917.217 | FR | CENTAUR | | | Expired | 952.354 | 15-Apr-1976 |
| 0917.217 | BX | CENTAUR | | | Expired | 058.095 | |
| 0917.217 | US | CENTAUR | | | Inactive | | |
| 0917.217 | GB | CENTAUR | | | Expired | 894,527 | |
| 0917.218 | JP | PIXIE | | | Expired | 1319398 | |
| 0917.219 | US | FLIGHT | 042,676 | 26-Mar-1990 | Registered | 1,654,833 | 27-Aug-1991 |
| 0917.219 | CN | FLIGHT | 2001088217 | 28-May-2001 | Registered | 1922453 | 21-Jan-2003 |
| 0917.252 | US | WAFER | | | Cancelled | 1,292,113 | 28-Aug-1984 |
| 0917.253 | US | SCAMP | 409,498 | 14-Jan-1983 | Cancelled | 1,269,112 | 06-Mar-1984 |
| 0917.254 | US | NUGGET | | | Inactive | | |
| 0917.254 | JP | NUGGET | | | Expired | 718542 | |
| 0917.254 | BX | NUGGET | | | Expired | 058.089 | |

10

619046-05

| CaseNumber | Country | Trademark Name | Application | Filing Date | Status | Registration | Reg. Date |
|---|---|---|---|---|---|---|---|
| 0917.254 | DE | NUGGET | | | Expired | 816,880 | |
| 0917.254 | GB | NUGGET | | | Expired | | |
| 0917.254 | IT | NUGGET | | | Expired | 206.292 | |
| 0917.255 | JP | COMAIR ROTRON | 2000-90989 | 18-Aug-2000 | Registered | 4503016 | 31-Aug-2001 |
| 0917.255 | EU | COMAIR ROTRON | 001761220 | 17-Jul-2000 | Registered | 001761220 | 02-Oct-2001 |
| 0917.255 | CN | COMAIR ROTRON | 2000163773 | 05-Oct-2000 | Registered | 1748115 | 14-Apr-2002 |
| 0917.255 | US | COMAIR ROTRON | 312,304 | 09-Sep-1992 | Registered | 1,774,167 | 01-Jun-1993 |
| 0917.255 | TW | COMAIR ROTRON | 89051217 | 05-Sep-2000 | Registered | 009706610 | 16-Nov-2001 |
| 0917.255 | KR | COMAIR ROTRON | 2000-38350 | 09-Aug-2000 | Registered | 522703 | 12-Jun-2002 |
| 0917.256 | US | THERMA PRO-V | 042,644 | 26-Mar-1990 | Registered | 1,660,709 | 15-Oct-1991 |
| 0917.257 | US | SKELETON | | | Inactive | | |
| 0917.258 | US | VIKING | 042,615 | 26-Mar-1990 | Abandoned | | |
| 0917.259 | US | EAGLE | | | Inactive | | |
| 0917.260 | US | CB | | | Inactive | | |
| 0917.261 | ES | DIPLOMAT | 1,919,446 | 30-Aug-1994 | Registered | 1,919,446 | 28-May-1996 |
| 0917.261 | IT | DIPLOMAT | RM94C003880 | 01-Sep-1994 | Registered | 689570 | 14-Oct-1996 |
| 0917.261 | GB | DIPLOMAT | 1 582 004 | 17-Aug-1994 | Registered | 1 582 004 | 02-Jun-1995 |
| 0917.261 | DE | DIPLOMAT | C47362/11Wz | 12-Aug-1994 | Registered | 2 909 074 | 13-Jul-1995 |
| 0917.261 | FR | DIPLOMAT | 94/533.242 | 18-Aug-1994 | Registered | 94/533.242 | 18-Aug-1994 |
| 0917.261 | US | DIPLOMAT | 299,219 | 28-Jul-1992 | Registered | 1,976,999 | 28-May-1996 |
| 0917.262 | US | PERFORMER | | | Inactive | | |
| 0917.263 | FR | CHINOOK | | | Inactive | | |
| 0917.263 | US | CHINOOK | | | Inactive | | |
| 0917.264 | US | WHIFFET | 74/042,628 | 26-Mar-1990 | Registered | 1,753,188 | 16-Feb-1993 |
| 0917.265 | US | STERLING | | | Inactive | | |
| 0917.266 | US | GALAXY | 74/265,858 | 14-Apr-1992 | Registered | 1,758,195 | 16-Mar-1993 |
| 0917.267 | US | PHOENIX | | | Inactive | | |
| 0917.268 | US | VIKING | 261,982 | 02-Apr-1992 | Registered | 1,953,895 | 06-Feb-1996 |
| 0917.271 | DE | WIND-SHEER | | 24-May-1994 | Abandoned | | |
| 0917.271 | US | WIND-SHEER | 467,888 | 09-Dec-1993 | Abandoned | | |
| 0917.271 | IT | WIND-SHEER | RM94C002558 | 08-Jun-1994 | Abandoned | | |
| 0917.271 | FR | WIND-SHEER | 94/523,525 | 07-Jun-1994 | Abandoned | | |
| 0917.271 | ES | WIND-SHEER | | 09-Jun-1994 | Abandoned | | |

11

619046-05

| CaseNumber | Country | Trademark Name | Application | Filing Date | Status | Registration | Reg. Date |
|---|---|---|---|---|---|---|---|
| 0917.271 | GB | WIND-SHEER | | 24-May-1994 | Abandoned | | |
| 0917.272 | GB | FALCON | 2 012 634 | 28-Feb-1995 | Registered | 2 012 634 | 22-Mar-1996 |
| 0917.272 | DE | FALCON | 394 09 556.1 | 27-Dec-1994 | Registered | 394 09 556 | 28-Jun-1995 |
| 0917.272 | ES | FALCON | 1.953.950 | 14-Mar-1995 | Registered | 1,953,950 | 18-Apr-1997 |
| 0917.272 | FR | FALCON | 95/562,545 | 13-Mar-1995 | Registered | 95/562,545 | 13-Mar-1995 |
| 0917.272 | IT | FALCON | RM95C001853 | 14-Apr-1995 | Registered | 713,752 | 16-Jun-1997 |
| 0917.272 | US | FALCON | 587,035 | 18-Oct-1994 | Registered | 2,091,642 | 26-Aug-1997 |
| 0917.273 | GB | MALTESE FALCON | 2 047 857 | 08-Dec-1995 | Registered | 2,047,857 | 08-Dec-1995 |
| 0917.273 | DE | MALTESE FALCON | 395 50 527.5 | 11-Dec-1995 | Registered | 395 50 527 | 30-Jul-1996 |
| 0917.273 | US | MALTESE FALCON | 74/687,940 | 13-Jun-1995 | Registered | 2,247,903 | 25-May-1999 |
| 0917.273 | FR | MALTESE FALCON | 95/600,234 | 08-Dec-1995 | Registered | 95/600,234 | 08-Dec-1995 |
| 0917.274 | EU | ENVIROSHIELD | 000950758 | 08-Oct-1998 | Registered | 000950758 | 28-Feb-2000 |
| 0917.274 | US | ENVIRO SHIELD | 75/464,997 | 09-Apr-1998 | Registered | 2,371,549 | 25-Jul-2000 |
| 0917.275 | US | SYNCHRONOUS-FAN | | | Inactive | | |
| 0917.276 | US. | SYNCHRO-FAN | 75/933,440 | 01-Mar-2000 | Allowed | | |
| 0917.276 | EU | SYNCHRO-FAN | 001770700 | 24-Jul-2000 | Registered | 1770700 | 01-Oct-2002 |
| 0917.277 | CN | SHANGHAI COMAIR ROTRON | 2001088216 | 28-May-2001 | Abandoned | | |
| 0917.278 | EU | COMAIR ROTRON EUROPE LTD. | 002091049 | 16-Feb-2001 | Registered | 2091049 | 08-Sep-2003 |
| 0917.279 | EU | COM-FLO | | | Inactive | | |
| 0917.280 | CN | MIXTUS | 3578508 | 03-Jun-2003 | Pending | | |
| 0917.280 | US | MIXTUS | 76/258,756 | 17-May-2001 | Allowed | | |
| 0917.280 | EU | MIXTUS | 003210549 | 03-Jun-2003 | Published | | |
| 0917.280 | KR | MIXTUS | 40-200324271 | 29-May-2003 | Pending | | |
| 0917.280 | TW | MIXTUS | 092039451 | 24-Jun-2003 | Pending | | |
| 0917.280 | JP | MIXTUS | 2003-45014 | 02-Jun-2003 | Registered | 4730204 | 28-Nov-2003 |
| 0917.280 | CA | MIXTUS | 1,184,398 | 15-Jul-2003 | Pending | | |
| 0917.281 | US | INTERMIX | | | Inactive | | |
| 0917.282 | US | AMBASSADOR | 78/177,442 | 23-Oct-2002 | Allowed | | |
| 0917.283 | EU | AIR BOX | 003399383 | 10-Oct-2003 | Pending | | |
| 0917.283 | US | AIR BOX | 78/260,677 | 10-Jun-2003 | Pending | | |
| 0917.284 | EU | COMAIR ROTRON (plus design) | 003206257 | 22-May-2003 | Published | | |
| 0917.284 | TW | COMAIR ROTRON (plus design) | 092045561 | 24-Jul-2003 | Pending | | |
| 0917.284 | CA | COMAIR ROTRON (plus design) | 1,184,401 | 15-Jul-2003 | Pending | | |

12

619046-05

**193**

| CaseNumber | Country | Trademark Name | Application | Filing Date | Status | Registration | Reg. Date |
|---|---|---|---|---|---|---|---|
| 0917.284 | US | COMAIR ROTRON (plus design) | 78/247,691 | 09-May-2003 | Pending | | |
| 0917.284 | JP | COMAIR ROTRON (plus swirl | 2003-41382 | 21-May-2003 | Registered | 4723749 | 31-Oct-2003 |
| 0917.284 | CN | COMAIR ROTRON (plus design) | 3569248 | 27-May-2003 | Pending | | |
| 0917.284 | KR | COMAIR ROTRON (plus design) | 40200322364 | 19-May-2003 | Pending | | |
| 0917.285 | TW | Swirl design | 092045562 | 24-Jul-2003 | Pending | | |
| 0917.285 | CN | Swirl design | 3569247 | 27-May-2003 | Pending | | |
| 0917.285 | CA | Swirl design | 1,184,400 | 15-Jul-2003 | Pending | | |
| 0917.285 | JP | Swirl design | 2003-41383 | 21-May-2003 | Registered | 4723750 | 31-Oct-2003 |
| 0917.285 | KR | Swirl design | 40200322365 | 19-May-2003 | Pending | | |
| 0917.285 | EU | Swirl design | 003206273 | 22-May-2003 | Pending | | |
| 0917.285 | US | Swirl design (design only) | 78/247,986 | 09-May-2003 | Published | | |
| 0917.286 | US | GRYPHON | 78/306,239 | 26-Sep-2003 | Pending | | |
| 0917.286 | KR | GRYPHON | 40-200412176 | 18-Mar-2004 | Pending | | |
| 0917.286 | CA | GRYPHON | 1,209,954 | 17-Mar-2004 | Pending | | |
| 0917.286 | CN | GRYPHON | | 25-Mar-2004 | Pending | | |
| 0917.286 | EU | GRYPHON | | 24-Mar-2004 | Pending | | |
| 0917.286 | JP | GRYPHON | 2004-25041 | 17-Mar-2004 | Pending | | |
| 0917.287 | US | HIQ | | | Inactive | | |

13

619046-05

194

**<u>Schedule B</u>**

License Agreements

619046-05

EXHIBIT G

## HOLDING GUARANTY

**THIS HOLDING GUARANTY** (this "**Guaranty**") is made on April 2, 2004 by Comair Holding Corp., a Delaware corporation (the "**Guarantor**"), to and for the benefit of LaSalle Bank National Association (the "**Lender**").

**WHEREAS**, pursuant to that certain Loan and Security Agreement of even date herewith, (the "**Loan Agreement**," and together with all other documents and instruments executed or created in connection therewith, the "**Loan Documents**") between Lender and Comair Rotron, Inc., a Delaware corporation (the "**Borrower**"), Lender has agreed to make a term loan to Borrower in the principal amount of $7,000,000 (the "**Term Loan**") and to make available a revolving credit facility in the amount of up to $5,000,000 (the "**Revolving Credit Facility**," and together with the Term Loan, the "**Loans**");

**WHEREAS**, the Term Loan is evidenced by a certain term loan note (the "**Term Note**") in the principal amount of $7,000,000 and the Revolving Credit Facility is evidenced by a certain revolving credit note in a principal amount of $5,000,000 (the "**Revolving Credit Note**," and together with the Term Note, the "**Notes**"). The Notes are dated as of the date hereof and are made by Borrower payable to the order of Lender;

**WHEREAS**, Guarantor, is the owner of 100% of Borrower's stock, and will therefor benefit from the Loans; and

**WHEREAS**, Lender is requiring Grantor to execute and deliver this Guaranty (i) in order to secure the prompt and complete payment, observance and performance of all of the obligations of Borrower under the Loan Agreement (the "**Obligations**") and (ii) as a condition precedent to the Loan Agreement.

**NOW, THEREFORE**, in consideration of the foregoing promises and for the purpose of inducing Lender to make the Loans, Guarantor hereby agrees as follows:

1.    <u>Definitions</u>. Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Loan Agreement.

2.    <u>Guaranty of Payment and Performance</u>. Guarantor unconditionally, absolutely and irrevocably guarantees, without limitation, for the benefit of Lender and each and every present and future holder or holders of the Notes, or assignee or assignees of the Loan Documents, the due, punctual and full payment of the Loans, the interest thereon and all other monies due or which may become due thereunder or under the Loan Documents, whether according to the present terms thereof or at any earlier or accelerated date or dates as provided therein, or pursuant to any extensions of time or to any change or changes in the terms, covenants or conditions thereof or at any time hereafter made or granted, and the complete performance in full of all Obligations of Borrower under the Loan Documents. The guaranty set forth in this Paragraph 2 is a guaranty of payment and not of collection.

619938-05

G        **196**

3.     Representations and Warranties.  Guarantor represents and warrants to Lender as follows, and hereby acknowledges that Lender intends to make the Loans in reliance thereon:

(a)     Guarantor has the requisite power, authority, capacity and legal right to execute, deliver and perform this Guaranty and all other documents required to be executed and delivered hereunder.  This Guaranty and all other documents required to be executed and delivered hereunder, when executed and delivered, will constitute legal, valid and binding obligations of Guarantor enforceable against Guarantor in accordance with their terms;

(b)     Guarantor is not in default, and no event has occurred which with the passage of time and/or the giving of notice will constitute a default, under any agreement to which Guarantor is a party, the effect of which will impair performance by Guarantor of its obligations pursuant to and as contemplated by the terms of this Guaranty, and neither the execution and delivery of this Guaranty nor compliance with the terms and provisions hereof will, violate any applicable law, rule, regulation, decree or order, or will materially conflict or will be materially inconsistent with, or will result in any material breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, any indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind that creates, represents, evidences or provides for any lien, charge or encumbrance upon any of the property or assets of Guarantor, or any other indenture, mortgage, deed of trust, instrument, document, agreement or contract of any kind to which Guarantor is a party or by which Guarantor or the property of Guarantor may be subject, or in the event of any such conflict, the required consent or waiver of the other party or parties thereto has been validly granted, is in full force and effect, is valid and sufficient therefor and has been approved by Lender;

(c)     There is not any litigation, arbitration, governmental or administrative proceedings, actions, examinations, claims or demands pending or threatened that will adversely and materially affect performance by Guarantor of its obligations pursuant to and as contemplated by the terms and provisions of this Guaranty;

(d)     Guarantor has taken all necessary corporate action to ensure that the execution, delivery and performance of this Guaranty are duly authorized;

(e)     The execution, delivery, and performance of this Guaranty by Guarantor and compliance with the provisions hereof by Guarantor will not violate any provision of Guarantor's Certificate of Incorporation or By-laws; and

(f)     Neither this Guaranty nor any statement or certification as to facts heretofore furnished or required herein to be furnished to Lender by Guarantor contains any inaccuracy or untruth in any representation, covenant or warranty or omits to state a fact material to this Guaranty.

4. Covenants. In furtherance of the guarantees, representations and warranties described above in Paragraphs 2 and 3, and not in any way in limitation thereof, Guarantor hereby acknowledges, covenants and agrees that:

(a)     any indebtedness of Borrower now or hereafter owing, together with any interest thereon, to Guarantor, is hereby subordinated to the indebtedness of Borrower to Lender under the Loan Documents, and such indebtedness of Borrower to Guarantor in the event of a Default hereunder shall be collected, enforced and received by Guarantor in trust for the benefit of Lender, and shall be paid over to Lender on account of the indebtedness of Borrower to Lender, but without impairing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty, provided that Borrower may repay such indebtedness of Borrower to Guarantor so long as no Event of Default has occurred and is continuing and subject to the provisions of that certain Intercreditor (Subordination) Agreement of even date herewith by and among Guarantor, Lender, Borrower, Comair Rotron de Mexico, S. de R.L. de C.V., note holders party to that certain Subordinated Note and Warrant Purchase Agreement dated as of August 8, 2002 and Howard Industries, Inc., a note holder and as agent for the note holders;

(b)     any lien, security interest or charge on the Collateral, all rights therein and thereto or on the revenue and income to be realized therefrom, which Guarantor may now have or hereinafter obtain as security for any loans, advances or costs shall be, and such lien, security interest or charge hereby is, subordinated to all liens and security interests heretofore, now or hereafter granted by Borrower to Lender under the Loan Documents;

(c)     until the Notes are repaid in full, no payment by Guarantor under any provision of this Guaranty shall entitle Guarantor, by subrogation to the rights of Lender or otherwise, to (i) any payment by Borrower or (ii) any payment from or rights in any commitments or indemnities or other security held by or for the benefit of Lender in connection with the Loans;

(d)     the liability of Guarantor hereunder shall in no way be affected, diminished or released by any extension of time or forbearance that may be granted by Lender to Borrower or to Guarantor or any waiver by Lender under the Loan Documents or by reason of any change or modification in any of said instruments or by the acceptance by Lender of additional security or any increase, substitution or changes therein, or by the release by Lender of any security or any withdrawal thereof or decrease therein or by the failure or election not to pursue any remedies it may have against Borrower or Guarantor;

(e)     Lender, in its sole discretion, may at any time enter into agreements with Borrower to amend and modify any one or more of the Loan Documents and may waive or release any provision or provisions of any one or more thereof and, with reference thereto, may make and enter into any such agreement or agreements with Borrower as Lender may deem proper or desirable, without any notice to or assent from Guarantor and

619938-05

3

without in any manner impairing or affecting this Guaranty or any of Lender's rights hereunder;

(f)    upon the occurrence of an Event of Default, Lender may enforce this Guaranty without the necessity at any time of first resorting to or exhausting any other remedy or any other security or collateral and without the necessity at any time of first having recourse to the Notes; provided that nothing herein contained shall prevent Lender from suing on the Notes, or from exercising or enforcing its rights under the Loan Documents, and if such other remedy is availed of only the net proceeds therefrom, after deduction of all charges and expenses of every kind and nature relating to collection of the indebtedness evidenced by the Notes, shall be applied in reduction of the amount due on the Notes and Loan Documents. Lender shall not be required to institute or prosecute proceedings to recover any deficiency as a condition of any payment hereunder or enforcement hereof. At any sale of the Collateral or other security for the indebtedness evidenced by the Notes, or any part thereof, whether by foreclosure or otherwise, Lender may at its discretion purchase all or any part of such Collateral offered for sale, for its own account, and may apply against the amount bid therefor the balance due it pursuant to the terms of the Notes and Loan Documents;

(g)    this Guaranty shall remain and continue in full force and effect notwithstanding the institution by or against Borrower or Guarantor of bankruptcy, reorganization, readjustment, receivership or insolvency proceedings of any nature, or the rejection of the Loan Documents in any such proceedings, or otherwise. In the event any payment by or on behalf of Borrower to Lender is held to constitute a preference under the bankruptcy laws, or if for any other reason Lender is required to refund such payment or pay the amount thereof to any other party, such payment by or on behalf of Borrower to Lender shall not constitute a release of Guarantor from any liability hereunder, but Guarantor agrees to pay such amount to Lender upon demand; and

(h)    this Guaranty shall be a continuing, absolute and unconditional Guaranty, and shall not be discharged, impaired or affected by the following, whether or not Guarantor has notice or knowledge of, or consents or agrees thereto: (i) the existence or continuance of any obligation on the part of Borrower on or with respect to the Notes or under Loan Documents; (ii) the release or agreement not to sue without reservation of rights of anyone liable in any way for repayment of the indebtedness evidenced by the Notes or any of the other covenants or conditions required to be performed under the Loan Documents for any reason whatsoever; (iii) the power or authority or lack of power or authority of Borrower to execute, acknowledge or deliver the Notes or Loan Documents; (iv) the validity or invalidity of the Notes and/or the Loan Documents; (v) any defenses whatsoever that Borrower may or might have to the performance or observance of any of the covenants or conditions contained in the Notes or Loan Documents; (vi) any limitation or exculpation of liability of Borrower that may be expressed in the Notes or Loan Documents; (vii) the transfer by Borrower of all or any part of any interest in all or any part of any property or rights described in any of the other Loan Documents; (viii) the existence or non-existence of Borrower as a legal entity; (ix)

619938-05

4

any sale, pledge, surrender, indulgence, alteration, substitution, exchange, modification, release or other disposition of any of the indebtedness hereby guaranteed or any security therefor, all of which Lender is expressly authorized to make and do from time to time; (x) any right or claim whatsoever which Guarantor may have against Borrower; (xi) any defense that Guarantor may or might have as to its respective undertakings, liabilities and obligations hereunder, each and every such defense being hereby expressly waived by Guarantor; (xii) the acceptance by Lender of any, all or part of the indebtedness evidenced by the Notes, or any failure, neglect or omission on the part of Lender to realize on or protect any of the indebtedness evidenced by the Notes, or any personal property or lien security given as security therefor, or to exercise any lien upon or right of appropriation of any monies, credits or property of Borrower toward liquidation of the indebtedness hereby guaranteed; or (xiii) the failure by Lender or anyone acting by or on behalf of Lender to perfect any lien or security interest upon any Collateral.

5.    Waivers.

(a)    Guarantor waives diligence, presentment, protest, notice of dishonor, demand for payment, extension of time of payments, notice of acceptance of this Guaranty, nonpayment at maturity and indulgences and notices of every kind with respect to the Notes and Loan Documents. Guarantor further consents to any and all forbearances and extensions of the time of payment of the Notes, including any extension of the maturity date of the Loans, to any and all changes in the terms, covenants and conditions of the Loan Documents, hereafter made or granted, and to any and all substitutions, exchanges or releases of all or any part of the collateral for the Notes, it being the intention hereof that Guarantor remain liable, until the unpaid principal amount of the Notes, together with interest thereon and all other sums due or to become due thereon or under Loan Documents shall have been fully repaid to Lender, notwithstanding any act, omission or thing which might otherwise operate as a legal or equitable discharge of Guarantor.

(b)    Until the Obligations have been paid in full and the Loan Agreement has been terminated, Guarantor hereby irrevocably and unconditionally waives and relinquishes all statutory, contractual, common law, equitable and other claims against Borrower, any Collateral or other assets of Borrower or any other obligor or guarantor, for subrogation, reimbursement, exoneration, contribution, indemnification, setoff or other recourse with respect to sums paid or payable to Lender by Guarantor hereunder and Guarantor hereby further irrevocably and unconditionally waives and relinquishes any and all other benefits which Guarantor might otherwise directly receive or be entitled to receive by reason of any amounts paid by or collected or due from Borrower or any other obligor or guarantor upon the indebtedness under the Notes and, or realized from their property.

6.    Effect of Lender's Delay or Action.    No delay on the part of Lender in the exercise of any right or remedy hereunder or under the Loan Documents shall operate as a waiver thereof, and no single or partial exercise by Lender of any right or remedy shall preclude other or further

exercise thereof or the exercise of any other right or remedy. No action of Lender permitted hereunder shall in any way affect or impair the rights of Lender and the obligations of Guarantor.

    7.     Business Loan.  Guarantor hereby represents and warrants to Lender that the proceeds of the Loans will be used solely for the purposes specified in 815 ILCS 205/4 (1992), as amended, and the principal sum advanced is for a "business loan" which comes with the purview of such section.

    8.     Successors and Assigns.  Guarantor agrees that this Guaranty shall inure to the benefit of and may be enforced by Lender and any subsequent holder of the Notes and their respective successors and assigns, and shall be binding upon and enforceable against Guarantor and its respective successors and assigns.

    9.     Modification; Amendment.  This Guaranty may not be modified, amended, revised, revoked, terminated, changed or varied in any way whatsoever except by the express terms of a writing signed by the party or parties sought to be bound thereby.

    10.    Construction.  When the context or construction of the terms of this Guaranty so require, all words used in the singular herein shall be deemed to have been used in the plural and the neuter shall include the masculine and feminine.

    11.    Notices.  All notices or other communications required or permitted to be given pursuant to this Guaranty shall be in writing and shall be considered as properly given if sent by overnight messenger or first class United States mail, postage prepaid registered or certified with return receipt requested, or by delivering same to the address listed below by prepaid messenger as follows:

        (a)    If to Lender, at:
                135 South LaSalle Street
                Chicago, Illinois 60603
                Attention: Travis Burns
                Fax No.: (312) 904-4364

                With copies to:
                Ungaretti & Harris
                3500 Three First National Plaza
                Chicago, Illinois 60602
                Attention: Gary I. Levenstein
                Fax No.: (312) 977-4405

619938-05

    (b)    If to Guarantor, at:
2675 Customhouse Court
San Diego, California 92154
Attn: Steve Pellegrini
Facsimile No.: (619) 661-6057

With copies to:
Katten Muchin Zavis Rosenman
525 W. Monroe Street
Chicago, Illinois 60661
Attn: Jeffrey L. Elegant
Facsimile No.: (312) 577-4676

or at such other place as any party hereto may by notice in writing designate as a place for service of notice hereunder. Notice so sent shall be effective upon delivery to such address, whether or not receipt thereof is acknowledged or is refused by the addressee or by any other person at such address.

    12.    <u>Severability</u>. Each provision of this Guaranty shall be interpreted in such manner as to be effective, valid and enforceable under applicable law, but if any provision of this Guaranty shall be prohibited by, or invalid under such law, such provision shall be deemed severable and ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

    13.    <u>Governing Law</u>. This Guaranty shall be construed in accordance with and governed by the internal laws of the State of Illinois.

    14.    <u>Jurisdiction and Venue</u>. Guarantor hereby expressly agrees that Lender may institute a proceeding to enforce Guarantor's obligations hereunder in Cook County, Illinois and Guarantor hereby submits to personal jurisdiction and venue in Cook County, Illinois for the enforcement of Guarantor's obligations hereunder, and Guarantor waives any and all personal rights under the law of any state to object to jurisdiction or venue within Cook County, Illinois for the purposes of litigation to enforce Guarantor's obligations hereunder. In the event such litigation is commenced, Guarantor agrees that service of process may be made and jurisdiction over Guarantor obtained, by delivery of copies of the summons, complaint and other pleadings required to commence such litigation to the address listed above or such other address shown on the books and records of Lender as the address of the Guarantor (or, if none, the address of Borrower then last shown on such books and records). The aforesaid means of obtaining personal jurisdiction and perfecting service of process are not intended to be exclusive but are cumulative in addition to all other means thereof or hereafter provided by applicable law.

    15.    <u>WAIVER OF JURY TRIAL</u>. GUARANTOR HEREBY IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING (I) TO ENFORCE OR DEFEND RIGHTS UNDER OR IN CONNECTION WITH THIS GUARANTY OR AN AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED IN

619938-05

CONNECTION HEREWITH OR (II) ARISING FROM ANY DISPUTE OR CONTROVERSY IN CONNECTION WITH OR RELATED TO THIS GUARANTY, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

[signature page follows]

619938-05

8

IN WITNESS WHEREOF, this Guaranty has been executed as of the date first above written.

GUARANTOR:

COMAIR HOLDING CORP., a Delaware corporation

By: _____
Name: STEPHEN L PELLEGRINI
Title: VICE PRESIDENT FINANCE

Holding Guaranty

FINAL

## REAFFIRMATION OF GUARANTY

THIS REAFFIRMATION OF GUARANTY (this **"Reaffirmation"**) is made as of December 9, 2005 by the undersigned guarantor, COMAIR HOLDING CORP., a Delaware corporation (**"Guarantor"**), who is the unconditional guarantor of the indebtedness owed by COMAIR ROTRON, INC., a Delaware corporation (**"Comair"**), THERMAFLO, INC., a California corporation (**"Subsidiary"** and together with Comair, the **"Borrowers"**) to LASALLE BANK NATIONAL ASSOCIATION (the **"Lender"**), direct or indirect, absolute or contingent, due or to become due, now or hereafter existing (all such indebtedness being hereinafter collectively called the **"Obligations"**), pursuant to that certain Holding Guaranty effective as of April 2, 2004, (herein, as the same may be amended, modified or supplemented from time to time, the **"Guaranty"**). The undersigned hereby consents to the execution and delivery by the Borrowers to the Lender of that certain First Amendment to Loan and Security Agreement dated as of the date hereof (the **"First Amendment"**) and all other documents, instruments and agreements to be executed and delivered in connection with the First Amendment, which amends that certain Loan and Security Agreement effective as of April 2, 2004 by and between Comair and Lender (the **"Existing Loan Agreement"** and together with the First Amendment, the **"Loan Agreement"**) to, among other things, (i) add Subsidiary as a borrower, (ii) extend the Revolving Loan Maturity Date and Term Loan Maturity Date, (iii) increase in the maximum principal amount of the Term Loan Commitment, and (iv) make certain changes to various loan covenants and interest rates.

Guarantor hereby acknowledges and affirms to Lender that: (a) the undersigned has unconditionally guaranteed and continues to unconditionally guarantee the Obligations, including, without limitation, all indebtedness and other obligations of all Borrowers under or in connection with the Loan Agreement; (b) Guarantor does not have any set-off, defense or counterclaim to the payment or performance of any of the obligations of the Borrower under the Existing Loan Agreement or under the Guaranty; (c) all such obligations and liabilities under the Guaranty shall continue in full force and that the execution and delivery of this First Amendment to, and its acceptance by, the Lender shall not in any manner whatsoever (i) impair or affect the liability of the Guarantor to the Lender under the Guaranty, (ii) prejudice, waive, or be construed to impair, affect, prejudice or waive the rights and abilities of the Lender at law, in equity or by statute, against the Guarantor pursuant to the Guaranty, and/or (iii) release or discharge, nor be construed to release or discharge, any of the obligations and liabilities owing to the Lender by the Guarantor under the Guaranty; and (d) that, except as modified by the First Amendment, each of the representations and warranties made by the Guarantor in any of the documents executed in connection with the Loans, including, without limitation, the Guaranty, remain true and correct as of the date hereof in all material respects. The Guarantor covenants and agrees to promptly notify the Lender upon the occurrence of any event that has had a material adverse effect on the undersigned's financial condition.

721187-3

205

FINAL

     IN WITNESS WHEREOF, this Reaffirmation of Guaranty has been executed as of the date first above written.

          GUARANTOR:

          COMAIR HOLDING CORP., a Delaware corporation

          By: _____
          Name: _____
          Title: _____

721187-3

## REAFFIRMATION OF GUARANTY

THIS REAFFIRMATION OF GUARANTY (this **"Reaffirmation"**) is made as of June __, 2006 by the undersigned guarantor, COMAIR HOLDING CORP., a Delaware corporation ("**Guarantor**"), who is the unconditional guarantor of the indebtedness owed by COMAIR ROTRON, INC., a Delaware corporation ("**Comair**"), and THERMAFLO, INC., a California corporation ("**Subsidiary**" and together with Comair, the "**Borrowers**") to LASALLE BANK NATIONAL ASSOCIATION (the "**Lender**"), direct or indirect, absolute or contingent, due or to become due, now or hereafter existing (all such indebtedness being hereinafter collectively called the "**Obligations**"), pursuant to that certain Holding Guaranty effective as of April 2, 2004, as reaffirmed by that certain Reaffirmation of Guaranty dated December 9, 2005 (as the same may be further amended, modified, reaffirmed or supplemented from time to time, the "**Guaranty**"). The undersigned hereby consents to the execution and delivery by the Borrowers to the Lender of that certain Second Amendment to Loan and Security Agreement dated as of the date hereof (the "**Second Amendment**") and all other documents, instruments and agreements to be executed and delivered in connection with the Second Amendment, which amends that certain Loan and Security Agreement effective as of April 2, 2004, as amended by that certain First Amendment effective as of December 9, 2005 by and between the Borrowers and Lender (the "**Existing Loan Agreement**" and together with the Second Amendment, the "**Loan Agreement**").

Guarantor hereby acknowledges and affirms to Lender that: (a) the undersigned has unconditionally guaranteed and continues to unconditionally guarantee the Obligations, including, without limitation, all indebtedness and other obligations of all Borrowers under or in connection with the Loan Agreement; (b) Guarantor does not have any set-off, defense or counterclaim to the payment or performance of any of the obligations of the Borrowers under the Existing Loan Agreement or under the Guaranty; (c) all such obligations and liabilities under the Guaranty shall continue in full force and that the execution and delivery of this Second Amendment to, and its acceptance by, the Lender shall not in any manner whatsoever (i) impair or affect the liability of the Guarantor to the Lender under the Guaranty; (ii) prejudice, waive, or be construed to impair, affect, prejudice or waive the rights and abilities of the Lender at law, in equity or by statute, against the Guarantor pursuant to the Guaranty, and/or (iii) release or discharge, nor be construed to release or discharge, any of the obligations and liabilities owing to the Lender by the Guarantor under the Guaranty; and (d) that, except as modified by the Second Amendment, each of the representations and warranties made by the Guarantor in any of the documents executed in connection with the Loans, including, without limitation, the Guaranty, remain true and correct as of the date hereof in all material respects. The Guarantor covenants and agrees to promptly notify the Lender upon the occurrence of any event that has had a material adverse effect on the undersigned's financial condition.

745192-1

IN WITNESS WHEREOF, this Reaffirmation of Guaranty has been executed as of the date first above written.

GUARANTOR:

COMAIR HOLDING CORP., a Delaware corporation

By: _____

Name: Stephen Pellegrini

Title: Vice - President

745192-1

208

## REAFFIRMATION OF CROSS-GUARANTY

THIS REAFFIRMATION OF CROSS-GUARANTY (this **"Reaffirmation"**) is made as of June __, 2006 by the undersigned cross-guarantors, COMAIR ROTRON, INC., a Delaware corporation (**"Comair"**), and THERMAFLO, INC., a California corporation (**"Subsidiary"** and together with Comair, the **"Borrowers"**), who unconditionally cross-guaranty the indebtedness owed by each Borrower to LASALLE BANK NATIONAL ASSOCIATION (the **"Lender"**), direct or indirect, absolute or contingent, due or to become due, now or hereafter existing (all such indebtedness being hereinafter collectively called the **"Obligations"**), pursuant to the new Section 10 (the **"Cross-Guaranty"**) contained in the First Amendment to Loan and Security Agreement date December 9, 2005 by and between the Borrowers and Lender (the **"First Amendment"**), as the same may be further amended, modified, reaffirmed or supplemented from time to time. The undersigned hereby consents to the execution and delivery by the Borrowers to the Lender of that certain Second Amendment to Loan and Security Agreement dated as of the date hereof (the **"Second Amendment"**) and all other documents, instruments and agreements to be executed and delivered in connection with the Second Amendment, which amends that certain Loan and Security Agreement effective as of April 2, 2004, as amended by the First Amendment (the **"Existing Loan Agreement"** and together with the Second Amendment, the **"Loan Agreement"**).

Each Borrower hereby acknowledges and affirms to Lender that: (a) the undersigned has unconditionally guaranteed and continues to unconditionally guarantee the Obligations, including, without limitation, all indebtedness and other obligations of any other Borrower under or in connection with the Loan Agreement; (b) such Borrower does not have any set-off, defense or counterclaim to the payment or performance of any of the obligations under the Loan Agreement; (c) all such obligations and liabilities under the Cross-Guaranty shall continue in full force and that the execution and delivery of this Second Amendment to, and its acceptance by, the Lender shall not in any manner whatsoever (i) impair or affect the liability of such Borrower to the Lender under the Cross-Guaranty, (ii) prejudice, waive, or be construed to impair, affect, prejudice or waive the rights and abilities of the Lender at law, in equity or by statute, against a Borrower pursuant to the Cross-Guaranty, and/or (iii) release or discharge, nor be construed to release or discharge, any of the obligations and liabilities owing to the Lender by a Borrower under the Cross-Guaranty; and (d) that, except as modified by the Second Amendment, each of the representations and warranties made by such Borrower in any of the documents executed in connection with the Loans remain true and correct as of the date hereof in all material respects.

745316-2

**209**

IN WITNESS WHEREOF, this Reaffirmation of Guaranty has been executed as of the date first above written.

CROSS-GUARANTORS:

COMAIR ROTRON, INC.,
a Delaware corporation

By: _Steve M Shamoun_____
Name: _Steve M. Shamoun_____
Title: _Treasurer_____

THERMAFLO, INC.,
a California corporation

By: _Steve M Shamoun_____
Name: _Steve M. Shamoun_____
Title: _Treasurer_____

745316-2

210

**EXHIBIT H**

# UNGARETTI
# & HARRIS

**ROBERT S. WINNER**
312.977.4326
rswinner@uhlaw.com

UNGARETTI & HARRIS LLP

CHICAGO
3500 Three First National Plaza
Chicago, Illinois 60602.4224
Telephone: 312.977.4400
Fax: 312.977.4405

WASHINGTON
1500 K Street, N.W., Suite 250
Washington, D.C. 20005.1714
Telephone: 202.030.7500
Fax: 202.689.7505

SPRINGFIELD
400 E. Jefferson Street, Suite 1200
Springfield, Illinois 62701.1053
Telephone: 217.544.7000
Fax: 217.544.7950

www.uhlaw.com

<u>VIA FACSIMILE AND REGULAR MAIL</u>

September 26, 2007

Comair Rotron, Inc.
2675 Customhouse Court
San Diego, California 92154
Attention: Rocco Melchione
Fax: (619) 661-6057

Katten Muchin Zavis Rosenman
525 West Monroe Street
Chicago, Illinois 60661
Attention: Jeffrey L. Elegant
Fax: (312) 577-4676

Howard Industries, Inc.
136 Main Street
Westport, Connecticut 06880
Attention: Peter Howard
Fax: (203) 227-3314

Re: <u>Comair Rotron Noncompliance with LaSalle Bank Loan and Security Agreement</u>

Gentlemen:

Please be advised that Ungaretti & Harris LLP represents LaSalle Bank National Association ("LaSalle") in connection with its outstanding loans to Comair Rotron, Inc. ("Comair").

It has come to our attention that Comair is no longer in compliance with the financial covenants set forth in that certain Loan and Security Agreement dated April 2, 2004 by and between Comair and LaSalle, as amended pursuant to that certain First Amendment to Loan and Security Agreement dated December 9, 2005 and that Second

H        211

UNGARETTI
&HARRIS

Comair Rotron, Inc.
Katten Muchin Zavis Rosenman
Howard Industries, Inc.
September 26, 2007
Page 2

Amendment to Loan and Security Agreement dated July 5, 2006 (collectively, the "Loan and Security Agreement") and such noncompliance has continued for more than thirty (30) days. As a condition to LaSalle not declaring an Event of Default under the Loan and Security Agreement, LaSalle has requested that an additional $3 million of capital be contributed to Comair, either in the form of equity or in the form of a subordinated loan. To LaSalle's knowledge, this request has not been honored.

In the event Comair is unable to satisfy this request in a timely manner, LaSalle will be forced to declare an Event of Default and pursue all remedies available to it under the Loan and Security Agreement and related agreements.

Please let me know how Comair intends to resolve this matter. Thank you.

Sincerely,

Robert S. Winner

cc:    Travis Burns, LaSalle Bank National Association

984714-2

**212**



**LOEB & LOEB** LLP

MICHAEL L. MOLINARO
Partner

321 North Clark Street
Suite 2300
Chicago, IL 60610-4746

Direct  312.464.3166
Main   312.464.3100
Fax    312.896.5592
mmolinaro@loeb.com

Via Telecopy

February 6, 2008

Comair Rotron, Inc.
Thermaflo, Inc.
2675 Customhouse Court
San Diego, CA 92154
Attn: Rocco Melchione

Howard Industries, Inc.
136 Main Street
Westport, CT 06880
Attn: Peter Howard

Comair Parent Corp.
2675 Customhouse Court
San Diego, CA 92154
Attn: Steve Pellegrini

Re:  Loan and Security Agreement dated April 2, 2004, as amended (the "Loan Agreement")
by and between Comair Rotron, Inc. and Thermaflo, Inc. (collectively, the "Borrowers")
and LaSalle Bank National Association ("Bank")

Gentlemen:

I am counsel for Bank in connection with the Loan Agreement. This letter is being sent to you
on Bank's behalf and at Bank's direction.

As you know, Bank has made loans to, and other financial accommodations for, Borrowers.
Borrowers' obligations and liabilities to Bank are secured by, among other things, the Loan
Agreement, that certain Holding Guaranty dated April 2, 2004 (the "Guaranty") by Comair
Parent Corp. (the "Guarantor"), and that certain Holding Pledge Agreement dated April 2, 2004
(the "Pledge Agreement") by Guarantor. The Loan Agreement, the Guaranty, the Pledge
Agreement and all related instruments, agreements and documents shall be collectively referred
to as the "Loan Documents."

Pursuant to letter dated September 26, 2007, Bank notified Borrowers and Howard Industries,
Inc. that Borrowers breached financial covenants set forth in the Loan Agreement. In addition,
Bank requested that an additional $3,000,000 be contributed to Borrowers in the form of either
equity or subordinated debt. To the Bank's knowledge, this cash infusion has not occurred and
the breach of such financial covenants has not been resolved. In addition, pleased be advised
that as of December 30, 2007 Borrowers have failed to comply with the financial covenants set
forth in Section 7.1(ii) of the Loan Agreement relating to the Senior Leverage Ratio and Section
7.1(iii) of the Loan Agreement relating to the Total Leverage Ratio.

Bank hereby demands that Borrowers cure their breach of these financial covenants by March
7, 2008. Borrowers failure to cure their breach of these financial covenants by March 7, 2008
shall result in the occurrence of an Event of Default under the Loan Agreement and the other
Loan Documents, and Lender shall be entitled to proceed to exercise and enforce all of its rights
and remedies under the Loan Documents and applicable law, including but not limited to

Los Angeles   New York   Chicago   Nashville   www.loeb.com

A limited liability partnership including professional corporations

CH40058.1
666666-55555





Comair Rotron, Inc.
Comair Holding Corp.
Howard Industries, Inc.
February 6, 2008
Page 2

accelerating all indebtedness under the Loan Documents, terminating the "Revolving Credit Loan Commitment," (as said term is defined in the Loan Agreement) foreclosing on the "Collateral" (as said term is defined in the Loan Agreement), and seeking collection of the Guaranty from the Guarantor.

This letter and any future discussions between Borrowers, Guarantor and Bank, if any, shall not (i) cause a modification of the Loan Documents or any of the instruments, agreements or documents related thereto, (ii) establish a custom or course of dealing, (iii) cure, release or postpone any existing or future default under the Loan Documents or any of the instruments, agreements or documents related thereto, or (iv) waive, limit or condition any of the Bank's rights and remedies against Borrowers, Guarantor or any other person or entity, all of which rights and remedies are expressly reserved.

If you have any questions regarding this matter, please have your attorney contact me.

Very truly yours,

Michael L. Molinaro
Partner

MLM:jlw

cc:    Mr. Gary Richerson (via telecopy)
       David Masterson, Esq. (via telecopy)
       Jeffrey Elegant, Esq. (via telecopy)

CH40058:1
666666-55555

**Johanna Womack**

| | |
|---|---|
| **From:** | send@mail.efax.com |
| **Sent:** | Wednesday, February 06, 2008 12:49 PM |
| **To:** | Johanna Womack |
| **Subject:** | Successful transmission to 16025232750. Re: |

Dear Michael Molinaro,

Re:

The 3 page fax you sent through eFax Solutions to 16025232750 was successfully transmitted at 2008-02-06 18:48:26 (GMT).

The length of transmission was 86 seconds.

The receiving machine's fax ID: 602 523 2750


If you need additional assistance, please visit our online help center at https://www.j2corporate.com/corp/twa/page/customerSupport. Thank you for using the eFax Solutions service.

Best Regards,
eFax Solutions

Customer Service
Help: https://www.j2corporate.com/corp/twa/page/customerSupport
Tel: 1-323-817-3202
Email: corporatesupport@mail.efax.com

1

215

**Johanna Womack**

| | |
|---|---|
| **From:** | send@mail.efax.com |
| **Sent:** | Wednesday, February 06, 2008 12:57 PM |
| **To:** | Johanna Womack |
| **Subject:** | Successful transmission to 13125774676. Re: |

Dear Michael Molinaro,

Re:

The 3 page fax you sent through eFax Solutions to 13125774676 was successfully transmitted at 2008-02-06 18:57:15 (GMT).

The length of transmission was 85 seconds.

The receiving machine's fax ID: KattenMuchinRosenman.

If you need additional assistance, please visit our online help center at https://www.j2corporate.com/corp/twa/page/customerSupport. Thank you for using the eFax Solutions service.

Best Regards,
eFax Solutions

Customer Service
Help: https://www.j2corporate.com/corp/twa/page/customerSupport
Tel: 1-323-817-3202
Email: corporatesupport@mail.efax.com

**Johanna Womack**

| | |
|---|---|
| **From:** | send@mail.efax.com |
| **Sent:** | Wednesday, February 06, 2008 1:33 PM |
| **To:** | Johanna Womack |
| **Subject:** | Successful transmission to 12032273314. Re: |

Dear Michael Molinaro,

Re:

The 3 page fax you sent through eFax Solutions to 12032273314 was successfully transmitted at 2008-02-06 19:31:29 (GMT).

The length of transmission was 82 seconds.

The receiving machine's fax ID: Howard Industries .

If you need additional assistance, please visit our online help center at https://www.j2corporate.com/corp/twa/page/customerSupport. Thank you for using the eFax Solutions service.

Best Regards,
eFax Solutions

Customer Service
Help: https://www.j2corporate.com/corp/twa/page/customerSupport
Tel: 1-323-817-3202
Email: corporatesupport@mail.efax.com

1

**Johanna Womack**

| | |
|---|---|
| **From:** | send@mail.efax.com |
| **Sent:** | Thursday, February 07, 2008 10:43 AM |
| **To:** | Johanna Womack |
| **Subject:** | Successful transmission to 18585664577: Re: |

Dear Michael Molinaro,

Re:

The 3 page fax you sent through eFax Solutions to 18585664577 was successfully transmitted at 2008-02-07 16:42:42 (GMT).

The length of transmission was 95 seconds.

The receiving machine's fax ID: .

If you need additional assistance, please visit our online help center at https://www.j2corporate.com/corp/twa/page/customerSupport. Thank you for using the eFax Solutions service.

Best Regards,
eFax Solutions

Customer Service
Help: https://www.j2corporate.com/corp/twa/page/customerSupport
Tel: 1-323-817-3202
Email: corporatesupport@mail.efax.com

1

**EXHIBIT J**



MICHAEL L. MOLINARO
Partner

321 North Clark Street
Suite 2300.
Chicago, IL 60610-4746

Direct  312.464.3166
Main   312.464.3100
Fax     312.896.5592
mmolinaro@loeb.com

Via Telecopy

March 10, 2008

Comair Rotron, Inc.
Thermaflo, Inc.
8929 Terman Court
San Diego, CA 92121
Attn: Rocco Melchione

Howard Industries, Inc.
136 Main Street
Westport, CT 06880
Attn: Peter Howard

Comair Parent Corp.
8929 Terman Court
San Diego, CA 92121
Attn: Steve Pellegrini

Re:  Loan and Security Agreement dated April 2, 2004, as amended (the "Loan Agreement")
     by and between Comair Rotron, Inc. and Thermaflo, Inc. (collectively, the "Borrowers")
     and LaSalle Bank National Association ("Bank")

Gentlemen:

I am counsel for Bank in connection with the Loan Agreement. This letter is being sent to you
on Bank's behalf and at Bank's direction.

As you know, Bank has made loans (collectively, the "Loans") to Borrowers pursuant to that
certain Term Note A dated June 27, 2006 in the original principal amount of $14,000,000 ("Note
A"), that certain Term Note B dated June 27, 2006 in the original principal amount of $5,000,000
("Note B"), and that certain Replacement Revolving Note dated June 27, 2006 in the maximum
principal amount of $5,000,000 ("Revolving Note"). The Loans and all of Borrowers' obligations
and liabilities to Bank are secured by, among other things, the Loan Agreement, that certain
Holding Guaranty dated April 2, 2004 (the "Guaranty") by Comair Parent Corp. (the
"Guarantor"), and that certain Holding Pledge Agreement dated April 2, 2004 (the "Pledge
Agreement") by Guarantor. The Loan Agreement, Note A, Note B, the Revolving Note, the
Guaranty, the Pledge Agreement and all related instruments, agreements and documents shall
be collectively referred to as the "Loan Documents."

Pursuant to letter dated September 26, 2007, Bank notified Borrowers and Howard Industries,
Inc. that Borrowers breached certain financial covenants set forth in the Loan Agreement. In
addition, pursuant to letter dated February 6, 2008, Bank notified Borrowers, Howard Industries,
Inc. and Guarantor that as of December 30, 2007 Borrowers have failed to comply with the
financial covenants set forth in Section 7.1(ii) of the Loan Agreement relating to the Senior
Leverage Ratio and Section 7.1(iii) of the Loan Agreement relating to the Total Leverage Ratio.
Moreover, Bank demanded that Borrowers cure their breach of these financial covenants by
March 7, 2008.



Comair Rotron, Inc.
Comair Holding Corp.
Howard Industries, Inc.
March 10, 2008
Page 2

Please be advised that Borrowers failed to cure their breach of these financial covenants by March 7, 2008. Consequently, an Event of Default has occurred under the Loan Agreement and the other Loan Documents, and the "Revolving Credit Loan Commitment," (as said term is defined in the Loan Agreement) is hereby terminated. Pursuant to that certain Intercreditor (Subordination) Agreement dated April 2, 2004 (the "Intercreditor Agreement"), all "Permitted Payments" (as said term is defined in the Intercreditor Agreement) are hereby prohibited. In addition, pursuant to that certain Subordination Agreement dated December 9, 2005 (the "Subordination Agreement"), all payments under Section 1.5(i) of the Subordination Agreement are hereby prohibited. Moreover, all of Borrowers' obligations and liabilities to Bank under the Loan Documents are hereby accelerated, and as of March 7, 2008, the sum of $20,168, 873.35 plus all accrued interest and cost, fees and expenses incurred by Bank, including without limitation, attorneys' fees and expenses (collectively, the "Indebtedness") is due and owing to Bank. The Indebtedness will increase due to the accrual of interest at Default Interest Rate specified in the Loan Agreement and additional costs, fees and expenses incurred by Bank, including without limitation, attorneys' fees and expenses.

In addition, Bank hereby reserves its right to exercise and enforce all of its remedies and other rights under the Loan Documents and applicable law against Borrowers and Guarantor, including without limitation, exercising its right of setoff and foreclosing on the "Collateral" (as said term is defined in the Loan Agreement). Partial payments received by Bank shall be applied to the Indebtedness, but shall not constitute, or be deemed to be, a cure of the aforementioned Event of Default.

This letter and any future discussions between Borrowers, Guarantor and Bank, if any, shall not (i) cause a modification of the Loan Documents or any of the instruments, agreements or documents related thereto, (ii) establish a custom or course of dealing, (iii) cure, release or postpone any existing or future default under the Loan Documents or any of the instruments, agreements or documents related thereto, or (iv) waive, limit or condition any of the Bank's rights and remedies against Borrowers, Guarantor or any other person or entity, all of which rights and remedies are expressly reserved.

If you have any questions regarding this matter, please have your attorney contact me.

Very truly yours,

Michael L. Molinaro
Partner

MLM:jlw

cc:    Mr. Gary Richerson (via telecopy)
       David Masterson, Esq. (via telecopy)
       David R. Shevitz, Esq. (via telecopy)
       Jeffrey Elegant, Esq. (via telecopy)

CH40587.1
210322-10006

```
************* -COMM. JOURNAL- ************** DATE MAR-10-2008 ***** TIME 10:17 *********

        MODE = MEMORY TRANSMISSION          START=MAR-10 10:16      END=MAR-10 10:17

           FILE NO.=237

     STN   COMM.   ONE-TOUCH/   STATION NAME/TEL. NO.                  PAGES    DURATION
     NO.            ABBR NO.

     001   OK      ☎            918585664577                          003/003   00:00:33


                                             -L&L UNASSIGNED               -

************************************** -LOEB & LOEB    - ***** -   312 464 3111- *********
```



## FACSIMILE
### Privileged and Confidential

This transmission is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential or exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone. Thank you.

| | |
|---|---|
| **Date:** March 10, 2008 | **Time:** |
| **To:** Rocco Melchiono/Steve Pellegrini | **Fax:** +1-8585664577 |
| Comair/Thermaflo | |
| **From:** Michael Molinaro | **Fax:** 3128985592 |
| | **Phone:** 312.464.3166 |
| | **Email:** jwomack@loeb.com |
| **Pages (Including Cover): Pages Total (** | |
| **Re:** Comair / LaSalle Bank | |

**MESSAGE TO ADDRESSEE:**

Please see attached.

Los Angeles  New York  Chicago  Nashville  www.loeb.com

A limited liability partnership including professional corporations

**221**

**Johanna Womack**

**From:**       send@mail.efax.com
**Sent:**       Monday, March 10, 2008 10:13 AM
**To:**         Johanna Womack
**Subject:**    Successful transmission to 16025232402. Re:


Dear Michael Molinaro,

Re:

The 3 page fax you sent through eFax Solutions to 16025232402 was successfully transmitted at 2008-03-10 15:12:38 (GMT).

The length of transmission was 114 seconds.

The receiving machine's fax ID: 6025232402


If you need additional assistance, please visit our online help center at
https://www.j2corporate.com/corp/twa/page/customerSupport. Thank you for using the eFax Solutions service.

Best Regards,
eFax Solutions

Customer Service
Help: https://www.j2corporate.com/corp/twa/page/customerSupport
Tel: 1-323-817-3202
Email: corporatesupport@mail.efax.com

1

**222**

**Johanna Womack**

| | |
|---|---|
| **From:** | send@mail.efax.com |
| **Sent:** | Monday, March 10, 2008 10:08 AM |
| **To:** | Johanna Womack |
| **Subject:** | Successful transmission to 12032273314. Re: |

Dear Michael Molinaro,

Re:

The 3 page fax you sent through eFax Solutions to 12032273314 was successfully transmitted at 2008-03-10 15:08:18 (GMT).

The length of transmission was 93 seconds.

The receiving machine's fax ID: Howard Industries

If you need additional assistance, please visit our online help center at https://www.j2corporate.com/corp/twa/page/customerSupport. Thank you for using the eFax Solutions service.

Best Regards,
eFax Solutions

Customer Service
Help: https://www.j2corporate.com/corp/twa/page/customerSupport
Tel: 1-323-817-3202
Email: corporatesupport@mail.efax.com

1

## Johanna Womack

**From:** send@mail.efax.com
**Sent:** Monday, March 10, 2008 10:08 AM
**To:** Johanna Womack
**Subject:** Successful transmission to 13125778768. Re:

Dear Michael Molinaro,

Re:

The 3 page fax you sent through eFax Solutions to 13125778768 was successfully transmitted at 2008-03-10 15:08:04 (GMT).

The length of transmission was 97 seconds.

The receiving machine's fax ID: KattenMuchinRosenman.

If you need additional assistance, please visit our online help center at
https://www.j2corporate.com/corp/twa/page/customerSupport. Thank you for using the eFax Solutions service.

Best Regards,
eFax Solutions

Customer Service
Help: https://www.j2corporate.com/corp/twa/page/customerSupport
Tel: 1-323-817-3202
Email: corporatesupport@mail.efax.com

1

**Johanna Womack**

| | |
|---|---|
| **From:** | send@mail.efax.com |
| **Sent:** | Monday, March 10, 2008 10:08 AM |
| **To:** | Johanna Womack |
| **Subject:** | Successful transmission to 13125774676. Re: |

Dear Michael Molinaro,

Re:

The 3 page fax you sent through eFax Solutions to 13125774676 was successfully transmitted at 2008-03-10 15:08:02 (GMT).

The length of transmission was 97 seconds.

The receiving machine's fax ID: KattenMuchinRosenman.

If you need additional assistance, please visit our online help center at
https://www.j2corporate.com/corp/twa/page/customerSupport. Thank you for using the eFax Solutions service.

Best Regards,
eFax Solutions

Customer Service
Help: https://www.j2corporate.com/corp/twa/page/customerSupport
Tel: 1-323-817-3202
Email: corporatesupport@mail.efax.com

1

**Johanna Womack**

| | |
|---|---|
| **From:** | send@mail.efax.com |
| **Sent:** | Monday, March 10, 2008 10:07 AM |
| **To:** | Johanna Womack |
| **Subject:** | Successful transmission to 16025232750. Re: |

Dear Michael Molinaro,

Re:

The 3 page fax you sent through eFax Solutions to 16025232750 was successfully transmitted at 2008-03-10 15:07:12 (GMT).

The length of transmission was 97 seconds.

The receiving machine's fax ID: (602)523 2750

If you need additional assistance, please visit our online help center at https://www.j2corporate.com/corp/twa/page/customerSupport. Thank you for using the eFax Solutions service.

Best Regards,
eFax Solutions

Customer Service
Help: https://www.j2corporate.com/corp/twa/page/customerSupport
Tel: 1-323-817-3202
Email: corporatesupport@mail.efax.com

1

**EXHIBIT K**

## FORBEARANCE AGREEMENT

THIS FORBEARANCE AGREEMENT (this "Agreement") is dated March 31, 2008 and is by and between COMAIR ROTRON, INC., a Delaware corporation ("Comair"), THERMAFLO, INC., a California corporation ("Thermaflo") (Comair and Thermaflo shall be collectively referred to as the "Borrower"), COMAIR PARENT CORP. a Delaware corporation ("Guarantor") and LASALLE BANK NATIONAL ASSOCIATION, a national banking association ("Bank").

### RECITALS

A.    Bank has made loans (the "Loans") to Borrower pursuant to that certain Loan and Security Agreement dated April 2, 2004, as amended (the "Loan Agreement");

B.    The Loans and all of Borrower's obligations and liabilities to Bank are secured by, among other things, a first priority lien on, and security interest in, all of Borrower's accounts, inventory, equipment, general intangibles, instruments, and other collateral as more fully set forth in the Loan Agreement (the "Personal Property"), 100% of the issued and outstanding stock of Comair (the "Comair Stock") pursuant to that certain Holding Pledge Agreement dated April 2, 2004 (the "Comair Pledge Agreement"), 100% of the issued and outstanding stock of Thermaflo (the "Thermaflo Stock") pursuant to that certain Subsidiary Stock Pledge Agreement dated December 9, 2005 (the "Thermaflo Pledge Agreement"), and 100% of the issued and outstanding stock of Comair Rotron de Mexico, S. DE R.L. DE C.V. (the "Mexico Stock") pursuant to that certain Equity Quotas Pledge Agreement dated April 2, 2004 (the "Mexico Pledge Agreement");

C.    The Loans and all of Borrower's obligations and liabilities to Bank are also secured by that certain Holding Guaranty dated April 2, 2004 (the "Guaranty") by Guarantor in favor of Bank;

D.    Events of Default (the "Existing Defaults") have occurred under the Loan Agreement due to Borrower's failure to comply with the financial covenants set forth in Sections 7.1(ii) and 7.1(iii) of the Loan Agreement;

E.    Bank has notified Borrower and Guarantor of the Existing Defaults pursuant to letters dated February 6, 2008 and March 10, 2008;

F.    As a result of the Existing Defaults, Bank has, among other things, terminated the Revolving Credit Loan Commitment, and Bank has the ability to exercise additional rights and remedies under the Loan Agreement and applicable law, including, but not limited to, taking possession of and foreclosing upon the Personal Property, the Comair Stock, the Thermaflo Stock, and the Mexico Stock;

G.    Borrower and Guarantor have requested that Bank rescind the termination of the Revolving Credit Loan Commitment and temporarily forbear from exercising certain of its rights under the Loan Agreement;

CH460745.3
210322-10806

H.     Bank has agreed to rescind the Revolving Credit Loan Commitment and to the temporary forbearance requested by Borrower and Guarantor, subject to the terms, conditions and requirements set forth herein; and

I.     Borrower and Guarantor desire to reaffirm their respective obligations and liabilities to Bank as set forth herein.

NOW THEREFORE, in consideration of the recitals set forth above, the covenants and agreements hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.     **Recitals.** The recitals set forth above constitute an integral part of this Agreement and are fully incorporated herein by this reference with the same force and effect as though restated herein.

2.     **Defined Terms.** The Loan Agreement, the Comair Pledge Agreement, the Thermaflo Pledge Agreement, the Mexico Pledge Agreement, the Guaranty and all other instruments, agreements or documents evidencing any loan, obligation, or liability between Borrower and Bank, or providing security therefore, are hereinafter collectively referred to as the "Loan Documents." To the extent not otherwise defined herein, all capitalized terms used in this Agreement shall have the respective meanings ascribed to such terms in the Loan Agreement.

3.     **Forbearance.** Bank hereby agrees to forbear temporarily from exercising its rights and remedies under the Loan Agreement and the other Loan Documents from the date hereof to and including April 30, 2008 (the "Forbearance Period"), subject to the full and timely compliance with the following terms, conditions and requirements (each, a "Forbearance Condition"):

(a)     Borrower shall pay Bank a Forbearance Fee in the amount of $31,000.00 payable in two installments of $15,500. The first installment upon execution of the Agreement and the second on April 4, 2008;

(b)     Borrower shall pay all interest payments for the Loans as and when due; Interest shall continue to accrue at the Default Interest Rate specified in the Loan Agreement;

(c)     Borrower shall execute and deliver to Bank the Deposit Account Control Agreement (the "Lockbox Agreement") attached hereto and incorporated herein as Exhibit A contemporaneously with the execution of this Agreement; the accounts which are subject to the Lockbox Agreement shall be swept daily and the proceeds shall be applied to reduce the "Revolving Note" (hereinafter defined) subject to re-borrowing as provided by the Loan Agreement;

(d)     Borrower shall actively seek to obtain a new credit facility to satisfy the Loans and all of Borrower's obligations and liabilities to Bank in full, and Borrower shall deliver to Bank a fully executed term sheet for such credit facility on or before March 31, 2008;

(e) Borrower shall not sell any machinery, equipment or other property outside of the ordinary course of business without Bank's prior written consent;

(f) On Tuesday of each week, commencing on March 18, 2008, Borrower shall deliver to Bank a 13-week cash flow forecast, which shall include, among other things, detailed explanations of actual to forecast performance;

(g) Borrower shall provide Bank and Bank's agents and consultants with full access to Borrower's business premises and books and records, except for information subject to the attorney-client privilege, during normal business hours upon 24 hours prior notice for the purpose of appraising the property used in Borrower's business and Bank's collateral; and

(h) The Loan and all of Borrower's obligations and liabilities to Bank shall be due and payable on May 2, 2008, and Borrower shall pay to Bank all of Borrower's obligations and liabilities in full on or before May 2, 2008.

If Borrower fails to comply with any one of the Forbearance Conditions set forth above, (i) the Forbearance Period and Bank's agreement to forbear hereunder shall immediately terminate without further notice to Borrower; (ii) Borrower shall surrender to Bank all property of Borrower on which Bank holds a lien including without limitation the Personal Property; and (iii) Bank may, at its option, exercise all of its legal and equitable rights and remedies against Borrower, Guarantor, and the Personal Property.

 4. **Revolving Credit Loan Commitment.** Bank hereby rescinds the termination of the Revolving Credit Loan Commitment and Borrower shall be entitled to borrow under the Replacement Revolving Note dated June 27, 2006 (the "Revolving Note"), provided that each advance under the Revolving Note complies with the margined eligible collateral availability requirements and all other requirements of the Loan Agreement and Borrower shall deliver to Bank a Borrowing Base with each request for an advance under the Revolving Note.

 5. **Reaffirmation.** Borrower and Guarantor, respectively, hereby (i) consent to this Agreement, (ii) ratify and reaffirm all of their payment and performance obligations, contingent or otherwise, under each of the Loan Documents to which they are a party (after giving effect hereto), including but not limited to all guaranties, subordination agreements and intercreditor agreements relating to the Loans; (iii) ratify and reaffirm all security interests, mortgages, and liens granted for the benefit of Bank and confirms and agrees that such security interests, mortgages, and liens hereafter secure all of the obligations and liabilities of the Borrower under the Loan Documents as amended hereby (the "Obligations"); and (iv) acknowledges that each of the Loan Documents remains in full force and effect and is hereby ratified and reaffirmed. The execution of this Agreement shall not operate as a waiver of any right, power or remedy of Bank, constitute a waiver of the Existing Defaults or any other Event of Default or other provision of any of the Loan Documents or serve to effect a novation of the Obligations.

 6. **Inducement by Borrower and Guarantor.** To induce Bank to enter into this Agreement:

(a)    Borrower and Guarantor, respectively, represent and warrant to Bank that they each have full power and authority to enter into this Agreement and to incur and perform the obligations provided for under this Agreement, all of which have been duly authorized by all proper and necessary action, and that no consent or approval of shareholders or creditors or of any public authority or regulatory body is required as a condition to the validity or enforceability of this Agreement which has not been obtained on or prior to the date hereof.

(b)    Borrower represents and warrants to Bank that this Agreement constitutes the valid and legally binding obligation of Borrower, fully enforceable against Borrower in accordance with its terms.

(c)    Borrower represents and warrants to Bank that the execution and performance by Borrower of this Agreement will not: (i) violate any provision of law, any order of any court or other agency of government, or the operating agreement or organizational documents of Borrower; (ii) violate any indenture, contract, agreement or other instrument to which Borrower is a party, or by which any of its property is bound, or be in conflict with, result in a breach of or constitute (with due notice and/or lapse of time) a default under, any such indenture, contract, agreement or other instrument; or (iii) result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of Borrower.

(d)    Guarantor represents and warrants to Bank that this Agreement constitutes the valid and legally binding obligation of Guarantor, fully enforceable against Guarantor in accordance with its terms.

(e)    Guarantor represents and warrants to Bank that the execution and performance by Guarantor of this Agreement will not: (i) violate any provision of law, any order of any court or other agency of government, or the operating agreement or organizational documents of Guarantor; (ii) violate any indenture, contract, agreement or other instrument to which Guarantor is a party, or by which any of its property is bound, or be in conflict with, result in a breach of or constitute (with due notice and/or lapse of time) a default under, any such indenture, contract, agreement or other instrument; or (iii) result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of Guarantor.

7.    **Conditions Precedent.**  This Agreement shall become effective as of the date hereof upon the satisfaction of each of the following conditions precedent by the close of business on the date hereof:

(a)    Bank shall have received from Borrower and Guarantor two fully executed original counterparts of this Agreement;

(b)    Bank shall have received from Borrower the executed original Lockbox Agreement;

(c)    Bank shall have received from Borrower payment of the $31,000.00 Forbearance Fee; and

(d)   Bank shall have received from Borrower, Guarantor, and other persons and entities such other instruments, documents and agreements in connection herewith as Bank shall reasonably request.

8.    **Affirmation of Indebtedness.**  Borrower hereby agrees and acknowledges that: (a) as of March 17, 2008, the aggregate outstanding principal balance of the Revolving Note is $5,000,000.00, the aggregate outstanding principal balance of the Term Note A dated June 27, 2006 is $10,640,000.00, and the aggregate outstanding principal balance of the Term Note B dated June 27, 2006 is $5,000,000.00 (exclusive of accrued interest, fees and expenses, including attorneys fees' and expenses); and (b) Bank has performed all obligations and duties owed to Borrower as of the date hereof, and Borrower and Guarantor, jointly or severally, have no defense, offset or counterclaim with respect to any amounts owed to Bank or with respect to the performance or observance by Borrower of any representation, covenant or other agreement contained in the Loan Documents.

9.    **Acknowledgments Regarding Negotiation of Agreement.**  Borrower and Guarantor, respectively, hereby acknowledge that (i) they have been represented by counsel of its own choosing throughout the negotiation, preparation and execution of this Agreement and the Loan Documents, (ii) they have exercised independent judgment with respect to the negotiation, preparation and execution of this Agreement and the Loan Documents, and the consummation of the transactions contemplated hereby and thereby, (iii) they have not relied upon Bank or on counsel for Bank for any advice with respect to the negotiation, preparation or execution of this Agreement and the Loan Documents, and (iv) any principle of contract construction which favors or disfavors the party whose attorneys have drafted a contract or a provision thereof shall not be applied to this Agreement and the Loan Documents.

10.   **Waiver, Release and Discharge.**  Borrower and Guarantor, on their own behalf and on behalf of their respective representatives, partners, agents, employees, servants, officers, directors, shareholders, subsidiary, affiliated and related companies, successors and assigns (collectively, the "Borrowing Group") hereby release and forever discharge Bank, and its officers, directors, subsidiary, affiliated and related companies, agents, servants, employees, shareholders, representatives, successors and assigns (collectively, the "Bank Group") of and from all manner of actions, cause and causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, obligations, liabilities, costs, expenses, losses, damages, judgments, executions, claims and demands of whatsoever kind or nature, in law or in equity, whether known or unknown, concealed or hidden, foreseen, or unforeseen, contingent or actual, liquidated or unliquidated, arising out of or relating to any of the Loan Documents, the transactions relating thereto, and/or any financial accommodations extended or denied by Bank to Borrower, that any of the Borrowing Group, jointly or severally, have had, now have or hereafter can, shall or may have against the Bank Group, directly or indirectly, through the date hereof. Borrower acknowledges and agrees that Bank is specifically relying upon the representations, warranties, covenants and agreements contained herein and that such representations, warranties, covenants and agreements constitute a material inducement to Bank's entering into this Agreement and the transactions contemplated herein. Borrower, on its own behalf and on behalf of the Borrowing Group, represents and warrants to Bank and the Bank Group that the Borrowing Group has not assigned, conveyed or otherwise transferred, either directly or indirectly, in whole or in part, any of the

CH40745.3
210322-10006                                  5

13.    **No Custom; Section Headings**.  This Agreement shall not establish a custom or course of dealing.  The section headings and captions herein are for convenience of reference only and shall not be deemed to limit, impair or affect the interpretation and construction of the terms hereof.

14.    **Counterparts**.  This Agreement may be signed in counterparts, each of which shall be deemed an original and all of which shall be deemed to constitute one agreement.  Any party hereto may execute and deliver a counterpart of this Agreement by delivering by facsimile a signature page of this Agreement signed by such party and such facsimile signature shall be treated in all respects as having the same effect as an original signature.

15.    **Merger; Modification**.  This Agreement embodies the entire agreement between the parties hereto with respect to the matters addressed herein and supersedes all prior oral and written and all contemporaneous oral communications with respect to such matters.  This Agreement shall not be modified or amended or extended except in writing signed by each of the parties hereto.

16.    **Further Assurances**.  Borrower and Guarantor shall execute and/or deliver any other agreements or documents and take such other actions which Bank deems reasonably necessary to achieve the objectives of this Agreement and/or the Loan Documents must be in writing and sent by (a) personal delivery, (b) prepaid overnight courier, (c) certified mail, return receipt requested, postage prepaid, or (d) confirmed telecopy or other facsimile transmission, addressed as follows:

If to Borrower and/or Guarantor:

> Comair Rotron, Inc.
> 8929 Terman Court
> San Diego, CA  92121
>
> Attention:  Rocco Melchione
> Telephone No.: (  )  858-348-6200
> Facsimile No.: (  )  858-566-4577

CH40745.3
210322-10006

With copies to:

   Howard Industries, Inc.
   136 Main Street
   Westport, CT 06880

   Attention: __Peter Howard__
   Telephone No.: ( ) __203-227-4900__ x 222
   Facsimile No.: ( ) __203-227-3314__

If to Bank:

   LaSalle Bank National Association
   c/o Bank of America N.A.
   201 East Washington Street, 19th Floor
   Phoenix, AZ 85004
   Attention: Gary Richerson
   Telephone No.: (602) 523-2147
   Facsimile No.: (602) 523-2750

with copies to:

   Loeb & Loeb LLP
   321 North Clark Street, Suite 2300
   Chicago, IL 60610
   Attention: Michael L. Molinaro, Esq.
   Telephone No.: (312) 464-3166
   Facsimile No.: (312) 896-5592

The parties may designate another addressee or change its address for notices and other communications hereunder by a notice given to the other parties in the manner provided in this paragraph. A notice or other communication sent in compliance with the provisions of this paragraph shall be deemed good and sufficient service regardless of whether the parties actually receive such notice.

18.   __GOVERNING LAW/VENUE__. THIS AGREEMENT SHALL BE DEEMED A CONTRACT MADE UNDER THE LAWS OF THE STATE OF ILLINOIS AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF ILLINOIS AND THE LAWS OF THE UNITED STATES OF AMERICA. BORROWER AND GUARANTOR HEREBY IRREVOCABLY SUBMIT THEMSELVES TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS OF THE STATE OF ILLINOIS AND AGREE AND CONSENT THAT SERVICE OF PROCESS MAY BE MADE UPON THEM IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT BY ANY MEANS ALLOWED UNDER ILLINOIS OR FEDERAL LAW. VENUE FOR ANY LEGAL PROCEEDING MAY BE COOK COUNTY, ILLINOIS OR, IN BANKS' SOLE DISCRETION, ANY OTHER VENUE PERMITTED BY APPLICABLE LAW.

19.   __WAIVER OF JURY TRIAL__. BORROWER AND GUARANTOR HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, CAUSE

CH407455
210322-10086

7

CH40745.3
210322-10006

x

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above

**BORROWER:**

COMAIR ROTRON, INC., a Delaware corporation

By: _____
Name: _____
Title: _____

THERMAFLO, INC., a California corporation

By: _____
Name: _____
Title: _____

**GUARANTOR:**

COMAIR PARENT CORP., a Delaware corporation

By: _____
Name: PETER HEWARD
Title: _____

**BANK:**

LASALLE BANK NATIONAL ASSOCIATION, a national banking association

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

BORROWER:

COMAIR ROTRON, INC., a Delaware corporation

By: _Steve M. Shemoun_____
Name: _Steve M. Shemoun_____
Title: _Treasurer_____

THERMAFLO, INC., a California corporation

By: _Steve M. Shemoun_____
Name: _Steve M. Shemoun_____
Title: _Treasurer_____

GUARANTOR:

COMAIR PARENT CORP., a Delaware corporation

By: _____
Name: _____
Title: _____

BANK:

LASALLE BANK NATIONAL ASSOCIATION, a national banking association

By: _____
Name: _Gary L. Richerson_____
Title: _Senior Vice President_____

Exhibit A

(Lockbox - Without Activation)

## DEPOSIT ACCOUNT CONTROL AGREEMENT

This Agreement is entered into as of _April 11_, 20_08_ among COMAIR ROTRON INC. ("Company"), LASALLE BANK N.A. ("Lender"), and LASALLE BANK N.A. ("Bank") with respect to the following:

A. Bank has agreed to establish and maintain for Company post office number 2071 @ 540 W. Madison, Chicago, IL 60661 (the "Lockbox Address") and deposit account number #5800026808 (the "Account"). Bank performs the services described in Exhibit A, which includes receiving mail at the Lockbox Address, processing it and depositing checks and other payment instructions ("Checks") into the Account (the "Lockbox Service").

B. Company has assigned to Lender a security interest in the Account and in Checks mailed to the Lockbox Address.

C. Company, Lender and Bank are entering into this Agreement to evidence Lender's security interest in the Account and such Checks and to provide for the disposition of net proceeds of Checks deposited in the Account.

Accordingly, Company, Lender and Bank agree as follows:

1. (a) This Agreement evidences Lender's control over the Account. A reasonable period of time, not to exceed two Business Days (defined below) following the effective date of this Agreement, Bank shall prevent Company from making any withdrawals from the Account. Notwithstanding anything to the contrary in the agreement between Bank and Company governing the Account, Bank will comply with instructions originated by Lender as set forth herein directing the disposition of funds in the Account without further consent of the Company.

(b) Company represents and warrants to Lender and Bank that it has not assigned or granted a security interest in the Account or any Check deposited in the Account, except to Lender.

(c) Company will not permit the Account to become subject to any other pledge, assignment, lien, charge or encumbrance of any kind, other than Lender's security interest referred to herein.

(d) The Account may receive merchant card deposits and chargebacks. Company acknowledges and agrees that within a reasonable period of time following the effective date of this Agreement chargebacks will be blocked from debiting the Account.

2. A reasonable period of time following the effective date of this Agreement, and continuing on each Business Day thereafter, Bank shall transfer all available balances in the Account to Lender at its account specified below:

00-35-1636NSBW 01-18-2008 (EL)                    1

| Bank Name: | LaSalle Bank N.A. |
| Bank Address: | 135 S. LaSalle Street  Ste. 216 |
| ABA No.: | 071000505 |
| Account Name: | Comair Rotron, Inc. LaSalle Bank as Custodian for Comair Rotron |
| Account No.: | #5801079905 |

A "Business Day" is each day except Saturdays, Sundays and Bank holidays. Funds are not available if, in the reasonable determination of Bank, they are subject to a hold, dispute or legal process preventing their withdrawal.

3.      Bank agrees it shall not offset, charge, deduct or otherwise withdraw funds from the Account, except as permitted by Section 4, until it has been advised in writing by Lender that all of Company's obligations that are secured by the Checks and the Account are paid in full. Lender shall notify Bank promptly in writing upon payment in full of Company's obligations by means of a letter substantially in the form of the Termination Notice (defined below).

4.      Bank is permitted to charge the Account:

        (a)      for its fees and charges relating to the Account or associated with the Lockbox Service and this Agreement; and

        (b)      in the event any Check deposited into the Account is returned unpaid for any reason or for any breach of warranty claim; and

        (c)      for any ACH credit entries that may have been originated by Company but that have not settled on the effective date of this Agreement or for any entries, whether credit or debit, that subsequently returned thereafter.

5.      (a)      If the balances in the Account are not sufficient to compensate Bank for any fees or charges due Bank in connection with the Account, the Lockbox Service or this Agreement, Company agrees to pay Bank on demand the amount due Bank. Company will have breached this Agreement if it has not paid Bank, within five days after such demand, the amount due Bank.

        (b)      If the balances in the Account are not sufficient to compensate Bank for any returned Check, Company agrees to pay Bank on demand the amount due Bank. If Company fails to so pay Bank immediately upon demand, Lender agrees to pay Bank within five days after Bank's demand to Lender to pay any amount received by Lender with respect to such returned Check. The failure to so pay Bank shall constitute a breach of this Agreement.

        (c)      Company hereby authorizes Bank, without prior notice, from time to time to debit any other account Company may have with Bank for the amount or amounts due Bank under subsection 5(a) or 5(b).

6.      (a)      Each Business Day, Bank will send any Checks not processed in accordance with the Lockbox Service set-up documents as well as any other materials, such as invoices, received at the Lockbox Address plus information regarding the deposit for the day to the address specified below for Company or as otherwise specified in writing by Company to Bank, and will send a copy of the deposit advice to the address specified below for Lender.

00-35-1636NSBW 01-18-2008 (EL)            2

238

(b)    In addition to the original Bank statement provided to Company, Bank will provide Lender with a duplicate of such statement.

7.    (a)    Bank will not be liable to Company or Lender for any expense, claim, loss, damage or cost ("Damages") arising out of or relating to its performance under this Agreement other than those Damages which result directly from its acts or omissions constituting negligence or intentional misconduct.

(b)    In no event will Bank be liable for any special, indirect, exemplary or consequential damages, including but not limited to lost profits.

(c)    Bank will be excused from failing to act or delay in acting, and no such failure or delay shall constitute a breach of this Agreement or otherwise give rise to any liability of Bank, if (i) such failure or delay is caused by circumstances beyond Bank's reasonable control, including but not limited to legal constraint, emergency conditions, action or inaction of governmental, civil or military authority, fire, strike, lockout or other labor dispute, war, riot, theft, flood, earthquake or other natural disaster, breakdown of public or private or common carrier communications or transmission facilities, equipment failure, or negligence or default of Company or Lender or (ii) such failure or delay resulted from Bank's reasonable belief that the action would have violated any guideline, rule or regulation of any governmental authority.

(d)    Bank shall have no duty to inquire or determine whether Company's obligations to Lender are in default. Bank may rely on notices and communications it believes in good faith to be genuine and given by the appropriate party.

(e)    Notwithstanding any of the other provisions in this Agreement, in the event of the commencement of a case pursuant to Title 11, United States Code, filed by or against Company, or in the event of the commencement of any similar case under then applicable federal or state law providing for the relief of debtors or the protection of creditors by or against Company, Bank may act as Bank deems necessary to comply with all applicable provisions of governing statutes and shall not be in violation of this Agreement as a result.

(f)    Bank shall be permitted to comply with any writ, levy order or other similar judicial or regulatory order or process concerning the Lockbox Address, the Account or any Check and shall not be in violation of this Agreement for so doing.

8.    (a)    Company shall indemnify Bank against, and hold it harmless from, any and all liabilities, claims, costs, expenses and damages of any nature (including but not limited to allocated costs of staff counsel, other reasonable attorney's fees and any fees and expenses) in any way arising out of or relating to disputes or legal actions concerning Bank's provision of the services described in this Agreement. This section does not apply to any cost or damage attributable to the gross negligence or intentional misconduct of Bank. Company's obligations under this section shall survive termination of this Agreement.

(b)    Lender hereby agrees to indemnify, defend and hold harmless Bank against any loss, liability or expense (including but not limited to allocated costs of staff counsel, other reasonable attorney's fees and any fees and expenses) arising from Bank complying with any written instructions of Lender pursuant to this Agreement other than if related to Bank's gross

negligence, bad faith, or willful misconduct.    Lender's obligations under this section shall survive termination of this Agreement.

9.    (a)    Company shall pay to Bank, upon receipt of Bank's invoice, all costs, expenses and attorneys' fees (including allocated costs for in-house legal services) incurred by Bank in connection with the enforcement of this Agreement and any instrument or agreement required hereunder, including but not limited to any such costs, expenses and fees arising out of the resolution of any conflict, dispute, motion regarding entitlement to rights or rights of action, or other action to enforce Bank's rights in a case arising under Title 11, United States Code. Company agrees to pay Bank, upon receipt of Bank's invoice, all costs, expenses and attorneys' fees (including allocated costs for in-house legal services) incurred by Bank in the preparation and administration of this Agreement (including any amendments hereto or instruments or agreements required hereunder).

(b)    Lender shall pay to Bank, upon receipt of Bank's invoice, all costs, expenses and attorneys' fees (including allocated costs for in-house legal services) incurred by Bank in connection with the enforcement against Lender of this Agreement and any instrument or agreement required hereunder to the extent that Bank is the prevailing party in such enforcement action.

10.    Termination and Assignment of this Agreement shall be as follows:

(a)    Lender may terminate this Agreement by providing notice substantially in the form of Attachment I ("Termination Notice") to Company and Bank that all of Company's obligations which are secured by Checks and the Account are paid in full. Lender may also terminate or it may assign this Agreement upon 30 days' prior written notice to Company and Bank. Bank may terminate this Agreement upon 30 days' prior written notice to Company and Lender. Company may not terminate this Agreement or the Lockbox Service except with the written consent of Lender and upon prior written notice to Bank.

(b)    Notwithstanding subsection 10(a), Bank may terminate this Agreement at any time by written notice to Company and Lender if either Company or Lender breaches any of the terms of this Agreement, or any other agreement with Bank.

11.    (a)    Each party represents and warrants to the other parties that (i) this Agreement constitutes its duly authorized, legal, valid, binding and enforceable obligation; (ii) the performance of its obligations under this Agreement and the consummation of the transactions contemplated hereunder will not (A) constitute or result in a breach of its certificate or articles of incorporation, by-laws or partnership agreement, as applicable, or the provisions of any material contract to which it is a party or by which it is bound or (B) result in the violation of any law, regulation, judgment, decree or governmental order applicable to it; and (iii) all approvals and authorizations required to permit the execution, delivery, performance and consummation of this Agreement and the transactions contemplated hereunder have been obtained.

(b)    The parties each agree that it shall be deemed to make and renew each representation and warranty in subsection 11(a) on and as of each day on which Company uses the services set forth in this Agreement.

00-35-1636NSBW 01-18-2008 (EL)    4

12.    (a)    This Agreement may be amended only by a writing signed by Company, Lender and Bank; except that Bank's charges are subject to change by Bank upon 30 days' prior written notice to Company.

(b)    This Agreement may be executed in counterparts; all such counterparts shall constitute but one and the same agreement.

(c)    This Agreement controls in the event of any conflict between this Agreement and any other document or written or oral statement. This Agreement supersedes all prior understandings, writings, proposals, representations and communications, oral or written, of any party relating to the subject matter hereof.

(d)    This Agreement shall be interpreted in accordance with Illinois law without reference to that state's principles of conflicts of law.

13.    Any written notice or other written communication to be given under this Agreement shall be addressed to each party at its address set forth on the signature page of this Agreement or to such other address as a party may specify in writing. Such notice shall be effective upon receipt.

14.    Nothing contained in the Agreement shall create any agency, fiduciary, joint venture or partnership relationship between Bank and Company or Lender. Company and Lender agree that nothing contained in this Agreement, nor any course of dealing among the parties to this Agreement, shall constitute a commitment or other obligation on the part of Bank to extend credit to Company or Lender.

*The Remainder of This Page Is Intentionally Left Blank.*

In Witness Whereof, the parties hereto have executed this Agreement by their duly authorized officers as of the day and year first above written.

COMAIR ROTRON INC.
("Company")

By: _Steve M. Shamoun_
Name: _Steve M. Shamoun_
Title: _Treasurer - CFO_

LASALLE BANK N.A.
("Lender")

By: _____
Name: _____
Title: _____

LASALLE BANK N.A.
("Bank")

By: _____
Name: _____
Title: _____

Address for notices:

Comair Rotron
8929 Terman Court
San Diego, CA 92121

Howard Industries, Inc.
136 Main Street
Westport, CT 06880
Attn: Peter Howard

Address for notices:

LaSalle Bank N.A.
c/o Bank of America
201 E. Washington St
19th Fl
AZ1-200-19-11
Phoenix, AZ 85004
Attn: Gary L. Richerson

Address for notices:

LaSalle Bank N.A.
c/o Bank of America
201 E. Washington St
19th Fl
AZ1-200-19-11
Phoenix, AZ 85004
Attn: Gary L. Richerson

00-35-1636NSBW 01-18-2008 (EL)                6

**EXHIBIT A**
**TO DEPOSIT ACCOUNT CONTROL AGREEMENT**

**STANDARD TERMS AND CONDITIONS**

The Lockbox Service involves processing Checks that are received at a Lockbox Address. With this Service, Company instructs its customers to mail checks it wants to have processed under the Service to the Lockbox Address. Bank picks up mail at the Lockbox Address according to its mail pick-up schedule. Bank will have unrestricted and exclusive access to the mail directed to the Lockbox Address. Bank will provide Company with the Lockbox Service for a Lockbox Address when Company has completed and Bank has received Bank's then current set-up documents for the Lockbox Address.

If Bank receives any mail containing Company's lockbox number at Bank's lockbox operations location (instead of the Lockbox Address), Bank may handle the mail as if it had been received at the Lockbox Address.

PROCESSING

Bank will handle Checks received at the Lockbox Address according to the applicable deposit account agreement, as if the Checks were delivered by Company to Bank for deposit to the Account, except as modified by these Terms and Conditions.

Bank will open the envelopes picked up from the Lockbox Address and remove the contents. For the Lockbox Address, Checks and other documents contained in the envelopes will be inspected and handled in the manner specified in the Company's set-up documents. Bank captures and reports information related to the lockbox processing, where available, if Company has specified this option in the set-up documents. Bank will endorse all Checks Bank processes on Company's behalf.

If Bank processes an unsigned check as instructed in the set-up documents, and the check is paid, but the account owner does not authorize payment, Company agrees to indemnify Bank, the drawee bank (which may include Bank) and any intervening collecting bank for any liability or expense incurred by such indemnitee due to the payment and collection of the check.

If Company instructs Bank not to process a check bearing a handwritten or typed notation "Payment in Full" or words of similar import on the face of the check, Company understands that Bank has adopted procedures designed to detect Checks bearing such notations; however, Bank will not be liable to Company or any other party for losses suffered if Bank fails to detect Checks bearing such notations.

RETURNED CHECK

Unless Company and Bank agree to another processing procedure, Bank will reclear a Check once which has been returned and marked "Refer to Maker," "Not Sufficient Funds" or "Uncollected Funds." If the Check is returned for any other reason or if the Check is returned a second time, Bank will debit the Account and return the Check to Company. Company agrees that Bank will not

00-35-1636NSBW 01-18-2008 (EL)        7

**243**

send a returned item notice to Company for a returned Check unless Company and Bank have agreed otherwise.

## ACCEPTABLE PAYEES

For the Lockbox Address, Company will provide to Bank the names of Acceptable Payees ("Acceptable Payee" means Company's name and any other payee name provided to Bank by Company as an acceptable payee for Checks to be processed under the Lockbox Service). Bank will process a check only if it is made payable to an Acceptable Payee and if the check is otherwise processable. Company warrants that each Acceptable Payee is either (i) a variation of Company's name or (ii) is an affiliate of Company which has authorized Checks payable to it to be credited to the Account. Bank may treat as an Acceptable Payee any variation of any Acceptable Payee's name that Bank deems to be reasonable.

## CHANGES TO PROCESSING INSTRUCTIONS

Company may request Bank orally or in writing to make changes to the processing instructions (including changes to Acceptable Payees) for any Lockbox Address by contacting its Bank representative, so long as such changes do not conflict with the terms of the Deposit Account Control Agreement. Bank will not be obligated to implement any requested changes until Bank has actually received the requests and had a reasonable opportunity to act upon them. In making changes, Bank is entitled to rely on instructions purporting to be from Company.

**ATTACHMENT I**
**DEPOSIT ACCOUNT CONTROL AGREEMENT**

Letterhead of Secured Party

_____, 200_

Bank of America, N.A.

_____

_____

Attn: _____

    Re:    **Termination of Deposit Account Control Agreement**

    **Account(s):** _____

Ladies and Gentlemen:

    Reference is made to that certain _____ dated as of _____, 200_ (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Agreement") among you, _____ (the "Company"), and us as ("Lender"). You are hereby notified that the Agreement is terminated with respect to the undersigned, and you have no further obligations to the undersigned thereunder. Notwithstanding any previous instructions to you, you are hereby instructed to accept all future directions with respect to the Account from the Company. This notice terminates any obligations you may have to the undersigned with respect to the Account.

                Very truly yours,

                _____

                as Lender

                By: _____
                      Name:
                      Title:

00-35-1636NSBW 01-18-2008 (EL)       9

ACKNOWLEDGED AND AGREED:

BANK OF AMERICA, N.A., as Bank

By _____
    Name:
    Title:

00-35-1636NSBW 01-18-2008 (EL)    10

## FORBEARANCE AGREEMENT

THIS FORBEARANCE AGREEMENT (this "Agreement") is dated May 2, 2008 and is by and between COMAIR ROTRON, INC., a Delaware corporation ("Comair"), THERMAFLO, INC., a California corporation ("Thermaflo") (Comair and Thermaflo shall be collectively referred to as the "Borrower"), COMAIR PARENT CORP. a Delaware corporation ("Guarantor") and LASALLE BANK NATIONAL ASSOCIATION, a national banking association ("Bank").

### RECITALS

A.    Bank has made loans (the "Loans") to Borrower pursuant to that certain Loan and Security Agreement dated April 2, 2004, as amended (the "Loan Agreement");

B.    The Loans and all of Borrower's obligations and liabilities to Bank are secured by, among other things, a first priority lien on, and security interest in, all of Borrower's accounts, inventory, equipment, general intangibles, instruments, and other collateral as more fully set forth in the Loan Agreement (the "Personal Property"), 100% of the issued and outstanding stock of Comair (the "Comair Stock") pursuant to that certain Holding Pledge Agreement dated April 2, 2004 (the "Comair Pledge Agreement"), 100% of the issued and outstanding stock of Thermaflo (the "Thermaflo Stock") pursuant to that certain Subsidiary Stock Pledge Agreement dated December 9, 2005 (the "Thermaflo Pledge Agreement"), and 100% of the issued and outstanding stock of Comair Rotron de Mexico, S. DE R.L. DE C.V. (the "Mexico Stock") pursuant to that certain Equity Quotas Pledge Agreement dated April 2, 2004 (the "Mexico Pledge Agreement");

C.    The Loans and all of Borrower's obligations and liabilities to Bank are also secured by that certain Holding Guaranty dated April 2, 2004 (the "Guaranty") by Guarantor in favor of Bank;

D.    Events of Default (the "Initial Defaults") have occurred under the Loan Agreement due to Borrower's failure to comply with the financial covenants set forth in Sections 7.1(ii) and 7.1(iii) of the Loan Agreement;

E.    Bank has notified Borrower and Guarantor of the Initial Defaults pursuant to letters dated February 6, 2008 and March 10, 2008;

F.    As a result of the Initial Defaults, Bank has, among other things, terminated the Revolving Credit Loan Commitment, and Bank has the ability to exercise additional rights and remedies under the Loan Agreement and applicable law, including, but not limited to, taking possession of and foreclosing upon the Personal Property, the Comair Stock, the Thermaflo Stock, and the Mexico Stock;

G.    Pursuant to that certain Forbearance Agreement dated March 31, 2008 (the "First Forbearance"), Bank agreed to rescind the termination of the Revolving Credit Loan Commitment and to temporarily forbear from exercising certain of its rights under the Loan Agreement until April 30, 2008 and Borrower agreed to pay the Loan and all of Borrower's obligations and liabilities to Bank in full on May 2, 2008;

H.    Borrower failed to pay the Loan and all of its obligations and liabilities to Bank in full on May 2, 2008, and additional Events of Default (the "Additional Defaults") have occurred under the Loan Agreement due to Borrower's failure to comply with the financial covenants set forth in Sections 7.1(ii) and 7.1(iii) of the Loan Agreement;

I.    Borrower and Guarantor have requested that Bank temporarily forbear from exercising certain of its rights under the Loan Agreement in connection with the Initial Defaults and the Additional Defaults;

J.    Bank has agreed to the temporary forbearance requested by Borrower and Guarantor, subject to the terms, conditions and requirements set forth herein; and

K.    Borrower and Guarantor desire to reaffirm their respective obligations and liabilities to Bank as set forth herein.

NOW THEREFORE, in consideration of the recitals set forth above, the covenants and agreements hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    **Recitals.** The recitals set forth above constitute an integral part of this Agreement and are fully incorporated herein by this reference with the same force and effect as though restated herein.

2.    **Defined Terms.** The Loan Agreement, the Comair Pledge Agreement, the Thermaflo Pledge Agreement, the Mexico Pledge Agreement, the Guaranty and all other instruments, agreements or documents evidencing any loan, obligation, or liability between Borrower and Bank, or providing security therefore, are hereinafter collectively referred to as the "Loan Documents." To the extent not otherwise defined herein, all capitalized terms used in this Agreement shall have the respective meanings ascribed to such terms in the Loan Agreement.

3.    **Forbearance.** Bank hereby agrees to forbear temporarily from exercising its rights and remedies under the Loan Agreement and the other Loan Documents for the Initial Defaults and the Additional Defaults from the date hereof to and including May 30, 2008 (the "Forbearance Period"), subject to the full and timely compliance with the following terms, conditions and requirements (each, a "Forbearance Condition"):

(a)    Borrower shall pay Bank a non-refundable Forbearance Fee in the amount of $17,200.00;

(b)    Borrower shall pay all interest payments for the Loans as and when due; Interest shall continue to accrue at the Default Interest Rate specified in the Loan Agreement;

(c)    Borrower shall pay Bank $34,010.68 to reimburse Bank for all out of pocket expenses incurred by Bank in connection with the enforcement of Bank's rights and remedies and the negotiation and documentation of this Agreement and the First Forbearance, including without limitation attorneys' fees and expenses;

2

(d)    Borrower shall actively seek to obtain a new credit facility to satisfy the Loans and all of Borrower's obligations and liabilities to Bank in full, and Borrower shall deliver to Bank a fully executed term sheet for such credit facility on or before May 16, 2008;

(e)    Borrower shall not sell any machinery, equipment or other property outside of the ordinary course of business without Bank's prior written consent;

(f)    On Tuesday of each week, commencing on May 6, 2008, Borrower shall deliver to Bank a 13-week cash flow forecast, which shall include, among other things, detailed explanations of actual to forecast performance;

(g)    Borrower shall provide Bank and Bank's agents and consultants with full access to Borrower's business premises and books and records, except for information subject to the attorney-client privilege, during normal business hours upon 24 hours prior notice for the purpose of appraising the property used in Borrower's business and Bank's collateral; and

(h)    The Loan and all of Borrower's obligations and liabilities to Bank shall be due and payable on May 30, 2008, and Borrower shall pay to Bank all of Borrower's obligations and liabilities in full on or before May 30, 2008.

If Borrower fails to comply with any one of the Forbearance Conditions set forth above, (i) the Forbearance Period and Bank's agreement to forbear hereunder shall immediately terminate without further notice to Borrower; (ii) Borrower shall surrender to Bank all property of Borrower on which Bank holds a lien including without limitation the Personal Property; and (iii) Bank may, at its option, exercise all of its legal and equitable rights and remedies against Borrower, Guarantor, and the Personal Property.

4.    **Reaffirmation.**  Borrower and Guarantor, respectively, hereby (i) consent to this Agreement; (ii) ratify and reaffirm all of their payment and performance obligations, contingent or otherwise, under each of the Loan Documents to which they are a party (after giving effect hereto), including but not limited to all guaranties, subordination agreements and intercreditor agreements relating to the Loans; (iii) ratify and reaffirm all security interests, mortgages, and liens granted for the benefit of Bank and confirms and agrees that such security interests, mortgages, and liens hereafter secure all of the obligations and liabilities of the Borrower under the Loan Documents as amended hereby (the "Obligations"); and (iv) acknowledges that each of the Loan Documents remains in full force and effect and is hereby ratified and reaffirmed.  The execution of this Agreement shall not operate as a waiver of any right, power or remedy of Bank, constitute a waiver of the Initial Defaults, the Additional Defaults or any other Event of Default or other provision of any of the Loan Documents or serve to effect a novation of the Obligations.

5.    **Inducement by Borrower and Guarantor.**  To induce Bank to enter into this Agreement:

(a)    Borrower and Guarantor, respectively, represent and warrant to Bank that they each have full power and authority to enter into this Agreement and to incur and perform the obligations provided for under this Agreement, all of which have been duly

CH42181.1
210322-10006                                            3

authorized by all proper and necessary action, and that no consent or approval of shareholders or creditors or of any public authority or regulatory body is required as a condition to the validity or enforceability of this Agreement which has not been obtained on or prior to the date hereof.

(b)   Borrower represents and warrants to Bank that this Agreement constitutes the valid and legally binding obligation of Borrower, fully enforceable against Borrower in accordance with its terms.

(c)   Borrower represents and warrants to Bank that the execution and performance by Borrower of this Agreement will not: (i) violate any provision of law, any order of any court or other agency of government, or the operating agreement or organizational documents of Borrower; (ii) violate any indenture, contract, agreement or other instrument to which Borrower is a party, or by which any of its property is bound, or be in conflict with, result in a breach of or constitute (with due notice and/or lapse of time) a default under, any such indenture, contract, agreement or other instrument; or (iii) result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of Borrower.

(d)   Guarantor represents and warrants to Bank that this Agreement constitutes the valid and legally binding obligation of Guarantor, fully enforceable against Guarantor in accordance with its terms.

(e)   Guarantor represents and warrants to Bank that the execution and performance by Guarantor of this Agreement will not: (i) violate any provision of law, any order of any court or other agency of government, or the operating agreement or organizational documents of Guarantor; (ii) violate any indenture, contract, agreement or other instrument to which Guarantor is a party, or by which any of its property is bound, or be in conflict with, result in a breach of or constitute (with due notice and/or lapse of time) a default under, any such indenture, contract, agreement or other instrument; or (iii) result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of Guarantor.

6.   **Conditions Precedent**. This Agreement shall become effective as of the date hereof upon the satisfaction of each of the following conditions precedent by the close of business on the date hereof:

(a)   Bank shall have received from Borrower and Guarantor two fully executed original counterparts of this Agreement;

(b)   Bank shall have received from Borrower payment of $34,010.68 to reimburse Bank for all out of pocket expenses incurred by Bank in connection with the enforcement of the Bank's rights and remedies and the negotiation and documentation of this Agreement and the First Forbearance, including without limitation attorneys' fees and expenses;

(c)   Bank shall have received from Borrower payment of the non-refundable $17,000.00 Forbearance Fee; and

CH42181.1
210322-10006

4



(d)    Bank shall have received from Borrower, Guarantor, and other persons and entities such other instruments, documents and agreements in connection herewith as Bank shall reasonably request.

7.    **Affirmation of Indebtedness.**  Borrower hereby agrees and acknowledges that: (a) as of May 1, 2008, the aggregate outstanding principal balance of the Revolving Note is $5,000,000.00, the aggregate outstanding principal balance of the Term Note A dated June 27, 2006 is $10,640,000.00, and the aggregate outstanding principal balance of the Term Note B dated June 27, 2006 is $5,000,000.00 (exclusive of accrued interest, fees and expenses, including attorneys fees' and expenses); and (b) Bank has performed all obligations and duties owed to Borrower as of the date hereof, and Borrower and Guarantor, jointly or severally, have no defense, offset or counterclaim with respect to any amounts owed to Bank or with respect to the performance or observance by Borrower of any representation, covenant or other agreement contained in the Loan Documents.

8.    **Acknowledgments Regarding Negotiation of Agreement.**  Borrower and Guarantor, respectively, hereby acknowledge that (i) they have been represented by counsel of its own choosing throughout the negotiation, preparation and execution of this Agreement and the Loan Documents, (ii) they have exercised independent judgment with respect the negotiation, preparation and execution of this Agreement and the Loan Documents, and the consummation of the transactions contemplated hereby and thereby, (iii) they have not relied upon Bank or on counsel for Bank for any advice with respect to the negotiation, preparation or execution of this Agreement and the Loan Documents, and (iv) any principle of contract construction which favors or disfavors the party whose attorneys have drafted a contract or a provision thereof shall not be applied to this Agreement and the Loan Documents.

9.    **Waiver, Release and Discharge.**  Borrower and Guarantor, on their own behalf and on behalf of their respective representatives, partners, agents, employees, servants, officers, directors, shareholders, subsidiary, affiliated and related companies, successors and assigns (collectively, the "Borrowing Group") hereby release and forever discharge Bank, and its officers, directors, subsidiary, affiliated and related companies, agents, servants, employees, shareholders, representatives, successors and assigns (collectively, the "Bank Group") of and from all manner of actions, cause and causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, obligations, liabilities, costs, expenses, losses, damages, judgments, executions, claims and demands of whatsoever kind or nature, in law or in equity, whether known or unknown, concealed or hidden, foreseen, or unforeseen, contingent or actual, liquidated or unliquidated, arising out of or relating to any of the Loan Documents, the transactions relating thereto, and/or any financial accommodations extended or denied by Bank to Borrower, that any of the Borrowing Group, jointly or severally, have had, now have or hereafter can, shall or may have against the Bank Group, directly or indirectly, through the date hereof.  Borrower acknowledges and agrees that Bank is specifically relying upon the representations, warranties, covenants and agreements contained herein and that such representations, warranties, covenants and agreements constitute a material inducement to Bank's entering into this Agreement and the transactions contemplated herein.  Borrower, on its own behalf and on behalf of the Borrowing Group, represents and warrants to Bank and the Bank Group that the Borrowing Group has not assigned, conveyed or otherwise transferred, either directly or indirectly, in whole or in part, any of the

CH42181.1
210322-10006                                                  5

claims against the Bank Group to be released herein. The foregoing release and discharge shall not apply to any matter arising from occurrences after the date hereof and any obligations under this Agreement.

10.    **Event of Default.** Borrower and Guarantor hereby acknowledge and agree that a breach by Borrower of any term, provision, covenant, or condition herein set forth or herein required of Borrower to be kept or performed, shall constitute an Event of Default under the Loan Documents.

11.    **No Custom; Section Headings.** This Agreement shall not establish a custom or course of dealing. The section headings and captions herein are for convenience of reference only and shall not be deemed to limit, impair or affect the interpretation and construction of the terms hereof.

12.    **Counterparts.** This Agreement may be signed in counterparts, each of which shall be deemed an original and all of which shall be deemed to constitute one agreement. Any party hereto may execute and deliver a counterpart of this Agreement by delivering by facsimile a signature page of this Agreement signed by such party and such facsimile signature shall be treated in all respects as having the same effect as an original signature.

13.    **Merger; Modification.** This Agreement embodies the entire agreement between the parties hereto with respect to the matters addressed herein and supersedes all prior oral and written and all contemporaneous oral communications with respect to such matters. This Agreement shall not be modified or amended or extended except in writing signed by each of the parties hereto.

14.    **Further Assurances.** Borrower and Guarantor shall execute and/or deliver any other agreements or documents and take such other actions which Bank deems reasonably necessary to achieve the objectives of this Agreement.

15.    **Notices.** All notices or other information sent in connection with this Agreement and/or the Loan Documents must be in writing and sent by (a) personal delivery, (b) prepaid overnight courier, (c) certified mail, return receipt requested, postage prepaid, or (d) confirmed telecopy or other facsimile transmission, addressed as follows:

If to Borrower and/or Guarantor:

Comair Rotron, Inc.
8929 Terman Court
San Diego, CA 92121
Attention: Rocco Melchione
Telephone No.: (858) 348-6200
Facsimile No.: (858) 566-4577

With copies to:

Howard Industries, Inc.
136 Main Street
Westport, CT 06880

CH42181.1
210322-10006

6

Attention: Peter Howard
Telephone No.: (203) 227-4900 ext. 222
Facsimile No.: (203) 227-3314

If to Bank:

LaSalle Bank National Association
c/o Bank of America N.A.
201 East Washington Street, 19th Floor
Phoenix, AZ 85004
Attention: Gary Richerson
Telephone No.: (602) 523-2147
Facsimile No.: (602) 523-2750

with copies to:

Loeb & Loeb LLP
321 North Clark Street, Suite 2300
Chicago, IL 60610
Attention: Michael L. Molinaro, Esq.
Telephone No.: (312) 464-3166
Facsimile No.: (312) 896-5592

The parties may designate another addressee or change its address for notices and other communications hereunder by a notice given to the other parties in the manner provided in this paragraph. A notice or other communication sent in compliance with the provisions of this paragraph shall be deemed good and sufficient service regardless of whether the parties actually receive such notice.

16.     **GOVERNING LAW/VENUE.** THIS AGREEMENT SHALL BE DEEMED A CONTRACT MADE UNDER THE LAWS OF THE STATE OF ILLINOIS AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF ILLINOIS AND THE LAWS OF THE UNITED STATES OF AMERICA. BORROWER AND GUARANTOR HEREBY IRREVOCABLY SUBMIT THEMSELVES TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS OF THE STATE OF ILLINOIS AND AGREE AND CONSENT THAT SERVICE OF PROCESS MAY BE MADE UPON THEM IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT BY ANY MEANS ALLOWED UNDER ILLINOIS OR FEDERAL LAW. VENUE FOR ANY LEGAL PROCEEDING MAY BE COOK COUNTY, ILLINOIS OR, IN BANKS' SOLE DISCRETION, ANY OTHER VENUE PERMITTED BY APPLICABLE LAW.

17.     **WAIVER OF JURY TRIAL.** BORROWER AND GUARANTOR HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, CAUSE OF ACTION, SUIT OR PROCEEDINGS (A) ARISING UNDER THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS OR (B) IN ANY WAY CONNECTED WITH OR RELATED TO OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS OR THE

TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. BORROWER AND GUARANTOR HEREBY AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION, CAUSE OF ACTION, SUIT OR PROCEEDING SHALL BE DECIDED BY A COURT TRIAL, WITHOUT A JURY, AND THAT ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

*Remainder of page intentionally left blank*

CH42181.1
210322-10006

8

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first set forth above.

**BORROWER:**

COMAIR ROTRON, INC., a Delaware corporation

By: _Steve M. Shamoun_
Name: _Steve M. Shamoun_
Title: _C.F.O._

THERMAFLO, INC., a California corporation

By: _Steve M. Shamoun_
Name: _Steve M. Shamoun_
Title: _C.F.O._

**GUARANTOR:**

COMAIR PARENT CORP., a Delaware corporation

By: _Steve M. Shamoun_
Name: _Steve M. Shamoun_
Title: _Treasurer_

**BANK:**

LASALLE BANK NATIONAL ASSOCIATION, a national banking association

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

BORROWER:

COMAIR ROTRON, INC., a Delaware corporation

By: _Steve M. Shamoun_
Name: _Steve M. Shamoun_
Title: _C.F.O._

THERMAFLO, INC., a California corporation

By: _Steve M. Shamoun_
Name: _Steve M. Shamoun_
Title: _C.F.O._

GUARANTOR:

COMAIR PARENT CORP., a Delaware corporation

By: _Steve M. Shamoun_
Name: _Steve M. Shamoun_
Title: _Treasurer_

BANK:

LASALLE BANK NATIONAL ASSOCIATION, a national banking association

By: _____
Name: _Gary L. Richerson_
Title: _Senior Vice President_

## FORBEARANCE AGREEMENT

THIS FORBEARANCE AGREEMENT (this "Agreement") is dated May 31, 2008 and is by and between COMAIR ROTRON, INC., a Delaware corporation ("Comair"), THERMAFLO, INC., a California corporation ("Thermaflo") (Comair and Thermaflo shall be collectively referred to as the "Borrower"), COMAIR PARENT CORP. a Delaware corporation ("Guarantor") and LASALLE BANK NATIONAL ASSOCIATION, a national banking association ("Bank").

### RECITALS

A.    Bank has made loans (the "Loans") to Borrower pursuant to that certain Loan and Security Agreement dated April 2, 2004, as amended (the "Loan Agreement");

B.    The Loans and all of Borrower's obligations and liabilities to Bank are secured by, among other things, a first priority lien on, and security interest in, all of Borrower's accounts, inventory, equipment, general intangibles, instruments, and other collateral as more fully set forth in the Loan Agreement (the "Personal Property"), 100% of the issued and outstanding stock of Comair (the "Comair Stock") pursuant to that certain Holding Pledge Agreement dated April 2, 2004 (the "Comair Pledge Agreement"), 100% of the issued and outstanding stock of Thermaflo (the "Thermaflo Stock") pursuant to that certain Subsidiary Stock Pledge Agreement dated December 9, 2005 (the "Thermaflo Pledge Agreement"), and 100% of the issued and outstanding stock of Comair Rotron de Mexico, S. DE R.L. DE C.V. (the "Mexico Stock") pursuant to that certain Equity Quotas Pledge Agreement dated April 2, 2004 (the "Mexico Pledge Agreement");

C.    The Loans and all of Borrower's obligations and liabilities to Bank are also secured by that certain Holding Guaranty dated April 2, 2004 (the "Guaranty") by Guarantor in favor of Bank;

D.    Events of Default (the "Initial Defaults") have occurred under the Loan Agreement due to Borrower's failure to comply with the financial covenants set forth in Sections 7.1(ii) and 7.1(iii) of the Loan Agreement;

E.    Bank has notified Borrower and Guarantor of the Initial Defaults pursuant to letters dated February 6, 2008 and March 10, 2008;

F.    As a result of the Initial Defaults, Bank has, among other things, terminated the Revolving Credit Commitment, and Bank has the ability to exercise additional rights and remedies under the Loan Agreement and applicable law, including, but not limited to, taking possession of and foreclosing upon the Personal Property, the Comair Stock, the Thermaflo Stock, and the Mexico Stock;

G.    Pursuant to that certain Forbearance Agreement dated March 31, 2008 (the "First Forbearance"), Bank agreed to rescind the termination of the Revolving Credit Commitment and to temporarily forbear from exercising certain of its rights under the Loan Agreement until April 30, 2008 and Borrower agreed, among other things, to pay the Loan and all of Borrower's obligations and liabilities to Bank in full on May 2, 2008;

CH42847.3
210322-10006

1:

**257**

H.    Borrower failed to pay the Loan and all of its obligations and liabilities to Bank in full on May 2, 2008;

I.    Pursuant to that certain Forbearance Agreement dated May 2, 2008 (the "Second Forbearance"), Bank agreed to temporarily forbearance from exercising its rights under the Loan Agreement until May 30, 2008 and Borrower agreed, among other things, to pay the Loan and all of Borrower's obligations and liabilities to Bank in full on May 30, 2008;

J.    Borrower failed to pay the Loan and all of its obligations and liabilities to Bank in full on May 30, 2008 and additional Events of Default (the "Additional Defaults") have occurred under the Loan Agreement due to Borrower's failure to comply with the financial covenants set forth in Sections 7.1(ii) and 7.1(iii) of the Loan Agreement as of May 30, 2008;

K.    Borrower and Guarantor have again requested that Bank temporarily forbear from exercising certain of its rights under the Loan Agreement in connection with the Initial Defaults and the Additional Defaults;

L.    Bank has agreed to the temporary forbearance requested by Borrower and Guarantor, subject to the terms, conditions and requirements set forth herein; and

M.    Borrower and Guarantor desire to reaffirm their respective obligations and liabilities to Bank as set forth herein.

NOW THEREFORE, in consideration of the recitals set forth above, the covenants and agreements hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

1.    **Recitals.**  The recitals set forth above constitute an integral part of this Agreement and are fully incorporated herein by this reference with the same force and effect as though restated herein.

2.    **Defined Terms.**  The Loan Agreement, the Comair Pledge Agreement, the Thermaflo Pledge Agreement, the Mexico Pledge Agreement, the Guaranty and all other instruments, agreements or documents evidencing any loan, obligation, or liability between Borrower and Bank, or providing security therefore, are hereinafter collectively referred to as the "Loan Documents." To the extent not otherwise defined herein, all capitalized terms used in this Agreement shall have the respective meanings ascribed to such terms in the Loan Agreement.

3.    **Forbearance.**  Bank hereby agrees to forbear temporarily from exercising its rights and remedies under the Loan Agreement and the other Loan Documents for the Initial Defaults and the Additional Defaults (and to continue to provide Loans to Borrower under the Revolving Credit Facility in accordance with the terms and conditions set forth in the Loan Documents) from the date hereof to and including June 30, 2008 (the "Forbearance Period"), subject to the full and timely compliance with the following terms, conditions and requirements (each, a "Forbearance Condition"):

CH42847.3
210322-10006

2

(a) Borrower shall pay Bank a non-refundable Forbearance Fee in the amount of $17,000.00;

(b) Borrower shall pay all interest payments for the Loans as and when due; Interest shall accrue at the Default Interest Rate of Prime plus 3% commencing May 31, 2008;

(c) Borrower shall pay Bank $5,000.00 to reimburse Bank for all out of pocket expenses incurred by Bank in connection with the enforcement of Bank's rights and remedies and the negotiation and documentation of this Agreement, including without limitation attorneys' fees and expenses;

(d) Borrower shall actively market for sale Borrower's business operations and assets, and/or seek to obtain a new credit facility, to satisfy the Loans and all of Borrower's obligations and liabilities to Bank in full; and Borrower shall engage a consultant, acceptable to Bank, on or before June 13, 2008 to assist Borrower with such sale and refinancing and shall demonstrate meaningful progress toward such sale and refinancing by June 30, 2008;

(e) Borrower shall not sell any machinery, equipment or other property outside of the ordinary course of business without Bank's prior written consent;

(f) On Tuesday of each week, commencing on June 3, 2008, Borrower shall deliver to Bank a 13-week cash flow forecast, which shall include, among other things, detailed explanations of actual to forecast performance;

(g) Borrower shall execute and deliver to Bank the Deposit Account Control Agreement ("Control Agreement") attached hereto and incorporated herein as Exhibit A;

(h) Borrower shall provide Bank and Bank's agents and consultants with full access to Borrower's business premises and books and records, except for information subject to the attorney-client privilege, during normal business hours upon 24 hours prior notice for the purpose of appraising the property used in Borrower's business and Bank's collateral; and

(i) The Loan and all of Borrower's obligations and liabilities to Bank shall be due and payable on June 30, 2008; and Borrower shall pay to Bank all of Borrower's obligations and liabilities in full on or before June 30, 2008.

**If Borrower fails to comply with any one of the Forbearance Conditions set forth above, (i) the Forbearance Period and Bank's agreement to forbear hereunder shall immediately terminate without further notice to Borrower; (ii) Borrower shall surrender to Bank all property of Borrower on which Bank holds a lien including without limitation the Personal Property; and (iii) Bank may, at its option, exercise all of its legal and equitable rights and remedies against Borrower, Guarantor, and the Personal Property.**

CH42847.3
210322-10006

3

4.    **Reaffirmation.** Borrower and Guarantor, respectively, hereby (i) consent to this Agreement, (ii) ratify and reaffirm all of their payment and performance obligations, contingent or otherwise, under each of the Loan Documents to which they are a party (after giving effect hereto), including but not limited to all guaranties, subordination agreements and intercreditor agreements relating to the Loans; (iii) ratify and reaffirm all security interests, mortgages, and liens granted for the benefit of Bank and confirms and agrees that such security interests, mortgages, and liens hereafter secure all of the obligations and liabilities of the Borrower under the Loan Documents as amended hereby (the "Obligations"); and (iv) acknowledges that each of the Loan Documents remains in full force and effect and is hereby ratified and reaffirmed. The execution of this Agreement shall not operate as a waiver of any right, power or remedy of Bank, constitute a waiver of the Initial Defaults, the Additional Defaults or any other Event of Default or other provision of any of the Loan Documents or serve to effect a novation of the Obligations.

5.    **Inducement by Borrower and Guarantor.** To induce Bank to enter into this Agreement:

(a)    Borrower and Guarantor, respectively, represent and warrant to Bank that they each have full power and authority to enter into this Agreement and to incur and perform the obligations provided for under this Agreement, all of which have been duly authorized by all proper and necessary action, and that no consent or approval of shareholders or creditors or of any public authority or regulatory body is required as a condition to the validity or enforceability of this Agreement which has not been obtained on or prior to the date hereof.

(b)    Borrower represents and warrants to Bank that this Agreement constitutes the valid and legally binding obligation of Borrower, fully enforceable against Borrower in accordance with its terms.

(c)    Borrower represents and warrants to Bank that the execution and performance by Borrower of this Agreement will not: (i) violate any provision of law, any order of any court or other agency of government, or the operating agreement or organizational documents of Borrower; (ii) violate any indenture, contract, agreement or other instrument to which Borrower is a party, or by which any of its property is bound, or be in conflict with, result in a breach of or constitute (with due notice and/or lapse of time) a default under, any such indenture, contract, agreement or other instrument; or (iii) result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of Borrower.

(d)    Guarantor represents and warrants to Bank that this Agreement constitutes the valid and legally binding obligation of Guarantor, fully enforceable against Guarantor in accordance with its terms.

(e)    Guarantor represents and warrants to Bank that the execution and performance by Guarantor of this Agreement will not: (i) violate any provision of law, any order of any court or other agency of government, or the operating agreement or organizational documents of Guarantor; (ii) violate any indenture, contract, agreement or other instrument to which Guarantor is a party, or by which any of its property is bound,

or be in conflict with, result in a breach of or constitute (with due notice and/or lapse of time) a default under, any such indenture, contract, agreement or other instrument; or (iii) result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the property or assets of Guarantor.

6.    **Conditions Precedent.**  This Agreement shall become effective as of the date hereof upon the satisfaction of each of the following conditions precedent by the close of business on the date hereof:

(a)    Bank shall have received from Borrower and Guarantor two fully executed original counterparts of this Agreement;

(b)    Bank shall have received from Borrower the executed original Control Agreement;

(c)    Bank shall have received from Borrower payment of $5,000.00 to reimburse Bank for all out of pocket expenses incurred by Bank in connection with the enforcement of the Bank's rights and remedies and the negotiation and documentation of this Agreement, including without limitation attorneys' fees and expenses;

(d)    Bank shall have received from Borrower payment of the non-refundable $17,000.00 Forbearance Fee; and

(e)    Bank shall have received from Borrower, Guarantor, and other persons and entities such other instruments, documents and agreements in connection herewith as Bank shall reasonably request.

7.    **Affirmation of Indebtedness.**  Borrower hereby agrees and acknowledges that: (a) as of May 31, 2008, the aggregate outstanding principal balance of the Revolving Note is $5,000,000.00, the aggregate outstanding principal balance of the Term Note A dated June 27, 2006 is $10,640,000.00, and the aggregate outstanding principal balance of the Term Note B dated June 27, 2006 is $5,000,000.00 (exclusive of accrued interest, fees and expenses, including attorneys fees' and expenses); and (b) Bank has performed all obligations and duties owed to Borrower as of the date hereof, and Borrower and Guarantor, jointly or severally, have no defense, offset or counterclaim with respect to any amounts owed to Bank or with respect to the performance or observance by Borrower of any representation, covenant or other agreement contained in the Loan Documents.

8.    **Acknowledgments Regarding Negotiation of Agreement.**  Borrower and Guarantor, respectively, hereby acknowledge that (i) they have been represented by counsel of its own choosing throughout the negotiation, preparation and execution of this Agreement and the Loan Documents, (ii) they have exercised independent judgment with respect to the negotiation, preparation and execution of this Agreement and the Loan Documents, and the consummation of the transactions contemplated hereby and thereby, (iii) they have not relied upon Bank or on counsel for Bank for any advice with respect to the negotiation, preparation or execution of this Agreement and the Loan Documents, and (iv) any principle of contract construction which favors or disfavors the party whose attorneys have drafted a contract or a provision thereof shall not be applied to this Agreement and the Loan Documents.

9.    **Waiver, Release and Discharge.**  Borrower and Guarantor, on their own behalf and on behalf of their respective representatives, partners, agents, employees, servants, officers, directors, shareholders, subsidiary, affiliated and related companies, successors and assigns (collectively, the "Borrowing Group") hereby release and forever discharge Bank, and its officers, directors, subsidiary, affiliated and related companies, agents, servants, employees, shareholders, representatives, successors and assigns (collectively, the "Bank Group") of and from all manner of actions, cause and causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, obligations, liabilities, costs, expenses, losses, damages, judgments, executions, claims and demands of whatsoever kind or nature, in law or in equity, whether known or unknown, concealed or hidden, foreseen, or unforeseen, contingent or actual, liquidated or unliquidated, arising out of or relating to any of the Loan Documents, the transactions relating thereto, and/or any financial accommodations extended or denied by Bank to Borrower, that any of the Borrowing Group, jointly or severally, have had, now have or hereafter can, shall or may have against the Bank Group, directly or indirectly, through the date hereof. Borrower acknowledges and agrees that Bank is specifically relying upon the representations, warranties, covenants and agreements contained herein and that such representations, warranties, covenants and agreements constitute a material inducement to Bank's entering into this Agreement and the transactions contemplated herein. Borrower, on its own behalf and on behalf of the Borrowing Group, represents and warrants to Bank and the Bank Group that the Borrowing Group has not assigned, conveyed or otherwise transferred, either directly or indirectly, in whole or in part, any of the claims against the Bank Group to be released herein. The foregoing release and discharge shall not apply to any matter arising from occurrences after the date hereof and any obligations under this Agreement.

10.    **Event of Default.**  Borrower and Guarantor hereby acknowledge and agree that a breach by Borrower of any term, provision, covenant, or condition herein set forth or herein required of Borrower to be kept or performed, shall constitute an Event of Default under the Loan Documents.

11.    **No Custom; Section Headings.**  This Agreement shall not establish a custom or course of dealing. The section headings and captions herein are for convenience of reference only and shall not be deemed to limit, impair or affect the interpretation and construction of the terms hereof.

12.    **Counterparts.**  This Agreement may be signed in counterparts, each of which shall be deemed an original and all of which shall be deemed to constitute one agreement. Any party hereto may execute and deliver a counterpart of this Agreement by delivering by facsimile a signature page of this Agreement signed by such party and such facsimile signature shall be treated in all respects as having the same effect as an original signature.

13.    **Merger; Modification.**  This Agreement embodies the entire agreement between the parties hereto with respect to the matters addressed herein and supersedes all prior oral and written and all contemporaneous oral communications with respect to such matters. This Agreement shall not be modified or amended or extended except in writing signed by each of the parties hereto.

14.    **Further Assurances.**  Borrower and Guarantor shall execute and/or deliver any other agreements or documents and take such other actions which Bank deems reasonably necessary to achieve the objectives of this Agreement.

15.    **Notices.**  All notices or other information sent in connection with this Agreement and/or the Loan Documents must be in writing and sent by (a) personal delivery, (b) prepaid overnight courier, (c) certified mail, return receipt requested, postage prepaid, or (d) confirmed telecopy or other facsimile transmission, addressed as follows:

If to Borrower and/or Guarantor:

Comair Rotron, Inc.
8929 Terman Court
San Diego, CA 92121
Attention:  Rocco Melchione
Telephone No.:  (858) 348-6200
Facsimile No.:  (858) 566-4577

With copies to:

Howard Industries, Inc.
136 Main Street
Westport, CT 06880
Attention:  Peter Howard
Telephone No.:  (203) 227-4900 ext. 222
Facsimile No.:  (203) 227-3314

If to Bank:

LaSalle Bank National Association
c/o Bank of America N.A.
201 East Washington Street, 19th Floor
Phoenix, AZ 85004
Attention:  Gary Richerson
Telephone No.:  (602) 523-2147
Facsimile No.:  (602) 523-2750

with copies to:

Loeb & Loeb LLP
321 North Clark Street, Suite 2300
Chicago, IL 60610
Attention:  Michael L. Molinaro, Esq.
Telephone No.:  (312) 464-3166
Facsimile No.:  (312) 896-5592

The parties may designate another addressee or change its address for notices and other communications hereunder by a notice given to the other parties in the manner provided in this paragraph.  A notice or other communication sent in compliance with the provisions of this paragraph shall be deemed good and sufficient service regardless of whether the parties actually

CH42847.3
210322-10006

7

**263**

receive such notice.

16.     **GOVERNING LAW/VENUE**. THIS AGREEMENT SHALL BE DEEMED A CONTRACT MADE UNDER THE LAWS OF THE STATE OF ILLINOIS AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF ILLINOIS AND THE LAWS OF THE UNITED STATES OF AMERICA.     BORROWER AND GUARANTOR HEREBY IRREVOCABLY SUBMIT THEMSELVES TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS OF THE STATE OF ILLINOIS AND AGREE AND CONSENT THAT SERVICE OF PROCESS MAY BE MADE UPON THEM IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT BY ANY MEANS ALLOWED UNDER ILLINOIS OR FEDERAL LAW.  VENUE FOR ANY LEGAL PROCEEDING MAY BE COOK COUNTY, ILLINOIS OR, IN BANKS' SOLE DISCRETION, ANY OTHER VENUE PERMITTED BY APPLICABLE LAW.

17.     **WAIVER OF JURY TRIAL**. BORROWER AND GUARANTOR HEREBY WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, CAUSE OF ACTION, SUIT OR PROCEEDINGS (A) ARISING UNDER THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS OR (B) IN ANY WAY CONNECTED WITH OR RELATED TO OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO WITH RESPECT TO THIS AGREEMENT OR ANY OF THE LOAN DOCUMENTS OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.  BORROWER AND GUARANTOR HEREBY AGREE AND CONSENT THAT ANY SUCH CLAIM, DEMAND, ACTION, CAUSE OF ACTION, SUIT OR PROCEEDING SHALL BE DECIDED BY A COURT TRIAL, WITHOUT A JURY, AND THAT ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

*Remainder of page intentionally left blank*

CH42847.3
210322-10006                                8

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first set forth above.

**BORROWER:**

COMAIR ROTRON, INC., a Delaware corporation

By: _____
Name: _Steve M. Shamoun_
Title: _C.F.O._

THERMAFLO, INC., a California corporation

By: _____
Name: _Steve M. Shamoun_
Title: _C.F.O._

**GUARANTOR:**

COMAIR PARENT CORP., a Delaware corporation

By: _____
Name: _Steve M. Shamoun_
Title: _Treasurer_

**BANK:**

LASALLE BANK NATIONAL ASSOCIATION, a national banking association

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first set forth above.

**BORROWER:**

COMAIR ROTRON, INC., a Delaware corporation

By: _____
Name: _____
Title: _____

THERMAFLO, INC., a California corporation

By: _____
Name: _____
Title: _____

**GUARANTOR:**

COMAIR PARENT CORP., a Delaware corporation

By: _____
Name: _____
Title: _____

**BANK:**

LASALLE BANK NATIONAL ASSOCIATION, a national banking association

By: _____
Name: ___Gary L. Richerson_____
Title: ___Senior Vice President_____

EXHIBIT A

(Lockbox - Without Activation)

## DEPOSIT ACCOUNT CONTROL AGREEMENT

This Agreement is entered into as of April 11, 2008, among COMAIR ROTRON INC. ("Company"), LASALLE BANK NATIONAL ASSOCIATION, a national banking association ("Lender"), and LASALLE BANK NATIONAL ASSOCIATION, a national banking association ("Bank") with respect to the following:

    A.    Bank has agreed to establish and maintain for Company post office number 2071 @ 540 W. Madison, Chicago, IL 60661 (the "Lockbox Address") and deposit account number #5800026808 (the "Account"). Bank performs the services described in Exhibit A, which includes receiving mail at the Lockbox Address, processing it and depositing checks and other payment instructions ("Checks") into the Account (the "Lockbox Service").

    B.    Company has assigned to Lender a security interest in the Account and in Checks mailed to the Lockbox Address.

    C.    Company, Lender and Bank are entering into this Agreement to evidence Lender's security interest in the Account and such Checks and to provide for the disposition of net proceeds of Checks deposited in the Account.

Accordingly, Company, Lender and Bank agree as follows:

1.    (a)    This Agreement evidences Lender's control over the Account. A reasonable period of time, not to exceed two Business Days (defined below) following the effective date of this Agreement, Bank shall prevent Company from making any withdrawals from the Account. Notwithstanding anything to the contrary in the agreement between Bank and Company governing the Account, Bank will comply with instructions originated by Lender as set forth herein directing the disposition of funds in the Account without further consent of the Company.

    (b)    Company represents and warrants to Lender and Bank that it has not assigned or granted a security interest in the Account or any Check deposited in the Account, except to Lender.

    (c)    Company will not permit the Account to become subject to any other pledge, assignment, lien, charge or encumbrance of any kind, other than Lender's security interest referred to herein.

    (d)    The Account may receive merchant card deposits and chargebacks. Company acknowledges and agrees that within a reasonable period of time following the effective date of this Agreement chargebacks will be blocked from debiting the Account.

00-35-1636NSBW 01-18-2008 (EL)        1
CH42937.1
210322-10006

2.      A reasonable period of time following the effective date of this Agreement, and continuing on each Business Day thereafter, Bank shall transfer all available balances in the Account to Lender at its account specified below.

| | |
|---|---|
| Bank Name: | LaSalle Bank National Association |
| Bank Address: | 135 S. LaSalle Street, Ste. 216 |
| ABA No.: | 071000505 |
| Account Name: | Comair Rotron, Inc. LaSalle Bank as Custodian for Comair Rotron |
| Account No.: | #5801079905 |

A "Business Day" is each day except Saturdays, Sundays and Bank holidays.  Funds are not available if, in the reasonable determination of Bank, they are subject to a hold, dispute or legal process preventing their withdrawal.

3.      Bank agrees it shall not offset, charge, deduct or otherwise withdraw funds from the Account, except as permitted by Section 4, until it has been advised in writing by Lender that all of Company's obligations that are secured by the Checks and the Account are paid in full.  Lender shall notify Bank promptly in writing upon payment in full of Company's obligations by means of a letter substantially in the form of the Termination Notice (defined below).

4.      Bank is permitted to charge the Account:

        (a)      for its fees and charges relating to the Account or associated with the Lockbox Service and this Agreement; and

        (b)      in the event any Check deposited into the Account is returned unpaid for any reason or for any breach of warranty claim; and

        (c)      for any ACH credit entries that may have been originated by Company but that have not settled on the effective date of this Agreement or for any entries, whether credit or debit, that are subsequently returned thereafter.

5.      (a)      If the balances in the Account are not sufficient to compensate Bank for any fees or charges due Bank in connection with the Account, the Lockbox Service or this Agreement, Company agrees to pay Bank on demand the amount due Bank.  Company will have breached this Agreement if it has not paid Bank, within five days after such demand, the amount due Bank.

        (b)      If the balances in the Account are not sufficient to compensate Bank for any returned Check, Company agrees to pay Bank on demand the amount due Bank.  If Company fails to so pay Bank immediately upon demand, Lender agrees to pay Bank within five days after Bank's demand to Lender to pay any amount received by Lender with respect to such returned Check.  The failure to so pay Bank shall constitute a breach of this Agreement.

        (c)      Company hereby authorizes Bank, without prior notice, from time to time to debit any other account Company may have with Bank for the amount or amounts due Bank under subsection 5(a) or 5(b).

00-35-1636NSBW 01-18-2008 (EL)                    2
CH42937.1
210322-10006

**268**

6.    (a)    Each Business Day, Bank will send any Checks not processed in accordance with the Lockbox Service set-up documents as well as any other materials, such as invoices, received at the Lockbox Address plus information regarding the deposit for the day to the address specified below for Company or as otherwise specified in writing by Company to Bank, and will send a copy of the deposit advice to the address specified below for Lender.

(b)    In addition to the original Bank statement provided to Company, Bank will provide Lender with a duplicate of such statement.

7.    (a)    Bank will not be liable to Company or Lender for any expense, claim, loss, damage or cost ("Damages") arising out of or relating to its performance under this Agreement other than those Damages which result directly from its acts or omissions constituting negligence or intentional misconduct.

(b)    In no event will Bank be liable for any special, indirect, exemplary or consequential damages, including but not limited to lost profits.

(c)    Bank will be excused from failing to act or delay in acting, and no such failure or delay shall constitute a breach of this Agreement or otherwise give rise to any liability of Bank, if (i) such failure or delay is caused by circumstances beyond Bank's reasonable control, including but not limited to legal constraint, emergency conditions, action or inaction of governmental, civil or military authority, fire, strike, lockout or other labor dispute, war, riot, theft, flood, earthquake or other natural disaster, breakdown of public or private or common carrier communications or transmission facilities, equipment failure, or negligence or default of Company or Lender or (ii) such failure or delay resulted from Bank's reasonable belief that the action would have violated any guideline, rule or regulation of any governmental authority.

(d)    Bank shall have no duty to inquire or determine whether Company's obligations to Lender are in default. Bank may rely on notices and communications it believes in good faith to be genuine and given by the appropriate party.

(e)    Notwithstanding any of the other provisions in this Agreement, in the event of the commencement of a case pursuant to Title 11, United States Code, filed by or against Company, or in the event of the commencement of any similar case under then applicable federal or state law providing for the relief of debtors or the protection of creditors by or against Company, Bank may act as Bank deems necessary to comply with all applicable provisions of governing statutes and shall not be in violation of this Agreement as a result.

(f)    Bank shall be permitted to comply with any writ, levy order or other similar judicial or regulatory order or process concerning the Lockbox Address, the Account or any Check and shall not be in violation of this Agreement for so doing.

8.    (a)    Company shall indemnify Bank against, and hold it harmless from, any and all liabilities, claims, costs, expenses and damages of any nature (including but not limited to allocated costs of staff counsel, other reasonable attorney's fees and any fees and expenses) in any way arising out of or relating to disputes or legal actions concerning Bank's provision of the

00-35-1636NSBW 01-18-2008 (EL)    3
CH42937.1
210322-10006

269

services described in this Agreement. This section does not apply to any cost or damage attributable to the gross negligence or intentional misconduct of Bank. Company's obligations under this section shall survive termination of this Agreement.

(b)    Lender hereby agrees to indemnify, defend and hold harmless Bank against any loss, liability or expense (including but not limited to allocated costs of staff counsel, other reasonable attorney's fees and any fees and expenses) arising from Bank complying with any written instructions of Lender pursuant to this Agreement other than if related to Bank's gross negligence, bad faith, or willful misconduct.    Lender's obligations under this section shall survive termination of this Agreement.

9.    (a)    Company shall pay to Bank, upon receipt of Bank's invoice, all costs, expenses and attorneys' fees (including allocated costs for in-house legal services) incurred by Bank in connection with the enforcement of this Agreement and any instrument or agreement required hereunder, including but not limited to any such costs, expenses and fees arising out of the resolution of any conflict, dispute, motion regarding entitlement to rights or rights of action, or other action to enforce Bank's rights in a case arising under Title 11, United States Code. Company agrees to pay Bank, upon receipt of Bank's invoice, all costs, expenses and attorneys' fees (including allocated costs for in-house legal services) incurred by Bank in the preparation and administration of this Agreement (including any amendments hereto or instruments or agreements required hereunder).

(b)    Lender shall pay to Bank, upon receipt of Bank's invoice, all costs, expenses and attorneys' fees (including allocated costs for in-house legal services) incurred by Bank in connection with the enforcement against Lender of this Agreement and any instrument or agreement required hereunder to the extent that Bank is the prevailing party in such enforcement action.

10.    Termination and Assignment of this Agreement shall be as follows:

(a)    Lender may terminate this Agreement by providing notice substantially in the form of Attachment I ("Termination Notice") to Company and Bank that all of Company's obligations which are secured by Checks and the Account are paid in full. Lender may also terminate or it may assign this Agreement upon 30 days' prior written notice to Company and Bank. Bank may terminate this Agreement upon 30 days' prior written notice to Company and Lender. Company may not terminate this Agreement or the Lockbox Service except with the written consent of Lender and upon prior written notice to Bank.

(b)    Notwithstanding subsection 10(a), Bank may terminate this Agreement at any time by written notice to Company and Lender if either Company or Lender breaches any of the terms of this Agreement, or any other agreement with Bank.

11.    (a)    Each party represents and warrants to the other parties that (i) this Agreement constitutes its duly authorized, legal, valid, binding and enforceable obligation; (ii) the performance of its obligations under this Agreement and the consummation of the transactions contemplated hereunder will not (A) constitute or result in a breach of its certificate or articles of

00-35-1636NSBW 01-18-2008 (EL)    4
CH42937.1
210322-10006

incorporation, by-laws or partnership agreement, as applicable, or the provisions of any material contract to which it is a party or by which it is bound or (B) result in the violation of any law, regulation, judgment, decree or governmental order applicable to it; and (iii) all approvals and authorizations required to permit the execution, delivery, performance and consummation of this Agreement and the transactions contemplated hereunder have been obtained.

(b)    The parties each agree that it shall be deemed to make and renew each representation and warranty in subsection 11(a) on and as of each day on which Company uses the services set forth in this Agreement.

12.    (a)    This Agreement may be amended only by a writing signed by Company, Lender and Bank; except that Bank's charges are subject to change by Bank upon 30 days' prior written notice to Company.

(b)    This Agreement may be executed in counterparts; all such counterparts shall constitute but one and the same agreement.

(c)    This Agreement controls in the event of any conflict between this Agreement and any other document or written or oral statement. This Agreement supersedes all prior understandings, writings, proposals, representations and communications, oral or written, of any party relating to the subject matter hereof.

(d)    This Agreement shall be interpreted in accordance with Illinois law without reference to that state's principles of conflicts of law.

13.    Any written notice or other written communication to be given under this Agreement shall be addressed to each party at its address set forth on the signature page of this Agreement or to such other address as a party may specify in writing. Such notice shall be effective upon receipt.

14.    Nothing contained in the Agreement shall create any agency, fiduciary, joint venture or partnership relationship between Bank and Company or Lender. Company and Lender agree that nothing contained in this Agreement, nor any course of dealing among the parties to this Agreement, shall constitute a commitment or other obligation on the part of Bank to extend credit to Company or Lender.

*The Remainder of This Page Is Intentionally Left Blank.*

00-35-1636NSBW 01-18-2008 (EL)            5
CH42937.1
210322-10006

In Witness Whereof, the parties hereto have executed this Agreement by their duly authorized officers as of the day and year first above written.

COMAIR ROTRON INC.
("Company")

By: _Steve M. Shannon_
Name: _Steve M. Shannon_
Title: _C.F.O._

Address for notices:

Comair Rotron
8929 Terman Court
San Diego, CA  92121

Howard Industries, Inc.
136 Main Street
Westport, CT 06880
Attn: Peter Howard

LASALLE BANK NATIONAL
ASSOCIATION
("Lender")

By: _____
Name: _____
Title: _____

Address for notices:

LaSalle Bank National Association
c/o Bank of America
201 E. Washington St.
19th Fl
AZ1-200-19-11
Phoenix, AZ 85004
Attn: Gary L. Richerson

LASALLE BANK NATIONAL
ASSOCIATION
("Bank")

By: _____
Name: _____
Title: _____

Address for notices:

LaSalle Bank National Association
c/o Bank of America
201 E. Washington St.
19th Fl
AZ1-200-19-11
Phoenix, AZ 85004

00-35-1636NSBW 01-18-2008 (EL)           6
CH42937.1
210322-10006

272

In Witness Whereof, the parties hereto have executed this Agreement by their duly authorized officers as of the day and year first above written.

COMAIR ROTRON INC.
("Company")

By: _____
Name: _____
Title: _____

Address for notices:

Comair Rotron
8929 Terman Court
San Diego, CA. 92121

Howard Industries, Inc.
136 Main Street
Westport, CT 06880
Attn: Peter Howard

LASALLE BANK NATIONAL
ASSOCIATION
("Lender")

By: _____
Name:  Gary L. Richerson
Title:  Senior Vice President

Address for notices:

LaSalle Bank National Association
c/o Bank of America
201 E. Washington St
19th Fl
AZ1-200-19-11
Phoenix, AZ 85004
Attn: Gary L. Richerson

LASALLE BANK NATIONAL
ASSOCIATION
("Bank")

By: _____
Name:  Gary L. Richerson
Title:  Senior Vice President

Address for notices:

LaSalle Bank National Association
c/o Bank of America
201 E. Washington St
19th Fl
AZ1-200-19-11

00-35-1636NSBW 01-18-2008 (EL)          6
CH42937.1
210322-10006

**273**

Attn: Gary L. Richerson

**274**

**EXHIBIT A**
**TO DEPOSIT ACCOUNT CONTROL AGREEMENT**

## STANDARD TERMS AND CONDITIONS

The Lockbox Service involves processing Checks that are received at a Lockbox Address. With this Service, Company instructs its customers to mail checks it wants to have processed under the Service to the Lockbox Address. Bank picks up mail at the Lockbox Address according to its mail pick-up schedule. Bank will have unrestricted and exclusive access to the mail directed to the Lockbox Address. Bank will provide Company with the Lockbox Service for a Lockbox Address when Company has completed and Bank has received Bank's then current set-up documents for the Lockbox Address.

If Bank receives any mail containing Company's lockbox number at Bank's lockbox operations location (instead of the Lockbox Address), Bank may handle the mail as if it had been received at the Lockbox Address.

## PROCESSING

Bank will handle Checks received at the Lockbox Address according to the applicable deposit account agreement, as if the Checks were delivered by Company to Bank for deposit to the Account, except as modified by these Terms and Conditions.

Bank will open the envelopes picked up from the Lockbox Address and remove the contents. For the Lockbox Address, Checks and other documents contained in the envelopes will be inspected and handled in the manner specified in the Company's set-up documents. Bank captures and reports information related to the lockbox processing, where available, if Company has specified this option in the set-up documents. Bank will endorse all Checks Bank processes on Company's behalf.

If Bank processes an unsigned check as instructed in the set-up documents, and the check is paid, but the account owner does not authorize payment, Company agrees to indemnify Bank, the drawee bank (which may include Bank) and any intervening collecting bank for any liability or expense incurred by such indemnitee due to the payment and collection of the check.

If Company instructs Bank not to process a check bearing a handwritten or typed notation "Payment in Full" or words of similar import on the face of the check, Company understands that Bank has adopted procedures designed to detect Checks bearing such notations; however, Bank will not be liable to Company or any other party for losses suffered if Bank fails to detect Checks bearing such notations.

## RETURNED CHECK

Unless Company and Bank agree to another processing procedure, Bank will reclear a Check once which has been returned and marked "Refer to Maker," "Not Sufficient Funds" or "Uncollected Funds." If the Check is returned for any other reason or if the Check is returned a second time,

00-35-1636NSBW 01-18-2008 (EL)          8
CH42937.1
210322-10006

Bank will debit the Account and return the Check to Company. Company agrees that Bank will not send a returned item notice to Company for a returned Check unless Company and Bank have agreed otherwise.

## ACCEPTABLE PAYEES

For the Lockbox Address, Company will provide to Bank the names of Acceptable Payees ("Acceptable Payee" means Company's name and any other payee name provided to Bank by Company as an acceptable payee for Checks to be processed under the Lockbox Service). Bank will process a check only if it is made payable to an Acceptable Payee and if the check is otherwise processable. Company warrants that each Acceptable Payee is either (i) a variation of Company's name or (ii) is an affiliate of Company which has authorized Checks payable to it to be credited to the Account. Bank may treat as an Acceptable Payee any variation of any Acceptable Payee's name that Bank deems to be reasonable.

## CHANGES TO PROCESSING INSTRUCTIONS

Company may request Bank orally or in writing to make changes to the processing instructions (including changes to Acceptable Payees) for any Lockbox Address by contacting its Bank representative, so long as such changes do not conflict with the terms of the Deposit Account Control Agreement. Bank will not be obligated to implement any requested changes until Bank has actually received the requests and had a reasonable opportunity to act upon them. In making changes, Bank is entitled to rely on instructions purporting to be from Company.

**ATTACHMENT I**
**DEPOSIT ACCOUNT CONTROL AGREEMENT**

Letterhead of Secured Party

_____, 200\_

LaSalle Bank National Association

_____

_____

Attn: _____

    Re:   **Termination of Deposit Account Control Agreement**

    **Account(s):** _____

Ladies and Gentlemen:.

    Reference is made to that certain _____ dated as of \_\_\_\_\_, 200\_ (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Agreement") among you, _____ (the "Company"), and us as ("Lender"). You are hereby notified that the Agreement is terminated with respect to the undersigned, and you have no further obligations to the undersigned thereunder. Notwithstanding any previous instructions to you, you are hereby instructed to accept all future directions with respect to the Account from the Company. This notice terminates any obligations you may have to the undersigned with respect to the Account.

        Very truly yours,

        _____

        as Lender

        By:  _____
            Name:
            Title:

00-35-1636NSBW 01-18-2008 (EL)     10
CH42937.1
210322-10006

**277**

ACKNOWLEDGED AND AGREED:

LASALLE BANK NATIONAL ASSOCIATION, as
Bank

By _____
     Name:
     Title:

00-35-1636NSBW 01-18-2008 (EL)     11
CH42937.1
210322-10006



MICHAEL L. MOLINARO
Partner

321 North Clark Street
Suite 2300
Chicago, IL 60610-4746

Direct  312.464.3166
Main   312.464.3100
Fax    312.896.5592
mmolinaro@loeb.com

Via Telecopy

July 9, 2008

Comair Rotron, Inc.
Thermaflo, Inc.
2675 Customhouse
San Diego, CA 92154
Attn: Rocco Melchione

Howard Industries, Inc.
136 Main Street
Westport, CT 06880
Attn: Peter Howard

Comair Parent Corp.
2675 Customhouse
San Diego, CA 92154
Attn: Steve Pellegrini

Re:   Loan and Security Agreement dated April 2, 2004, as amended (the "Loan Agreement")
      by and between Comair Rotron, Inc. and Thermaflo, Inc. (collectively, the "Borrowers")
      and LaSalle Bank National Association ("Bank")

Gentlemen:

I am counsel for Bank in connection with the Loan Agreement. This letter is being sent to you
on Bank's behalf and at Bank's direction.

As you know, Bank has made loans (collectively, the "Loans") to Borrowers pursuant to that
certain Term Note A dated June 27, 2006 in the original principal amount of $14,000,000 ("Note
A"), that certain Term Note B dated June 27, 2006 in the original principal amount of $5,000,000
("Note B"), and that certain Replacement Revolving Note dated June 27, 2006 in the maximum
principal amount of $5,000,000 ("Revolving Note"). The Loans and all of Borrowers' obligations
and liabilities to Bank are secured by, among other things, the Loan Agreement, that certain
Holding Guaranty dated April 2, 2004 (the "Guaranty") by Comair Parent Corp. (the
"Guarantor"), and that certain Holding Pledge Agreement dated April 2, 2004 (the "Pledge
Agreement") by Guarantor. The Loan Agreement, Note A, Note B, the Revolving Note, the
Guaranty, the Pledge Agreement and all related instruments, agreements and documents shall
be collectively referred to as the "Loan Documents."

Pursuant to letters dated September 26, 2007, February 6, 2008 and March 10, 2008, Bank
notified Borrowers and Howard Industries, Inc. that Borrowers breached certain financial
covenants set forth in the Loan Agreement. Borrowers, however, have failed to satisfy these
defaults.

In addition, pursuant to that certain Forbearance Agreement dated May 31, 2008, Borrowers
agreed to pay the Loans and all other obligations and liabilities to Bank in full on or before June
30, 2008. Please be advised that Borrowers failed to make such payment. Consequently, an
Event of Default has occurred under the Loan Agreement and the other Loan Documents. As a
result of the Event of Default, all future advances under the Revolving Note, if any, shall be in





Bank's sole and absolute discretion, and Bank may elect not to make any additional advances to Borrowers. Moreover, any advance requests from Borrowers must be received by Bank no later than 1:00 p.m. central time. Pursuant to that certain Intercreditor (Subordination) Agreement dated April 2, 2004 (the "Intercreditor Agreement"), all "Permitted Payments" (as said term is defined in the Intercreditor Agreement) are hereby prohibited. Pursuant to that certain Subordination Agreement dated December 9, 2005 (the "Subordination Agreement"), all payments under Section 1.5(i) of the Subordination Agreement are hereby prohibited.

As of July 7, 2008, the sum of $20,640,000 plus all accrued interest and cost, fees and expenses incurred by Bank, including without limitation, attorneys' fees and expenses (collectively, the "Indebtedness") is due and owing to Bank. The Indebtedness will increase due to the accrual of interest at Default Interest Rate of Prime plus 3% and additional costs, fees and expenses incurred by Bank, including without limitation, attorneys' fees and expenses.

Bank hereby demands that Borrowers pay in full the outstanding balance of the Loans and all other obligations and liabilities to Bank on or before July 10, 2008. If such payment is not made on or before July 10, 2008, Bank shall proceed to exercise and enforce all of its remedies and other rights under the Loan Documents and applicable law against Borrowers and Guarantor, including without limitation, exercising its right of setoff and foreclosing on the "Collateral" (as said term is defined in the Loan Agreement). Partial payments received by Bank shall be applied to the Indebtedness, but shall not constitute, or be deemed to be, a cure of the aforementioned Event of Default.

This letter and any future discussions between Borrowers, Guarantor and Bank, if any, shall not (i) cause a modification of the Loan Documents or any of the instruments, agreements or documents related thereto, (ii) establish a custom or course of dealing, (iii) cure, release or postpone any existing or future default under the Loan Documents or any of the instruments, agreements or documents related thereto, or (iv) waive, limit or condition any of the Bank's rights and remedies against Borrowers, Guarantor or any other person or entity, all of which rights and remedies are expressly reserved.

If you have any questions regarding this matter, please have your attorney contact me.

Very truly yours,

Michael L. Molinaro
Partner

MLM:jlw

cc:    Mr. Gary Richerson (via telecopy)
       David Masterson, Esq. (via telecopy)
       Jeffrey Elegant, Esq. (via telecopy)

CH44083.1
210322-10006

**Johanna Womack**

| | |
|---|---|
| **From:** | send@mail.efax.com |
| **Sent:** | Wednesday, July 09, 2008 1:15 PM |
| **To:** | Johanna Womack |
| **Subject:** | Successful transmission to 16025232402. Re: |

Dear Michael Molinaro,

Re:

The 3 page fax you sent through eFax Solutions to 16025232402 was successfully transmitted at 2008-07-09 18:14:33 (GMT).

The length of transmission was 98 seconds.

The receiving machine's fax ID: 6025232402

If you need additional assistance, please visit our online help center at
https://www.j2corporate.com/corp/twa/page/customerSupport. Thank you for using the eFax Solutions service.

Best Regards,
eFax Solutions

Customer Service
Help: https://www.j2corporate.com/corp/twa/page/customerSupport
Tel: 1-323-817-3202
Email: corporatesupport@mail.efax.com

1

**Johanna Womack**

| | |
|---|---|
| **From:** | send@mail.efax.com |
| **Sent:** | Wednesday, July 09, 2008 1:15 PM |
| **To:** | Johanna Womack |
| **Subject:** | Successful transmission to 16025232750. Re: |

Dear Michael Molinaro,

Re:

The 3 page fax you sent through eFax Solutions to 16025232750 was successfully transmitted at 2008-07-09 18:14:32 (GMT).

The length of transmission was 97 seconds.

The receiving machine's fax ID: (602)523 2750

If you need additional assistance, please visit our online help center at
https://www.j2corporate.com/corp/twa/page/customerSupport. Thank you for using the eFax Solutions service.

Best Regards,
eFax Solutions

Customer Service
Help: https://www.j2corporate.com/corp/twa/page/customerSupport
Tel: 1-323-817-3202
Email: corporatesupport@mail.efax.com

1.

## Johanna Womack

**From:** send@mail.efax.com
**Sent:** Wednesday, July 09, 2008 1:21 PM
**To:** Johanna Womack
**Subject:** Successful transmission to 13125774676. Re:

Dear Michael Molinaro,

Re:

The 3 page fax you sent through eFax Solutions to 13125774676 was successfully transmitted at 2008-07-09 18:20:43 (GMT).

The length of transmission was 96 seconds.

The receiving machine's fax ID: KattenMuchinRosenman.

If you need additional assistance, please visit our online help center at
https://www.j2corporate.com/corp/twa/page/customerSupport. Thank you for using the eFax Solutions service.

Best Regards,
eFax Solutions

Customer Service
Help: https://www.j2corporate.com/corp/twa/page/customerSupport
Tel: 1-323-817-3202
Email: corporatesupport@mail.efax.com

1

**283**

**Johanna Womack**

| | |
|---|---|
| **From:** | send@mail.efax.com |
| **Sent:** | Wednesday, July 09, 2008 1:22 PM |
| **To:** | Johanna Womack |
| **Subject:** | Successful transmission to 12032273314. Re: |


Dear Michael Molinaro,

Re:

The 3 page fax you sent through eFax Solutions to 12032273314 was successfully transmitted at 2008-07-09 18:21:19 (GMT).

The length of transmission was 94 seconds.

The receiving machine's fax ID: Howard Industries


If you need additional assistance, please visit our online help center at
https://www.j2corporate.com/corp/twa/page/customerSupport. Thank you for using the eFax Solutions service.

Best Regards,
eFax Solutions

Customer Service
Help: https://www.j2corporate.com/corp/twa/page/customerSupport
Tel: 1-323-817-3202
Email: corporatesupport@mail.efax.com

1